**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 26, 2004

# TABLE OF CONTENTS

PAGE

Table of Authorities ........ iii

Index to Plaintiff's Appendix ........ vi

I. Statement of the Issues ........ 8

II. Statement of the Case ........ 9

A. Background. ........ 9

B. The *Seriatim* Suspensions of Precision Pine's Operations in 1995, 1996, And 1997. ........ 10

C. Precision Pine Advised The Forest Service Immediately That The Forest Service's Suspension That Began On August 25, 1995 Was A Breach Of Its Contracts And Pursued Its Remedies For Breach. ........ 10

D. Precision Pine's Decision Not To Repudiate The Contracts. ........ 11

E. The Closure of the Primary Outlet for Pulpwood. ........ 13

F. Difficulty In Obtaining Bonding Acceptable To the Forest Service in 2000 And The Forest Service's Unreasonable Treatment of Similarly Situated Contractors.. ........ 14

G. Defendant's "Claim" On The O.D. Ridge Contract Has Been Satisfied. ........ 15

III. Argument ........ 17

A. Standard Of Review. ........ 17

B. Defendant Has Failed To Issue Proper Final Decisions Or Properly Calculate Its Damages In Accordance With Clause CT9.4. ........ 17

C. The Issue Of Waiver Of Material Breach Is Typically A Question Of Fact, Which In This Case Is Not Susceptible To Resolution At Summary Judgment. ........ 19

D. Precision Pine Has Demonstrated, At A Minimum, That Genuine Issues Of Material Fact Exist As To Defendant's Waiver Claim. ........ 23

1. Precision Pine Immediately Informed The Forest Service Of Its Breach Claim. ....................24

2. The Forest Service Was Able To Assess Precision Pine's Assertion That The Forest Service Materially Breached The Contracts And To Protect Its Interests. ....................25

3. The Government Has Proffered No Facts Demonstrating That It Changed Its Position In Reasonable Reliance On Its Belief That Precision Pine Would Not Claim Material Breach Of Contract. ....................26

4. Precision Pine's Exercise Of Reasonable Commercial Judgment, Which Also Benefited The Forest Service, Should Not Be Held Against It. ....................27

5. Precision Pine Notified The Government Of Its Belief That The Putative Default Terminations Were Inoperative Due To The Forest Service's Prior Material Breach. ....................30

E. Genuine Issues Of Material Fact With Respect To Whether The Forest Service Reasonably Exercised Its Default Authority Preclude Summary Judgment In Defendant's Favor On This Issue. ....................31

F. Defendant's Arguments With Respect To The Resales Of The O.D. Ridge And Jersey Horse Contracts Are Irrelevant. ....................35

IV. Conclusion. ....................37

**TABLE OF AUTHORITIES**

**PAGE**

Alaska Pulp Corp., Inc. v. United States,
48 Fed. Cl. 655 (2001) ....................27

American Export Isbrandtsen Lines, Inc. v. United States,
499 F.2d 552 (Ct. Cl. 1974) ....................32

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ....................17

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002) ....................23

Becho, Inc. v. United States,
47 Fed. Cl. 595 (2000) ....................27

Brand S Roofing,
ASCBA No. 24688, 82-1 BCA ¶ 15,513 ....................20

Chernick v. United States,
372 F.2d 492 (Ct. Cl. 1967) ....................32

Cities Service Helex, Inc. v. United States,
543 F.2d 1306 (Ct. Cl. 1976) ....................21, 22, 23, 25

Conley v. Gibson,
355 U.S. 41 (1957) ....................19

Dynacs Engineering Co., Inc. v. U.S.,
48 Fed. Cl. 614 (2001) ....................14

First Commerce Corp. v. United States,
335 F.3d 1373 (Fed. Cir. 2003) ....................17

First Fed. Savings Bank of Hegewisch v. United States,
52 Fed. Cl. 774 (2002) ....................19

First Interstate Bank v. Interfund Corp.,
924 F.2d 588 (5th Cir. 1991) ....................20

Gallien v. Connecticut General Life Ins. Co.,
49 F.3d 878 (2nd Cir. 1995) ....................20

Grady-Gould Watershed Improvement Dist. v. Transamerica Ins. Co.,
570 F.2d 720 (6th Cir. 1976) ....................23

Hunt v. Cromartie,
526 U.S. 541 (1999)....................17

Intel Corp. v. Hartford Accident & Indemnity Co.,
952 F.2d 1551 (9th Cir. 1991) ....................20

Lathem v. Sentry Ins.,
845 F.2d 914 (11th Cir. 1988) ....................20

Ling-Temco-Vought, Inc. v. United States,
475 F.2d 630 (Ct. Cl. 1973) ....................25, 27

Malone v. United States,
849 F.2d 1441 (Fed. Cir. 1988)....................20

Matinchek v. John Alden Life Ins. Co.,
93 F.3d 96 (3rd Cir. 1996) ....................20

Metric Construction Co. v. United States,
1 Cl. Ct. 383 (1983) ....................32

Northern Helex Co. v. United States,
455 F.2d 456 (Ct. Cl. 1972) ....................*passim*

Ouimette v. E.F. Hutton & Co.,
740 F.2d 72 (1st Cir. 1984)....................20

Pacific Far East Line, Inc. v. United States,
394 F.2d 990 (Ct. Cl. 1968) ....................32

PIN/NIP Inc. v. Platte Chemical Co.,
304 F.3d 1235 (Fed. Cir. 2002)....................17

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) ....................*passim*

Precision Pine & Timber, Inc. v. United States,
2001 WL 1819224 (Fed. Cl. 2001)....................29

Rosenburg v. Lincoln American Life Ins. Co.,
883 F.2d 1328 (7th Cir. 1989) ....................20

Spalding v. Agri-Risk Services,
855 F.2d 586 (8th Cir. 1988) ....................20

Silver v. Babbit,
924 F. Supp. 976 (D.Ariz. 1995) ....................10

Sundstrand Turbo v. United States,
389 F.2d 406 (Ct. Cl. 1968) ....................32

Sunoco, Inc. v. United States,
59 Fed. Cl. 390 (2004) ....................20

William H. Sill Mortgs., Inc. v. Ohio Casualty Ins. Co.,
412 F.2d 341 (6th Cir. 1969) ....................20

**RULES AND REGULATIONS**

36 C.F.R.

§ 223.49(e), (g) ....................28

§ 223.86....................12, 28

§ 223.101....................12, 29

§ 223.114....................29

§ 223.130....................12, 28

Rules of Court of Federal Claims

8....................19

8(a) ....................19

56(c) .................... 17

**MISCELLANEOUS**

Williston on Contracts ....................21, 22

## INDEX TO PLAINTIFF'S APPENDIX

**Description** **Pl. App. Page**


Letter dated September 5, 1995 from Lewis Tenney to Clifford Dils re: Forest Service liability for the August 1995 suspension ....................1

Letter dated September 5, 1995 from Lewis Tenney to Ken Broyles re: Forest Service liability for the August 1995 suspension ....................2

Letter dated September 6, 1995 from Lewis Tenney to David Harris re: Forest Service liability for the August 1995 suspension ....................3

Letter dated October 4, 1995 from Lorin Porter to David Harris re: Forest Service liability for damages and refunds owed Precision Pine ....................4

Letter received by the Forest Service on June 26, 1996 from Lorin Porter to Chip Cartwright and certain contracting officers re: harm caused to Precision Pine and expected compensation ....................5

Letter dated December 31, 1996 from Lewis Tenney to Ken Broyles re: expected items of compensation ....................7

Letter dated December 31, 1996 from Lewis Tenney to Eddie Alford re: expected items of compensation ....................8

Letter dated December 11, 1996 from David Unger to Lorin Porter re: remedies provided by the contracts ....................9

Letter dated December 13, 1996 from Milo Larson (signed Marlin Johnson) to Forest Supervisors re: consistency of contract administration activities following the lifting of the suspension ....................10

Letter dated January 24, 1997 from Robert Leaverton to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................12

Letter dated January 30, 1997 from Ken Broyles to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................13

Letter dated February 7, 1997 from Clifford Dils to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................14

Email dated January 14, 1997 from Alan Lucas to C. Dills, B. Leaverton, K. Broyles, D. Harris and M. Johnson re: a consistent response to Precision Pine. ....................15

Letter dated January 9, 2001 from Eleanor Towns to Lorin Porter re: terminating the contracts at issue ....................16

Letter dated January 12, 2001 from Alan Saltman to Eleanor Towns re: cancellation of Precision Pine's timber sales ....................18

Letter dated September 17, 2001 from Lorin Porter to Eleanor Towns re: bidding on the resale of contracts and partial payment of money owed on O.D. Ridge....................19

Letter dated September 28, 2001 from Alan Saltman to Laurie Tippin re: Forest Service review of Precision Pine for possible suspension or debarment....................23

Cover letter enclosing Decision Document and Default Damage Calculations for O.D. Ridge ....................31

Page 1 of Decision Document for O.D. Ridge.................... 31A

Calculation sheet for estimated damages for O.D. Ridge .................... 31B

Letter dated October 12, 2001 from Eleanor Towns to Lorin Porter re: partial payment for O.D. Ridge....................32

Letter dated October 27, 2001 from Lorin Porter to Eleanor Towns re: payment of balance on O.D. Ridge, the ruling against the Forest Service on liability, and settlement, with copy of check attached ....................34

Letter dated November 16, 2001 from Eleanor Towns to Lorin Porter re: payment of balance on O.D. Ridge and a possible meeting with the agency ....................39

"A" clauses from the Monument Multi-product Timber Sale ....................40

Declaration of Kennard Williams ....................52

Declaration of Lorin Porter....................54

Page 1 of Decision Document for Wiggins Multi-Product Sale....................61

Decision Document and Default Damage Calculations for Jersey Horse ....................62

Pursuant to the Rules of the Court of Federal Claims, Rule 56, plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), respectfully submits its response to defendant's motion for summary judgment and for the reasons set forth below as supported by Precision Pine's Proposed Findings of Uncontroverted Fact, Appendix, and Response to Defendant's Proposed Findings of Uncontroverted Fact filed herewith, Precision Pine respectfully requests that defendant's motion be denied.

## I. Statement Of The Issues.

1. Whether defendant has demonstrated the absence of any genuine issue of material fact as to whether or not Precision Pine waived the Forest Service's prior material breach.

2. Whether defendant has demonstrated the absence of any genuine issue of material fact as to whether or not the Forest Service unreasonably exercised its claimed discretion in defaulting the contracts.

3. Whether defendant is entitled to summary judgment where it has not demonstrated that it has issued valid final decisions or complied with the terms of the contracts in seeking estimated damages.

4. Whether defendant is entitled to any payment on its counterclaim with respect to the O.D. Ridge sale when its claim with respect to this contract has already been paid in full by Precision Pine.

## II. Statement of the Case.[1]

A. Background.

Precision Pine was founded in 1984 in Heber, Arizona to obtain timber in order to manufacture that timber into lumber. PPFUF 20(d). Precision Pine is a small, privately-owned company that qualifies as a small business for purposes of purchasing federal timber to supply its lumber manufacturing operations. Id. Precision Pine is one of the few companies remaining in its area which purchases federal timber and manufactures it into lumber. Id.

Precision Pine has been recognized for Distinguished Professional Forest Resource Management in the Southwest by the Southwest Section of the Society of American Foresters. PPFUF 20(c). Prior to 1998, Precision Pine had never been placed in default on any Forest Service timber sale contract in more than a decade of operations under dozens of such contracts. PPFUF 20(m).

In the area of Northeastern Arizona from which Precision Pine obtains raw material, i.e., timber for its sawmill(s), the Forest Service is by far the largest holder of timber land and seller

---

[1]For the reasons set forth in Precision Pine's Motion To Dismiss Defendant's Counterclaim Or, In The Alternative, For Summary Judgment filed with the Court on March 25, 2004, this Court lacks jurisdiction over defendant's putative defaults and/or Precision Pine is entitled to summary judgment as a matter of law. The facts set forth herein are only an overview of those facts relevant to defending against defendant's cross-motion for summary judgment should the Court first determine that it has jurisdiction to consider that motion. A separate document containing a set of Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFUF") is being provided to the Court with this response.

Moreover, plaintiff further notes that as demonstrated in Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact, a number of defendant's proposed findings are incorrect, not supported by defendant's poorly indexed and disorganized appendix, or only supported by general references to 240 pages of the appendix.

of timber. PPFUF 20(e). Since its founding, Precision Pine has been dependant on the Forest Service's timber sale program as the primary source of its raw material for its sawmill(s). Id.

B. The *Seriatim* Suspensions Of Precision Pine's Operations In 1995, 1996, And 1997.

Through no fault of its own, some or all of Precision Pine's Forest Service timber sale contracts were suspended by the Forest Service during parts of 1995, 1996 and 1997. PPFUF 20(f). The suspensions in each of these years were in place during the fall months, which is an important time period for Precision Pine to have access to its timber sales because the risk of fire closures is lower than in the summer months and Precision Pine typically built log decks at its sawmills at this time in order to have a supply of logs through the winter months when operations are difficult or impossible. Id. Due to an inability to build such winter log decks and/or to access its timber sales due to the suspensions, Precision Pine ran out of logs and was forced to shut down one or more of its sawmills at various times during each of these years. Id.

C. Precision Pine Advised The Forest Service Immediately That The Forest Service's Suspension That Began On August 25, 1995 Was A Breach Of Its Contracts And Pursued Its Remedies For Breach.

Precision Pine informed the Forest Service from the very outset and throughout the suspension that lasted from August 25, 1995 through early December of 1996 that it considered the Forest Service to have breached its contracts (PPFUF 1-2),[2] requested compensation for the

[2]Defendant is fond of referring to this suspension as the "Mexican Spotted Owl Suspension." See, e.g., Government's Motion at 9. Unfortunately for defendant, two courts have found that it was the Forest Service's failure to abide by its environmental obligations that required the suspensions, not the Mexican Spotted Owl. See Silver v. Babbit, 924 F. Supp. 976 (D.Ariz. 1995) and Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001).

breach of those contracts once the suspension was ended (PPFUF 3), and when the government denied that it had breached the contracts or that it was responsible for Precision Pine's damages (PPFUF 4-6), Precision Pine prepared and submitted fourteen claim letters alleging breach of contract, Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 51 (2001), and promptly filed suit when those claims were denied virtually in their entirety by the contracting officers. Id.[3] Precision Pine ultimately prevailed on its breach claims for twelve of the fourteen contracts, of which eight are in issue in the instant litigation. Id. at 73-74.

D. Precision Pine's Decision Not To Repudiate The Contracts.

Had Precision Pine repudiated any of its breached contracts at any time prior to a court ruling that the Forest Service had in fact breached the contracts, the Forest Service, which disputed that it had breached the contracts, would have terminated Precision Pine's contracts for default. PPFUF 20(n). In placing Precision Pine in default, the Forest Service would likely have cited contract clause CT9.2 which indicates that pending the resolution of any claim, "the contractor shall proceed diligently with the performance of the contract." PPFUF 20(o). Moreover, had Precision Pine repudiated (and subsequently been defaulted on its contracts), Precision Pine would have lost virtually its entire portfolio of timber sale contracts, a supply of raw material for its sawmills that could not have been fully replaced, except with other Forest Service timber sales offerings. PPFUF 20(p).

[3] In its claim letters, Precision Pine sought recovery of the several million dollars in damages it had suffered due to the Forest Service's suspension for which the Forest Service provided total compensation in the amount of $18,242.78, see Precision Pine, 50 Fed. Cl. at 52, i.e., less than $2,000 per contract.

Moreover, had Precision Pine repudiated and been defaulted on its contracts, Precision Pine also would have faced the distinct possibility of being suspended or debarred from bidding on future federal timber sale contracts or being able to obtain Forest Service logs purchased or harvested by others (see PPFUF 20(q); see also 36 C.F.R. §§ 223.130-223.145).[4] At a minimum, had Precision Pine repudiated, it would have run the substantial risk of no longer being viewed by the Forest Service as a responsible bidder, precluding it from purchasing future Forest Service timber offerings. See PPFUF 20(q); see also 36 C.F.R. § 223.101.

Even if Precision Pine had not been suspended or debarred, had Precision Pine repudiated and been defaulted on its contracts, the Forest Service (1) would almost certainly also have tried to preclude Precision Pine from bidding on any resale of the defaulted contracts (see PPFUF 20(r), see also 36 C.F.R. § 223.86), and (2) Precision Pine would have been required to make substantially increased downpayments on any future contracts. See PPFUF 20(t); see also 36 C.F.R. § 223.101. Following the termination of the contracts at issue, the Forest Service did, in fact, prevent Precision Pine from bidding on the resale of the Salt and O.D Ridge contracts, and tried to prevent Precision Pine from bidding on the resale of the Jersey Horse contract (i.e., the "Jersey Horse II contract"). Pl. App. 20(r)-(s). Moreover, the Forest Service did, in fact, require Precision Pine to make an increased downpayment on the Jersey Horse II contract, after it was awarded to Precision Pine. Pl. App. 20(t).

---

[4]That the prospect of suspension or debarment was real can be seen from the fact that Precision Pine's putative default of the contracts at issue in this case, the Forest Service did in fact threaten suspension and debarment of Precision Pine. See PPFUF 14.

Absent the ability to obtain Forest Service timber sale contracts, Precision Pine almost certainly could not have survived until this Court ruled in July 2001 that the Forest Service had, in fact, breached its contracts. PPFUF 20(u). Accordingly, had Precision Pine repudiated its timber sale contracts during or shortly after the suspension as defendant claims it should have, the Forest Service would now be facing increased damages in the Court of Federal Claims Case No. 98-720C for the total destruction of Precision Pine's business. Id. Additionally, Precision Pine's harvesting of some or all of the remaining timber on some of the contracts that had been breached resulted in cash flow to the Forest Service and the accomplishment of some of the management goals desired by the Forest Service, i.e., the reasons that the contracts were offered in the first place. PPFUF 20(v).

Precision Pine also advised the Forest Service of its belief, both at the time of the putative defaults and shortly after the Court's ruling that the Forest Service had breached the contracts, that the Forest Service's prior material breach relieved Precision Pine of any putative defaults. PPFUF 11, 13.

E. The Closure Of The Primary Outlet For Pulpwood.

During the 1990s, the Forest Service began increasingly to offer multi-product sales, i.e., sales containing both sawlogs and roundwood. PPFUF 20(j). Sawlogs consist of trees, the diameter of which at breast height is nine inches or greater and which, as the term suggests, are suitable for use at a sawmill.[5] Id. Roundwood, which is also referred to as pulpwood, is woody

[5]Defendant incorrectly tells this Court that "Timber is generally defined as trees larger than 9 inches in diameter at breast height ("dbh")." The contracts at issue do not define the term

material measuring less than nine inches in diameter, the primary economic utility of which is in the making of wood pulp for use in a variety of products including paper. Id.

Precision Pine has never had a manufacturing facility to make wood pulp. PPFUF 20(k). Precision Pine bid on multi-product timber sales on the basis that it would be able to sell the pulpwood from the sale to Stone Container's pulp facility located in Snowflake, Arizona. Id. Precision Pine had relied on Stone Container's facility for years as an outlet for the pulpwood component of its Forest Service timber sales. Id. These facts were known to the Forest Service at the time it awarded the multi-product sales at issue in this case to Precision Pine. Id. However, in February of 1998, Stone Container announced that it was closing its wood pulp facility in Snowflake, Arizona. PPFUF 20(l). All of the sales at issue in this case, except the Wiggins sale, were awarded to Precision Pine before Stone Container made that announcement. Id. See also Pl. App. 61.

F. Difficulty In Obtaining Bonding Acceptable To The Forest Service In 2000 And The Forest Service's Unreasonable Treatment Of Similarly Situated Contractors.

In 1999, Precision Pine's bonding company, Capitol Indemnity Corporation, refused to continue bonding Precision Pine's Forest Service timber sale contracts. PPFUF 20(g). The only bonding company Precision Pine could locate that would bond Precision Pine's Forest Service timber sales was Frontier Insurance Company ("Frontier"), although Frontier required Precision Pine to make full payment of the annual cost of the bonds, a sizeable sum, in advance. PPFUF

timber and unambiguously refer to "sawlogs" as being nine inches or larger in diameter. See, e.g., Monument MultiProduct Timber Sale Contract Clause AT2. Pl. App. 42. As this term suggests, sawlogs are suitable for use at a sawmill. PPFUF 20(j).

20(h). Nevertheless, for 1999, Precision Pine obtained bonding for its Forest Service timber sale contracts from Frontier. Id. These bonds were accepted by the Forest Service without incident. Id.

For the year 2000, Precision Pine again obtained its bonding from Frontier, for which Precision Pine again paid in full, in advance, PPFUF 20(i), and again the Forest Service accepted them. However, in June of 2000, the Forest Service advised Precision Pine for the first time that it would no longer accept bonds from Frontier. Id.

Due to the financial impact that the Forest Service's *seriatim* suspensions had on Precision Pine, and the fact that Precision Pine had already fully paid Frontier for the bonding but could not get its money back, Precision Pine did not have funds readily available to pay for bonding a second time (had Precision Pine even been able to find a company willing to bond its sales). Id. Precision Pine advised the Forest Service of its difficulties in finding and paying for bonding. Id. However, despite its explanations and pleas for additional time to secure bonding, the Forest Service putatively defaulted Precision Pine for failing to provide replacement bonds. Appendix to Defendant's Motion for Summary Judgment at 10-14, 18-21, 201-205, 278-282 (declarations of Harris, Stephens and Cummings); PPFUF 10.

G. Defendant's "Claim" On The O.D. Ridge Contract Has Been Satisfied.

The estimated damages sought by defendant in its March 1, 2001 putative final decision with respect to the O.D. Ridge timber sale contract were for timber volume cut, removed but not

paid for in the amount of $148,845.38. PPFUF 15.[6] However, Precision Pine has paid for all of the timber it removed from the O.D. Ridge sale. That is, on September 17, 2001, the President of Precision Pine wrote to the Regional Forester and offered to pay the balance remaining on the O.D. Ridge contract. PPFUF 16. This letter enclosed a check for $50,000 toward the payment of the outstanding balance. Id. In response to this letter, on October 12, 2001, the Regional Forester acknowledged receipt of the $50,000 payment, and sought payment of the still outstanding principal **plus** additional "administrative fees and interest" totaling more than $24,500. PPFUF 17. By letter dated October 27, 2001, Precision Pine submitted a check in the amount of $116,130.70 in full and final payment of the outstanding balance on the O.D. Ridge sale. PPFUF 18. By letter dated November 16, 2001, the Regional Forester acknowledged Precision Pine's "payment of the balance due on the O.D. Ridge Timber Sale Contract." PPFUF 19.[7]

Despite this payment in full in November of 2001 of the Forest Service's claimed "damages" in this matter, the government, nonetheless, continues to seek a double recovery of this money in the instant case. See Defendant's Counterclaim, asserting that $148,845.38 plus

---

[6]This assertion of estimated damages was made because the Forest Service actually anticipated obtaining more from the resale of the O.D. Ridge timber sale contract than it estimated it would have sustained in damages from Precision Pine's putative default. Id. See also Government's Motion at 14, n.11.

[7]Although the Regional Forester's letter also suggests a willingness to accept Precision Pine's offer to meet to "see what we can resolve" (Pl. App. 39), the meeting ultimately only led to more than a year of "informal discovery" during which the Forest Service simply sought ever increasing levels of detail as to Precision Pine's damages. The Forest Service has, in fact, never offered a single penny to resolve any of the damages issues in the wake of the Court's July 30, 2001 ruling finding that twelve of Precision Pine's contracts had been breached.

interest "is due and owing" to the United States on the O.D. Ridge contract; see also Government's Motion at 17, asserting that summary judgment should be granted upon the United States' counterclaim with respect to the O.D. Ridge contract.

## III. Argument.

### A. Standard Of Review.

Summary Judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003), RCFC 56(c). When ruling on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Summary Judgment . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999).

### B. Defendant Has Failed To Issue Proper Final Decisions Or Properly Calculate Its Damages In Accordance With Clause CT9.4.

As Precision Pine has demonstrated in its Motion to Dismiss or, In The Alternative, For Summary Judgment filed with the Court on March 25, 2004, the Forest Service's purported final decisions were improperly issued based on claims that were not yet in dispute. Plaintiff's Motion at 4-10.[8] Moreover, the damages that the Forest Service claimed in these decisions were "estimated" for each contract which is also improper. Plaintiff's Motion at 10-14.

---

[8]Because this argument is jurisdictional, it should be resolved before the Court addresses any of the motions for summary judgment. See PIN/NIP, Inc. v. Platte Chemical Co., 304 F.3d 1235, 1241 (Fed. Cir. 2002).

Defendant asserts in its Motion for Summary Judgment that it assessed damages for each contract in accordance with CT9.4. Government's Motion at 12. However, other than merely stating this proposition several times, i.e., that the Forest Service acted in accordance with CT9.4, defendant does nothing to demonstrate the veracity of this assertion. Government's Motion at 12-14. Because defendant has failed to allege any facts indicating that the Forest Service actually assessed damages in accordance with clause CT9.4, and Precision Pine has provided ample evidence to show that the Forest Service in fact did not act in accordance with CT9.4, there is no issue of material fact regarding this issue and Precision Pine is entitled to summary judgment as a matter of law. See Plaintiff's Motion at 10-14.

Apparently unable to demonstrate its own compliance with the requirements of clause CT9.4, defendant argues that Precision Pine did not raise the issue of the propriety of the estimated damages with respect to all the contracts except two, stating "except with respect to the O.D. Ridge and Jersey Horse contracts, neither Precision Pine's complaint, nor its answer to the United States' counterclaim, contests the manner in which the Forest Service contracting officers calculated breach damages." Government's Motion at 13. However, this statement is flatly contradicted by defendant's own parenthetical description of Precision Pine's Reply to Defendant's Counterclaim, indicating that Precision Pine had denied "that defendant had made 'a valid demand for payment.'" Government's Motion at 13 (quoting Plaintiff's Reply to Defendant's Counterclaim at 2). Certainly, Precision Pine's questioning the validity of defendant's demand for payment encompasses the method in which such a demand was calculated, and defendant has cited no authority to the contrary.

Indeed, the rules of this Court, particularly RCFC 8, which pertains to complaints, contemplate the liberal requirements of notice pleading. See First Fed. Savings Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 789 (2002); Dynacs Engineering Co., Inc. v. U.S., 48 Fed. Cl. 614, 615 n. 5 (2001). RCFC 8(a) states in pertinent part, that "[a] pleading which sets forth a claim for relief . . . shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." This short and plain statement need only give defendant fair notice of what plaintiff's claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957). By challenging the validity of defendant's demand for payment, Precision Pine clearly put defendant on notice that it contests the manner in which the Forest Service had calculated the damages. Not only did Precision Pine's Reply to Defendant's Counterclaim challenge the validity of the demands, but Precision Pine's complaint also specifically challenged the validity of the Contracting Officers' decision for each and every one of the twelve (12) contracts at issue. See Complaint at ¶¶ 28-29, 36-37, 43-44, 51-52, 58-59, 65-66, 72-73, 79-80, 86-87, 91-92, 96-97, and 102-103. For each contract at issue, Precision Pine also noted that the Forest Service was improperly seeking "estimated" damages. Id. Accordingly, defendant was on notice of Precision Pine's claim regarding the improper estimates from the time it received the complaint.

C. The Issue Of Waiver Of Material Breach Is Typically A Question Of Fact, Which In This Case Is Not Susceptible To Resolution At Summary Judgment.

In its motion for summary judgment, defendant correctly anticipates Precision Pine's defense of prior material breach to a number of defendant's putative default claims. Government's Motion at 8-9. As defendant concedes in its motion, it is well-established that "a

prior material breach can be a defense to a subsequent default claim." Government's Motion at 8. See also, e.g., Malone v. United States, 849 F.2d 1441 (Fed. Cir. 1988) (material breach allows contractor to void contract, discharge its duty to perform and relieves it of a default determination and its consequences, citing Brand S Roofing, ASCBA No. 24688, 82-1 BCA ¶ 15,513).[9]

However, defendant asserts that Precision Pine, through its conduct, has waived its right to assert the defense of prior material breach as a matter of law. Government's Motion at 9. Of course, the issue of waiver is typically a matter of fact which is not readily susceptible to resolution on summary judgment. See, e.g., Sunoco, Inc. v. United States, 59 Fed. Cl. 390, 398-399 (2004) (C.J. Damich) (finding that waiver is an issue of fact and denying summary judgment on the issue of waiver due to the existence of material facts).[10] Indeed, it was for this reason, and in an effort to conserve the resources of the Court and of the parties, that Precision Pine opted not to raise the material breach issues in its dispositive motion as it would inevitably lead to a discussion of the government's putative affirmative defense of waiver, which is an intensely

[9]Defendant has not moved for summary judgment, nor could it, on the basis that the Forest Service's adjudicated breaches of Precision Pine's contracts were not material. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001).

[10]As noted in Sunoco, Inc., most Circuit Courts of Appeal have also concluded that waiver is a question of fact. Id. at 399, citing Ouimette v. E.F. Hutton & Co., 740 F.2d 72, 76 (1st Cir. 1984); Gallien v. Connecticut General Life Ins. Co., 49 F.3d 878, 885-86 (2nd Cir. 1995); Matinchek v. John Alden Life Ins. Co., 93 F.3d 96, 103 (3rd Cir. 1996); First Interstate Bank v. Interfund Corp., 924 F.2d 588, 595 (5th Cir. 1991); William H. Sill Mortgs., Inc. v. Ohio Casualty Ins. Co., 412 F.2d 341, 346 (6th Cir. 1969); Rosenburg v. Lincoln American Life Ins. Co., 883 F.2d 1328, 1334 (7th Cir. 1989); Spalding v. Agri-Risk Services, 855 F.2d 586 (8th Cir. 1988); Intel Corp. v. Hartford Accident & Indemnity Co., 952 F.2d 1551, 1559 (9th Cir. 1991); Lathem v. Sentry Ins., 845 F.2d 914, 917 (11th Cir. 1988).

factual issue. See Precision Pine's Motion to Dismiss or, In the Alternative, For Summary Judgment at 2, n.2. Nevertheless, defendant has raised it.

In an attempt to convert waiver into an issue of law susceptible to resolution in a motion for summary judgment, defendant relies heavily on Cities Service Helex, Inc. v. United States, 543 F.2d 1306 (Ct. Cl. 1976), for the proposition that:

> Thus a material breach gives the non-breaching party the choice of canceling or affirming the contract. Significantly, where the contract is affirmed, the prior breach cannot be invoked as defense to non-performance. If a party elects to continue performance of a contract that has been materially breached the obligations of both parties remain in force.

Government's Motion at 8-9 (emphasis in motion). However, as Cities Service demonstrates, the primary sources of support proffered by defendant in its motion describe a "strict" view of waiver in which any act by the non-breaching party to continue the contract results in an election to waive a defense premised on the prior material breach. Id. citing inter alia Williston on Contracts. Defendant fails to advise this Court, however, that Cities Service also recognizes that the weight of modern authority, not to mention precedent binding on this Court, has modified the strict view:

> As the plaintiffs stress, some courts and commentators and the Uniform Commercial Code have modified various aspects of this strict view. In Northern Helex Co. v. United States, 455 F.2d 456, 197 Ct. Cl. 118 (1972), **the court adopted the position** that the injured party may itself continue performance in certain circumstances and yet preserve its right to claim material breach without the breaching party's assent.

Cities Service, 543 F.2d at 1314 (emphasis supplied).[11] In rejecting a rigid application of the strict rule of waiver which defendant advocates here, the Court of Claims in Northern Helex observed:

> There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse (Williston, Contracts, 3rd ed., Vol. 5, § 688). But it is very doubtful that, even when first formulated, that rule disregarded particular circumstances justifying further performance in the specific case. As a general proposition, one side cannot continue after a material breach by the other (such as failure to pay), act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court. In this case, however, we have a special set of qualifying facts.

Northern Helex, 455 F.2d at 551. Thus, binding authority in this Circuit requires this Court to consider particular circumstances justifying further performance. As demonstrated below, the existence of such facts in this case preclude summary judgment in favor of defendant.[12]

Moreover, unlike the present case, none of the cases relied on by defendant involved a special set of qualifying facts justifying further performance. On the contrary, each case arose in circumstances where the party claiming a material breach had plainly waived its claim through protracted delay in raising its breach claim and/or by affirmatively misleading the other party into believing that no such claim would be advanced. See Cities Service, supra at 1316.

---

[11]As defendant correctly notes, the precedent of the United States Court of Claims, which is the predecessor to Court of Appeals for the Federal Circuit remain binding on this Court. Government's Motion at 8 n.6. Although the Court in Cities Service went on to analyze the facts of that case under both the strict view and the modified view of waiver, it may have done so because the facts at issue took place in 1972, i.e., around the time that the Court of Claims first formally adopted the modified view of waiver.

[12]This, of course, assumes that this Court has jurisdiction, which it does not because the Contracting Officers did not have a "claim" before them upon which to render a valid final decision.

(Contractor waived breach claim when, after the breach occurred, the contractor sued and obtained a court order to force the government to perform contracts, which the contractor also performed and only subsequently tried to revive material breach claim); Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 322-323 (2002) (Government waived claim of prior material breach because "at no time did the government suggest that plaintiffs were in violation of their contract."); Grady-Gould Watershed Improvement Dist. v. Transamerica Ins. Co., 570 F.2d 720, 723 (6th Cir. 1976) (party waived breach claim where it failed to raise breach of notice requirement, it had actual notice and yet affirmed the contract without ever having raised the breach of the notice requirement). Because Precision Pine maintained at all times that the Forest Service was in breach of contract and due to the special set of facts in this case, as in Northern Helex, summary judgment in favor of defendant is precluded.

D. Precision Pine Has Demonstrated, At A Minimum, That Genuine Issues Of Material Fact Exist As To Defendant's Waiver Claim.

As described in Cities Service, the test employed in Northern Helex to determine if there had been a waiver of a material breach focuses on a number of facts and issues to determine whether or not the non-breaching party's continued performance had been undertaken in the exercise of reasonable commercial judgment:

> In the present case continued performance on both sides for a long period of time and without any explicit warning that claims of material breach would some day be asserted went far beyond the reasonable commercial judgment that we found in Northern Helex. See 455 F.2d at 553, 197 Ct. Cl. at 129.

Cities Service, 543 F.2d at 1315-16 (footnote omitted). Notably, in Cities Service, plaintiffs had actually sued and obtained an order in district court forcing the government to perform the very contracts that plaintiffs' later argued they had a right to walk away from based on the

government's prior breach. Id. at 1316. In the instant case, the circumstances are very different such that, at a minimum, genuine issues of material fact remain in dispute which preclude a ruling in favor of defendant at summary judgment:

1. Precision Pine Immediately Informed The Forest Service Of Its Breach Claim.

In the instant case, Precision Pine informed the Forest Service from the very outset and throughout the suspension that it considered the Forest Service to be in breach of its contracts. PPFUF 1-2. Precision Pine requested compensation for the breach of those contracts once the Forest Service lifted the suspension in December of 1996. PPFUF 3. The Forest Service denied that it had breached the contracts or that it was responsible for Precision Pine's damages based on breach of contract and maintained that the Forest Service was only willing to consider paying "out-of-pocket" expenses authorized under the contract. PPFUF 4-6.

Because the Forest Service was unwilling to accept responsibility for the damages its breaches of contract had caused Precision Pine, Precision Pine prepared and submitted fourteen claim letters under the Contract Disputes Act less than one year after the lifting of the suspension, alleging that the Forest Service had breached the contracts, and seeking the millions of dollars in damages that the breach had caused Precision Pine to incur. PPFUF 7. In responding to the claim letters in final decisions issued between November of 1997 and March of 1998, the Forest Service disputed that it had breached any of the contracts and provided Precision Pine with "compensation" in the form of out-of-pocket expenses under the contracts for the protracted suspension in the total amount of $18,242.71. PPFUF 8. Shortly thereafter, on

September 11, 1998, Precision Pine commenced the action at issue in Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 and on July 30, 2001, Precision Pine ultimately prevailed on its breach claims for twelve of the fourteen contracts, of which eight are at issue in the instant litigation. PPFUF 9, 12.

Clearly, in light of these facts, the Forest Service had been put on notice by Precision Pine virtually from the beginning of the suspension in 1995 and continuously thereafter until it prevailed on the point in 2001 that Precision Pine considered the suspension to have been a material breach of contract for which it would hold the Forest Service responsible. Thus, this is not a case where the government was misled into believing that Precision Pine would not assert its material breach claim and the government has not presented any material facts demonstrating otherwise.

2. The Forest Service Was Able To Assess Precision Pine's Assertion That The Forest Service Materially Breached The Contracts And To Protect Its Interests.

Another reason which is often cited for requiring the injured party to make an early declaration of its belief that a breach has occurred is to allow the breaching party to protect itself, i.e., by leaving it up to the breaching party whether or not to continue its own performance. See Cities Service at 1316, and n.23, citing Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 638 (Ct. Cl. 1973). Once again, for all of the reasons stated in the preceding paragraph, the government could have been under no misapprehension that Precision Pine considered the Forest Service's suspension to have been a material breach of contract for which it intended to hold the government fully responsible. PPFUF 1-9. In this regard, the government was readily able to

assess the situation and protect itself – and yet it opted to proceed with the contracts it had breached. Again, defendant has failed to present any facts, and certainly has not demonstrated an absence of a genuine material fact suggesting that it was misled into believing that Precision Pine would not assert a material breach.

3. The Government Has Proffered No Facts Demonstrating That It Changed Its Position In Reasonable Reliance On Its Belief That Precision Pine Would Not Claim Material Breach Of Contract.

Another and related circumstance for allowing a party to continue performance while retaining its right to claim a prior material breach is that the breaching party had not changed its position in reasonable reliance on the fact that the injured party will not declare a breach. Northern Helex, 455 F.2d at 554 & nn.7-8. In this case, defendant has not even asserted, let alone presented, a single fact demonstrating a change in its position based on its belief that Precision Pine did not intend to hold it responsible for a material breach of contract.

Moreover, even if defendant were able to point to some facts demonstrating that it had altered its position in reliance on its "belief" that Precision Pine did not intend to claim a material breach, defendant would also have to show that this change in position was "reasonable" – a matter upon which defendant bears the burden, upon which it has again proffered no facts, and which, in any event, is not an issue typically resolvable through summary judgment. See Northern Helex, 455 F.2d at 554.

4. Precision Pine's Exercise Of Reasonable Commercial Judgment, Which Also Benefited The Forest Service, Should Not Be Held Against It.

The law with respect to the waiver of a material breach was recently restated in the context of the government's breach of a timber sale contract:

> Waiver has been found when the injured party remains silent in response to a breach, thereby misleading the other party as to its intentions, inducing detrimental reliance. See Ling-Temco-Vought, 475 F.2d at 636-38 (in continuing to perform and failing to object or reserve its rights, plaintiff prevented government's ability to evaluate its position and choose from among its options, thereby causing significant federal expenditures). We also recognize that often a contractor purposefully and tactically declines to mention a breach, and thereby waives its claim. Becho, Inc. v. United States, 47 Fed. Cl. 595, 604-05 (2000). But these are not the circumstances here. Every step of the way, APC registered its objection to the unilateral terms. The company endeavored to negotiate a settlement that would preserve its long-term relationship, while making clear to the government that it objected to the [breach]. We should not apply the waiver doctrine so as to compound the injury of the non-breaching party by precluding its efforts to preserve the contractual relationship on a compromised basis. The government's approach would force the non-breaching party to choose between swallowing the [government's violation of the contract] or abandoning the contract entirely, a Thomas Hobson's choice that would reward the breaching party and add further injury to APC.

Alaska Pulp Corp., Inc. v. United States, 48 Fed. Cl. 655, 671, (2001).[13] (Emphasis supplied) In the instant case, defendant also seeks to force Precision Pine into an equally "Hobsonian" choice of not challenging the government's violation of the contracts or declaring a material breach and repudiating the contracts. However, as noted above, had it repudiated the contracts, Precision Pine almost certainly would have gone out of business and the government would actually be in a worse position than it is in now. That is, in the area of Northeastern Arizona from which

[13]This determination echoes the holding of Northern Helex:

> In this instance continued [performance] was not an inconsistent, voluntarily chosen, course of action, but an indispensable route which was the only practicable one.

Northern Helex, 455 F.2d at 554.

Precision Pine can most affordably obtain raw material for its sawmill(s), by far the largest holder of timber land and seller of timber is the federal government. PPFUF 20(e). Since its founding, Precision Pine has been dependent on the Forest Service's timber sale program as the primary source of its raw material for its sawmill(s). Id. Of course, had Precision Pine repudiated its fourteen timber sale contracts at any time prior to a court ruling that the Forest Service had in fact breached the contracts, Precision Pine knew that it faced the very likely prospect that the Forest Service, which vigorously disputed that it had breached the contracts, would have terminated Precision Pine's contracts for default. PPFUF 20(n). In placing Precision Pine in default, the Forest Service no doubt would have cited, among other things, standard clause C(T)9.2 which indicates that pending resolution of any claim, "the contractor shall proceed diligently with the performance of the contract." PPFUF 20(o). Such action by the Forest Service would not only have resulted in Precision Pine's losing its entire portfolio of Forest Service timber sales, but also would have resulted in its being precluded from bidding on the resale of the defaulted contracts (PPFUF 20(p), (r); see also 36 C.F.R. § 223.86), and most likely requiring it to make substantial increased deposits on future sales because of its status as a "defaulter." PPFUF (t); see also 36 C.F.R. § 223.49(e), (g).[14] Precision Pine would probably also have faced suspension and debarment as a bidder on federal timber sale contracts (PPFUF 20(q), see also 36 C.F.R. § 223.130-223.145), or at a minimum, it would no longer have been viewed by the Forest Service as a responsible purchaser, precluding it from purchasing future

[14]That the Forest Service would have attempted to preclude Precision Pine from bidding on the resale is evidenced by the fact that the Forest Service did preclude Precision Pine from bidding on the resale of the Salt and O.D. Ridge contracts, and tried to preclude Precision Pine from bidding on the Jersey Horse II contract. PPFUF 20(r), (s). That the Forest Service would have substantially increased Precision Pine's downpayment requirements is shown by the fact that the Forest Service made Precision Pine increase such downpayments on the Jersey Horse II contract. PPFUF 20(t).

sales (PPFUF 20(q); see also 36 C.F.R. § 223.101), or even accepting sales from third parties. PPFUF 20(q). See also 36 C.F.R. § 223.114.

Despite Precision Pine's vigorous prosecution of its breach claims, this Court did not issue its ruling finding that the Forest Service's suspension had, in fact, breached Precision Pine's contracts until July of 2001, i.e., nearly six years after the Forest Service had first imposed the suspension.[15] PPFUF 1, 7, 9, 12. Absent some ability to process Forest Service timber throughout this extended time period, it is very unlikely that Precision Pine could have survived as a corporate entity capable of assisting the Forest Service as it has. PPFUF 20 (u)-(v). Accordingly, had Precision Pine "elected" to repudiate the breached contracts which represented a vital supply of raw material for Precision Pine, as defendant suggests it should have, Precision Pine simply would no longer be in existence and the government's even greater liability for the damages resulting from the Forest Service's breach would be at issue in Precision Pine and Timber, Inc. v. United States, No. 98-720C.

Moreover, Precision Pine's harvesting of the remaining timber on the sales which the Forest Service breached resulted in cash flow to the Forest Service in the form of payments for timber removed and the advancement of the original management goals desired by the Forest Service, i.e., the very reasons why the contracts were presumably let in the first place. As was the case in Northern Helex, Precision Pine's exercise of reasonable commercial judgment

[15]This was due in no small measure to the improper delaying tactics employed by the government during discovery for which it was sanctioned by this Court. See Precision Pine & Timber, Inc. v. United States, 2001 WL 1819224 (Fed. Cl. 2001).

justified its continued performance of the contracts, as circumstances allowed -- something which also benefited the government.

### 5. Precision Pine Notified The Government Of Its Belief That The Putative Default Terminations Were Inoperative Due To The Forest Service's Prior Material Breach.

By letter dated January 9, 2001, the Regional Forester for Region 3 of the Forest Service putatively terminated the contracts at issue in this case for breach due to Precision Pine's failure to provide a replacement surety that was satisfactory to the Forest Service within the time frames demanded by the Forest Service. PPFUF 10. Immediately thereafter, by letter dated January 12, 2001, counsel for Precision Pine advised the Forest Service that Precision Pine considered the government's prior material breach to have relieved it of liability for the putative defaults and reserved its right to make this argument once the issue of breach was resolved by the Court in Precision Pine and Timber, Inc. v. United States, No. 98-720C. PPFUF 11.

Subsequently, on July 30, 2001, this Court ruled that the Forest Service had in fact breached twelve of the fourteen contracts on which Precision Pie had brought suit, including eight of the twelve contracts at issue in the instant case. Precision Pine and Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001). Shortly thereafter, in a letter dated September 17, 2001, the President of Precision Pine reiterated his belief that the Court's determination that the contracts had been materially breached relieved Precision Pine of any liability for the putative defaults:

> . . . the Forest Service is scrupulously choosing to ignore the black letter law that a pre-existing material breach of contract, such as the Court of Federal Claims found the Forest Service committed on our sales, precludes a subsequent finding of default by Precision Pine.

PPFUF 13. Just a few days later, in a letter dated September 28, 2001 which was sent to the Washington Office of the Forest Service and which addressed the Forest Service's suggestion that it would suspend and/or debar Precision Pine as timber purchaser due to its purported default, counsel for Precision Pine reiterated the view that the Forest Service's prior material breach relieved Precision Pine of liability for the subsequent defaults:

> In sum, irrespective of the subsequent ostensible failure of Precision Pine to provide a replacement surety when the one that it was using was removed from the Treasury's lest of approved sureties, in June of 2000, for the 11 sales which the Forest Service has been found to have materially beached, which remain uncompleted, that material breach of contract relieved Precision Pine of its obligation to perform and precluded the Forest Service's termination for default.

PPFUF 14.

In this regard, it was also Mr. Porter's belief that any performance rendered by Precision Pine under the contracts after the material breach was commercially reasonable, benefited the Forest Service and would not prejudice Precision Pine's ability to subsequently treat the contracts as being at an end. PPFUF 20(w). Thus, the Forest Service was on notice of Precision Pine's belief the Forest Service's prior material breach of eight of the contracts precluded any purported default termination of the contracts by the Forest Service.

E. Genuine Issues Of Material Fact With Respect To Whether The Forest Service Reasonably Exercised Its Default Authority Preclude Summary Judgment In Defendant's Favor On This Issue.

In its Complaint, Precision Pine alleges that once Frontier was delisted by the Department of Treasury, the Forest Service selectively enforced the bonding requirement among companies that had previously secured bonding from Frontier. Complaint at ¶¶ 18-21. In response,

defendant argues that the "Forest Service's administration of other contracts has no legal significance," and that the Forest Service's decision whether to enforce the bonding requirement is "made on a case-by-case basis." Government's Motion at 11. However, "it is a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'" American Export Isbrandtsen Lines, Inc. v. United States, 499 F.2d 552, 576 (Ct. Cl. 1974) (quoting Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 998 (Ct. Cl. 1968)). What is reasonable in a given set of circumstances is an issue of fact. Chernick v. United States, 372 F.2d 492, 496 (Ct. Cl. 1967); see, e.g., Metric Construction Co. v. United States, 1 Cl. Ct. 383, 398-99 (1983) (reasonableness of costs); Sundstrand Turbo v. United States, 389 F.2d 406, 415 (Ct. Cl. 1968) (reasonableness of time). In the present case, as demonstrated below, there are genuine issues of material fact as to whether the Forest Service reasonably exercised its discretion in enforcing the bonding requirement against Precision Pine but not against other companies.

In this regard, Precision Pine is aware of at least one instance where the Forest Service opted not to terminate a timber sale contract held by another company, North Pacific Timber Enterprises ("NPTE"), when its surety was removed from the Treasury's list of approved insurers barely a month after Precision Pine's surety, Frontier Insurance Company, was removed. That is, NPTE had secured bonding from Frontier Pacific Insurance Company for the Jordon Multi-Product Timber Sale, which was awarded on March 17, 1999. PPFUF 21 (d)-(e). Frontier Pacific Insurance Company was removed from the Treasury's list in July 2000. PPFUF 21(h). This was just a month after Precision Pine's bonding company, Frontier, had been removed from Treasury's list. Nevertheless, the Forest Service did not require NPTE to secure new bonding,

and harvesting on the Jordan contract continued through December 2000, at which time the Forest Service suspended the contract for reasons unrelated to bonding. PPFUF 21(f)-(g). The Forest Service also did not require NPTE to provide replacement bonding when the Forest Service permitted operations on the Jordon sale to resume in February 2000. PPFUF 21(g). The fact that the Forest Service did not enforce the bonding "requirement" against NPTE during the same time period in which it aggressively enforced the very same provision against Precision Pine, at a minimum, raises a genuine issue of material fact as to whether Precision Pine was the victim of the Forest Service's selective and unreasonable exercise of its contractual authority.

Additionally, although defendant asserts that selective enforcement did not occur here, it fails to offer any evidence supporting its contention. Government's Motion at 11. For example, defendant states that Stone Container Corporation ("Stone Container") was the only other company operating timber sales in Region 3 that was bonded by Frontier. Id. Defendant goes on to state that "Stone Container was in fact required to secure new bonding when Frontier's insolvency caused Frontier to be removed from the Government's list of acceptable sureties," citing to Defendant's Proposed Findings of Uncontroverted Facts ("Government's Proposed Facts") at ¶ 28. Id. Not surprisingly, paragraph 28 of the Government's Proposed Facts makes the same assertion, i.e., that Stone Container was the only other timber contractor in Region 3 bonded by Frontier, and that the Forest Service required Stone Container to secure new bonding, citing exclusively to the Government's Appendix at 527-528.

However, the Government's Appendix, does not support the entire proposition for which it is cited. That is, pages 527-528 of the Government's Appendix merely provide a chart that

purports to show "instances" of bonding provided by Frontier, the type of bonding, and the contracts for which the bonding was secured.[16] Although this chart does indicate that Stone Container purportedly secured bonding from Frontier, neither these pages nor any other pages in the Government's Appendix demonstrate that: 1) Stone Container was actually required to secure new bonding once Frontier was removed from the list of approved sureties; or 2) that Stone Container did, in fact, actually secure new bonding.

Moreover, the chart provided by defendant at pp. 527-528 of the Government's Appendix also purportedly indicates that at least five other timber sale contracts, held by other companies in Forest Service Regions 6 and 8, had bonding provided by Frontier.[17] The chart does not provide the names of these purchasers, nor does it provide any indication as to whether these purchasers were required to secure new bonding when Frontier was delisted. Not only has defendant failed to establish that there is no issue of material fact as to whether it unreasonably enforced the bonding requirement with regard to Precision Pine, defendant has actually provided evidence indicating that there are facts at issue as to whether the Forest Service ever enforced the bonding requirement in other situation. Accordingly, defendant is not entitled to summary judgment.

---

[16]Defendant does not identify who prepared the chart or otherwise vouch for the accuracy or completeness of its contents.

[17]The Forest Service is comprised of nine regions. Defendant does not indicate whether contractors in other regions were bonded by Frontier and, if so, how these contractors were treated once Frontier was delisted.

F. Defendant's Arguments With Respect To The Resales Of The O.D. Ridge And Jersey Horse Contracts Are Irrelevant.

Defendant's arguments that its resales of the O.D. Ridge and Jersey Horse contracts were: (1) authorized by the contracts and (2) that the resale contracts contained terms that were not materially different from those of the original contracts are irrelevant to this matter. These contentions, even if they could be resolved as a matter of law, are of no moment because the damages asserted in the putative final decisions of the contracting officers and which defendant seeks to recover here are not based on what was bid on a resale of the timber. For the Jersey Horse sale, the Forest Service's estimated damages contained in the putative Contracting Officer's final decision of March 1, 2001 were based on the claimed appraised values, which were calculated several months before the resale of the Jersey Horse contract. See Pl. App. 62-70.[18] In this regard, defendant has proffered no evidence that any calculation of damages based on the actual resale of the Jersey Horse contract was ever made or that based on the results of the resale that the Forest Service, in fact, suffered any damages. As such, the sale of the Jersey Horse II contract, albeit under materially different terms, has no bearing on the "estimated" damages defendant seeks to recover in the putative final decision at issue in this matter.

Moreover, with respect to the O.D. Ridge timber sale contract, the estimated damages sought by defendant in its March 1, 2001 putative final decision were only for timber volume cut

[18]The Forest Service attempted to bar Precision Pine from participating in the bidding on the Jersey Horse resale contract (the "Jersey Horse II contract") and only allowed Precision Pine to bid on the sale after Precision Pine filed a bid protest action in this Court. See Precision Pine & Timber, Inc. v. United States, No. 01-544C. As a result of this bid protest, the Forest Service eventually relented and allowed Precision Pine to bid on the Jersey Horse II contract which was conducted on or about November 26, 2001. Precision Pine was eventually declared the high bidder and was awarded the Jersey Horse II contract which it has continued to operate without incident since that time. PPFUF 20(s).

and removed but not paid for in the amount of $148,845.38. PPFUF 15. This assertion of damages was made because the Forest Service actually anticipated obtaining more from the resale of the O.D. Ridge timber sale contract than it estimated it would have sustained in damages from Precision Pine's putative default. Id. Defendant concedes these facts with respect to the O.D. Ridge sale. See Government's Motion at 14, n.11. What defendant does not tell the Court, however, is that Precision Pine has paid for all of the timber it removed from the O.D. Ridge sale. That is, on September 17, 2001, the President of Precision Pine wrote to the Regional Forester and offered to pay the balance remaining on the O.D. Ridge contract. PPFUF 16. This letter, which was part of a larger effort by Precision Pine to find common ground with the Forest Service (and which would ultimately be rebuffed by the Forest Service), enclosed a check for $50,000 toward the payment of the outstanding balance. Id. In response to this letter, on October 12, 2001, the Regional Forester acknowledged receipt of the $50,000 payment, sought payment of the outstanding principal **plus** additional "administrative fees and interest" totaling more than $24,500. PPFUF 17. Despite the financial strain that had been placed on Precision Pine by the Forest Service's prior suspension and breach of 12 of its contracts, by letter dated October 27, 2001, Precision Pine submitted a check in the amount of $116,130.70 in full and final payment of the outstanding balance on the O.D. Ridge sale. PPFUF 18. By letter dated November 16, 2001, the Regional Forester acknowledged Precision Pine's "payment of the balance due on the O.D. Ridge Timber Sale Contract." PPFUF 19.

Despite this payment in full in November of 2001 of the Forest Service's claimed "damages" in this matter, the government has, nonetheless, continued to seek a double recovery of this money in the instant case. See Defendant's Counterclaim, asserting that $148,845.38 plus

interest "is due and owing" to the United States on the O.D. Ridge contract; see also Government's Motion at 17, asserting that summary judgment should be granted upon the United States' counterclaim with respect to the O.D. Ridge contract. Accordingly, Precision Pine requests that the government withdraw its claim with respect to the O.D. Ridge contract forthwith.

Accordingly, the defendant's motion for summary judgment with respect to O.D. Ridge should be denied.[19]

## IV. Conclusion.

In light of the foregoing, plaintiff, Precision Pine & Timber, Inc., respectfully requests that this Court deny defendant's motion for summary judgment.

Respectfully submitted,

s/ Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

[19] If anything, summary judgment should be granted to the plaintiff with respect to O.D. Ridge. See, e.g., 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2720 and cases collected at n.24. ("The judgment may be rendered in favor of the opposing party even though the opponent has made no formal motion under Rule 56.")

Of Counsel:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 26, 2004

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, NW
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, NW
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 26, 2004

# INDEX TO PLAINTIFF'S APPENDIX

**Description** **Pl. App. Page**

Letter dated September 5, 1995 from Lewis Tenney to Clifford Dils re: Forest Service liability for the August 1995 suspension ....................1

Letter dated September 5, 1995 from Lewis Tenney to Ken Broyles re: Forest Service liability for the August 1995 suspension ....................2

Letter dated September 6, 1995 from Lewis Tenney to David Harris re: Forest Service liability for the August 1995 suspension ....................3

Letter dated October 4, 1995 from Lorin Porter to David Harris re: Forest Service liability for damages and refunds owed Precision Pine ....................4

Letter received by the Forest Service on June 26, 1996 from Lorin Porter to Chip Cartwright and certain contracting officers re: harm caused to Precision Pine and expected compensation ....................5

Letter dated December 31, 1996 from Lewis Tenney to Ken Broyles re: expected items of compensation ....................7

Letter dated December 31, 1996 from Lewis Tenney to Eddie Alford re: expected items of compensation ....................8

Letter dated December 11, 1996 from David Unger to Lorin Porter re: remedies provided by the contracts ....................9

Letter dated December 13, 1996 from Milo Larson (signed Marlin Johnson) to Forest Supervisors re: consistency of contract administration activities following the lifting of the suspension ....................10

Letter dated January 24, 1997 from Robert Leaverton to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................12

Letter dated January 30, 1997 from Ken Broyles to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................13

Letter dated February 7, 1997 from Clifford Dils to Lewis Tenney re: compensation addressed in December 31, 1996 letter from Precision Pine ....................14

Email dated January 14, 1997 from Alan Lucas to C. Dills, B. Leaverton, K. Broyles, D. Harris and M. Johnson re: a consistent response to Precision Pine. ....................15

Letter dated January 9, 2001 from Eleanor Towns to Lorin Porter re: terminating the contracts at issue ....16

Letter dated January 12, 2001 from Alan Saltman to Eleanor Towns re: cancellation of Precision Pine's timber sales ....18

Letter dated September 17, 2001 from Lorin Porter to Eleanor Towns re: bidding on the resale of contracts and partial payment of money owed on O.D. Ridge....19

Letter dated September 28, 2001 from Alan Saltman to Laurie Tippin re: Forest Service review of Precision Pine for possible suspension or debarment....23

Cover letter enclosing Decision Document and Default Damage Calculations for O.D. Ridge ....31

Page 1 of Decision Document for O.D. Ridge....31A

Calculation sheet for estimated damages for O.D. Ridge ....31B

Letter dated October 12, 2001 from Eleanor Towns to Lorin Porter re: partial payment for O.D. Ridge....32

Letter dated October 27, 2001 from Lorin Porter to Eleanor Towns re: payment of balance on O.D. Ridge, the ruling against the Forest Service on liability, and settlement, with copy of check attached ....34

Letter dated November 16, 2001 from Eleanor Towns to Lorin Porter re: payment of balance on O.D. Ridge and a possible meeting with the agency ....39

"A" clauses from the Monument Multi-product Timber Sale ....40

Declaration of Kennard Williams ....52

Declaration of Lorin Porter....54

Page 1 of Decision Document for Wiggins Multi-Product Sale....61

Decision Document and Default Damage Calculations for Jersey Horse ....62

MCO-691

SEP 12 1995

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

September 5, 1995

Clifford J. Dils
U.S. Department of Agriculture
Forest Service
Tonto National Forests
2324 E. McDowell Road
Phoenix, AZ 95938

Re: Salt Timber Sale-Contract #005937
Manaco Timber Sale-Contract #004625

Dear Mr. Dils:

We are in receipt of your letter of August 25, 1995 suspending our operations on the above referenced sales. As you know, we are a small company that is unfortunately almost totally dependent on federal timber. Accordingly, this suspension, unless promptly lifted, is going to have a devastating effect on our operations to the point of threatening our continued existence.

Please be advised that since we believe that the proximate cause of the suspension is the Forest Service's apparent failure to meet its implied obligation to take all steps necessary to insure that these sales complied with the law, we intend to hold the Forest Service fully liable for any and all damages that we incur as a result of this totally avoidable suspension.

Sincerely yours.

Lewis N. Tenney, Jr.

cc: Saltman & Stevens P.C.

MON 319

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

September 5, 1995

Ken Broyles
U.S. Department of Agriculture
Forest Service
Coconino National Forest
2323 E. Greenlaw Lane
Flagstaff, AZ 86004

Re: Barber Multiproduct-Contract #005226
Merritt Multiproduct-Contract #005101
Hutch-Boondock Multiproduct-Contract #005465
Monument Multiproduct-Contract #005556
U-Bar Timber Sale-Contract #005051

Dear Ken:

We are in receipt of your letter of August 28, 1995 suspending our operations on the above referenced sales. As you know, we are a small company that is unfortunately almost totally dependent on federal timber. Accordingly, this suspension, unless promptly lifted, is going to have a devastating effect on our operations to the point of threatening our continued existence.

Please be advised that since we believe that the proximate cause of the suspension is the Forest Service's apparent failure to meet its implied obligation to take all steps necessary to insure that these sales complied with the law, we intend to hold the Forest Service fully liable for any and all damages that we incur as a result of this totally avoidable suspension.

Sincerely yours,

Lewis N Tenney, Jr.

cc: Saltman & Stevens P.C.

 S-K 508

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

September 6, 1995

David P. Harris
Contracting Officer
U.S. Department of Agriculture
Forest Service
Kaibab National Forest
800 S. 6th Street
Williams, AZ 86046

Re: Dog Timber Sale-Contract #006593
Brann Timber Sale-Contract #006577
Saginaw-Kennedy Timber Sale-Contract #006585

Dear Mr. Harris:

We are in receipt of your letter of August 30, 1995 suspending our operations on the above referenced sales. As you know, we are a small company that is unfortunately almost totally dependent on federal timber. Accordingly, this suspension, unless promptly lifted, is going to have a devastating effect on our operations to the point of threatening our continued existence.

Please be advised that since we believe that the proximate cause of the suspension is the Forest Service's apparent failure to meet its implied obligation to take all steps necessary to insure that these sales complied with the law, we intend to hold the Forest Service fully liable for any and all damages that we incur as a result of this totally avoidable suspension.

Sincerely yours,

Lewis N. Tenney, Jr.

cc: Saltman & Stevens

October 4, 1995

Mr. David Harris
Contracting Officer
Kaibab National Forest
800 S. 6th Street
Williams, AZ 86046

Mr. Harris:

In reference to your letter dated October 2, 1995, I find it ironic that you would suggest Precision Pine being in breach of contract. We are required to build specified roads on the Brann Timber Sale and are allowed effective purchaser credit for doing so, yet we are locked out of the woods and unable to cut timber which is rightfully ours according to our contract. Because the work has been done, we have paid our contractor and the money has been gone from our cash flow some 35 to 40 days.

We hold the Forest Service liable, not only for the loss of cash flow (with no timber to cut and no sales to apply the effective purchaser credit), but also for our inability to operate our mills on the timber that is contractually ours to cut. The damages we have incurred due to these curtailments should be yours to bear.

Regardless of the situation or who is at fault, I hereby request that you transfer to the Dog Timber Sale moneys from the down payment refund we have requested from the Brann and Saginaw-Kennedy contracts. These moneys should be applied to Bill for Collection #7001. Also, please refund the effective purchaser credit earned on the Brann Timber Sale in the form of cash. Please include 10% interest for 30 days in the amount of $93.40 plus an administrative charge of $50.

Mr. Harris, we realize this is not personally your fault, but it isn't ours either. However, the Forest Service is ultimately responsible.

Sincerely,

Lorin D. Porter
Precision Pine & Timber, Inc.

 JRH-449

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
~~(602) 536-2181~~
Phone: (520) 535-9112 Fax: (520) 535-9196

REC'D USDA
REGIONAL FORESTER'S OFFICE
JUN 26 1996

Mr. Chip Cartwright, Regional Forester
& Contracting Officers of A-S, Coconino,
Kaibab and Tonto National Forests
Region 3
517 Gold Avenue, SW
Albuquerque, NM 87102

Dear Mr. Cartwright & Contracting Officers

This letter will inform you of our situation regarding the contracts we have in force in your region.

We recognize the impact of the injunction put out by Judge Muecke's court, however, this injunction has gone at least six to eight months past a reasonable period of time. Our sawmill in Eagar, Arizona has been shut down since November 1995 and we have three timber sales, Hay, O.D. Ridge and Kettle, that we could have and should have been able to operate on.

Our Heber mill was shut down between September and December of 1995 and will be forced to shut down again as of June 17, 1996. We have four timber sales under contract that should flow to this mill. They are the Brookbank, the Jersey Horse, the Monaco, and the Salt.

Our Winslow mill was shut down between March 12 and April 15, 1996. We have kept this mill running longer because of private and Native American timber we have purchased, but will be forced to close this mill by the end of June. We have under contract the U-Bar, the Saginaw-Kennedy and the Monument Timber Sales.

We actually built the Eagar sawmill (at a cost of around one million dollars) because of the Forest Service Timber Sale contracts we had been able to procure in that area, especially the Hay Timber Sale. We actually bought the Reidhead mill in Show Low so that we could have the timber from the Hay sale. Our projections showed that we would be better off to build a mill in Eagar because of the timber we now had in that area (specifically the Hay T.S.), than to try to transport the logs to our Heber mill. Those projections also showed that our planing operation would be more efficient with two mills feeding it. Since we had the timber under contract we decided to go ahead with the building of the Eagar mill. As your records will show we have not been

JRH - 450

able to harvest much volume from the Hay sale specifically r any of the other sales we have under contract with your agency.

Because of curtailments, modifications, injunctions, appeals and other legal or administrative challenges we were also forced to close our Snowflake Planing and Drying facility. This closure occurred May 5, 1995.

We have been forced to jump around from sale to sale, to go out further and pay more for either private or Native American timber in order to maintain any sort of viability in our business.

We have done this so that we could have the ability to fulfill our contractual obligations on the timber sale contracts we have with the Forest Service. These contracts are still in force. We have had to maintain performance bonds, payment bonds and cash deposits on these contracts; therefore we know they are in force and that we will be expected to complete them, and fulfill our obligations or be placed in breach. We have therefore, at great additional cost, and great loss of profitability, tried to maintain our viability so we can fulfill our obligations to your agency.

We submit that we have been unjustly harmed financially because of the breach of your contracts with us, and that we expect to be justly compensated for our lost opportunities, the additional expenses incurred, and other reasonable costs and/or losses associated with not only closures, but the keeping open and viable our mills in order to fulfill our contractual obligations with you.

We do not like to do this, but we have been severely harmed and we see no other way. You will be receiving actual dollar amounts associated with the above mentioned harm.

Sincerely,

Lorin D. Porter
President

cc: Saltman & Stephens, P.C.

RF
DRF-Admin Pat
DRF-Resources
FOR
AS
Coconino
Kaibab
Tonto

Ken Broyles
Contracting Officer
Coconino National Forest
2323 E. Greenlaw Lane
Flagstaff, Az. 86004

12-31-96

Re: (Hutch-Brookbank, Monument, Mud, Saginaw-Kennedy and U-bar timber sales.)

Dear Ken Broyles,

We have received a letter dated December 11, 1996, from the Acting Chief stating among other things that we should contact you with regard to obtaining reimbursement for the substantial costs we incurred as a result of the Forest Service's suspension of the above-referenced sales for nearly a year and a half. As he states, Contracting Officers have the authority to take action, "i.e. pay us for the costs we have incurred.

We believe that among other things we should be compensated for:

-the cost of maintaining our bonds during the suspension;
-interest on our deposits including interest on any effective purchaser credit that we could not transfer because of the suspension;
-the unamortized cost of maintaining our manufacturing facilities and critical personnel:
-the unamortized cost of administration and management;
-idle equipment cost;
-the extra cost we incurred in transferring logs between mills in order to keep them operating for as long as possible;
-increases in the cost of manufacturing the wood; and
-lost market opportunity.

Please advise us as to how soon we can expect compensation for these items.

Sincerely yours,

Lewis N. Tenney Jr.

CC: Alan I. Saltman
David G. Unger, Acting Chief
Senator John McCain

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

Eddie Alford
Contracting Officer
Tonto National Forest
2324 E. McDowell Rd. 85006

12-31-96

Re: (Manaco and Salt timber sales)

Dear Eddie Alford,

We have received a letter dated December 11, 1996, from the Acting Chief stating among other things that we should contact you with regard to obtaining reimbursement for the substantial costs we incurred as a result of the Forest Service's suspension of the above-referenced sales for nearly a year and a half. As he states, Contracting Officers have the authority to take action, "i.e. pay us for the costs we have incurred.

We believe that among other things we should be compensated for:

-the cost of maintaining our bonds during the suspension;
-interest on our deposits including interest on any effective purchaser credit that we could not transfer because of the suspension;
-the unamortized cost of maintaining our manufacturing facilities and critical personnel:
-the unamortized cost of administration and management;
-idle equipment cost;
-the extra cost we incurred in transferring logs between mills in order to keep them operating for as long as possible;
-increases in the cost of manufacturing the wood; and
-lost market opportunity.

Please advise us as to how soon we can expect compensation for these items.

Sincerely yours,

Lewis H. Tenney Jr.

CC: Alan I. Saltman
David G. Unger, Acting Chief
Senator John McCain

U-B 1099

United States Department of Agriculture
Forest Service
Washington Office
14th & Independence SW
P.O. Box 96090
Washington, DC 20090-6090

**File Code:** 2450

**Date:** December 11, 1996

Mr. Lorin D. Porter
President, Precision Pine
and Timber, Inc.
Post Office Box 70
Heber, Arizona 85928

Dear Mr. Porter:

Thank your for your October 4, 1996, letter to Senator John McCain concerning the need for financial assistance for your company Precision Pine and Timber, Inc., Heber, Arizona. Senator McCain has forwarded your letter to the USDA Forest Service for consideration and response.

The Forest Service is well aware of the hardships that the long injunction in the Thomas vs. Silver lawsuit has caused to the timber industry. Fortunately, as you are probably aware now, that injunction has recently been lifted.

The timber sale contracts of those sales of yours that have had operations suspended provide for remedies in your situation. You may contact the Contracting Officers to discuss what remedies your specific contracts provide. The Contracting Officers have the authority to take action, as provided in your timber sale contracts.

Thank you again for writing. Stories such as yours dramatically illustrate the effects that have resulted from the environmentalist effort to stop all timber sales.

Sincerely,

/s/ Robert Lynn for
DAVID G. UNGER
Acting Chief

United States Department of Agriculture | Forest Service | Southwestern Region | 517 Gold Avenue SW. Albuquerque, NM 87102-0084
FAX: (505) 842-3800
V/TTY: (505) 842-3292

**File Code:** 2450 **Date:** December 13, 1996

**Subject:** Timber Sale Contracts and Permits

**To:** Forest Supervisors

On December 4, 1996, U.S. District Court Judge Robert G. Strand signed an order granting the Forest Service motion to declare the required consultation complete in the Silver v. Thomas lawsuit. In addition, it was ordered that the injunction against tree cutting activities on Forest Service lands in Arizona and New Mexico be terminated. This action opens the door for the Forest Service to again issue NEPA decisions on projects involving tree cutting, award timber sale contracts, and allows for operations under existing timber sale contracts to resume.

As a result of the effects of the injunction and before operations under existing timber sale contracts can resume, certain contract administration activities may be required. This memo is to serve as a reminder of these activities and to promote consistency throughout the Region in working with our purchasers as timber sale contract operations start up again.

Before on-the-ground operations on a specific timber sale can resume, it is important that the following activities have taken place, where applicable:

a. That the purchaser is notified in writing that the injunction is lifted and that operations may resume as on-the-ground conditions permit and contract requirements are met.

b. That any temporary reduction in the required downpayment on the contract is returned to the full amount. **(CT4.222)**

c. That the general operating plan required under **<u>CT6.3</u>** - **<u>Plan of Operation</u>**, be updated and approved by the FS.

d. That the purchaser provide an annual operating schedule of anticipated major logging activities, as required in standard provision **BT6.31**.

e. That both purchaser and Forest Service representatives responsible for administration of the contract are verified and named in writing as per **BT6.1**.

f. That the sale traffic control (safety) plan is reviewed and agreed to by the purchaser and the FS, and that all required traffic control devices and warning signs are in place prior to beginning operations. **(CT6.33)**

g. That on all payment units the purchaser is proposing to enter that payment or payment guarantee has been confirmed and a written "Release For Cutting" has been issued. **(BT6.3)**

h. It is recommended that a pre-work conference be held with the purchaser to go over the above and other contract requirements and allow for questions to be brought up and discussed.

As a result of the injunction, there may be other contract actions required that do not necessarily have to take place before purchaser's operations begin. The following actions fall into this category and should be acted on where applicable:

a. Contract Term Adjustment (CTA) **(BT8.21)**. Adjust contract termination date by the number of days, during the "Normal Operating Season" specified in the contract, that the purchaser's operations were shut down due to the injunction. Since the FS was aware of the cause for this interruption, a written request from the purchaser is not required to initiate CTA **(FSH 2409.15, 31.1)**. The Contracting Officer should provide written notice to the purchaser of the adjusted contract termination date.

b. Adjust the periodic payment date(s) **(CT4.264#)** by the number of days qualifying for CTA under BT8.21 if Periodic Payment Determination Date(s) had not been reached prior to the injunction.

c. Where road construction remains to be done, purchaser should submit or revise their annual Plan of Operation for Road Construction **(CT6.311)**. Also, adjustment of the road completion date specified in **CT5.101#** may be needed.

d. Under special contract provision **<u>CT6.01</u> - <u>Interruption or Delay of Operations</u>**, purchasers may submit claims for out-of-pocket expenses incurred as a direct result of the interruption and delay of their operations due to the injunction. The Contracting Officer must respond to all claims following procedures outlined in the Contract Disputes Act.

It is possible that claims will be received for questionable expenses or other alleged damages. Whenever there is a question, you are encouraged to seek advice from the Regional Contract Disputes Act team and our Office of General Counsel (OGC).

The above actions and noted contract references were specific to our 2400-6T timber sale contracts. Similar actions may be needed on 2400-03 timber sale contracts and 2400-4, Forest Products Sale Permits. If you have any questions regarding these actions or any other contract administration activity, contact Alan Lucas at (505) 842-3426.

/s/ Marlin Johnson (for)
MILO J. LARSON
Director of Forestry, Forest Health

cc:
M.Johnson
A.Lucas

**Concur:A.Lucas:12/13/96**
**Concur:A.Benavides:12/13/96**
**CONCURRENCE:A.WILLIAMS:12/13/96**

COPY

United States Department of Agriculture | Forest Service | Apache-Sitgreaves NFs | P.O. Box 640 Springerville, AZ 85938 520 333-4301

Reply To: 2450

Date: January 24, 1997

Lewis N. Tenney, Jr.
Precision Pine & Timber, Inc.
P.O. Box 70
Heber, AZ 85928

Dear Lewis:

We are in receipt of your letter dated December 31, 1996, concerning compensation for the suspension time on the Brookbank, Hay, Kettle, Jersey Horse, and the O.D. Ridge timber sales as a result of the Silver vs. Thomas lawsuit.

I am unsure as to what compensation you are requesting from the content of your letter. Please refer to CT6.01 - Interruption or Delay of Operation clause of the timber sale contract for the types of compensation allowed, and the procedure for requesting specific amounts. I will respond to your request for specific compensation, as per the timber sale contract.

The Hay Timber Sale Contract does not include C6.01, but would certainly qualify for a contract term adjustment for the time period of the suspension. Any additional claims beyond the adjustment will be handled according to C9.2 and C9.21 of the contract.

If you should have any questions concerning this letter, please contact Susan Lee or myself directly.

Sincerely,

Robert J. Leaverton

ROBERT J. LEAVERTON
Contracting Officer

Pl. App. 12



Printed on Recycled Paper
FS-6200-28b (12/93)

United States Department of Agriculture | Forest Service | Coconino National Forest | 2323 E. Greenlaw Lane, Flagstaff, AZ 86004
FAX: (520) 527-3620
V/TTY: (520) 527-3600

U-B 1108

Reply To: 2450

Date: January 30, 1997

Lewis N. Tenney Jr.
Precision Pine & Timber, Inc.
P.O. Box 70
Heber, Arizona 85928

Dear Lewis:

We are in receipt of your letter dated December 31, 1996, concerning compensation for a variety of things related to the suspension time on the Hutch-Brookbank, Monument, Mud, Saginaw-Kennedy, and U-Bar Timber Sale contracts due to the injunction as a result of the Silver vs Thomas lawsuit. The only contracts Precision Pine had on the Coconino during the injunction period were Hutch-Boondock (#005465), Monument (#005564), Mud (#005556), and U-Bar (#005051). We do not have a Hutch-Brookbank, or Saginaw-Kennedy contract with Precision Pine.

I am unsure as to what compensation you are requesting from the content of your letter. Please refer to CT6.01 - Interruption or Delay of Operation clause of the timber sale contracts for the types of compensation allowed. These contracts are subject to the Contract Disputes Act of 1978 (Pub. L. 95-563). Procedures for submitting a written claim seeking, as a legal right, payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to these contracts are outlined in special contract provisions CT9.2 - Disputes and CT9.21 - Submission of Claim. Upon receipt of a written claim on an individual contract, I will respond to your specific requests for compensation on each contract, as per the timber sale contract.

If you should have any questions concerning this letter, please contact me directly.

Sincerely,

Ken Broyles
Contracting Officer

cc: Dan Derrick, FSR
Dick Stephens, FSR

United States Department of Agriculture
Forest Service
Payson RD
2009 E. Hwy. 260
Payson, AZ 85541
(520) 474-7900

File Code: 2450

Date: February 7, 1997

Precision Pine and Timber, Inc.
Attention: Lewis N. Tenney, Jr.
P.O. Box 219
Heber, AZ 85928

Dear Mr. Tenney:

We are in receipt of your letter dated December 31, 1996, concerning compensation for a variety of things related to the suspension time on the Salt Timber Sale, Contract No. #005937 and Manaco Timber Sales, Contract No. #004625, as a result of the Silver vs. Thomas lawsuit.

I am unsure as to what compensation you are requesting from the content of your letter. Please refer to CT6.01 - Interruption or Delay of Operation clause of the timber sale contract for the types of compensation allowed. These contracts are subject to the Contract Disputes Act of 1978 (Pub. L. 95-563). Procedures for submitting a written claim seeking, as a legal right, payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract are outlined in special contract provisions CT9.2 - Disputes and CT9.21 - Submission of Claim. Upon receipt of a written claim on an individual contract, I will respond to each of your specific requests for compensation, as per the timber sale contract.

I would also like to remind you that all correspondence relating to the above mentioned contracts should be addressed to the Contracting Officer.

Should you have any questions concerning this letter, please contact Cliff Dils, Contracting Officer, at (520) 474-7900.

Sincerely,

Clifford J. Dils

CLIFFORD J. DILS
Contracting Officer

cc:
S.O. - Forestry

MON 351

MESSAGE SCAN FOR BROYLES,KEN

'o C.DILLS:R03F12D04A
o B.LEAVERTON:R03F01A
To K.BROYLES:R03F04A
To D.HARRIS:R03F07A
CC M.JOHNSON

From: Alan Lucas:R03A
Postmark: Jan 14,97 1:08 PM Delivered: Jan 14,97 1:09 PM
Status: Previously read Urgent
Subject: Forwarded:

---

Comments:
From: Alan Lucas:R03A
**Date: Jan 14,97 1:08 PM**
For your information, attached is a copy of the Dec. 11, 1996 letter from the acting Chief to Precision Pine regarding remedies for the suspension of contracts in the Silver v. Thomas injunction. This is the letter referred to in Precision Pine's 12/31/96 letter to Contracting Officers, that you may have received. We will want to be consistent across the Region in any response to Precision Pine on this issue. Therefore, I will set up a conference call to discuss this after I have visited with our OGC. I will notify you when this will be. In the meantime, if you have any suggestions or additional information, let me know. -- alan

Previous comments:
From: Rex Baumback:WO
Date: Jan 14,97 2:45 PM
As requested. I apparently neglected to put a cc to the Region.

---------------X--------------

United States Department of Agriculture

Forest Service

Unit Name

517 Gold Avenue, SW
Albuquerque, NM 87102-0084
FAX (505) 842-3800
V/TTY (505) 842-3292

File Code: 2450

Date: JAN - 9 2001

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Lorin D. Porter, President
Precision Pine & Timber, Inc.
P.O. Box 70
Heber, AZ 85928

Dear Mr. Porter:

By letters from the Contracting Officers on the timber sale contracts noted below, sent between the dates of September 26 and October 2, 2000, you were given final notice that unless you provided adequate bonding for the timber sale contracts indicated, the contracts would terminate on October 25, 2000. You did not provide the requested bonding.

On Thursday, October 26, 2000, I received requests from the Timber Sale Contracting Officers to terminate the referenced contracts for failure to remedy breach pursuant to contract provisions BT9.3 - Breach and CT9.3 - Breach. The breach stems from your failure to provide new bonding satisfactory to the Forest Service when Frontier Insurance Company was removed from the list of acceptable sureties on Government contracts in June of this year. Along with their requests, the Contracting Officers provided information pertinent to the situation, sufficient to form a basis for making a decision.

I have reviewed the information provided to me regarding the failure of Precision Pine & Timber, Inc. to provide payment guaranties or other bonding or surety acceptable to the Forest Service as required by timber sale contract provision BT9.1 - Performance Bond on the following Region 3 timber sales:

| National Forest | Sale Name | Contract Number |
|---|---|---|
| Apache-Sitgreaves: | Gentry Multiproduct | 030104001939 |
| | Wiggins Multiproduct | 030104020012 |
| | Jersey Horse | 030105001756 |
| | Brookbank Multiproduct | 030105001822 |
| | O.D. Ridge | 030106001574 |
| Coconino: | Hutch-Boondock Multiproduct | 030404005465 |
| | Monument Multiproduct | 030404005564 |
| | U-Bar | 030407005051 |
| Gila: | Lily | 030603020140 |

| | | |
|---|---|---|
| Kaibab: | Saginaw-Kennedy<br>Brann | 030701006585<br>030702006577 |
| Tonto: | Manaco | 031204004625 |

Upon review of the material provided, it is apparent that the Contracting Officers have given you ample opportunity to remedy this situation. Not only have you had the time granted under the terms of the contract to rectify the situation, but you were also given more than 50 additional calendar days to comply with the terms of your contracts. In addition, you were presented with the opportunity to unburden yourself of these contracts, without the assessment of damages, through mutual cancellation at our recent settlement discussions. Unfortunately, you chose not to take advantage of this offer, leaving our Contracting Officers no choice but to take action pursuant to the terms of these contracts when you failed to provide adequate bonding or otherwise remedy the breaches by October 25, 2000.

Based upon the failure of Precision Pine & Timber, Inc. to provide surety acceptable to the Forest Service despite having over 3 months to remedy the situation, I conclude that it is appropriate to cancel the above-listed contracts by termination for breach pursuant to special contract provision CT9.3 - Breach and for the Contracting Officers to seek recovery for any damages due the government arising out of the termination of these contracts in accordance with special contract provision CT9.4 - Failure to Cut.

I understand that the Contracting Officers have referred to a cancellation of the contracts as of December 4, 2000. Due to a clerical error, which we have only now discovered, I realize that the appropriate letter canceling all of the contracts may not have been sent.

Therefore, pursuant to 36 CFR § 223.116(b), I hereby cancel the above-listed timber contracts pursuant to contract provisions and regulations regarding cancellation for breach effective Tuesday, January 9, 2000. This decision is final. The Contracting Officers will determine damages due pursuant to CT9.4 - Failure to Cut.

Eleanor S. Towns

ELEANOR S. TOWNS
Regional Forester

Cc:
Frontier Insurance Company
2636 Elm Hill Pike, Suite 500
Nashville, TN 37214

SALTMAN & STEVENS, P.C.

1801 K Street, N.W., Washington, D.C. 20006

(202) 452-2140

Fax: (202) 775-8217

E-mail: asaltman@saltmanandstevens.com

January 12, 2001

Eleanor S. Towns
Regional Forester
United States Forest Service
517 Gold Avenue
Albuquerque, NM 87102

Re: Precision Pine & Timber, Inc. v. United States,
CoFC No. 98-720C

Dear Ms. Towns:

A copy of your letter dated January 9, 2001 putatively cancelling a number of timber sales held by Precision Pine has been forwarded to me. While I realize that you had to do what you thought best in the circumstances, I feel that this action was unfortunate.

Moreover, I was troubled by the fact that you chose to characterize Precision Pine's unwillingness to accept the Forest Service's nuisance value offer to settle a huge breach of contract action against the Forest Service on these very contracts as an "opportunity to unburden yourself of these contracts." Using a similar rationale, Precision Pine could accurately say that the Forest Service precipitated these defaults by failing to propose a realistic resolution of the long-pending breach of contract action. However, Precision Pine will refrain from doing so at this time and will simply await the decision of Judge Damich on the material breach issue.

Perhaps, after that decision is issued and the indication that it will contain as to which party first breached the contracts is known, the parties can again meet to try to resolve the issues that surround these sales.

Sincerely yours,

SALTMAN & STEVENS, P.C.

Alan I. Saltman

AIS/bjr

cc: Precision Pine & Timber, Inc.

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70 • HEBER, ARIZONA 85928
(520) 535-9112 • FAX (520) 535-9196

September 17, 2001

Eleanor S. Towns
Regional Forester
Southwestern Region
USDA Forest Service
517 Gold Avenue, SW
Albuquerque, NM 87102

Dear Ms. Towns:

I am writing because I believe that we currently have a window of opportunity to move beyond the combative relationship that has existed between Precision Pine and the Forest Service for far too long. Indeed, it is my hope that we can now begin a dialogue about how to restore what was once a mutually beneficial relationship for both of our organizations. As I see it, we currently have two basic options before us:

Our first option is simply to allow inertia to continue us down the path we have been traveling for years, *i.e.*, still more legal proceedings and bad feelings on both sides. In this regard, it is my perception (and I hope that I am wrong) that there are those in Region 3 who have lost the ability to view this situation objectively and who continue to re-fight legal battles they have been consistently losing since at least 1995. If nothing else, two recent court rulings should have sounded the alarm that something has been terribly amiss in Region 3. In the first ruling, issued on March 6, 2001 and which sanctioned the government more than $53,000.00 for its improper conduct during discovery, the Court of Federal Claims found:

> [T]he Forest Service and the Department of Agriculture did not fully cooperate or communicate with the Department of Justice. Miscommunication between Department of Justice counsel and the agencies they defend does, unhappily, occur from time to time. Rarely are the problems that the Court encountered in this case so acute. The year-long delay in rectifying its patently deficient discovery responses inexcusably prejudiced [Precision Pine] by causing it to waste valuable resources in prosecuting this case.

Additionally, and more significantly, on July 30, 2001, the court issued a 52-page opinion which found that the Forest Service had breached 12 of Precision Pine's contracts over which we have been forced to battle in the Court of Federal Claims for several years now. If I am correct that individuals with entrenched views have been driving events in Region 3, I implore you to reject their destructive counsel which has already needlessly prolonged and increased our differences.

As you can probably imagine, I did not get into the timber business for the purpose of engaging in lengthy court battles with the federal government. I would like nothing better than to get back to the work that I love and that Region 3 needs to have performed— which brings me to our second option, something that requires both of us to begin the process of compromise in resolving at least some of our differences. I am not necessarily suggesting settling the pending Court of Federal Claims cases, (although I am not unwilling to discuss doing so). Rather, I want to propose two steps toward a more normal relationship between the Forest Service and Precision Pine.

As you may know, despite the court's ruling that the Forest Service breached most of Precision Pine's contracts in 1995 and 1996, many of the Forests in Region 3 continue to press for damages from Precision Pine on some of these same contracts.[1] Additionally, these Forests are refusing to let Precision Pine bid on the resale of the "defaulted" contracts, claiming that to do so would not be in the public interest. In this regard, the Forest Service is scrupulously choosing to ignore the black letter law that a pre-existing material breach of contract, such as the Court of Federal Claims found the Forest Service committed on our sales, precludes a subsequent finding of default by Precision Pine. Moreover, the alleged defaults were wholly beyond the control of Precision Pine due, in part, to the apparent financial difficulties of the bonding company and the government's decision to delist it.[2]

[1]All but two of these "defaults" were premised on the fact that the government removed Precision Pine's bonding company from a list of government approved sureties. Thereafter, Precision Pine was unable to either obtain the return of its premiums or find affordable alternative bonding and the "defaults" ensued.

[2]I note that despite the government's delisting of Precision Pine's bonding company, the Forest Service has continued to make demands for payment from the bonding company for Precision Pine's alleged defaults.

However, regardless of whether or not the Forest Service is acting within the letter of the law by refusing to allow Precision Pine to bid on the resale contracts, the fact is that you retain the ultimate discretion to allow Precision Pine to bid on these sales if you find that it is in "the public interest" to do so. 36 C.F.R. § 223.86; FSH, Timber Sale Preparation § 2409.18 at 56.7. In determining whether or not to allow a purchaser to bid on a resale contract, the Handbook indicates that the Forest Service is to "consider both the circumstances of the original sale and the circumstances of the resale." *See* §2409.18 at 56.72. As noted above, the circumstances of the "default"— *e.g.*, the delisting of Precision Pine's bonding company, the Forest Service's breach of these contracts by suspending them during 1995 and 1996, the subsequent suspension of many of these same sales by the Forest Service in 1997, followed by the 1998 closure of Stone Container (the primary roundwood outlet in the region)— all suggest the "defaults" were caused by factors beyond Precision Pine's control.

Additionally, by permitting Precision Pine to participate in the bidding for the resales, the Forest Service will avoid situations where it receives only one, or at best, only a few bids for the timber. By increasing competition for these resales, not only will the Forest Service maximize the price it receives for this timber, but it will help maintain Precision Pine as a viable contractor for future work to be performed in Region 3. In doing so the Forest Service would be unquestionably acting in the public interest as well as in its own interest and Precision Pine's interest. As you may know, between 1984 when Precision Pine started in business and 1997, Precision Pine completed dozens of contracts and was not once put into default. This shows that when our relationship with the Forest Service is on an even keel, Precision Pine has an exemplary record of performance. Under the circumstances, I request that you use your authority under the regulations to make the determination that allowing Precision Pine to participate in the bidding process on these resale contracts would be in the public interest.[3]

An additional reason sometimes raised by the Forest Service for not letting Precision Pine bid on the resale contracts is that Precision Pine allegedly owes $148,845.38 for timber removed

---

[3] I would ask that in deciding whether to exercise this discretion that you view critically the advice of anyone involved in the initial failure to consult and the subsequent lengthy consultation on the LRMPs in 1995-1996 that the Court found breached Precision Pine's contracts. If this requires that you solicit a more objective view from outside of the Region, then so be it.

from the O.D. Ridge sale. Although Precision Pine has struggled financially in the aftermath of the suspensions, I have personally secured the funds to bring this account current. Toward this end, I have enclosed a certified check in the amount of $50,000.[4] I will pay the remaining balance of the bill (*i.e.*, $98,845.38) within 30 days, if the Forest Service agrees to waive any and all additional claims it may have due to Precision Pine's alleged default for failure to pay this amount, including interest, administrative costs, and penalties. My lawyers tell me that Precision Pine would have been entirely within its rights to refuse to pay the $148, 845.38 and to set-off the government's claim for payment on O.D. Ridge against the funds that we will recover in the Court of Federal Claims litigation, including the funds which we have already been awarded by way of sanctions against the government. Nevertheless, I offer this payment as a reaffirmation of Precision Pine's good faith desire to re-establish its working relationship with the Forest Service.

I look forward to your decision regarding permitting Precision Pine to bid on the "defaulted" sales. Hopefully, our ability to resolve these peripheral matters can lead to the resolution of larger issues.

If you have any questions about this letter, please do not hesitate to give me a call.

Sincerely,

Lorin D. Porter
President
Precision Pine & Timber, Inc.

cc: Dale Bosworth

---

[4]The offer of these funds is in no way prejudicial to Precision Pine's defenses to the payment of this amount including, but not limited to, the fact that Forest Service materially breached the O.D. Ridge contract in 1995.

SALTMAN & STEVENS, P.C.

1801 K Street, N.W., Washington, D.C. 20006

(202) 452-2140
Fax: (202) 775-8217
E-mail: asaltman@saltmanandstevens.com

September 28, 2001

**VIA HAND DELIVERY**

Laurie Tippin
United States Forest Service
Timber Management - 3 SW
201 14th Street, S.W.
Washington, D.C. 20250

Dear Ms. Tippin:

I understand that Precision Pine & Timber, Inc. is being reviewed for possible suspension and/or debarment as a result of its purported "default" of a number of timber sales in Region 3.

While I certainly do not know what information has been forwarded to you, I am concerned that you have been apprized of the applicable law and/or all of the facts.

First, virtually all of the sales which Region 3 has no doubt indicated Precision Pine "defaulted," were, in fact, **never defaulted**. That is, the cause of the "default" was the ostensible failure of Precision Pine to provide a replacement bonding when the company it had been using was removed from the Treasury's list of approved sureties in June of 2000. However, the fact of the matter is that prior to this alleged default the Forest Service had materially breached nearly all of the contacts in question. Moreover, those few contracts not directly breached by the Forest Service were rendered impossible of performance by virtue of the Forest Service's actions.

As you may know, during the 1995 timber harvest season the Forest Service suspended all of Precision Pine's timber sales in the wake of an August 24, 1995 injunction issued against

the Forest Service due to its failure to abide by its obligations under the Endangered Species Act. See Silver v. Babbitt, 924 F. Supp. 976 (D.Ariz. 1995). During the suspension which remained in place until December 4, 1996, operations at Precision Pine's three mills were severely disrupted and all three mills were shut down for a time due to the resulting shortage of raw material.

Subsequent to the suspension, Precision Pine sought compensation from the Forest Service for the breach of its timber sale contracts. The Forest Service denied these claims almost entirely. Thereafter, in 1998 Precision Pine filed suit in the Court of Federal Claims to obtain compensation for the breach of 14 of its contracts. See Precision Pine & Timber, Inc. v. United States, No. 98-720C. At all times Precision Pine believed the suspension of the 14 timber sale contracts between August 24, 1995 and December 4, 1996, was the result of the Forest Service's failure to abide by its environmental obligations and therefore was a material breach of the timber sale contracts. Moreover, on numerous occasions Precision Pine advised the Forest Service that any actions it took with respect to these sales was without prejudice to this belief.

In the course of the litigation in the Court of Federal Claims, the court held that during much of 1999 and into 2000 the government had failed to provide responses to Precision Pine's discovery requests thereby improperly increasing the time and expense to Precision Pine to obtain a resolution of breach of its contract claims. The court also noted that the government's year-long delay in rectifying its patently deficient discovery responses inexcusably prejudiced Precision Pine by causing it to waste valuable resources in prosecuting this case. See Order dated March 6, 2001. As a result of this improper delay of Precision Pine's case, the Court sanctioned the government in the amount of $53,335.33. Id.

Following full briefing, oral argument and supplemental briefing on the parties cross-motions for summary judgment in Case No. 98-720C, on July 30, 2001, the court held that the Forest Service had breached 12 of the 14 timber sale contracts at issue in the case. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001), copy attached. On August 13, 2001 the government filed a motion for reconsideration and clarification. On September 25, 2001, the government's motion for reconsideration was denied in toto.[1] Copy enclosed.

The existence of these rulings is critical to the question before you since it is a fundamental principle of law that an owner's material breach of contract, such as existed here, relieves a contractor of its obligation to perform and precludes the termination by the owner for default. See Marathon Oil Co. v. Hollis, 305 S.E. 864 (Ga. 1983); D.E.W. Inc., v. Depco Forms, Inc. 827 SW 2d 379 (Tex. App. 1992 ). See also Restatement (Second) of Contacts § 243 comment a (1979). This rule has been adopted in the Federal Circuit which held in Malone v. United States, 849 F.2d 1441 (Fed. Cir. 1988), that, notwithstanding the presence in the contract of a clause which required the contractor to continue performance pending resolution of any dispute, a material breach provides the contractor with the legal right to void the contract, discharge its duty to perform and relieves it of a default determination and its consequences, citing Brand S Roofing, ASBCA No. 24688, 82-1 BCA ¶15,513.

As stated more recently in Alaska Pulp Corporation v. United States, 48 Fed. Cl. 655, 659 (2001), "[a] material breach terminates the contract, relieving the injured party of its remaining duties of performance" (citing E. Allen Farnsworth, Farnsworth on Contracts § 8.20 (2d ed. 1998); Restatement (Second) of Contracts at § 243 comment a (1981)).

---

[1] The sole remaining item still to be decided by the Court flows from the Government's motion for clarification and involves the question of whether significant hindrance to Precision Pine's operations, (something which the Court had found had occurred) need also be addressed in the damage phase of the case. See Courts )order of Septemeber 25, 2001 at 8.

As the Court of Federal Claims found in its decision of July 30, 2001, in Precision Pine & Timber v. United States, the Forest Service breached 11 timber sale contracts by violating its implied duty not to hinder Precision Pine's performance as a result of the Forest Service's not submitting its Land Resources Management Plans for consultation under § 7 of the Endangered Species Act, 16 U.S.C. § 1531, et seq., upon the Ninth Circuit's decision in Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994), until ordered to do so. 50 Fed Cl. at 70. The Court went on to find the resulting suspension of the these 11 sales for 18 months covering the best portion of two operating seasons was not only unreasonable but both "inexplicable" and "particularly egregious" under the circumstances. Id. The Court further found that the Forest Service also breached its implied duty to cooperate on 7 sales (one of which was not also included in the group of 11 noted above) by breaching an express warranty that it had at the time of award to disclose all measures (that were known or should have been known) needed to protect endangered species on the sales. In sum, twelve of the 14 sales at issue were found to have been breached by the Forest Service. (At least one of the two contracts that the court found were not breached was successfully completed and are not, we suspect, included on Region 3's list of "defaulted"sales.)

The Forest Service actions were a material breach of these 12 sales contracts. That is, the breach, which the Court found, related not just to a "matter of vital importance" to the contract as in Alaska Pulp but, in fact, went "to the essence of the contract." Thomas v. H.U.D., 124 F.3d 1439, 1442 (Fed. Cir. 1997), citing 5 Corbin on Contracts § 1104 (1964).

The provisions of the contract that were violated in the instant case involved Precision Pine's right to proceed with the contracts, i.e., something that was certainly within the justifiable expectation of Precision Pine. Indeed, given the fact that each contract provided for completion by a date certain, Precision Pine certainly believed that any impediments to its performance that

were within the purview of the Forest Service to remove either had been removed prior to award or, if arising thereafter, would be removed promptly when they became known. As Judge Baskir stated in Alaska Pulp, "purchasers [of Forest Service timber sales] make long-term commitments **to assure supply of a product . . ."** Alaska Pulp, 124 F.3d at 665. Certainly, Precision Pine made such a commitment. In these sales, Precision Pine was looking for an assured source of raw material to supply its mills. As the court noted in its July 30 decision, the Forest Service was fully aware of this as well. 50 Fed. Cl. at 47, 71. Under the circumstances, Precision Pine was certainly reasonable in believing that once the requirement for consultation arose, the Forest Service would proceed reasonably and that no long interruption of planned operations would result from any Forest Service failure to take prompt and appropriate action. Nevertheless, the suspension precluded Precision Pine from removing any timber from 11 of the sales. Quite clearly, as of the time of the suspension the Forest Service had not rendered substantial performance of these contracts and the suspension made substantial performance unachievable until after the suspension was lifted.

In sum, irrespective of the subsequent ostensible failure of Precision Pine to provide a replacement surety when the one that it was using was removed from the Treasury's list of approved sureties in June of 2000, for the 11 sales which the Forest Service has been found to have materially breached, which remained uncompleted, that material breach of contract relieved Precision of its obligation to perform and precluded the Forest Service's termination of those contracts for default.

With regard to the sales which were not the subject of the Court of Federal Claims litigation, that fact does not mean that the Forest Service was not culpable in their "default" as well. That is, in the aftermath of the seriatim court ordered injunction of Forest Service timber

sale operations in Region 3 in 1995, 1996 and again in 1997[2], the extreme financial repercussions that the resulting suspensions had on Precision Pine as well as the decreasing market for timber products, Precision Pine's long-standing bonding company refused to renew its bonding for Precision Pine's Forest Service timber sales at in 1999 a rate that Precision Pine could afford. In fact, the only surety acceptable to the government that would provide bonding to Precision Pine at anything approaching affordable rates was Frontier Insurance Group, Inc. ("Frontier").

As the litigation in the Court of Federal Claims dragged on, due to the Forest Service's failure to cooperate during discovery, Precision Pine obtained bonding from Frontier for its Forest Service timber sale contracts in 1999, albeit at a considerable premium over the price it had paid for bonding prior to the seriatim injunctions. In addition to providing relatively high-priced bonding, Frontier required payment in cash, in full, at the beginning of the harvest season. The bonding provided by Frontier was accepted by the Forest Service throughout the entire 1999 harvest season. Precision Pine again secured bonding from Frontier for its timber sales by paying for the bonding in cash, in full, prior to the start of the 2000 harvest season. However, as of June, 2000, Frontier was removed by the government from the government's list of acceptable sureties.

In "Notice of Breach" letters issued in June 2000, the Forest Service advised Precision Pine that Frontier was no longer an acceptable surety and demanded that Precision Pine provide a "surety or other security" that would be acceptable to the government within 30 days. Due to the fact that substantial premiums were tied up with Frontier, while other resources had been used up in attempting to get the Forest Service to compensate it for the devastating breaches of

---

[2] In 1997, Forest Service sales in Region 3 were suspended from June 4, to and including December 20 as a result of two injunctive stays issued by the 9th Circuit in Forest Guardians v. Thomas, 967 F. Supp. 1536 (D. Ariz,); aff'd sub nom. Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir. 1997).

contract that had occurred earlier, Precision found itself in an impossible position of not being able to secure an approved surety. Rather, all that Precision Pine could do was to hope that the publicized efforts to sell Frontier to another approved surety company would prove successful.

This notwithstanding, the fact remains that but for the Forest Service's intransigence and failure to abide by the rules of discovery in the Court of Federal Claims, the litigation in that Court should have been concluded prior to any problem having arisen with Frontier and/or Precision would have been in a position to have secured a substitute surety if such problems had occurred.

Even if this had not been the case, prior to being terminated for "default", Precision Pine had earned an additional year within which to complete a number of its Forest Service timber sale contracts contract pursuant to clause CT8.212# "Market Related Contract Term Addition." Accordingly, performance was neither required nor could have it been expected by the Forest Service on these sales in 2000. As such, the Forest Service, in a reasonable exercise of discretion in view of the totality of the circumstances, could and should have permitted Precision Pine the additional time so that the potential acquisition of Frontier might occur or for Precision Pine could obtain a refund of its premiums and thus secure alternative bonding that would have been acceptable to the Forest Service. However, in its zeal to place Precision Pine in breach, the Forest Service refused to provide Precision Pine with additional time, and "defaulted" numerous sales.

In conclusion, I respectfully request that you bear the foregoing points in mind while formulating your recommendation regarding any suspension and/or debarment proceeding against Precision Pine and that you include this letter in any material that you pass on to the

suspension/debarring official. Should you have any questions or require any addition information, please do not hesitate to contact me.

Sincerely yours,

SALTMAN & STEVENS, P.C.

Alan I. Saltman

AIS/smg

Enclosures

cc: Precision Pine & Timber, Inc.
Senator Jon Kyl
Senator John McCain
Congressman J.D. Hayworth

United States Department of Agriculture | Forest Service | Apache-Sitgreaves National Forests | P.O. Box 640
Springerville, AZ 85938-0640
(520) 333-4301 Fax: 333-6357
TTY/TDD: (520) 333-6292

**File Code:** 2450
**Date:** March 1, 2001

CERTIFIED MAIL - RRR

Lorin Porter
Precision Pine and Timber, Inc.
P.O. Box 70
Heber, AZ 85928

RE: Brookbank Multi-Product Sale, #001822, Gentry Multi-Product, #001939, Jersey Horse Timber Sale, #001756, O.D. Ridge Timber Sale #001574,Wiggins Multi-Product Sale, #020012.

Dear Lorin:

The above-mentioned timber sales were terminated on January 9, 2001, (for failure to remedy CT 9.3 Breach), by Regional Forester, Eleanor S. Towns. This breach stems from your failure to provide new bonding satisfactory to the Forest Service when Frontier Insurance Company was removed from the list of acceptable sureties on Government contracts in June of 2000.

Enclosed are the estimated Default Damage Calculations, Decision Documents, and Bill for Collection for estimated damages for these sales. Payment is due on March 30, 2001. The O.D. Ridge Timber Sale Bill for Collection includes a bill for volume cut and removed which you have not paid. The Bill for Collection for the Jersey Horse Timber Sale Periodic Payment has been cancelled.

Because you have had the above-mentioned contracts cancelled for breach, your company will be referred to the Debarring or Suspending Official for possible administrative action.

Your bonding company, Frontier Insurance Company will be notified of this pending claim.

Sincerely,

Susan N. Lee

SUSAN N. LEE
Contracting Officer

Enclosures

cc:
Alan Lucas, R.O. - Forestry
Patricia Disert, OGC
Springerville R.D.
Black Mesa R.D.
Frontier Insurance Co
Resources

# DECISION DOCUMENT

PURCHASER AND ADDRESS:

Precision Pine & Timber, Inc
P.O. Box 70
Heber, AZ 85928

1) Preface & Digest:

Decision Number: 3-01-05
Location of Sale:

| | |
|---|---|
| Region | 3 |
| National Forest | Apache-Sitgreaves N.F.'s |
| Ranger District | Springerville |

Sale Information:

| | |
|---|---|
| Purchaser Name: | Precision Pine & Timber, Inc. |
| Contract Date: | August 14, 1992 |
| Contract Number: | 001574 |
| Sale Name: | O.D. Ridge Timber Sale |
| Contract Form: | FS 2400-6T |
| Termination Date: | January 9, 2001 |

2) Claim Summary:

This documents the Contracting Officer's Decision regarding a claim under the Contract Disputes Act by the United States Government against Precision Pine & Timber, Inc. for the sum of **$148,845.38** for its default of the O.D. Ridge Timber Sale, contract number 001574.

3) Government's Claim:

The O.D. Ridge Timber Sale was cancelled by the Regional Forester, Eleanor S. Towns, on January 9, 2001, for failure to remedy breach pursuant to special contract provision

# CALCULATION OF DAMAGES

| A) **Calculation of Potential Damages** | | VOLUME | VALUE |
|---|---|---|---|
| 1. **Current Contract Value at Termination:** | | | |
| Volume and Contract Value, remaining timber: | | | |
| a. On area not cut over | Sawtimber | 1218 | $ 292,663.18 |
| | Pulpwood | 0 | $ 0.00 |
| b. On area cut over | Sawtimber | 0 | $ 0.00 |
| | Pulpwood | 0 | $ 0.00 |
| TOTAL REMAINING TIMBER | Sawtimber | 991 | $ 292,663.18 |
| | Pulpwood | 0 | $ 0.00 |
| | **Sub-Total:** | | **$ 292,663.18** |
| 2. **Additional Damages:** | | | |
| Liquidated Damages | | | $ 0.00 |
| Cost of Resale | | | $ 11,358.69 |
| Cost of Completing Contractual Requirements | | | $ 0.00 |
| Interest on remaining contract value *** | | | $ 34,119.58 |
| Other Damages— (List) | | | $ |
| | **Sub-Total:** | | $ 45,478.27 |
| 3. **Adjustment for Purchaser Credit:** | | | |
| Less Purchaser Credit that HAS NOT been earned: | | | ($ 0.00 ) |
| 4. **Maximum Potential Damages (A1 + A2 – A3):** | | | **$ 338,141.45** |

**B) Calculation of Resale Value:** (Use the Predicted Bid Value, Line 28, of the appraisal)

| | | |
|---|---|---|
| 1. **Predicted High Bid Appraisal value at termination:** (1218 MBF) | | **$ 455,374.20** |
| Add Remaining Effective Purchaser Credit | | $ 0.00 |
| | **Sub-Total:** | **$ 455,374.20** |
| 2. **Actual Bid Value of Resale:** | | **$( )** |
| 3. **Resale Value:** | | **$ 455,374.20** |

(RESALE VALUE IS THE LARGER OF THE APPRAISAL SUB-TOTAL OR THE ACTUAL BID VALUE OF THE RESALE)

**C) Damages:**

| | |
|---|---|
| 1. Maximum Potential Damages (A4) | $ 338,141.45 |
| 2. Resale Value (B3) | $ 455,374.20 |
| 3. **Damages (C1-C2):** | **$ 0.00** |
| 4. Unobligated Cash on Account | $ 0.00 |
| 5. **Estimated Damages Due Government: Volume Cut, Removed Not paid for** | **$ 148,845.38** |
| 6. **Refund Due Purchaser:** | **$ 0.00** |

United States Department of Agriculture | Forest Service | R3 Regional Office | 333 Broadway SE
Albuquerque, NM 87102
FAX (505) 842-3800
V/TTY (505) 842-3292

File Code: 2450
Date: October 12, 2001

Lorin D. Porter
President
Precision Pine & Timber, Inc.
P.O. Box 70
Heber, AZ 85928

**CERTIFIED MAIL -
RETURN RECEIPT REQUESTED**

Dear Mr. Porter:

Thank you for your letter of September 17, 2001, and your tender of $50,000.00 toward the balance you owe for timber cut and removed on the O.D. Ridge Timber Sale Contract. The check is being forwarded to the lockbox and will be applied to the current balance. Acceptance of this check does not waive the agency's rights to the balance of the debt.

After factoring in the interest and this partial payment, we find the balance due on this account is $116,130.70* as of October 31, 2001.

As we have indicated before, the agency has been and continues to be interested in settlement possibilities with you, and hopes that at some time we will again be able to count Precision Pine among the responsible timber operators in Region 3. That being said, there is no basis upon which the agency can waive the interest on this account; and holding Precision Pine to a lesser standard than we hold all other timber operators would be against public interest.

After receipt of the remaining debt, including the interest thereon, and any information you wish to provide to support the conclusion that it would be in the public's best interest to allow Precision Pine to bid on the re-offered sale, I will reconsider whether, in accordance with 36 CFR §223.86, it would be in the public's best interest to allow Precision Pine to bid on any re-offered sales.

If you have any questions or would like to discuss this matter further, please do not hesitate to give me a call.

Sincerely,

for Gil M. Camarena
ELEANOR S. TOWNS
Regional Forester

Enclosure

cc:
- Chief, USFS
- Patricia Disert, OGC

**Calculation of Amount Owed by Precision Pine & Timber**

| | | |
|---|---|---|
| * | $ 141,520.75 | PRINCIPAL (BILLINGS FOR TIMBER CUT AND REMOVED) |
| + | $ 725.00 | Administrative Fees |
| + | $ 23,884.95 | Interest on: $94,029.87 since 5/27/00 and $54,083.31 since 6/28/00 |
| | ----------------- | |
| | $ 166,130.70 | Total |
| - | $ 50,000.00 | Paid Sept. 17 |
| | $ 116,130.70 | Still due |

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70 • HEBER, ARIZONA 85928
(520) 535-9112 • FAX (520) 535-9196

October 27, 2001

Eleanor S. Towns
Regional Forester
Southwestern Region
USDA - Forest Service
517 Gold Avenue, SW
Albuquerque, NM 87102

Dear Ms. Towns:

Thank you for your letter dated October 12, 2001 in response to my letter of September 17, 2001. I was generally encouraged by your stated willingness to work with Precision Pine to try to resolve the spectrum of issues that confront us. As further evidence of Precision Pine's continuing good faith desire to resume a more normal relationship with the Forest Service, enclosed please find a check in the amount of $116,130.70 for the balance of stumpage payments plus included interest, penalties and administrative fees claimed by the Forest Service on the O.D. Ridge timber sale.[1]

I was puzzled, however, by your statement that the Forest Service "hopes that at some time we will again be able to count Precision Pine among the responsible timber operators in

[1]I was disappointed that the Forest Service rejected our reasonable suggestion that it waive its claim for interest, penalties, and administrative fees and chose instead to impose more than $24,500 in such costs, which Precision Pine can ill-afford at this time. However, in the spirit of compromise, I have decided to "bite the bullet" and pay the full amount you seek in the hope that the Forest Service might begin to realistically assess the full extent of its liability to Precision Pine.

Eleanor S. Towns
October 27, 2001
Page 2

Region 3." As I think you know, there has never been any question about Precision Pine's desire or ability to perform operations in the woods. Indeed, all but one of Precision Pine's pending "defaults" resulted from the government's decision to remove Precision Pine's bonding company from an approved list of sureties. This was an event entirely out of our control. Additionally, with respect to many of these "defaults," the Court of Federal Claims has already ruled that the Forest Service materially breached these contracts back in 1995 and 1996, a fact which provides us with a virtually impregnable defense to these "defaults."[2]

Wholly apart from the legal issue of who will ultimately bear the liability for the "defaults," there is no serious question that having Precision Pine as a viable timber contractor in Region 3 is in the public interest. In this regard in my letter of September 17, 2001, I summarized many of the reasons I believe that the continued existence of Precision Pine is vital to the accomplishment of the Forest Service management objectives in Region 3. A more elaborate statement of my reasoning can also be found in my letter to you of May 4, 1999 (copy attached). I know that you and members of your staff already understand these reasons well and have publically stated the desire to retain Precision Pine as a viable contractor in Region 3.

---

[2]I note that the Forest Service has improperly seized funds belonging to Precision Pine including deposits, performance guarantees, periodic payments and the like on a number of these "defaulted" sales. The Forest Service's liability to Precision Pine in this regard alone likely more than offsets the amount the Forest Service seeks from Precision Pine with respect to the O.D. Ridge sale. However, in an effort to resolve at least one of the issues between us, I have decided not to offset these funds against the amounts you say that are owed on O.D. Ridge at this time. Of course, Precision Pine continues to expect the Forest Service to return these funds to us, with interest.

However, the time has now come for these words to be backed by action, first by permitting Precision Pine to bid on all timber sales offerings in Region 3 without further ado and by reaching a fair resolution of the current litigation.

In this regard, I truly appreciate your statement that "the agency has been and continues to be interested in settlement possibilities." However, I think you know that Precision Pine has been underwhelmed by the Forest Service's idea of what has been a "possible" settlement. Indeed, last year at about this time we spent considerable effort thinking about, preparing and presenting a settlement proposal to you which represented a substantial discount from our claimed damages and which also offered many innovative ways to resolve the host of issues between us. However, our proposal was summarily dismissed by the Forest Service and a nuisance value counteroffer was made. Since that time, a Federal judge has assessed the facts and the law and found that the Forest Service breached 12 of Precision Pine's timber sale contracts. Moreover, this is not the first court to find that the Forest Service acted improperly in causing these suspensions. I say this not to gloat, but simply to suggest that the time has come for the Forest Service to realistically assess the harm that it has caused to Precision Pine.

With a trial on damages likely to commence in the court in the near future, we will shortly be re-examining and, if necessary, refining our damages. If the Forest Service demonstrates a willingness to meaningfully discuss settlement, we would be happy to make a presentation on

damages to you and your lawyers. Please be advised we have no desire whatsoever to engage in another exercise in futility and are quite willing to prove our damages in court if that is the only way for us to be reasonably compensated for the Forest Service's breaches.[3]

I look forward to your response.

Very truly yours,

Lorin D. Porter
President
Precision Pine & Timber, Inc.

cc: Dale Bosworth, Chief
Tom L. Thompson, Deputy Chief, National Forest System

[3]In this regard, my lawyers tell me that in another case, where the amount being sought was less than our claim, the government recently offered $4 million to resolve an alleged breach of four timber sale contracts where the court had not yet even ruled on the issue of liability.

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 959
HEBER, AZ 85928

91-584/1221
8229218372

1201

date Oct 27, 2001

PAY TO THE ORDER OF: U.S.D.A. Forest Service $ 116,130.70/xx

One hundred sixteen thousand one hundred thirty and 70/100 dollars

**Community First**
National Bank
1945 Highway 260
Heber AZ 85928

for

122105647 8229218372 1201

United States Department of Agriculture
Forest Service
R3 Regional Office
333 Broadway SE
Albuquerque, NM 87102
FAX (505) 842-3800
V/TTY (505) 842-3292

File Code: 2450
Date: NOV 16 2001

Lorin D. Porter
President
Precision Pine & Timber, Inc.
P.O. Box 70
Heber, AZ 85928

Dear Mr. Porter:

Thank you for your letter of October 27, 2001, and your payment of the balance due on the O.D. Ridge Timber Sale Contract. I believe it is in the best interests of the United States to have as much competition as possible in timber sales. Therefore, pursuant to 36 CFR § 223.86, I conclude that it is in the public's best interest to allow Precision Pine to bid on the Jersey Horse II Timber Sale.

As to the rest of your letter, while I believe neither that Precision Pine's failure to provide a surety acceptable to the United States is out of your control, nor that the Court of Federal Claims opinion of July 30, 2001, in Precision Pine & Timber, Inc. v. The United States, No 98-720 C, provides you with a defense to your failure to provide an acceptable surety, the Forest Service is interested in resolving this situation and moving on.

You have suggested a meeting with agency and counsel regarding the damages you are requesting. I think a meeting on that subject would be very productive. Please have your attorney contact Jim Caine at the Department of Justice to set up a meeting date that is convenient to everyone, and let's see what we can resolve.

Sincerely,

for David Stewart

ELEANOR S. TOWNS
Regional Forester

cc:
Kerry Nedrow, A/SNF
James Caine, DOJ
FFH
Patricia Disert, OGC

| U.S. DEPARTMENT OF AGRICULTURE FOREST SERVICE **TIMBER SALE CONTRACT** (Applicable to Sales to be Measured Before Felling) | | NAME OF PURCHASER Precision Pine & Timber Inc. | |
|---|---|---|---|
| NATIONAL FOREST COCONINO | RANGER DISTRICT LONG VALLEY | REGION THREE | CONTRACT NO. 005564 |
| SALE NAME MONUMENT MULTIPRODUCT TIMBER SALE | | SUBREGION | AWARD DATE 9/28/94 / TERMINATION DATE December 31, 1996 |

The parties to this contract are The United States of America, acting through the Forest Service, United States Department of Agriculture, hereinafter called Forest Service, and Precision Pine and Timber, Inc., P O Box 70, Heber, AZ 85928, a corporation organized and existing under the laws of the State of Arizona, hereinafter called Purchaser.

2/ Forest Service having advertised a sale at which either (1) Purchaser, whose required bid deposit is now held by Forest Service as an initial deposit, was the successful bidder, or (2) no bids were received and Purchaser having subsequently offered at least the minimum advertised price and made an initial deposit in the same amount as the bid deposit specified in the sale advertisement; and the parties hereto desiring to record their agreement; now therefore,

In consideration of the premises and the promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber.

This contract consists of three Divisions: AT - Specific Conditions, BT - Standard Provisions, and CT - Special Provisions, together with Sale Area Map, Drawings and specifications for developments (if any) and such attachments as may be provided for in Division CT. Specific Conditions are numbered and apply to the Part, Section, Subsection, or Item of the Standard Provisions, as indicated hereunder. Other conditions of this contract are stated in Division CT-Special Provisions.

**IN WITNESS WHEREOF**, the parties hereto have executed this contract as of the award date.

UNITED STATES OF AMERICA

BY Ken Broyles

Contracting Officer
(Title)

Two Witnesses: 3/

________________
(Name)

________________
(Address)

________________
(Name)

________________
(Address)

* Precision Pine + Timber, Inc.
(Purchaser) 4/

BY [signature]

* President
(Title)

* P.O. Box 70
(Business Address)

Heber, AZ 85928

I, 5/ Tonita Porter, certify that I am the ________ Secretary of the corporation named as Purchaser herein; that Lorin D. Porter who signed this contract on behalf of Purchaser, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers

Tonita Porter

CORPORATE SEAL 6/

INSTRUCTIONS
FOR COMPLETING
TIMBER SALE CONTRACT

1/ If Purchaser is a corporation, state "a corporation organized and existing under the laws of the State of ______________________________" and specify the State; if Purchaser is a partnership, state "a partnership consisting of ___________________________________" and specify the names of each partner; and if Purchaser is a sole proprietor doing business under an assumed name, state "an individual doing business under the name of __________________________________________________ City of ___________________________________, State of ________________________________________."

2/ Delete this paragraph for unadvertised administrative use, and timber settlement contracts.

3/ The signatures and addresses of two witnesses are required if Purchaser is other than a corporation.

4/ If Purchaser is a co-partnership, the signatures should be: XYZ Company, by John Doe, a member of the firm. If Purchaser is a corporation, form of signature should be: XYZ Company, by John Doe, President (or other officer or agent) and the seal of the corporation must be impressed or indicated.

5/ The certificate must be completed if Purchaser is a corporation.

6/ If the corporation has no corporate seal that fact shall be stated, in which case a scroll or adhesive seal shall follow the corporate name.

The following conditions apply to the indicated portions of Division BT-Standard Provisions issued 10/73 (Month-Year)

**AT1 - Location and Area,** applicable to BT1.1

This Sale Area of 2560 acres more or less is located in: Sections 2 & 3, T15N, R8E; Sections 11, 14, 24-26, 34-36 T16N, R8E,; Sections 18, 19 & 30, T16N., R9E., Gila and Salt River Meridian.

**AT2 - Volume Estimate and Utilization Standards,** applicable to BT2.1, BT2.2, BT2.4, BT6.4 and BT6.8

| SPECIES AND PRODUCT | ESTIMATED QUANTITY 1/ AND UNIT OF MEASURE | MINIMUM TREE SPECIFICATIONS INCLUDE ONE MINIMUM PIECE<br>DIAMETER BREAST HIGH (d.b.h.) Inches | MINIMUM PIECE SPECIFICATIONS<br>LENGTH Feet | <br>DIAMETER INSIDE BARK AT SMALL END Inches | <br>NET MEASURE IN % OF GROSS MEASURE |
|---|---|---|---|---|---|
| Ponderosa Pine and Other Conifer Sawlogs | 1461 CCF | 9.0 | 8 | 6.0 | 33 1/3 |
| Ponderosa Pine and Other Conifer Roundwood 1/ | 1100 CCF | 5.0 | 10 | 4.0 | N/A |
| TOTAL | 2561 CCF | ////////////////// | ////////// | ////////// | /////// |

1/ Roundwood should be reasonably straight and sound. When roundwood is cut into smaller dimensions than shown above, the pieces meet utilization standards.

1/Quantities not included here are described in BT2.4.

**AT3 - Timber Designations,** applicable to BT2.3; acres are approximate:

| | Number | Acres |
|---|---|---|
| Clearcutting Units (BT2.31) | None | None |
| Specified Road Clearing (BT2.32) | None | None |
| Overstory-Removal Units (BT2.33) | None | None |
| Understory-Removal Units (BT2.34) | None | None |
| Individual Trees (BT2.35) | /////////////// | 651 |
| Incompletely-Measured Payment Units(BT2.36) | None | None |

**AT4 - Dead Trees Required to be Felled,** applicable to BT2.12, BT2.3 and BT6.4.

**Size Requirements:** N/A feet high and N/A inches d.b.h.

**Number Limitations:** Applicable only if Sale Area Map indicates there are subdivisions where timber is to be designated after date of sale advertisement. In addition to dead trees felled within Clearcutting Units, construction clearings and other authorized development clearings, no more than N/A dead trees must be felled within subdivisions, or those portions thereof, where timber is designated after date of sale advertisement. Number limitation does not apply to subdivisions, or portions thereof, designated at time of sale advertisement.

AT5 - Timber Payment Rates, applicable to BT3.1 and BT4.0

AT5a - For Species and Products to be Paid for at Rates Escalated under BT3.2.

| SPECIES AND PRODUCT | UNIT OF MEASURE | RATES PER UNIT OF MEASURE BASE $ | ADVERTISED $ | BID PREMIUM $ | BID (Tentative) $ | REQUIRED DEPOSITS SLASH DISPOSAL $ | BASE INDEX |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

AT5b - For Species and Products to be Paid for at Flat Rates

| SPECIES AND PRODUCT | UNIT OF MEASURE | RATES PER UNIT OF MEASURE BASE $ | ADVERTISED $ | BID PREMIUM $ | BID (Flat) $ | REQUIRED DEPOSITS SLASH DISPOSAL | BASE INDEX |
|---|---|---|---|---|---|---|---|
| Ponderosa Pine and Other Conifer Sawlog (9.0" DBH and Larger) | CCF | 5.00 | 42.01 | 19.99 | 62.00 | $1.12/CCF | $250.07/MBF WWPAA |
| Pondersoa Pine and Other Conifer Roundwood | CCF | 5.00 | 9.40 | None | 9.40 | $1.21/CCF SRR | |
| Surface Rock Replacement -- Required Deposits | | | | | | $1.21/CCF | |

For purposes of convenience in collection and bookkeeping, Bid Rates stated in AT5 include payment of deposits for sale area betterment required pursuant to 16 U.S.C. 576b. Such deposits are not included as Required Deposits defined hereunder.

AT5c - Schedule of Payment Units

| Payment Unit Number | Approx. Acres | Quantity of Species and Products to be Escalated under AT5a | Total Tentative Payment | Quantity of Species and Products to be Paid for at Flat Rates under AT5b | Total Flat Rate Payment | Total Required Deposits for Slash Disposal |
|---|---|---|---|---|---|---|
| 1 | 278 | | | 708 CCF Ponderosa Pine Sawtimber and 478 CCF Ponderosa Pine Roundwood | $48,389.20 | $ 792.96 SLASH ( 708 CCF)<br>$1435.06 SRR (1178 CCF) |
| 2 | 373 | | | 753 CCF Ponderosa Pine Sawtimber and 622 CCF Ponderosa Pine Roundwood | $52,532.80 | $ 843.36 SLASH (753 CCF)<br>$ 1663.75 SRR (1375 CCF) |
| AT# | Unest. | Unestimated vol. from damaged trees & ROW. (Ponderosa Pine) | | | | $1.12/CCF SLASH<br>$1.21/CCF SRR |

The following definitions are established for the terms used in AT5:

**Base Rates** are the lowest rates of payment for timber which are authorized by this contract. Base rates remain constant throughout the life of this contract and are not subject to change by rate redetermination except for reduction under BT3.32.

**Advertised Rates** are the minimum acceptable Bid Rates for timber, exclusive of Required Deposits. These rates are those indicated by appraisal in which no cost allowance has been made for construction of Specified Roads listed in AT9 but are never less than Base Rates.

**Bid Premium Rates** are the amounts by which Purchaser's bid is in excess of Advertised Rates. Bid Premium Rates are constant during this contract.

**Bid Rates** are the rates bid by Purchaser (exclusive of Required Deposits for slash disposal and road maintenance) and are the sum of Advertised Rates and Bid Premium Rates. Until a rate redetermination becomes effective, the Bid Rate for species and products in AT5a is the Tentative Rate which is subject to quarterly adjustment under BT3.2; for species and products in AT5b the Bid Rate is the Flat Rate.

**Required Deposits** are deposits which Purchaser may be required by law to pay for slash disposal (16 U.S.C. 490) and road maintenance (16 U.S.C. 537). Required Deposits may be adjusted as part of a rate redetermination or Contract Term Extension. The tables show only Required Deposits for slash disposal; road maintenance deposits, if any, are given in CT5.4 or CT5.41.

**Base Index** is the specified average of the lumber or other product selling value index used as the basis for computing adjustment in rates for variance in product selling value as provided in BT3.2. Base Indices shall be redetermined when rate redeterminations are made under BT3.31.

**AT6 - Indices used in Quarterly Adjustment**, applicable to BT3.2

| SPECIES | INDEX NAME AND DATE |
|---|---|
| Ponderosa Pine and Other | WWPAA Rocky Mountain Ponderosa Pine, 1985-1986 Basis |

**AT7 - Scheduled Rate Redetermination**, applicable to BT3.31.

Date for scheduled rate redetermination is N/A. Rate redeterminations shall cover Included Timber in the entire sale unless otherwise specified in CT3.31. Timber quantity required to be paid for and Released for Cutting before lower rates developed from scheduled rate redetermination can become effective is N/A (State quantity and unit of measure based on estimates in AT5c) or the quantities from Payment Units numbered N/A.

**AT8 - High Stumps**, applicable to BT6.412.

| SPECIES | MAXIMUM STUMP HEIGHT (inches) |
|---|---|
| Ponderosa Pine 9.0"+ DBH Sawtimber All Other Cutting Units | 12" |
| Ponderosa Pine 5-8.9" DBH Roundwood | 6" |

AT9-1 **Specified Roads**, applicable to BT5.2

| PROJECT No. | PROJECT NAME | | DESIGN CLASS | APPROXIMATE LENGTH (Miles) | SHEET NUMBERS AND APPROVAL DATE | SURVEY CLASS | PERFORMANCE RESPONSIBILITY SURVEY | PERFORMANCE RESPONSIBILITY DESIGN | PERFORMANCE RESPONSIBILITY CONST. STAKING 1/ |
|---|---|---|---|---|---|---|---|---|---|
| 9359X | Local | Reconst | SL-5 | .61 | | N/A | FS | FS | PUR. BC* |
| 9392C | Local | Reconst | SL-5 | .84 | | N/A | FS | FS | PUR. BC* |
| 9357J | Local | Reconst | SL-5 | .18 | | N/A | FS | FS | PUR. BC* |

* BC = Before Clearing

AT10-1 **Estimated Costs of Specified Roads**, applicable to BT5.24

| PROJECT SEGMENT NUMBER | STATION FROM-TO | SURVEY | DESIGN | STAKING | CLEARING | EXCAVATION | CULVERTS | BASE COURSE | SURFACING | STABILIZATION | OTHER | TOTAL | PURCHASER CREDIT LIMIT $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | TOTAL | $ 22,649.28 |

Case 1:02-cv-00131-GWM Document 39-7 Filed 04/26/2004 Page 2 of 10

AT11 - Base Course Surface Rock and Rock Riprap, applicable to RT's 257

| 1/ | ROAD NUMBER | STATION FROM - TO | TYPE 2/ | SOURCE, SHOWN ON SALE AREA MAP: MAP KEY NO. | SOURCE, SHOWN ON SALE AREA MAP: LOCATION |
|---|---|---|---|---|---|
| | FOR ROCK TYPES, GRADATIONS, ESTIMATED QUANTITIES AND UNIT COSTS FOR PROJECT SEGEMENTS LISTED IN TABLE AT-9, SEE SCHEDULE OF ITEMS. FOR SOURCE LOCATIONS SEE THE SALE AREA MAP, BORROW AND AGGREGATE MAPS AND SPECIFIED ROAD DRAWINGS | | | | |

| 1/ | ESTIMATED QUANTITIES (STATE UNIT) | ESTIMATED RATES PER UNIT: BASIC ROCK COST 3/ $ | LOAD AND APPLY COST 4/ $ | HAUL COSTS: HAUL COST PER UNIT PER MILE 5/ $ | HAUL COSTS: ESTIMATED AVERAGE HAUL MILES 6/ | HAUL COSTS: HAUL COST 7/ $ | TOTAL COST PER UNIT 8/ $ | TOTAL ESTIMATED COST 9/ $ |
|---|---|---|---|---|---|---|---|---|
| | | | | SEE SCHEDULE OF ITEMS FOR COSTS | | | | |

1/ Letters cross reference lines in two portions of table.
2/ Show, e.g. pit run, screened, crushed, graded, etc.
3/ Including pit developments, crush, screen, stockpile, and purchase price, if any.
4/ Including loading, dumping, spreading, watering, mixing, compacting, loading and dumping delay, etc.
5/ Including required maintenance, resurfacing, and road-use charges.
6/ To nearest 0.1 mile.
7/ Obtain by multiplying Haul Cost Per Unit Per Mile by Estimated Average Haul.
8/ Sum of Basic Rock Cost, Load and Apply Cost, and Haul Cost.
9/ Obtain by multiplying Total Cost Per Unit by Estimated Quantity.

AT12 - Culvert Cost Rates, applicable to BT5.252

| CULVERTS | | | | | DRAINAGE ACCESSORIES | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | ESTIMATED COST RATE PER FOOT | | | | | ESTIMATED COST PER UNIT | |
| DIAMETER OR RISE AND SPAN | GAUGE & MATERIAL Al | Fe | FURNISH & INSTALL $ | INSTALL ONLY $ | ITEM AND SIZE | GAUGE & MATERIAL Al | Fe | FURNISH & INSTALL $ | INSTALL ONLY $ |
| | | | NOT | APPLICABLE | | | | | |

Material Abbreviation Al - Aluminum; Fe - Galvanized Steel

AT13 - Fire Precautionary Period, applicable to BT7.2
April 1 to November 30 , inclusive 1994 through 1996

AT14 - Purchaser Responsibility to Furnish Crews and Equipment for:
Initial Fire Suppression, applicable to BT7.3
Within 10 road miles

Fire Suppression Reinforcement, applicable to BT7.312 and BT7.313
Within 50 road miles

AT15 - Maximum Amount of Purchaser's Obligation per Operations Fire, applicable to BT7.41
$5,000.00

AT16 - Termination Date, applicable to BT8.2 December 31, 1996.

AT17 - Normal Operating Season, applicable to BT6.31, BT6.65, BT8.21, and BT9.3
April 15 to November 30 , inclusive

AT18 - Performance Bond Amount, applicable to BT9.1
$11,000.00

AT19 - Inapplicable Standard Provisions

The following listed Sections, Subsections or Items of Division BT - Standard Provisions - are hereby made inapplicable. (Instructions: List by reference number and title.)

| | |
|---|---|
| BT3.21 | BT8.23 |
| BT4.221 | BT9.2 |
| BT4.224 | BT9.4 |
| BT4.226 | |
| BT4.23 | |
| BT4.4 | |
| BT5.211 | |
| BT5.251 | |
| BT5.252 | |
| BT5.253 | |
| BT5.254 | |
| BT6.24 | |

AT20 - List of Special Provisions

The following listed special provisions are attached to and made a part of this contract as Division CT. Unless listed herein or added by modification pursuant to BT8.23, BT8.3 or BT8.31 no provision of Division CT shall have force or effect. Provisions with reference numbers followed by # contain blanks into which data have been entered for this sale. (Instructions: List by reference number, title and date.)

SEE ATTACHED LIST

MONUMENT MULTIPRODUCT TIMBER SALE
2400-6T DIVISION CT PROVISIONS

| | |
|---|---|
| CT2.351# | Individual Trees (Cut Tree Marking) (11/86) |
| CT3.312 | Rate Redetermination for Environmental Modification (4/82) |
| CT4.12 | Adjustment of Volume (6/81) |
| CT4.211# | Transfer of Purchaser Credit (3/83) |
| CT4.220# | Down Payment (4/94) |
| CT4.221 | Advance Deposits (7/91) |
| CT4.222 | Temporary Reduction of Downpayment (7/93) |
| CT4.224 | Deposit When Payment Guaranteed (6/87) |
| CT4.23 | Refund of Excess Cash (7/91) |
| CT4.264# | Periodic Payment Schedule (10/91) |
| CT4.3 | Letters of Credit for Payment Bond (9/78) |
| CT4.4 | Payment Not Received For Timber Cut and Other Charges (3/93) |
| CT4.41 | Other Payments Not Received (3/93) |
| CT5.101# | Road Completion Date (11/85) |
| CT5.12# | Use of Roads by Purchaser (12/76) |
| CT5.123 | Existing Roads (11/86) |
| CT5.2 | Specifications and Drawings for Construction of Specified Roads (12/89) |
| CT5.211 | Contract Documents (6/80) |
| CT5.221# | Material Sources (5/91) |
| CT5.251# | Variation in Quantities (12/79) |
| CT5.253 | Physical Change (12/79) |
| CT5.254 | Design Change (10/86) |
| CT5.4# | Road Maintenance (2/94) |
| CT5.412# | Required Surface Replacement Deposit (11/83) |
| CT5.46 | Snow Removal (11/86) |
| CT6.0 | Operations (6/90) |
| CT6.01 | Interruption or Delay of Operations (6/90) |
| CT6.1 | Representatives (7/88) |
| CT6.2 | Improvements (6/80) |
| CT6.22 | Protection of Improvements Not Owned by Forest Service (1/80) |
| CT6.221 | Protection of Property (6/80) |
| CT6.222 | Protection of Fences (3/80) |
| CT6.24# | Protection of Cultural Resources (7/90) |
| CT6.241 | Protection of Cultural Resources (11/86) |
| CT6.242 | Cultural Resource Protection (7/87) |
| CT6.25# | Protection of Habitat of Endangered Species (7/86) |
| CT6.3 | Plan of Operation (10/77) |
| CT6.311 | Plan of Operations for Road Construction (6/80) |
| CT6.33 | Safety (6/78) |
| CT6.341 | Prevention of Oil Spills (6/81) |
| CT6.35 | Final Acceptance of Specified Roads (1/80) |
| CT6.351 | Acceptance of Specified Road (6/78) |
| CT6.4# | Conduct of Logging (9/90) |
| CT6.43 | Protection of Public in Recreation Areas (3/75) |

AT-20 ATTACHMENT (CONT.)

MONUMENT MULTIPRODUCT TIMBER SALE
2400-6T DIVISION CT PROVISIONS

| | |
|---|---|
| CT6.6 | Erosion Prevention and Control (8/92) |
| CT6.601# | Erosion Control Seeding (2/87) |
| CT6.602 | Temporary Road and Landing Scarification (11/86) |
| CT6.7# | Slash Treatment (2/94) |
| CT6.8# | Quantity Determination Methods (4/83) |
| CT6.82 | Product Identification (9/90) |
| CT6.84 | Accountability (4/83) |
| CT7.2 | Specific Fire Precautionary Measures (3/91) |
| CT7.21 | Fire Guards (11/75) |
| CT7.22# | Emergency Fire Precautions (3/91) |
| CT7.23 | Communications (5/89) |
| CT8.2 | Termination (6/92) |
| CT8.21 | Delay in Reconstruction of Processing Facilities (6/78) |
| CT8.212# | Market-Related Contract Term Addition (9/91) |
| CT8.23 | Contract Term Extension (7/91) |
| CT8.231 | Conditions for Contract Term Extensions (7/91) |
| CT8.3 | Contract Modification (10/77) |
| CT8.63 | Nondiscrimination in Employment (6/78) |
| CT8.641# | Use of Timber (9/90) |
| CT9.1 | Letter of Credit (6/78) |
| CT9.11 | Failure to Provide Performance Bond (11/85) |
| CT9.2 | Disputes (7/80) |
| CT9.21 | Submission of Claims (4/94) |
| CT9.3 | Breach (6/90) |
| CT9.4 | Failure to Cut (4/82) |
| CT9.41 | Failure to Execute Contract (4/94) |
| CT9.5 | Settlement (10/77) |
| CT9.53 | Settlement (6/92) |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-131C<br>(Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# DECLARATION OF KENNARD WILLIAMS

I, Kennard Williams, declare under penalty of perjury that the following is true and correct:

1. I am the president of North Pacific Timber Enterprises, Inc. ("NPTE"), P.O. Box 247, Chilcooot, CA 96105.

2. NPTE is a small logging company in California that occasionally purchases timber sale contracts from the Forest Service.

3. NPTE has no affiliation with Precision Pine & Timber, Inc., nor has it ever conducted business with Precision Pine & Timber, Inc. To the best of my knowledge, neither I nor any of NPTE's employees or representatives has any personal or business relationship with any employee or representative of Precision Pine & Timber, Inc.

4. On March 17, 1999, NPTE was awarded the Jordon Multi-product Salvage timber sale ("Jordon timber sale"), Contract No. 069288, by the U.S. Forest Service.

5. NPTE secured the contractually required bonding for the Jordon timber sale through Frontier Pacific Insurance Company ("Frontier") on April 16, 1999. The Jordon timber sale was located in the Beckwourth Ranger District, Plumas National Forest, in California.

6. On or about December 11, 2000, the Forest Service suspended operations on the Jordon timber sale because of environmental litigation that affected the sale area. NPTE was conducting harvesting operations on the Jordon timber sale at the time the suspension

was imposed.

7. Frontier was still providing bonding for the Jordon timber sale at the time of the suspension in December, 2000. Moreover, Frontier continued to provide bonding for the Jordon timber sale when the Forest Service lifted the suspension in February of 2001.

8. Sometime in 2002, it was brought to my attention that Frontier had been removed from the Treasury's list of approved sureties in July of 2000.

9. However, at no time during 2000 did NPTE receive notification from the Forest Service that Frontier had been removed from the Treasury's list of approved sureties, nor did the Forest Service request or demand that NPTE seek out a new source of bonding for the Jordon timber sale. NPTE also did not receive such a notification, request or demand at any time during 2001.

Respectfully submitted:

Kennard Williams

Date: 4/17/04

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRECISION PINE & TIMBER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-131C<br>(Judge George W. Miller) |

**DECLARATION OF LORIN D. PORTER**

I, Lorin D. Porter, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. I am currently, and at all times relevant to this case have been, the President of Precision Pine & Timber, Inc. ("Precision Pine") based in Heber, Arizona.

2. I have 25 years of experience in the forest products industry in the Southwestern United States. I am generally familiar with the standard provisions of the Forest Service's timber sale contracts.

3. Precision Pine has been recognized for Distinguished Professional Forest Resource Management in the Southwest by the Southwest Section of the Society of American Foresters.

4. I co-founded Precision Pine in 1984 in order to obtain timber and to manufacture that timber into lumber products in Precision Pine's sawmills. Precision Pine is a small, privately-owned company that qualifies as a small business for purposes of purchasing federal timber to supply its lumber manufacturing operations. Precision Pine is one of the few lumber manufacturers remaining in its area.

5. In the area of Northeastern Arizona from which Precision Pine obtains raw material, i.e., timber for its sawmill(s), Forest Service is by far the largest holder of timber land and seller of timber. Since its founding, Precision Pine has been dependant on the Forest Service's timber sale program as the primary source of its raw material for its sawmill(s).

6. Through no fault of its own, some or all of Precision Pine's Forest Service timber sale contracts were suspended by the Forest Service, during parts of 1995, 1996 and 1997. The suspensions in each of these years were in place during the fall months, which is an important time period for Precision Pine to have access to its timber sales because the risk of fire closures is lower than in the summer months and Precision Pine typically built log decks at its sawmills at this time in order to have a supply of logs through the winter months. Due to an inability to build such winter log decks and/or to access our timber sales due to the suspensions, we ran out of logs and were forced to shut down one or more of our mills at various times during each of these years.

7. In 1999, our long-time bonding company, Capitol Indemnity Corporation, refused to continue bonding our Forest Service timber sale contracts.

8. The only bonding company I could locate that would bond Precision Pine's Forest Service timber sales was Frontier Insurance Company ("Frontier"), although they required payment of the annual cost in full and in advance. I obtained bonding for Precision Pine's Forest Service timber sale contracts from Frontier in 1999. These bonds were accepted by the Forest Service without incident.

9. For the year 2000, Precision Pine again obtained bonding from Frontier, for which it paid in full, in advance. The Forest Service again accepted this bonding. However, in approximately June of 2000, the Forest Service advised me for the first time that it was no longer willing to accept bonding from Frontier. Due to the financial impact that the Forest Service's *seriatim* suspensions had on Precision Pine, Precision Pine did not have funds readily available to pay for bonding a second time (had it been able to find a company willing to bond our sales). I was also engaged in trying to get the money back from Frontier that I had paid for bonding in 2000. I advised the Forest Service of Precision Pine's difficulties in finding and paying for bonding.

10. During the 1990s, the Forest Service began increasingly to offer multi-product sales, i.e., sales containing both sawlogs and roundwood. As identified in the Forest Service contract, sawlogs consists of trees, the diameter of which at breast height is 9" or greater. Sawlogs, as the term suggests, are suitable for use at a sawmill to produce lumber. Roundwood, which is also referred to as pulpwood, is identified in the Forest Service contract as material measuring less than 9" in diameter at breast height, the primary economic utility of which is in the making of wood pulp for use in a variety of products including paper.

11. Precision Pine has never had a manufacturing facility to make pulp from pulpwood. Precision Pine bid on Forest Service multi-product timber sales on the basis that it would be able to sell the pulpwood from the sale to Stone Container's pulp facility located in Snowflake, Arizona. Precision Pine had relied on the Stone Container pulp facility for years as an outlet for the pulpwood component of its Forest Service multi-product timber sales. These facts were known to the Forest Service at the time it awarded the multi-product sales at issue in this case to Precision Pine.

12. However, in February 1998, Stone Container announced that it was closing its wood pulp facility in Snowflake, Arizona and, therefore, it would no longer be utilizing any pulpwood. All of the sales at issue in this case, except for the Wiggins contract, were awarded to Precision Pine before Stone Container announced that it would no longer be utilizing pulpwood.

13. Prior to 1998, Precision Pine had never been defaulted on any Forest Service contract in more than a decade of operations under dozens of such contracts.

14. Had Precision Pine repudiated the contracts that the Forest Service breached at any time prior to a court ruling that the Forest Service had in fact breached the contracts, it was my belief that the Forest Service, which disputed that it had breached the contracts, would have terminated Precision Pine's contracts for default.

15. In placing Precision Pine in default, the Forest Service would likely have cited contract clause CT9.2 which indicates that pending the resolution of any claim, "the contractor shall proceed diligently with the performance of the contract."

16. Had Precision Pine repudiated and been defaulted on its contracts, it would have resulted in Precision Pine losing virtually its entire portfolio of timber sale contracts, i.e., a supply of raw material for it sawmills(s) that could not have been fully replaced except with other Forest Service timber sales offerings.

17. Had Precision Pine repudiated and been defaulted on its contracts, it was my belief that Precision Pine would have faced suspension or debarment as a bidder on future federal timber sale contracts or, at a minimum, Precision Pine would have no longer been viewed as a responsible bidder, precluding it from purchasing future Forest Service timber offerings, or even from accepting Forest Service timber sales from third parties.

18. Had Precision Pine repudiated and been defaulted on its contracts, it was my belief that the Forest Service would have tried to preclude Precision Pine from bidding on any resale of the defaulted contracts. The Forest Service in fact prevented Precision Pine from bidding on the Forest Service's resale of the Salt and O.D. Ridge contracts.

19. Moreover, the Forest Service also tried to bar Precision Pine from bidding on the resale of the Jersey Horse contract (i.e. the "Jersey Horse II contract") and only relented after Precision Pine filed a bid protest action in this Court. The resale of the Jersey Horse II contract was

conducted on or about November 26, 2001. Precision Pine was declared the high bidder and was awarded the Jersey Horse II contract, which it has continued to operate without incident since that time.

20. Had Precision Pine repudiated and been defaulted on its contracts, and even if it would have been allowed thereafter to bid on future Forest Service timber offerings, it was my belief that Precision Pine would have been required to make substantially increased downpayments on any future contracts. In this regard, the Forest Service in fact required Precision Pine to make such increased downpayments on the Jersey Horse II contract.

21. Absent the ability to obtain Forest Service timber sale contracts, I do not believe that Precision Pine could have survived until this Court ruled in July 2001 that the Forest Service had, in fact, breached its contracts. Accordingly, had Precision Pine repudiated its timber sale contracts during or shortly after the suspension as defendant claims it should have, the Forest Service would now be facing increased damages in the Court of Federal Claims Case No. 98-720C for the total destruction of Precision Pine's business.

22. Additionally, Precision Pine's harvesting of some or all of the remaining timber on some of the contracts that had been breached resulted in cash flow to the Forest Service and the accomplishment of some of the management goals desired by the Forest Service, <u>i.e.</u>, the reasons that the contracts were offered in the first place.

23. In light of the foregoing facts, it was my belief that any performance rendered by Precision Pine under the contracts after the material breach was commercially reasonable, benefited the Forest Service and would not prejudice Precision Pine's ability to subsequently treat the contracts as being at an end.

Dated: April 23, 2004

Lorin D. Porter
President
Precision Pine & Timber, Inc.

# DECISION DOCUMENT

PURCHASER AND ADDRESS:

Precision Pine & Timber, Inc
P.O. Box 70
Heber, AZ 85928

1) Preface & Digest:

Decision Number: 3-01-02
Location of Sale:

| | |
|---|---|
| Region | 3 |
| National Forest | Apache-Sitgreaves N.F.'s |
| Ranger District | Black Mesa (formerly Chevelon R.D.) |

Sale Information:

| | |
|---|---|
| Purchaser Name: | Precision Pine & Timber, Inc. |
| Contract Date: | December 2, 1998 |
| Contract Number: | 020012 |
| Sale Name: | Wiggins Multi-Product Sale |
| Contract Form: | FS 2400-6T |
| Termination Date: | January 9, 2001 |

2) Claim Summary:

This documents the Contracting Officer's Decision regarding a claim under the Contract Disputes Act by the United States Government against Precision Pine & Timber, Inc. for the sum of **$13,016.93** for its default of the Wiggins Multi-Product Sale, contract number 020012.

# DECISION DOCUMENT

## PURCHASER AND ADDRESS:

Precision Pine & Timber, Inc
P.O. Box 70
Heber, AZ 85928

1) Preface & Digest:

Decision Number: 3-01-03
Location of Sale:

| | |
|---|---|
| Region | 3 |
| National Forest | Apache-Sitgreaves N.F.'s |
| Ranger District | Black Mesa (formerly HeberR.D.) |

Sale Information:

| | |
|---|---|
| Purchaser Name: | Precision Pine & Timber, Inc. |
| Contract Date: | December 13, 1993 |
| Contract Number: | 001756 |
| Sale Name: | Jersey Horse Timber Sale |
| Contract Form: | FS 2400-6T |
| Termination Date: | January 9, 2001 |

2) Claim Summary:

This documents the Contracting Officer's Decision regarding a claim under the Contract Disputes Act by the United States Government against Precision Pine & Timber, Inc. for the sum of **$9,035.47** for its default of the Jersey Horse Timber Sale, contract number 001756.

3) Government's Claim:

The Jersey Horse Timber Sale timber sale was cancelled by the Regional Forester, Eleanor S. Towns, on January 9, 2001, for failure to remedy breach pursuant to special contract provision CT 9.3 - Breach. When a timber sale contract is terminated before completion, the Contracting Officer must determine if the United States has been damaged (FSM 2453.5). Damages due to the United States for Purchaser's failure to cut and remove included timber are outlined in contract provision CT9.4 -- Failure to Cut.

Based on procedures and applicable costs described in provision CT9.4 I have estimated the damages due the United States to be **$9,035.47** for the Jersey Horse Timber Sale. This estimate may be adjusted once final damages are determined following the resale of the remaining timber. At that time any surplus damages collected by this estimate will be refunded to the purchaser, or any additional damages due will be collected, as appropriate.

4) Findings:

A. Contract Requirements:

The following CT contract provisions are pertinent to the claim.

CT9.3 B BREACH (6/90)
CT9.4 B FAILURE TO CUT (4/82)

B. Facts:

Precision Pine designated Frontier Insurance Company as its surety for the Jersey Horse Timber Sale. In June, the Department of the Treasury removed Frontier Insurance Company from their list of acceptable sureties for federal contracts. The Contracting Officer sent Purchaser a letter advising it of the removal, and reminding the Purchaser of the contract requirement in BT9.1 -- Performance Bond to provide alternative surety satisfactory to the Forest Service.

Precision Pine failed to provide a surety satisfactory to the Forest Service within the appropriate time period. On July 20, 2000, the Contracting Officer notified Purchaser that it was in material breach of the contract. Purchaser thereafter failed to remedy the material breach. Based on this failure, the Regional Forester terminated the Jersey Horse Timber Sale contract for failure to remedy breach pursuant to CT9.3-- BREACH, on January 9, 2001.

Pursuant to CT9.4-- FAILURE TO CUT, the Contracting Officer has estimated the damages suffered by the Government as a result of the default. A summary of the Contracting Officer's calculations of the estimated damages for the Jersey Horse Timber Sale timber sale is attached.

5) **Contracting Officer's Disposition of the Claim:**

The Contracting Officer estimates the damages due the government for the default of the Jersey Horse Timber Sale to be **$9,035.47.**

A Bill for Collection in that amount is attached to this decision.

6) **Concluding Information:**

This is the final decision of the Contracting Officer. This decision may be appealed to the Agriculture Board of Contract Appeals.

If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the Agriculture Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision appeal is intended, shall reference this decision, and identify this contract by number. In lieu of appealing to the Agriculture Board of Contract Appeals, you may bring an action directly in the Court of Federal Claims within 12 months of the date you receive this decision.

In the event you appeal this decision to the Agriculture Board of Contract Appeals, you may request that the Board process this appeal under the accelerated procedures (41 U.S.C. 601, et seq., section 8f), or under the small claims procedures (41 U.S.C. 601,et seq., section 9).

Susan N. Lee (signature) 3/1/01

Susan N. Lee
Contracting Officer
P.O. Box 469
Alpine, AZ 85920
520-339-4384

Date:

# DEFAULT DAMAGE CALCULATIONS

## JERSEY HORSE TIMBER SALE
## CONTRACT NO. 001756
## USDA FOREST SERVICE
## APACHE-SITGREAVES NATIONAL FOREST'S

The Jersey Horse timber sale was cancelled by the Regional Forester, Eleanor S. Towns, on January 9, 2001, for failure to remedy breach pursuant to special contract provision CT 9.3 - Breach. As directed by the Regional Forester and in accordance with Forest Service policy when a timber sale contract is terminated before completion, the Contracting Officer must determine if the United States has been damaged (FSM 2453.5). Damages due the United States for Purchaser's failure to cut and remove included timber are outlined in contract provision CT9.4 -- Failure to Cut.

The Jersey Horse Timber sale consisted of seven (7) separate payment units when originally sold. Payment units 1, 5, 6, and 7 were operated in and harvested. Payment Units 2, 3, and 4 were never released. At the time of termination the remaining volume of included timber on the Jersey Horse Timber sale was 1354 CCF of sawtimber. The current contract value of the sale at termination was **$203,831.16.** The sale was sold as an escalated sale, so there will be adjustments to the current contract rates necessary at the end of this quarter. All purchaser credit was earned, and used. An appraisal of the remaining timber at the time of termination, using the standard Forest Service method in use at that time and conditions of the original contract, resulted in an appraised value of **$227,783.42.**

Based on procedures and applicable costs described in provision CT9.4 the following outlines the calculation of estimated damages due the United States for default of the Jersey Horse timber sale contract. This estimate may be adjusted once final damages are determined following the resale of the remaining timber. At that time any surplus damages collected by this estimate will be refunded to the purchaser, or any additional damages due will be collected, as appropriate.

### REMAINING TIMBER

At the time of default the contract value of the timber at termination was:

Unreleased Payment Units (# 2,3 & 4)

| Species | Volume | Rates @ Termination | Value |
|---|---|---|---|
| PP-Sawtimber | 1354 ccf | $ 150.54/ccf | $ 203,831.16 |

**REMAINING CONTRACT VALUE @ TERMINATION:** **$ 203,831.16**

## COST OF RESALE

Because this sale is an older sale, marked and cruised in 1991 and 1992, it will need touch up marking of cut and/or leave trees and the cutting unit boundaries will need to be remarked prior to reselling. In addition, the remaining payment units will need to be recruised. Additional costs associated with the resale include the cost of preparing a revised appraisal and contract package as well as an additional advertisement. Costs here are based on best estimates of what will be required and will be adjusted, upwards or downwards depending upon actual costs incurred, once final damages are determined.

**Estimated time and costs to remark cutting unit boundaries, touch up mark and recruise payment units 2,3,4:**

4 Crew members at 15 days each:

| | |
|---|---|
| Crew Member @ $145.00/day X 1 5 days = | $ 2,175.00 |
| Crew Member @ $145.00/day X 1 5 days = | $ 2,175.00 |
| Crew Member @ $145.00/day X 1 5 days = | $ 2,175.00 |
| Crew Member @ $145.00/day X 1 5 days = | $ 2,175.00 |
| Paint: 20 cases @ $ 96/case = | $ 1920.00 |
| Vehicle Cost: | |
| Crew Truck – Miles $450 miles, FOR $420 | $ 870.00 |
| Sale Admin Truck – Miles $30, FOR $30 | $ 90.00 |
| Cruise Design and Check Cruise – | |
| Pre-Sale Forester – GS 9 @ $202.00/day X 5 days = | $1,010.00 |
| Check Cruiser – GS 11 @ $233.00/day X 2 days = | $ 466.00 |
| **Total Field Preparation Costs:** | **$13,056.00** |

**Preparation of Appraisal Report, Prospectus and Advertisement:**

| | | | |
|---|---|---|---|
| Forester | GS 9 | 2 days @ $202.00/day | $ 404.00 |
| Timber Resource Clerk | GS 5 | 2 days @ $143.00/day | $ 286.00 |
| | | TOTAL | $ 690.00 |

**Sale Package Preparation:**

| | | |
|---|---|---|
| Pre-Sale Forester GS 9 | 5 days @ $202.00/day | $1,010.00 |
| Contracting Officer GS 11 | 3 days @ $233.00/day | $ 699.00 |
| Engineering GS 11 | 1 day @ $272.00/day | $ 272.00 |
| Timber Resource Clerk GS 6 | 3 day @ $161.00/day | $ 483.00 |
| Sale Admininstrator GS 9 | 2 day @ $206.00/day | $ 412.00 |
| Miscellaneous Costs: | | |
| Mailings/ Printing/Legal Ads | | $ 100.00 |
| | TOTAL | $2,976.00 |

**Total Cost For Appraisal And Package Preparation: $3,666.00**

TOTAL COST OF RESALE: $16,722.00

**INTEREST ON REMAINING CONTRACT VALUE**

As per CT9.4-Failure to Cut (4/82) "interest will be charged for the total number of months, or portions thereof from Termination Date until mid-point of the contract resale period, less any time in excess of one year needed to make the resale." Interest is charged at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department in TFRM 6-8020-20). The current interest rate for January 2001 is 6%; the resale offering will have a contract term of 2 years and the sale will be reoffered within 4 months. Therefore:

**INTEREST ($203,831.16 X .06 X 1.33 years): $16,265.73**

**CALCULATION OF RESALE VALUE**

According to FSH 2409.22, Section 62.3, an appraisal is done at the time of termination of the sale and is based upon the remaining contract volume and the original appraisal conditions. The only value in the original appraisal that has been updated is the Quality Adjustment figure for the included timber because of significant changes in the formulas since the original sale was sold. Appraisal Bulletin Number 01, CY 01,1st Quarter (January) was used to determine the reappraised value of the sale: The results are as follows:

| Species | Volume | Predicted Bid Rate (Line 28) | Total Value |
|---|---|---|---|
| PP-Sawtimber | 1354 CCF | $ 168.23/ CCF | $227,783.42 |

**TOTAL REAPPRAISED VALUE @ TERMINATION: $227,783.42**

# CALCULATION OF DAMAGES

| | | VOLUME | VALUE |
|---|---|---|---|
| **A) Calculation of Potential Damages** | | | |
| **1. Current Contract Value at Termination:** | | | |
| Volume and Contract Value, remaining timber: | | | |
| a. On area not cut over | Sawtimber | 1354 | $ 203,831.16 |
| | Pulpwood | 0 | $ 0.00 |
| b. On area cut over | Sawtimber | 0 | $ 0.00 |
| | Pulpwood | 0 | $ 0.00 |
| TOTAL REMAINING TIMBER | Sawtimber | 1354 | $ 203,831.16 |
| | Pulpwood | 0 | $ 0.00 |
| | **Sub-Total:** | | **$ 203,831.16** |
| **2. Additional Damages:** | | | |
| Liquidated Damages | | | $ 0.00 |
| Cost of Resale | | | $ 16,722.00 |
| Cost of Completing Contractual Requirements | | | $ 0.00 |
| Interest on remaining contract value *** | | | $ 16,265.73 |
| Other Damages— (List) | | | $ |
| | **Sub-Total:** | | $ 32,987.73 |
| **3. Adjustment for Purchaser Credit:** | | | |
| Less Purchaser Credit that HAS NOT been earned: | | | ($ 0.00 ) |
| **4. Maximum Potential Damages (A1 + A2 – A3):** | | | **$ 236,818.89** |

| | | |
|---|---|---|
| **B) Calculation of Resale Value:** (Use the Predicted Bid Value, Line 28, of the appraisal) | | |
| **1. Predicted High Bid Appraisal value at termination:** (1354ccf @ $168.23ccf) = $227,783.42 | | **$ 227,783.42** |
| Add Remaining Effective Purchaser Credit | | $ 0.00 |
| | **Sub-Total:** | **$ 227,783.42** |
| **2. Actual Bid Value of Resale:** | | **$( )** |
| **3. Resale Value:** (RESALE VALUE IS THE LARGER OF THE APPRAISAL SUB-TOTAL OR THE ACTUAL BID VALUE OF THE RESALE) | | **$ 227,783.42** |

| | |
|---|---|
| **C) Damages:** | |
| 1. Maximum Potential Damages (A4) | $ 236,818.89 |
| 2. Resale Value (B3) | $ 227,783.42 |
| **3. Damages (C1-C2):** | **$ 9,035.47** |
| 4. Unobligated Cash on Account | $ 0.00 |
| **5. Estimated Damages Due Government:** | **$ 9,035.47** |
| **6. Refund Due Purchaser:** | **$ 0.00** |

REGION: SUMMARY CKED BY: snl
FOREST: ..che/Sitgreaves
SALE NAME: Jersey Horse Default STARS ID: 0 SALE ID: 03010151112001

| | | | | | |
|---|---|---|---|---|---|
| SPEC RD CONST (MI): | .0 | SPEC RD RECONST (MI): | .0 | ROAD COST: | 0 |
| ( 1) APPRAISED TO: HEBER | | HAUL MI: 39 RTM: 144 | | ESSENTIAL KV: | 0 |
| GROUND BASE VOL: | 1354 | SKY/GROUND LEAD VOL: | 0 | AERIAL VOL: | 0 |
| GRND BASE SKID COST: | 23.64 | SKY/GRND LEAD YARD COST: | .00 | AERIAL YARD COST: | .00 |
| CCF/ACRE (GRND/BASE): | 2.5 | ROADS IN PLACE: N | | SALE WT.AVG. SKID-YARD COST | 23.64 |
| CF/TREE(GRND/BASE): | 37 | | | RMPP % GRADE (R-3): | 37.9 |
| SKID DIST (GRND/BASE): | 300 | | | LRF (R-3): | 7.1054 |

| | | | | TOTAL OR AVG | | |
|---|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | 1-3 | | | | |
| 2 | SPECIES GROUP | PP | | | | |
| 3 | SPECIES CODE | 122 | | | | |
| 4 | % BY SPECIES | 100.00 | A | 100.00 | | |
| 5 | spvol( CCF | 1354 | T | 1354 | | |
| 6 | DBH (Inches) | 17.9 | A | 17.9 | | |
| 7 | BASE PERIOD PRICE (BPP) | 7.25 | A | 7.25 | | |
| 8 | MARKET ADJ | -.57 | A | -.57 | | |
| 9 | ADJ BPP (7+8) | 6.68 | A | 6.68 | | |
| 10 | BASE SKID-YARD COST | 26.32 | A | 26.32 | | |
| 11 | SALE SKID-YARD COST | 23.64 | A | 23.64 | | |
| 12 | SKID/YARD COST ADJ (10-11) | 2.68 | A | 2.68 | | |
| 13 | BASE HAUL COST | 40.51 | A | 40.51 | | |
| 14 | SALE HAUL COST | 13.05 | A | 13.05 | | |
| 15 | HAUL COST ADJ (13-14) | 27.46 | A | 27.46 | | |
| 16 | BASE RD MNT COST | 2.69 | A | 2.69 | | |
| 17 | SALE RD MNT COST | 4.58 | A | 4.58 | | |
| 18 | RD MNT COST ADJ (16-17) | -1.89 | A | -1.89 | | |
| 19 | BASE SLASH COST | 10.77 | A | 10.77 | | |
| 20 | SALE SLASH COST | 18.90 | A | 18.90 | | |
| 21 | SALE SLASH ADJ (19-20) | -8.13 | A | -8.13 | | |
| 22 | BASE TEMP RD COST | .28 | A | .28 | | |
| 23 | SALE TEMP RD COST | .00 | A | .00 | | |
| 24 | TEMP RD COST ADJ (22-23) | .28 | A | .28 | | |
| 25 | QUAL ADJ (RMPP) | 141.15 | A | 141.15 | | |
| 26 | UNUSUAL ADJ | .00 | A | .00 | | |
| 27 | TOTAL ADJ (Sum:12,15,18,21,24,25,26) | 161.55 | A | 161.55 | | |
| 28 | PREDICTED BID (9+27) | 168.23 | A | 168.23 | | |
| 29 | COMPETITION AMOUNT | .67 | A | .67 | | |
| 30 | IND ADV RATES (28-29-34+36) | 167.56 | A | 167.56 | TV | 226876.24 |
| 31 | BASE RATES + TPV (31+36) | 7.25 | A | 7.25 | | |
| 32 | ADJ TO BASE RATES | .00 | A | .00 | | |
| 33 | ADVERTISED RATES (30+32) | 167.56 | A | 167.56 | TV | 226876.24 |
| 34 | SALE SPECIFIED RD COST | .00 | A | .00 | | |
| 35 | BASE INDICES (DEC 00) | 159.65 | | | | |
| 36 | TIMBER PROPERTY VALUE | .00 | A | .00 | | |
| | MBF/CCF ratio: | .50000 | | .50000 | | |
| | TSA TABLE: | WWPAC | | | | |

*** Deficit Sale Increased: .00 Ineffective Roads: .00

MBF = Thousands of Board Feet CCF = Hundreds of Cubic Feet
Bulletin: BULLETIN # 01 CY 01 REV. 23-DEC-1999

PAGE: 1

USDA FOREST SERVICE
BILL FOR COLLECTION

1. BILL DATE: 3/1/01

ENCLOSE A COPY OF THIS BILL WITH YOUR CHECK OR MONEY ORDER.
DO NOT SEND CASH. PLEASE INCLUDE BILL NO. AND PAYER CODE NO.
ON YOUR CHECK.
MAKE CHECK PAYABLE TO:
USDA FOREST SERVICE

MAIL PAYMENT TO:
USDA FOREST SERVICE
FILE 71652
P.O. BOX 60000
SAN FRANCISCO, CA 94160-1652

TO:

PRECISION PINE & TIMBER
P.O. BOX 70

HEBER AZ 85928

PAYER INDICATE
AMOUNT ENCLOSED: $______

2. NET AMOUNT DUE: $ 9,035.47
3. DUE DATE: 3/30/01
4. BILL NUMBER: TM 03012110157
5. PAYER CODE: 860481719 A

6. AGREEMENT NO: CONTRACT NO: 030105001756

7. DESCRIPTION: 05 JERSEY HORSE DEFAULT

8. REMARKS:
RE: PAYER CODE: 860481719 A BILL NO: TM 03012110157

| | |
|---|---|
| 9. PRINCIPAL: | $ 9,035.47 |
| 10. INTEREST: | |
| 11. ADMINISTRATIVE COSTS: | |
| 12. PENALTY: | |
| 13. AMOUNT DUE: | $ 9,035.47 |
| 14. AMOUNT CREDITED: | |
| 15. NET AMOUNT DUE: | $ 9,035.47 |

NOTE:
PLEASE SEND ALL CORRESPONDENCE, INQUIRIES, AND CHANGE OF ADDRESS TO:

APACHE SITGREAVES N F
PO BOX 640

SPRINGERVILLE AZ 85938

FAILURE TO MAKE PAYMENT BY THE DUE DATE WILL RESULT IN THE ASSESSMENT OF LATE PAYMENT CHARGES (INTEREST, ADMINISTRATIVE COST, AND/OR PENALTY CHARGES) IN ACCORDANCE WITH YOUR CONTRACT, PERMIT, THE DEBT COLLECTION ACT OF 1982, AS AMENDED. POSTMARKS ARE NOT HONORED.

BLACK MESA RANGER DISTRICT
JERSEY HORSE MP ESTIMATED DEFAULTED SALE DAMAGE CONTRACT NO. 05-001756

| 16. ORG | 17. JOB | 18. AMOUNT | 16. ORG | 17. JOB | 18. AMOUNT | 16. ORG | 17. JOB | 18. AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 0301 | 87002801 | $ 9,035.47 | | | | | | |