**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Rules of the Court of Federal Claims, Rule 56(h)(2), Plaintiff Precision Pine & Timber, Inc. ("Precision Pine") respectfully submits the following proposed findings of uncontroverted fact as to those relevant matters not covered by defendant in its motion for summary judgment:

1. By letters dated September 5 and 6, 1995, i.e., ten (and eleven) days after the Forest Service suspended all of Precision Pine's timber sale contracts, Precision Pine put the Forest Service on notice that Precision Pine believed the suspension violated its contracts:

> Please be informed that since we believe that the proximate cause of the suspension is the Forest Service's apparent failure to meet its implied obligation to take all of the steps necessary to insure that these sales complied with the law, we intend to hold the Forest Service fully liable for any and all damages that we incur as a result of this totally avoidable suspension.

Plaintiff's Appendix ("Pl. App.") 1-3.

2. Throughout the suspension Precision Pine maintained its position and advised the Forest Service that Precision Pine considered the suspension to be a breach of Precision Pine's contracts for which it would seek damages from the Forest Service. See, e.g., letter from Lorin D. Porter, President of Precision Pine, to David Harris, Contracting Officer, dated October 4, 1995:

> We hold the Forest Service liable, not only for the loss of cash flow (with no timber to cut and no sales to apply the effective purchase credit), but also for our inability to operate our mills on the timber that is contractually ours to cut. The damages we have incurred due to these curtailments should be yours to bear.

Pl. App. 4. See also letter from Lorin D. Porter, President of Precision Pine, to Chip Cartwright, Forest Service Regional Forester, received by the Forest Service on June 26, 1996, detailing the difficulties caused by the Forest Service's ongoing suspensions of Precision Pine's timber sale contracts and concluding:

> We submit that we have been unjustly harmed financially because of the breach of your contracts with us, and that we expect to be justly compensated for our lost opportunities, the additional expenses incurred, and other reasonable costs and/or losses associated with not only closures, but the keeping open and viable our mills in order to fulfill our contractual obligations with you.
>
> We do not like to do this, but we have been severely harmed and we see no other way. You will be receiving actual dollar amounts associated with the above mentioned harm.

Pl. App. 5, 6.

3. Shortly after the suspension was lifted in December of 1996, Precision Pine restated its belief that it was entitled to breach of contract damages for the suspension and sought compensation therefor, including lost market opportunity (i.e., lost lumber profits), increased log hauling costs and mill impact damages. See, e.g., letters dated December 31, 1996 from Lewis

N. Tenney, Jr., Vice President of Precision Pine, to Ken Broyles, Contracting Officer, and to Eddie Alford, Contracting Officer. Pl. App. 7-8.

4. In a letter dated December 11, 1996, the Acting Chief of the Forest Service advised Precision Pine that, although the Forest Service was aware of the hardships that the long injunction had caused the timber industry, Precision Pine should ask the Contracting Officers to provide the relief allowed for under the contracts. Pl. App. 9.

5. Additionally, by letter dated December 13, 1996, the Forest Service's Regional Office advised the Forest Supervisors in the Region, among other things, how to address claims for damages resulting from the suspension:

> Under special contract provision <u>CT6.01</u> – <u>Interruption of Delay of Operations</u>, purchasers may submit claims for out-of-pocket expenses incurred as a direct result of the interruption and delay of their operations due to the injunction. The Contracting Officers must respond to all claims following procedures outlined in the Contract Disputes Act.
>
> It is possible that claims will be received for questionable expenses or other alleged damages. Whenever there is a question, you are encouraged to seek advice from the Regional Contract Disputes Act team and our Office of General Counsel.

Pl. App. 10, 11.

6. The Forest Service responded to Precision Pine's informal requests for compensation by maintaining that it had not breached the contracts and that Precision Pine could request compensation under clause CT6.01 for "out-of-pocket" expenses. Pl. App. 12-14. <u>See</u> <u>also</u> Pl. App. 15.

7. Because it had been made clear to Precision Pine that the Forest Service was not willing to accept responsibility for the damages its suspension had cause to Precision Pine, between February and November 1997, Precision Pine prepared and submitted claim letters pursuant to the Contract Disputes Act seeking the recovery of the millions of dollars in damages caused by the Forest Service's prolonged suspension of 14 of Precision Pine contracts. See Precision Pine & Timber v. United States, 50 Fed. Cl. 35, 51 (2001).

8. In the Contracting Officer's Final Decisions issued between November of 1997 and March of 1998, the Forest Service disputed that it had breached any of the contracts and provided Precision Pine with "compensation" under the contracts for the suspension in the total amount of $18,242.71. Id. at 52.

9. Precision Pine commenced the action at issue in Precision Pine & Timber, 50 Fed. Cl. 35, on September 11, 1998 seeking compensation for the breach of contracts damages it had sustained. See the Court's electronic docket for Precision Pine & Timber, No. 98-720C.

10. By letter dated January 9, 2001, the Regional Forester for Region 3 of the Forest Service putatively terminated the contracts at issue in this case for breach due to Precision Pine's failure to provide a replacement surety that was satisfactory to the Forest Service within the time frames demanded by the Forest Service. Pl. App. 16-17.

11. Immediately thereafter, by letter dated January 12, 2001, counsel for Precision Pine advised the Forest Service that Precision Pine considered the government's prior material breach

to have relieved it of liability for the putative defaults and reserved its right to make this legal argument once the issue of breach was resolved by the Court in Precision Pine & Timber, Inc. v. United States, No. 98-720C. Pl. App. 18.

12. On July 30, 2001, this Court ruled that the Forest Service had in fact breached 12 of the 14 contracts on which Precision Pine had brought suit, including eight of the 12 contracts at issue in the instant case. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001).

13. Shortly thereafter, in a letter dated September 17, 2001, the President of Precision Pine reiterated his belief that the Court's determination that the contracts had been materially breached relieved Precision Pine of any liability for the putative defaults due to Precision Pine's failure to provide a surety satisfactory to the Forest Service within the time limits set by the Forest Service:

> . . . the Forest Service is scrupulously choosing to ignore the black letter law that a pre-existing material breach of contract, such as the Court of Federal Claims found the Forest Service committed on our sales, precludes a subsequent finding of default by Precision Pine.

Pl. App. 19, 20.

14. A few days later, in a letter dated September 28, 2001 sent to the Washington Office of the Forest Service to address the Forest Service's suggestion that it would suspend and/or debar Precision Pine as a timber purchaser due to its purported default, counsel for Precision Pine reiterated the view that the Forest Service's prior material breach relieved Precision Pine of liability for the subsequent defaults:

> In sum, irrespective of the subsequent ostensible failure of Precision Pine to provide a replacement surety when the one that it was using was removed from the Treasury's list of approved sureties, in June of 2000, for the 11 sales which the Forest Service has been found to have materially beached, which remain uncompleted, that material breach of contract relieved Precision Pine of its obligation to perform and precluded the Forest Service's termination for default.

Pl. App. 23, 27.

15. The Forest Service anticipated sustaining no damages due to Precision Pine's putative default of the O.D. Ridge timber sale contract for failing to provide a surety and, in fact, the Forest Service anticipated obtaining $117,232.75 more from the resale than it would have obtained had it tried to collect its "estimated" breach damages from Precision Pine. Pl. App. 31-31B. Therefore, in its putative final decision of March 1, 2001, the Forest Service sought as damages the amount of $148,845.38 for payments it claimed Precision Pine still owed for timber removed from the sale area. Id.

16. With a letter dated September 17, 2001, Precision Pine forwarded a $50,000 payment toward the balance the Forest Service claimed was owed on the O.D. Ridge contract and agreed to pay the remaining principle balance within thirty days. Pl. App. 19-22.

17. By letter dated October 12, 2001, the Forest Service acknowledged receipt of the $50,000 payment and sought the payment of the outstanding balance, plus administrative fees and interest in the total amount of $24,609.95, which according to the Forest Service brought the outstanding balance owed on the O.D. Ridge sale to $116,130.70. Pl. App. 32-33.

18. With a letter dated October 27, 2001, Precision Pine sent a check to the Forest Service in the amount of $116,130.70 paying the entire balance the Forest Service claimed was due on the O.D. Ridge timber sale contract, including the administrative fees and expenses. Pl. App. 34-38.

19. In a letter dated November 16, 2001, the Forest Service acknowledged receipt of Precision Pine's letter of October 27, 2001 and Precision Pine's "payment in full of the balance due on the O.D. Ridge Timber Sale Contract." Pl. App. 39.

20. The Declaration of Lorin D. Porter, President of Precision Pine, is set forth in Plaintiff's Appendix at 54-60 and contains the following facts:

a. I am currently, and at all times relevant to this case have been, the President of Precision Pine & Timber, Inc. ("Precision Pine") based in Heber, Arizona.

b. I have 25 years of experience in the forest products industry in the Southwestern United States. I am generally familiar with the standard provisions of the Forest Service's timber sale contracts.

c. Precision Pine has been recognized for Distinguished Professional Forest Resource Management in the Southwest by the Southwest Section of the Society of American Foresters.

d. I co-founded Precision Pine in 1984 in order to obtain timber and to manufacture that timber into lumber products in Precision Pine's sawmills. Precision Pine is a small, privately-owned company that qualifies as a small business for purposes of purchasing federal timber to supply its lumber manufacturing operations. Precision Pine is one of the few lumber manufacturers remaining in its area.

e. In the area of Northeastern Arizona from which Precision Pine obtains raw material, i.e., timber for its sawmill(s), Forest Service is by far the largest holder of timber land and seller of timber. Since its founding, Precision Pine has been dependant on the Forest Service's timber sale program as the primary source of its raw material for its sawmill(s).

f. Through no fault of its own, some or all of Precision Pine's Forest Service timber sale contracts were suspended by the Forest Service, during parts of 1995, 1996 and 1997. The suspensions in each of these years were in place during the fall months, which is an important time period for Precision Pine to have access to its timber sales because the risk of fire closures is lower than in the summer months and Precision Pine typically built log decks at its sawmills at this time in order to have a supply of logs through the winter months. Due to an inability to build such winter log decks and/or to access our timber sales due to the suspensions, we ran out of logs and were forced to shut down one or more of our mills at various times during each of these years.

g. In 1999, our long-time bonding company, Capitol Indemnity Corporation, refused to continue bonding our Forest Service timber sale contracts.

h. The only bonding company I could locate that would bond Precision Pine's Forest Service timber sales was Frontier Insurance Company ("Frontier"), although they required payment of the annual cost in full and in advance. I obtained bonding for Precision Pine's Forest Service timber sale contracts from Frontier in 1999. These bonds were accepted by the Forest Service without incident.

i. For the year 2000, Precision Pine again obtained bonding from Frontier, for which it paid in full, in advance. The Forest Service again accepted this bonding. However, in approximately June of 2000, the Forest Service advised me for the first time that it was no longer willing to accept bonding from Frontier. Due to the financial impact that the Forest Service's *seriatim* suspensions had on Precision Pine, Precision Pine did not have funds readily available to pay for bonding a second time (had it been able to find a company willing to bond our sales). I was also engaged in trying to get the money back from Frontier that I had paid for bonding in 2000. I advised the Forest Service of Precision Pine's difficulties in finding and paying for bonding.

j. During the 1990s, the Forest Service began increasingly to offer multi-product sales, i.e., sales containing both sawlogs and roundwood. As identified in the Forest Service contract, sawlogs consists of trees, the diameter of which at breast height is 9" or greater. Sawlogs, as the term suggests, are suitable for use at a sawmill to

produce lumber. Roundwood, which is also referred to as pulpwood, is identified in the Forest Service contract as material measuring less than 9" in diameter at breast height, the primary economic utility of which is in the making of wood pulp for use in a variety of products including paper.

k. Precision Pine has never had a manufacturing facility to make pulp from pulpwood. Precision Pine bid on Forest Service multi-product timber sales on the basis that it would be able to sell the pulpwood from the sale to Stone Container's pulp facility located in Snowflake, Arizona. Precision Pine had relied on the Stone Container pulp facility for years as an outlet for the pulpwood component of its Forest Service multi-product timber sales. These facts were known to the Forest Service at the time it awarded the multi-product sales at issue in this case to Precision Pine.

l. However, in February 1998, Stone Container announced that it was closing its wood pulp facility in Snowflake, Arizona and, therefore, it would no longer be utilizing any pulpwood. All of the sales at issue in this case, except for the Wiggins contract, were awarded to Precision Pine before Stone Container announced that it would no longer be utilizing pulpwood.

m. Prior to 1998, Precision Pine had never been defaulted on any Forest Service contract in more than a decade of operations under dozens of such contracts.

n. Had Precision Pine repudiated the contracts that the Forest Service breached at any time prior to a court ruling that the Forest Service had in fact breached the contracts, it was my belief that the Forest Service, which disputed that it had breached the contracts, would have terminated Precision Pine's contracts for default.

o. In placing Precision Pine in default, the Forest Service would likely have cited contract clause CT9.2 which indicates that pending the resolution of any claim, "the contractor shall proceed diligently with the performance of the contract."

p. Had Precision Pine repudiated and been defaulted on its contracts, it would have resulted in Precision Pine losing virtually its entire portfolio of timber sale contracts, i.e., a supply of raw material for it sawmills(s) that could not have been fully replaced except with other Forest Service timber sales offerings.

q. Had Precision Pine repudiated and been defaulted on its contracts, it was my belief that Precision Pine would have faced suspension or debarment as a bidder on future federal timber sale contracts or, at a minimum, Precision Pine would have no longer been viewed as a responsible bidder, precluding it from purchasing future Forest Service timber offerings, or even from accepting Forest Service timber sales from third parties.

r. Had Precision Pine repudiated and been defaulted on its contracts, it was my belief that the Forest Service would have tried to preclude Precision Pine from

bidding on any resale of the defaulted contracts. The Forest Service in fact prevented Precision Pine from bidding on the Forest Service's resale of the Salt and O.D. Ridge contracts.

s. Moreover, the Forest Service also tried to bar Precision Pine from bidding on the resale of the Jersey Horse contract (i.e., the "Jersey Horse II contract") and only relented after Precision Pine filed a bid protest action in this Court. The resale of the Jersey Horse II contract was conducted on or about November 26, 2001. Precision Pine was declared the high bidder and was awarded the Jersey Horse II contract, which it has continued to operate without incident since that time.

t. Had Precision Pine repudiated and been defaulted on its contracts, and even if it would have been allowed thereafter to bid on future Forest Service timber offerings, it was my belief that Precision Pine would have been required to make substantially increased downpayments on any future contracts. In this regard, the Forest Service in fact required Precision Pine to make such increased downpayments on the Jersey Horse II contract.

u. Absent the ability to obtain Forest Service timber sale contracts, I do not believe that Precision Pine could have survived until this Court ruled in July 2001 that the Forest Service had, in fact, breached its contracts. Accordingly, had Precision Pine repudiated its timber sale contracts during or shortly after the suspension as defendant claims it should have, the Forest Service would now be facing increased damages in the

Court of Federal Claims Case No. 98-720C for the total destruction of Precision Pine's business.

v. Additionally, Precision Pine's harvesting of some or all of the remaining timber on some of the contracts that had been breached resulted in cash flow to the Forest Service and the accomplishment of some of the management goals desired by the Forest Service, i.e., the reasons that the contracts were offered in the first place.

w. In light of the foregoing facts, it was my belief that any performance rendered by Precision Pine under the contracts after the material breach was commercially reasonable, benefited the Forest Service and would not prejudice Precision Pine's ability to subsequently treat the contracts as being at an end.

Pl. App. 54-60.

21. The declaration of Kennard Williams, president of North Pacific Timber Enterprises, Inc., is set forth in Plaintiff's Appendix at 52-53 and contains the following facts:

a. I am the president of North Pacific Timber Enterprises, Inc. ("NPTE"), P.O. Box 247, Chilcoot, CA 96105.

b. NPTE is a small logging company in California that occasionally purchases timber sale contracts from the Forest Service.

c. NPTE has no affiliation with Precision Pine & Timber, Inc., nor has it ever conducted business with Precision Pine & Timber, Inc. To the best of my knowledge, neither I nor any of NPTE's employees or representatives has any personal or business relationship with any employee or representative of Precision Pine & Timber, Inc.

d. On March 17, 1999, NPTE was awarded the Jordon Multi-product Salvage timber sale ("Jordon timber sale"), Contract No. 069288, by the U.S. Forest Service.

e. NPTE secured the contractually required bonding for the Jordon timber sale through Frontier Pacific Insurance Company ("Frontier") on April 16, 1999. The Jordon timber sale was located in the Beckwourth Ranger District, Plumas National Forest, in California.

f. On or about December 11, 2000, the Forest Service suspended operations on the Jordon timber sale because of environmental litigation that affected the sale area. NPTE was conducting harvesting operations on the Jordon timber sale at the time the suspension was imposed.

g. Frontier was still providing bonding for the Jordon timber sale at the time of the suspension in December 2000. Moreover, Frontier continued to provide bonding for the Jordon timber sale when the Forest Service lifted the suspension in February of 2001.

h. Sometime in 2002, it was brought to my attention that Frontier had been removed from the Treasury's list of approved sureties in July of 2000.

j. However, at no time during 2000 did NPTE receive notification from the Forest Service that Frontier had been removed from the Treasury's list of approved sureties, nor did the Forest Service request or demand that NPTE seek out a new source of bonding for the Jordon timber sale. NPTE also did not receive such a notification, request or demand at any time during 2001.

Pl. App. 52-53.

Respectfully submitted,

s/ Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 26, 2004