No. 02-131C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: May 10, 2004

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 1

RESPONSE TO PRECISION PINE'S STATEMENT OF THE CASE . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 4

I. The Court Possesses Jurisdiction To Entertain This Action . . . . . . . . . . 4

II. Summary Judgment Should Be Entered Upon The United States' Counterclaims . . . . . . . . . . 6

A. Damages Were Calculated In Accordance With CT 9.4 . . . . . . . . . . 6

B. Precision Pine's Defenses Are Without Merit . . . . . . . . . . 8

1. Precision Pine Cannot Rely Upon The Defense of Prior Material Breach . . . . . . . . . . 8

2. Precision Pine's Disparate Treatment Allegation Is Legally Insufficient And Factually Unsupported . . . . . . . . . . 11

C. Determination Of Amount Of Damages Due For Precision Pine's Breach Of The O.D. Ridge Contract Should Be Remanded To The Contracting Officer . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**Cases:**


American Export Isbrandtsen Lines, Inc. v. United States,
499 F.2d 552 (1974) . . . . . . . . . . 11

Asco-Falcon II Shipping Co. v. United States,
32 Fed. Cl. 595 (1994)) . . . . . . . . . . 11-12

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002) . . . . . . . . . . 8-9

Becho, Inc. v. United States,
47 Fed. Cl. 595 (2000) . . . . . . . . . . 8

CACI, Inc. v. United States,
719 F.2d 1567 (Fed. Cir.1983) . . . . . . . . . . 12

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 7

Cities Service Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . 8-10

Durable Metal Products, Inc. v. United States,
21 Cl. Ct. 41 (1990) . . . . . . . . . . 8

Fields v. United States,
53 Fed. Cl. 412 (2002) . . . . . . . . . . 11

Grady-Gould Watershed Improvement District v. Transamerica Insurance Co.
570 F.2d 720 (8th Cir. 1978) . . . . . . . . . . 9

Hoskins Lumber Co. v. United States,
89 F.3d 816 (Fed. Cir. 1996) . . . . . . . . . . 7

Kalvar Corp. v. United States,
543 F.2d 1298, 1301 (1976) . . . . . . . . . . 12

Northern Helex Company v. United States,
197 Ct. C 455 F.2d 546 (1972) . . . . . . . . . . 9-10

Pacific Far East Line, Inc. v. United States,
394 F.2d 990 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Process Control Technologies v. United States,
53 Fed. Cl. 71 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

RT Computer Graphics, Inc. v. United States,
44 Fed. Cl. 747 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Sharman Co. v. United States,
2 F.3d 1564 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Torncello v. United States,
681 F.2d 756 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Travelers Indemnity Co. v. United States,
16 Cl. Ct. 142, 149 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Docketed Cases:**

Precision Pine & Timber, Inc. v. United States,
No. 98-720 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Statutes:**

41 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5, 8

# INDEX TO APPENDIX


Document | Page

Declaration of David P. Harris (with exhibit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Letter from Kerry Nedrow to Stone Forest Industries (a/k/a Stone Container Corporation) (June 9, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Letter from Bonnie Kruse to Kerry Nedrow (June 22, 2000) . . . . . . . . . . . . . . . . . . . . . 11

Letter from Kerry Nedrow to Stone Forest Industries (Sept. 19, 2000) . . . . . . . . . . . . . . 12

Letter from Bonnie Kruse to Administrator U.S. Dept. of Agriculture (Oct. 17, 2000) . 13

Letter from Mindy M. Lewis to Kerry Nedrow (Oct. 20, 2000) (with enclosures) . . . . . 14

Letter from Lewis N. Tenney to Stone Container (Sept. 21, 1995) . . . . . . . . . . . . . . . . . 18

Letter from Sean P. Leary of Stone Container Corporation to Lewis Tenney (Oct. 3, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Letter from John B. Smith to Al Schirman (Oct. 31, 1995) . . . . . . . . . . . . . . . . . . . . . . 20

Draft Letter from Lorin D. Porter to Milo Larson (Mar. 22, 1996) . . . . . . . . . . . . . . . . . 21

Letter from John B. Smith to Richard Stevens (July 12, 1996) . . . . . . . . . . . . . . . . . . . . 23

Letter from John B. Smith to Interested Parties (Jan. 22, 1997) . . . . . . . . . . . . . . . . . . . 26

Excerpts from February 9, 2004 Deposition of John B. Smith in *Precision Pine & Timber, Inc. v. United States*, No. 98-720C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . 27

Stipulation and Order in *Silver v. Thomas*, Nos. CIV-94-0337-PHX-CAM & CIV-94-1610-PHX-CAM (dated Oct. 18, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 30

Letter from Ken Broyles to Lorin D. Porter (Mar. 11, 1996) . . . . . . . . . . . . . . . . . . . . . . 46

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-131C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The material facts are undisputed: (1) Precision Pine failed to maintain performance bonding with an approved surety as required by each of its contracts; (2) the contracts were terminated for default by the Forest Service as a result of Precision Pine's breach; and (3) Forest Service contracting officers subsequently issued final decisions assessing breach damages against Precision Pine in accordance with contract clause CT 9.4. Furthermore, with the exception of two contracts (O.D. Ridge and Jersey Horse) that were subsequently resold,[1] Precision Pine has presented no evidence that the Forest Service's calculations of breach damages are not correct.

Accordingly, pursuant to RCFC 56(b), the United States' motion for summary judgment should be granted and judgment entered upon United States' counterclaim with respect to the Brookbank, Saginaw-Kennedy, Brann, U-Bar, Monument, Manaco, Hutch-Boondock, Gentry and Lily contracts. With respect to O.D. Ridge, Jersey Horse and Wiggins contracts, the United States respectfully requests that the Court remand to the agency so that the respective contracting

[1] Timber upon a third contract – the Wiggins contract – was also in fact resold.

officers can redetermine damages resulting from Precision Pine's breach in light of the post-termination resales.

## RESPONSE TO PRECISION PINE'S STATEMENT OF THE CASE

In its statement of the case, Precision Pine crafts a story based almost entirely upon a declaration from company President Lorin Porter. No discovery has been conducted in this matter. Consequently, the United States is not presently in a position to respond to some of Mr. Porter's assertions and beliefs. See RCFC 56(f). While the allegations in Mr. Porter's declaration concern collateral issues, and do not therefore raise genuine issues of material facts, the United States respectfully requests that it be afforded the opportunity to take discovery if the Court should deem any of Mr. Porter's factual assertions material. See RCFC 56(f). However, even without discovery, it is apparent that some of the assertions in Mr. Porter's declaration are inaccurate or misleading.

Precision Pine would like to characterize itself as a model timber harvesting operation. See Opp. at 9. In an attempt to do so, Precision Pine states that it "had never [previously] been placed in default" upon any of its Forest Service timber sale contracts. Id. This is not correct. While none of Precision Pine's timber sale contracts had been terminated for default prior to 1998, Precision Pine was in default more than 40 times between July 1994 and July 2000. Def.'s Supp. App. 2 (Harris Decl. ¶ 4); App. 5-9.[2] Indeed, the Forest Service was, at times, forced to suspend contracts in order to obtain payment for harvested timber or compliance with other

[2] The appendix to defendant's motion for summary judgment is cited as "Def.'s App. __." The appendix to plaintiff's response to defendant's motion for summary judgment is cited as "Pl.'s App. __." The appendix included with this reply is cited as "Def.'s Supp. App. __."

contractual requirements. Def.'s Supp. App. 5-9. Simply put, Precision Pine has far from the pristine record of operations that its brief attempts to convey.

Precision Pine also refers to the Forest Service's "seriatim suspensions" of its "operations" in 1995, 1996 and 1997. Opp. at 10. However, at no time did the Government suspend all of Precision Pine's timber sale contracts – much less its "operations" – as Forest Service contracts were never the sole source of Precision Pine's timber. Indeed, Precision Pine obtained timber from the state of Arizona, various Indian tribes, private landowners, and its own privately-held lands. Def.'s Supp. App. 28-29. Furthermore, other than for a period of eight weeks in the Fall of 1995, Precision Pine always had available at least three Forest Service contracts upon which it could cut timber. See Def.'s Supp. App. 30-47.

Next, Precision Pine states that it promptly "advised" the Forest Service that it believed that the Mexican spotted owl ("MSO") suspension was a breach of its contracts. See Opp. at 10-11. However, Precision Pine never advised the Forest Service – then or later – that it was cancelling any timber sale contract as a result of the alleged breach. To the contrary, as Precision Pine admits in its brief, it elected to continue the contracts through 2001, at which time they were terminated for default by the Forest Service. See Opp. at 11 (section titled "Precision Pine's decision not to repudiate the contracts"). Consequently, as explained below, the defense of prior material breach is unavailable.

Precision Pine also avers that it lost its "primary outlet for pulpwood" – Stone Container Corporation ("Stone Container") – when Stone Container closed its pulpwood facility in February 1998. Opp. at 14. Stone Container was a competitor of Precision Pine. The business relationship between the companies was stormy. During the MSO suspension in 1995 and 1996,

Stone Container declined to purchase any pulpwood from Precision Pine. See Def.'s Supp. App. 18-26. Indeed, in early 1996, Stone Container even refused to take pulpwood from a third party when it learned that the material had come from one of Precision Pine's Forest Service contracts. Def.'s Supp. App. 21-22. Thus, Precision Pine's suggestion that it had a reliable outlet for pulpwood in Stone Container is inaccurate. Moreover, because there exists no nexus between Precision Pine's ability to sell pulpwood and its failure to provide contractually-required performance bonding to the Forest Service, Stone Container's availability as purchaser is irrelevant.

Lastly, Precision Pine states that it had "difficulty" in obtaining bonding. Opp. at 14. The reason for this purported difficulty is unclear. Precision Pine's competitor, Stone Container, was able to promptly secure replacement bonding when Frontier Insurance was removed from the Government's list of acceptable sureties. Def.'s Supp. App. 10-17. In any event, Precision Pine's "difficulty" is irrelevant. The relevant (and undisputed) fact is that Precision Pine failed to secure replacement performance bonds for its timber sale contracts. E.g., Def.'s App. 179-80. As a result, Precision Pine breached the contracts, which were then properly terminated for default.

## ARGUMENT

### I. The Court Possesses Jurisdiction To Entertain This Action

The Contract Disputes Act distinguishes between claims by a contractor and claims by the Government. See 41 U.S.C. § 605. "[C]laims by the government against a contractor" need only "be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a) (emphasis added).

It is undisputed that Forest Service contracting officers issued final decisions assessing default damages with respect to each of the contracts at issue. Compl. ¶¶ 28, 36, 43, 51, 58, 65, 72, 79, 86, 91, 96, 102; Pl.'s Mot. to Dismiss at 3-4; PA12-137.[3] These final decisions were in writing, stated the reasons for the decision, informed Precision Pine of its right to appeal, were furnished to Precision Pine, and pre-date the filing of this action. PA12-137. Thus, final decisions addressing "the subject of" the Government's counterclaim were issued in accordance with the CDA. See 41 U.S.C. § 605(a).

In its motion to dismiss, Precision Pine argues that the Court is without jurisdiction because the issue of breach damages was not "in dispute" when the contracting officers issued final decisions in February and March 2001. See Pl.'s Mot. to Dismiss at 4-10. As explained in our response, this Court's jurisdiction to entertain Government claims pursuant to the CDA does depend upon a pre-existing dispute. See Def.'s Opp. to Pl.'s Mot. to Dismiss at 5-13. In any event, Precision Pine now admits that it wrote to the Forest Service on January 12, 2001 asserting that "the government's prior material breach . . . relieved it of liability for" its own default. Opp. at 30. This dispute regarding breach damages pre-dates the contracting officers' final decisions. Therefore, the Court possesses jurisdiction to entertain this action.

---

[3] Plaintiff's Motion to Dismiss Defendant's Counterclaim or, in the Alternative, for Summary Judgment is cited as "Pl.'s Mot. to Dismiss at __." The appendix to plaintiff's motion to dismiss is cited as "PA__." The appendix to defendant's response to plaintiff's motion to dismiss is cited as "DA__."

## II. Summary Judgment Should Be Entered Upon The United States' Counterclaim

### A. Damages Were Calculated In Accordance With CT 9.4

Precision Pine asserts that the United States has not shown that the damages calculations in the respective contracting officers' final decisions were prepared in accordance with CT 9.4. Opp. at 18. Precision Pine is mistaken. As an initial matter, each decision expressly states that damages are "[b]ased on procedures and applicable costs described in provision CT9.4." Def.'s App. 121, 134, 183, 264, 267, 270, 352, 470, 486, 497, 506, 519; see also PA12-127. Additionally, accompanying each decision assessing damages is a document entitled "default damages calculations." Def.'s App. 126-29, 138-41, 185-88, 355-60, 472-75, 488-92, 499-502, 509-12, 521-24; see also PA12-127. These documents set forth in detail the Forest Service's damages calculations, which plainly track the requirements of contract clause CT 9.4. Id. (stating that the calculations being performed are based upon the procedures and applicable cost provisions in CT 9.4). Finally, the United States submitted a declaration in conjunction with its response to Precision Pine's motion to dismiss confirming that damages were calculated in accordance with clause CT 9.4. DA4, 6-8 (Harris Decl. ¶¶ 9, 14, 18, 21) (damages were calculated using appraisals conducted in accordance with the standard Forest Service method in use at the time of termination).[4]

---

[4] Clause CT 9.4 provides two alternative measures of damages in the event of breach of a timber sale contract: one where the timber has been resold; and another where the timber has not been resold. E.g., Def.'s App. 545-46. At the time of the contracting officers' decisions in early 2001, no timber upon any of the breached contracts had been resold. See DA4, 7-8 (Harris Decl. ¶¶ 10, 15, 19, 22). Consequently, the final decisions assessed damages using the "no resale" formula in clause CT 9.4. See DA4, 6-8 (Harris Decl. ¶¶ 9, 14, 18, 21).

Precision Pine presents no documents, declarations or other evidence demonstrating that damages were calculated in some other manner. See Opp. at 18-19 (arguing only that it raised the issue in its complaint). Consequently, compliance with CT 9.4 is established. See Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987).[5] This in turn establishes the quantum of breach damages – based upon the no resale formula in CT 9.4 – as a matter of law. Hoskins Lumber Co. v. United States, 89 F.3d 816, 817 (Fed. Cir. 1996). Consequently, because no timber upon the Brookbank, Saginaw-Kennedy, Brann, U-Bar, Monument; Manaco, Hutch-Boondock, Gentry and Lily contracts has been or is being resold, DA4, 7-8 (Harris Decl. ¶¶ 10, 15, 19, 22), summary judgment should be granted upon the United States' counterclaim with respect to these contracts. See Hoskins Lumber, 89 F.3d at 817 (Plaintiff "was emphatically not entitled to a 'fair' appraisal, an 'accurate appraisal, a 'reasonable' appraisal, or any manner of appraisal other than the one indicated in section B9.4") (emphasis in original).[6]

The Forest Service did resell timber upon the O.D. Ridge, Jersey Horse, and Wiggins contracts after the respective contracting officers' final decisions were issued. DA6-7 (Harris

[5] As the Court of Appeals for the Federal Circuit emphasized in Sweats Fashions: "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court of Federal Claims] – that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-moving party's case. Celotex, 477 U.S. at 331. Precision Pine has failed to meet its burden here.

[6] Section B9.4 in Hoskins is essentially the same as section CT 9.4 in the contracts at issue. See Pl.'s Mot. to Dismiss at 11 n.9.

Decl. ¶ 15). No decisions recalculating damages based upon these resales have been issued because of this litigation. See Sharman Co. v. United States, 2 F.3d 1564, 1571-72 (Fed. Cir. 1993) (holding that a contracting officer is without jurisdiction to issue a final decision concerning a matter in litigation); Durable Metal Products, Inc. v. United States, 21 Cl. Ct. 41, 46 (1990) (same). As a result, while it is undisputed that Precision Pine breached the contracts, with respect to the O.D. Ridge, Jersey Horse, and Wiggins contracts, because no contracting officer decision applying the resale formula in clause CT 9.4 has been issued, the United States respectfully requests that the Court remand the dispute with respect to these three contracts to the agency to obtain final decisions from the respective contracting officers regarding damages. See 41 U.S.C. § 605(c) (authorizing a stay to obtain a contracting officer final decision).

## B. Precision Pine's Affirmative Defenses Are Without Merit

### 1. Precision Pine Cannot Rely Upon The Defense of Prior Material Breach

"A material breach does not ipso facto end a contract. It merely gives the injured party the right to end the agreement." Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 (1976); accord Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 322-23 (2002); Becho, Inc. v. United States, 47 Fed. Cl. 595, 604-05 (2000); RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 760 (1999). Precision Pine does not claim to have exercised "the right to end" any of the contracts. See, e.g., Opp. at 25 (stating simply that it "put the Forest Service on notice" that it viewed the MSO suspension a breach). To the contrary, Precision Pine elected to continue the contracts until their termination by the Forest Service on January 9, 2001. Mot. at 8-10 (explaining that Precision Pine requested and obtained contract

term extensions, submitted harvesting schedules and proceeded to cut timber upon the contracts after the MSO suspension was lifted); Opp. at 30 (admitting that Precision Pine "continued performance of the contracts"); see also Opp. at 28 (conceding, by speculating what might have happened had Precision Pine cancelled its timber sale contracts, that it did not cancel the contracts).

Precision Pine does not, therefore, invoke the doctrine of prior material breach to justify non-performance after having cancelled the contracts. Instead, it seeks to use the doctrine to disregard its contractual obligation to supply performance bonding during the continued performance of the contracts. Of course, Precision Pine's argument is not logically limited to performance of the bonding requirement contained in BT.9.1. If the Forest Service's prior breach entitles Precision Pine to disregard that provision, Precision Pine could just as easily ignore the contract's normal operating season, prescribed harvesting methods, or the obligation to pay for cut timber.

Not surprisingly, Precision Pine identifies no authority allowing it to continue the contracts while flouting its own contractual obligations. In Cities Service, the Court of Claims explained that where, as here, the non-breaching party "elects to continue the contract, the obligation of both parties remain in force." 543 F.2d at 1313; accord Barron Bancshares, 53 Fed. Cl. at 322-23; Grady-Gould Watershed Improvement Dist. v. Transamerica Ins. Co., 570 F.2d 720, 723 (8th Cir. 1978) (a party to a contract may forego cancellation based upon a material breach, and then be liable for its own subsequent breach); cf. Northern Helex Company v. United States, 197 Ct. Cl. 118, 455 F.2d 546 (1972) (holding that "special circumstances"

allowed Northern Helex to assert an action for breach damages despite the fact that it had not ceased performance immediately after the Government's breach).

In its brief, Precision Pine characterizes the United States' argument as asserting "waiver" of the material breach. See Opp. at 19-23. However, the United States has not argued that Precision Pine waived the right to recover damages resulting from the MSO suspension.[7] Rather, the United States argues that while contract performance was continuing – at Precision Pine's own election – Precision Pine was required comply with its own contractual obligations. See Cities Service, 543 F.2d at 1313 (where contract performance continues "the obligations of both parties remain in force").

Citing Northern Helex, Precision Pine seeks to distinguish Cities Service. However, Northern Helex addresses only whether a contractor who has continued performance can still maintain a damages claim for total breach. 455 F.2d at 553 (rejecting the "traditional view" that the aggrieved party may continue performance only with consent of the party in breach under the "special circumstances" of that action). Precision Pine does not seek damages in this action. Additionally, by its own admission, Precision Pine has never sought to cancel the once-breached contracts. The decision in Northern Helex is therefore inapposite.[8]

---

[7] The quantum of damages resulting from the Forest Service's alleged beach is at issue in Precision Pine & Timber, Inc. v. United States, No. 98-720 (Fed. Cl.). In that action, Precision Pine can, if warranted, recover "damages for partial breach." Cities Service, 543 F.2d at 1313.

[8] Additionally, the "special circumstances" in Northern Helex are not present here. For instance, Precision Pine did not reserve a right to claim total breach and terminate the contracts, but rather informed the Forest Service that it would be held "liable" as a result of the "suspension." Opp. at 24 (citing PPFUF 1-2). Thus, unlike Northern Helex, Precision Pine indicated its intent to continue performance and seek damages only for the suspension. Likewise, the Government is plainly in a changed position as a result of Precision Pine's election to

(continued...)

**2. Precision Pine's Disparate Treatment Allegation Is Legally Insufficient And Factually Unsupported**

Precision Pine alleges that "the Forest Service selectively enforced the bonding requirement among companies that had previously secured bonding from Frontier" Insurance Company. Opp. at 31 (citing Compl. ¶¶ 18-21). However, "a bland allegation of disparate treatment does not, ipso facto, state an actionable claim. Plaintiffs must show a breach of a contractual obligation." Process Control Technologies v. United States, 53 Fed. Cl. 71, 81 (2002) (quoting Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994)) (emphasis in original); accord Fields v. United States, 53 Fed. Cl. 412, 417 (2002).

Precision Pine identifies no contractual breach resulting from disparate treatment by the Forest Service. See Opp. at 31-34. Rather, Precision Pine cites two admiralty cases for the proposition that the Forest Service must show that the default termination of Precision Pine's contracts for breach was not arbitrary and capricious. Opp. at 32 (citing American Export Isbrandtsen Lines, Inc. v. United States, 499 F.2d 552 (1974), and Pacific Far East Line, Inc. v. United States, 394 F.2d 990 (1968)). These cases, which neither concern a contract termination nor address an allegation of disparate treatment, do not support Precision Pine's argument. Moreover, as discussed further below, Precision Pine has proffered no evidence that the termination of its contracts – based upon an undisputed failure to maintain contractually required performance bonding – was in fact arbitrary or capricious.

This Court has analyzed claims of disparate treatment among "similarly situated competitors" as alleged violations of the duty of good faith and fair dealing. See, e.g., Process

---

[8](...continued)
continue the contracts as Precision Pine has cut and removed timber from Federal lands.

Control Technologies, 53 Fed. Cl. at 81; Asco-Falcon, 32 Fed. Cl. at 604-05. Precision Pine has not raised this legal argument, but, even if it had, the argument would fail. The duty of good faith and fair dealing is a covenant which is implied in every contract. E.g., Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142, 149 (1988). "However, it is well-settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties." Asco-Falcon, 32 Fed. Cl. at 604 (citing Spezzaferro v. Federal Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986), Torncello v. United States, 681 F.2d 756, 770 (1982), and Kalvar Corp. v. United States, 543 F.2d 1298, 1301 (1976)). To establish a breach of the duty of good faith and fair dealing a "plaintiff[] must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." Asco-Falcon, 32 Fed. Cl. at 604 (citing Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 664, 652 (1993) (requiring "well nigh irrefragable proof"). Irrefragable proof has in turn been equated with evidence of "a specific intent to harm." Torncello, 681 F.2d at 771; Kalvar, 543 F.2d at 1302. Consequently, "alleged disparate treatment absent an allegation of malice or intent to harm, is insufficient to state a claim." Asco-Falcon, 32 Fed. Cl. at 604-05; see also CACI, Inc. v. United States, 719 F.2d 1567, 1582 (Fed. Cir.1983) (holding that an intent to injure must be proved with "hard facts" and that "suspicion and innuendo" do not suffice). Precision Pine has not alleged, much less produced hard facts, that the termination of its contracts was motivated by an intent to injure. Consequently, its disparate treatment defense fails as a matter of law.

Additionally, Precision Pine cannot even show that it was treated differently than its competitors. The only company operating in Forest Service Region 3 – other than Precision Pine – that used Frontier Insurance Company for performance bonding was Stone Container. Def.'s

App. 527-28. Like Precision Pine, Stone Container was informed of the need to obtain performance bonding from a new surety. Def.'s Supp. App. 10, 12. Unlike Precision Pine, Stone Container promptly complied with the Forest Service's request and obtained new bonding. Def.'s Supp. App. 11, 13-17.

In opposition to summary judgment, Precision Pine produces only a declaration from the president of North Pacific Timber Enterprises ("NPTE"). PA52-53. However, NPTE, which is based in northern California, is not a competitor of Precision Pine. PA52. In fact, according to company president Kennard Williams, neither NPTE, nor its employees, have ever had any business dealings with Precision Pine. PA52. Even more significantly, NPTE did not use Frontier Insurance Company for its bonding requirements. PA52 (stating that NPTE used Frontier Pacific Insurance Company).[9] Consequently, Mr. Williams' declaration provides no support whatsoever for Precision Pine's allegation that the bonding requirement for companies using Frontier Insurance Company was selectively enforced.[10] See Opp. at 31.

Because Precision Pine has produced no evidence supporting its "bland allegation" of disparate treatment, nor shown that selective enforcement of the contractual bonding requirement constitutes an affirmative defense to its own breach of contract, the Court should grant the United States' motion for summary judgment.

---

[9] The record on this point is somewhat confused as Precision Pine's supporting affidavits use "Frontier" as shorthand for both companies. See Pl.'s App. 52 (using "Frontier" to refer to Frontier Pacific Insurance Company); Pl's. App. 56 (using "Frontier" to refer to Frontier Insurance Company).

[10] In addition, Mr. Williams' declaration omits the fact that the Forest Service directed NPTE to obtain replacement performance bonding in 2002. NPTE complied with the Forest Service's directive.

### C. Determination Of The Amount Of Damages Due For Precision Pine's Breach Of The O.D. Ridge Contract Should Be Remanded To The Contracting Officer

In opposing summary judgment with respect to the O.D. Ridge contract, Precision Pine argues that some or all of the amount sought in the United States' counterclaim has been paid. Opp. at 35-36. Additionally, as noted above, timber upon the O.D. Ridge contract was resold after the contracting officer's decision upon which the United States' counterclaim is premised was issued. Thus, while there is no dispute that Precision Pine has breached the O.D. Ridge contract, and that CT 9.4 provides a different measure of damages when the timber has been resold, we agree that there is currently an issue with respect to the amount of damages owed as a result of Precision Pine's breach of the O.D. Ridge contract. Consequently, we respectfully requests that the Court remand to the agency so that the contracting officer can redetermine damages resulting from Precision Pine's breach in light of the post-termination resale.[11]

## CONCLUSION

For the reasons stated in our motion for summary judgment and above, the United States respectfully requests that the Court grant our motion for summary judgment with respect to liability, enter judgment upon our counterclaim with respect to the Brookbank, Saginaw-Kennedy, Brann, U-Bar, Monument, Manaco, Hutch-Boondock, Gentry and Lily contracts, and remand the dispute concerning O.D. Ridge, Jersey Horse and Wiggins contracts to the agency to enable the respective contracting officers to determine breach damages based upon the resale formula in contract provision CT 9.4.

---

[11] For the same reason, we respectfully request a remand with respect to the Jersey Horse and Wiggins contracts.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

May 10, 2004

# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | ) | No. 02-131C<br>(Judge George Miller) |

Declaration of David P. Harris

I, David P. Harris, declare as follows:

1. I am a Supervisory Forester in the Region 3, Regional Office of the U.S. Department of Agriculture Forest Service ("Forest Service") located in Albuquerque, New Mexico. Region 3 covers the states of Arizona and New Mexico.

2. As a Supervisory Forester, I am responsible for regional oversight of all sale preparation and sale administration aspects of timber sale contracts in Region 3. I am responsible for the training and certification of timber sale administrators and Contracting Officers in Region 3. In this role I am responsible for providing the necessary training opportunities and testing required for meeting the national standards established for certified sale administrators and

Contracting Officers. I have held my current position since December 1, 2002.

3. Previously, I served as a Timber Specialist and Contracting Officer on the Kaibab National Forest in Williams, Arizona. I served in that position from January 1994 to November 2002. As timber specialist and Contracting Officer for the Kaibab National Forest, my responsibilities included oversight of the Forest timber management program, including but not limited to, timber sale preparation, appraisal, contract formulation, and contract administration.

4. Between July 22, 1994, and October 5, 2000, Precision Pine incurred 45 breaches on 17 Forest Service timber sale contracts.

5. During July, 2000, the contracting officers handling Precision Pine's Forest Service timber sale contracts, including but not limited to Susan Lee, Richard Stephens, David Harris, Dave Cummings, and Marion (Bob) Yost reviewed all of Precision Pine's contracts dating back to mid-1994, one year before the Mexican Spotted Owl (MSO) suspension, pulled all the documentation regarding breaches by Precision Pine and compiled a summary of these breaches in an effort to gain a better perspective on all of Precision Pines operations. A true and correct copy of the table containing that information is

attached as exhibit A to this declaration. The Contracting Officers did not go back further than one year prior to the MSO suspension for review.

6. A review of the summary indicates that most of PP&T's breaches were due to their failure to pay for material cut and removed. A true and correct copy of this summary is attached as Exhibit A to this Declaration.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __7th__ day of May 2004.

David P. Harris
Supervisory Forester

USDA FOREST SERVICE – REGION 3

Precision Pine and Timber, Inc. Breach History

| Forest | Sale Name | Dates Of Breaches | Contract Provision Breached | Date of Follow-Up Remedy Notices | Date Remedied |
|---|---|---|---|---|---|
| A/S | Hay | 7/28/95 | C4.4 (1/84)-Payments Not Received. Letter did not specifically mention breach, But did suspend felling & skidding | | 8/26/95 |
| | Gentry M.P. | 7/20/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | 10/2/2000 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | Wiggins M.P. | 7/20/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | 10/2/2000 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 1/11/00 | CT4.4- Payments not received for material cut and removed. | | 04/24/00 |
| | | 12/29/98 | BT4.3- Blanket Payment Bond expired. | | 1/11/99- Bond Renewed |
| | Jersey Horse | 7/20/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | 10/2/2000 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 3/21/97 | CT4.222- Failure to return downpayment to full amount after temporary reduction. | | 3/31/97 |
| | Brookbank M.P. | 7/20/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | 10/2/2000 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 12/29/98 | BT4.3 – Blanket Payment Bond expired. | | 1/11/99 – Bond Renewed. |
| | | 8/4/98 | CT4.4 – Payment not received for material cut and removed. | | 8/20/98 |
| | | 5/14/98 | CT4.4 – Payment not received for material cut and removed. | | 7/22/98 |
| | | 3/21/97 | CT4.222- Failure to return downpayment to full amount after temporary reduction. | | 3/31/97 |

USDA FOREST SERVICE – REGION 3

Precision Pine and Timber, Inc. Breach History

| Forest | Sale Name | Dates Of Breaches | Contract Provision Breached | Date of Follow-Up Remedy Notices | Date Remedied |
|---|---|---|---|---|---|
| A/S | O.D.Ridge | 7/20/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | 10/2/2000 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 6/12/00 | CT4.4 – Payments not received for material cut and removed. | 7/5/00 | Not remedied prior to contract termination. |
| | | 5/31/00 | CT4.4 – Payments not received for material cut and removed. | | Not remedied. |
| | | 4/27/00 | CT4.4 – Payments not received for material cut and removed. | | 5/3/00 |
| | | 1/11/00 | CT4.4 – Payments not received for material cut and removed. | | 2/10/00 |
| | | | | | |
| Coconino | Hutch-Boondock | 7/17/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 07/2/00<br>08/10/00<br>09/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 02/09/99 | CT4.4 &CT4.224- Blanket Payment Bond. Expired. | | 02/22/99<br>Bond Replaced |
| | | 8/31/98 | CT4.4 – Payments not received for material cut and removed | | 09/18/98-Payment Received |
| | Monument | 07/17/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 07/2/00<br>08/10/00<br>09/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 02/09/99 | CT4.4 &CT4.224- Blanket Payment Bond. expired. | | 02/22/99<br>Bond Replaced |

USDA FOREST SERVICE – REGION 3

Precision Pine and Timber, Inc. Breach History

| Forest | Sale Name | Dates Of Breaches | Contract Provision Breached | Date of Follow-Up Remedy Notices | Date Remedied |
|---|---|---|---|---|---|
| | Monument (continued) | 05/15/98 | CT4.264# - Failure to pay Initial Periodic Payment. | | 05/22/98<br>PP&T given an extension of contract time. |
| | | 01/23/97 | CT4.222 – Failure to reestablish down payment deposit refunded during the injunction.. | | 02/04/97- Bill Paid-<br>Downpayment reestablished. |
| | U-Bar | 7/17/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 07/2/00<br>08/10/00<br>09/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 02/09/99 | CT4.4 &CT4.224- Blanket Payment Bond expired. | | 02/22/99 - Bond Replaced |
| | | 08/01/97 | CT4.4 –Payment not received for volume cut and removed in June of '97 | | 08/21/97<br>Payment Made |
| | | 07/16/97 | CT4.4 –Payment not received for volume cut and removed in May of '97 | | 07/28/97<br>Payment Made |
| | Kendrick Fire Salvage | 02/09/99 | C4.4 - Blanket Payment Bond expired. | | 02/22/99<br>Bond Replaced |
| | | 08/31/98 | CT4.4 –Payment not received for volume cut and removed in July of '98. | | 09/23/98<br>Payment Made |
| | | 08/04/98 | CT4.4 – Payment not received for volume cut and removed in June of '98 | | 08/28/98<br>Payment Made |
| | Mud | 08/31/98 | CT4.4 –Payment not received for volume cut and removed. | | 09/04/98 Payment Made |
| | | 08/04/98 | CT4.4 – Payment not received for volume cut and removed. | | 08/05/98 Payment Made |
| | | | | | |

USDA FOREST SERVICE – REGION 3

Precision Pine and Timber, Inc. Breach History

| Forest | Sale Name | Dates Of Breaches | Contract Provision Breached | Date of Follow-Up Remedy Notices | Date Remedied |
|---|---|---|---|---|---|
| | Mud (cont) | 05/15/98 | CT4.254#- Failure to make additional periodic payment. | | 5/22/98 – PP&T given an extension of contract time. |
| Gila | Lily | 7/31/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 8/11/00<br>9/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | | | | |
| Kaibab | Saginaw-Kennedy | 7/17/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 8/11/00<br>9/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | | | | |
| | Brann | 10/05/00 | CT4.264# - Failure to make required Additional Periodic Payment. | | Not Remedied- CO made demand on Letter of Credit securing partial payment. Sale terminated prior to remedy. |
| | | 7/17/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond. | 8/11/00<br>9/26/00 | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 7/28/98 | CT4.4 – Failure to pay for timber cut and removed-amount of $117.51. | | 8/17/98- Payment received. |
| | | | | | |
| Tonto | Rose TS (closed-8/25/95) | 07/22/94 | CT4.4 – Payment not received for material cut and removed. | None | 7/26/940- Payment Received |
| | | 5/31/95 | CT7.2 – Failure to comply with specific Fire Precautionary Measures. | None | 6/5/95 |
| | | | | | |
| | | | | | |

USDA FOREST SERVICE – REGION 3

Precision Pine and Timber, Inc. Breach History

| Forest | Sale Name | Dates Of Breaches | Contract Provision Breached | Date of Follow-Up Remedy Notices | Date Remedied |
|---|---|---|---|---|---|
| Tonto | Manaco TS | 7/18/00 | BT9.1 & BT4.3- Failure to provide acceptable Performance Bond | | Not Remedied-Sale Terminated for Breach on 1/9/01. |
| | | 8/17/98 | CT4.4-Payments not received for material cut and removed. | None | 8/21/98 |
| | | 7/31/95 | CT4.4-Payments Not Received for material cut and removed. | None | 8/14/95 |
| | Salt TS | 6/9/98 | CT4.222-Failure to replace downpayment deposit refunded during the injunction. | | 8/14/98- PP&T notified CO if intent not to perform the contract. (Contract repudiation) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

COPY

United States Department of Agriculture | Forest Service | Apache-Sitgreaves National Forests | P.O. Box 640
Springerville, AZ 85938
(520) 333-4301
V/TTY (520) 333-6292

File Code: 2450
Date: June 9, 2000

CERTIFIED MAIL - RRR

Stone Forest Industries
ATTN: Bob McKain
P.O. Box 457
Fernandina Beach, FL 32035-0457

Dear Bob:

It has come to our attention that your surety for performance bonds and blanket payment bonds, Frontier Insurance Company, is no longer listed in the Department of Treasury Circular 570 as an acceptable surety for Federal bonding, as required by BT4.3 - Payment Guaranteed by Bond or Deposited Securities, and BT9.1 - Performance Bond.

The following sales are affected; all are covered by payment bond #152924 for a total amount of $126,000:

1. Elk Multiproduct (#001749) – $15,000.
2. Whitcom Multiproduct (#001780) – $54,000.
3. Morgan Multiproduct (#001970) – $57,000.

Notice of Breach is hereby given, and under the terms of BT9.3 - Breach, you have 30 calendar days from the date of receiving this notice to provide acceptable surety or other security for the afore mentioned timber sales.

Sincerely,

KERRY NEDROW
Acting Contracting Officer

cc:
Susan Lee, Springerville RD
Dave Reisner, Lakeside RD
Alan Lucas, RO



Printed on Recycled Paper

SCHEER'S
INCORPORATED

23 West 55th Street
Countryside, Illinois 60525
708-352-6282 • Fax 708-352-6295

June 22, 2000

Mr. Kerry Nedrow
Acting Contracting Officer
United States Dept. of Agriculture
Forest Service Division
P.O. Box 640
Springerville, AZ 85938

SENT CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Re: Stone Forest Industries
Bond No. 152924

Dear Mr. Nedrow:

Please be advised that pursuant to your letter dated June 9, 2000 to Bob McKain of Stone Forest Industries, we, on behalf of Greenwich Insurance Company have issued bond no. 157710 with an effective date of June 21, 2000, as a replacement bond to bond no. 152924. The actual bond no. 157710 has been sent directly to Jefferson Smurfit Corporation for signature and will be sent directly to Bob McKain to forward onto you.

As there is no specific cancellation clause on bond no. 152924, we request that you return bond no. 152924 upon receipt of bond no. 157710. Please feel free to contact me if you have additional questions or concerns. Thank you for your assistance.

Sincerely,

SCHEER'S, INCORPORATED

Bonnie Kruse
Agent for Frontier Insurance Company

cc: Jefferson Smurfit Corporation
Stone Forest Industries
Frontier Insurance Company



*Specializing in Bonds and Insurance – since 1963*
Member National Association of Surety Bond Producers
Member Independent Insurance Agents of America

COPY

United States Department of Agriculture
Forest Service
Apache-Sitgreaves National Forests
P.O. Box 640
Springerville, AZ 85938
(520) 333-4301
V/TTY (520) 333-6292

File Code: 2450 ✓
Date: September 19, 2000

Stone Forest Industries
ATTN: Bob McKain
PO Box 457
Fernandina Beach, FL 32035-0457

CERTIFIED MAIL – RRR

Dear Bob:

Somehow we overlooked the fact that Frontier Insurance Company also carried the performance bond for the Elk Multiproduct Sale, (contract #81099), which is no longer an acceptable surety. The performance bond for $26,000.00 will need to be replaced by an acceptable surety, as listed in the Department of Treasury Circular 570.

Also, we have just recently noticed that your performance bonds for Morgan, (contract #001970), in the amount of $12,600, and Whitcom, (contract #001780), in the amount of $28,000, carried by Amwest Surety Insurance have expired. Please furnish new bonds with surety satisfactory to the Forest Service within 30 days of receipt, as per BT9.1 Performance Bond.

Sincerely,

Kerry Nedrow

KERRY NEDROW
Acting Contracting Officer

cc:
Susan A. Lee, Springerville R.D.
Lakeside R.D.
Alan Lucas, R.O.





Printed on Recycled Paper

OCT 24 2000

**FRONTIER INSURANCE COMPANY**
**2636 Elm Hill Pike, Ste. 500, Nashville, TN 37214**

October 17, 2000

Administrator
U.S. Dept. of Agriculture
Dept. of Forest Services
309 S. Mountain Avenue
Springersville, AZ 85938

RE: **Bond Number: 81099**
**Principal: Stone Container Corporation**
**Reason for Cancellation: Bond Replaced through Gulf Insurance Company, Bond No. BE0939856, effective October 11, 2000**

Dear Sir/Madam:

Please be advised that, in accordance with the terms of the above identified bond(s), the Surety hereby elects to cancel said bond(s) and hereby gives written notice of said cancellation to the Obligee.

The cancellation shall be effective **effective on October 11, 2000,** at which time the liability of Frontier Insurance Company under **Bond Number 81099** shall cease and terminate as to subsequent acts and liabilities of the Principal.

Sincerely,

FRONTIER INSURANCE COMPANY

Bonnie Kruse
Bonnie Kruse
Attorney-in-Fact

cc: Mr. Rusty Briggs, Risk Management
Stone Container Corporation
8182 Maryland Avenue
St. Louis, MO 63105

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Smurfit-Stone

VIA AIRBORNE

October 20, 2000

United States Department of Agriculture
ATTN: Kerry Nedrow
309 S. Mountain Avenue
Springerville, AZ 85938

Dear Kerry:

Enclosed are the executed bonds as requested in your letter of September 19, 2000.

If you require any additional information, please do not hesitate to contact me at 314-746-1146.

Sincerely,

Mindy Lewis

Mindy M. Lewis
Insurance Analyst

Enclosures (4)

Cc: Bob McKain
John Cantrell

BOND NO. BE0939856 (Issued in [illegible]licate)

| PERFORMANCE BOND<br>*(See instructions on reverse)* | DATE BOND EXECUTED *(Must be same or later than date of contract)*<br>October 11, 2000 | OMB No.: 9000-0045<br>Expires: 09/30/98 |
|---|---|---|

[illegible] reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data [illegible]s, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other [illegible] of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, [illegible]20405

| PRINCIPAL *(Legal name and business address)* | TYPE OF ORGANIZATION *("X" one)* |
|---|---|
| Stone Container Corporation, a Delaware Corporation<br>1300 S. Milton Road, Ste. 220<br>Flagstaff, AZ 86001 | Corporation<br>☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>STATE OF INCORPORATION<br>Delaware |

| SURETY(IES) *(Name(s) and business address(es)* | PENAL SUM OF BOND | | | |
|---|---|---|---|---|
| | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
| Gulf Insurance Company<br>2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | --------- | --26--- | ---000-- | --00-- |
| | CONTRACT DATE | CONTRACT NO. | | |
| | 09/30/93 | 001749 Elk Multiproduc | | |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The Principal has entered into the contract identified above.

THEREFORE:

[illegible]bove obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

WITNESS:

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

STONE CONTAINER CORPORATION

**PRINCIPAL**

| | | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. [signature] (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) *(Typed)* | 1. CHARLES A. HINRICHS<br>VICE PRESIDENT AND TREASURER | | 3. | |

**INDIVIDUAL SURETY(IES)**

| | | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) *(Typed)* | 1. | 2. |

GULF INSURANCE COMPANY

**CORPORATE SURETY(IES)**

| | | | | |
|---|---|---|---|---|
| NAME & ADDRESS | 2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | STATE OF INC.<br>MO | LIABILITY LIMIT<br>$33,382,000.00 | Corporate Seal |
| SIGNATURE(S) | 1. [signature] | 2. | | |
| NAME(S) & TITLE(S) *(Typed)* | 1. Peggy Faust<br>Attorney-in-Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(b)

| PERFORMANCE BOND *(See instructions on reverse)* | DATE BOND EXECUTED *(Must be same or later than date of contract)* October 11, 2000 | OMB No.: 9000-0045 Expires: 09/30/98 |
|---|---|---|

reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data es, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other ct of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405

| PRINCIPAL *(Legal name and business address)* | TYPE OF ORGANIZATION *("X" one)* |
|---|---|
| Stone Container Corporation<br>d.b.a. Stone Forest Industries<br>1300 S. Milton Road, Ste. 220<br>Flagstaff, AZ 86001 | ☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>STATE OF INCORPORATION<br>Delaware |

| SURETY(IES) *(Name(s) and business address(es)* | PENAL SUM OF BOND | | | |
|---|---|---|---|---|
| Gulf Insurance Company<br>2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | MILLION(S): ------- | THOUSAND(S): ---12--- | HUNDRED(S): --600--- | CENTS: --00-- |
| | CONTRACT DATE: 12/11/97 | CONTRACT NO.: 001970 Morgan Multiproduct | | |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The Principal has entered into the contract identified above.

EFORE:

above obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

WITNESS:

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

STONE CONTAINER CORPORATION D.B.A

**PRINCIPAL**

| | 1. | 2. | 3. | |
|---|---|---|---|---|
| SIGNATURE(S) | STONE FOREST INDUSTRIES [signature] (Seal) | (Seal) | (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) *(Typed)* | CHARLES A. HINRICHS<br>VICE PRESIDENT AND TREASURER | | | |

**INDIVIDUAL SURETY(IES)**

| | 1. | 2. |
|---|---|---|
| SIGNATURE(S) | (Seal) | (Seal) |
| NAME(S) *(Typed)* | | |

GULF INSURANCE COMPANY

**CORPORATE SURETY(IES)**

| | | | | | |
|---|---|---|---|---|---|
| SURETY | NAME & ADDRESS | 2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | STATE OF INC.: MO | LIABILITY LIMIT: $33,382,000.00 | Corporate Seal |
| | SIGNATURE(S) | 1. [signature] | 2. | | |
| | NAME(S) & TITLE(S) *(Typed)* | 1. Peggy Faust<br>Attorney-in-Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(b)

Bond No.BE00098859

| **PERFORMANCE BOND** *(See instructions on reverse)* | DATE BOND EXECUTED *(Must be same or later than date of contract)* October 13, 2000 | OMB No.: 9000-004 Expires: 09/30/98 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washin DC 20405

| PRINCIPAL *(Legal name and business address)* | TYPE OF ORGANIZATION *("X" one)* |
|---|---|
| Stone Container Corporation<br>d.b.a. Stone Forest Industries<br>P.O. Box 1480<br>Eager, AZ 85925 | ☐ INDIVIDUAL ☐ PARTNERSHIP<br>☐ JOINT VENTURE ☒ CORPORATION<br>STATE OF INCORPORATION: Delaware |

| SURETY(IES) *(Name(s) and business address(es)* | PENAL SUM OF BOND | | | |
|---|---|---|---|---|
| | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENT |
| Gulf Insurance Company<br>2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | -------- | ---28--- | --000--- | --( |
| | CONTRACT DATE: 07/14/94 | CONTRACT NO.: 001780 Whitcom | | |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only fo purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally wit Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full an of the penal sum.

CONDITIONS:

The Principal has entered into the contract identified above.

THEREFORE:

The above obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term o contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any gua required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respe which this bond is furnished.

WITNESS:

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

**PRINCIPAL**

STONE CONTAINER CORPORATION d.b.a. STONE FOREST INDUSTRIES

| | 1. | 2. | 3. | |
|---|---|---|---|---|
| SIGNATURE(S) | [signature] (Seal) | (Seal) | (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) *(Typed)* | CHARLES A. HINRICHS<br>VICE PRESIDENT AND TREASURER | | | |

**INDIVIDUAL SURETY(IES)**

| | 1. | 2. |
|---|---|---|
| SIGNATURE(S) | (Seal) | (S |
| NAME(S) *(Typed)* | | |

**CORPORATE SURETY(IES)**

GULF INSURANCE COMPANY

| SURETY A | | | | |
|---|---|---|---|---|
| NAME & ADDRESS | 2636 Elm Hill Pike, Ste. 500<br>Nashville, TN 37214 | STATE OF INC.: MO | LIABILITY LIMIT: $ 33,382,000.00 | Corporate Seal |
| SIGNATURE(S) | 1. [signature] | 2. | | |
| NAME(S) & TITLE(S) *(Typed)* | 1. Peggy Faust<br>Attorney-in-Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

September 21, 1995

Stone Container
Forest Products Division
P O Drawer 450
Snowflake, AZ 85937
Sean Leary

Dear Mr. Leary:

In light of the current timber shortage in Region 3, I was not surprised to hear recently that Stone Forest Industries is interested in purchasing round wood. As a long-time supplier of round wood to Stone, we were surprised that no one contatcted us regarding Precision Pines's availability as a source of supply. In any case, Prescision Pine does have round wood available. I am offering Stone approximately 1000 cords at $93.00 per cord form the Park Timber Sale. We are ready to make this available to you immediately. Please get back to me as soon as possible regarding this offer.

Sincerely yours,

Lewis N. Tenney, Jr.

EXHIBIT
Tenney No 12
2/5/04

**Stone Container Corporation**

Forest Products Division

P.O. Drawer 450
Snowflake, Arizona 85937

602 536-4314

OCTOBER 3, 1995

LEWIS TENNEY
PRECISION PINE & TIMBER
PO BOX 70
HEBER, AZ 85928

DEAR LEWIS

THANK YOU FOR YOUR LETTER REGARDING PULPWOOD FROM THE PARK TIMBER SALE. AT THIS TIME OUR SITUATION AT THE LOG LANDING IS FAIRLY SECURE FOR THE CURRENT LOGGING SEASON, AND AT THIS TIME WE ARE NOT LOOKING TO MAKE ANY NEW COMMITMENTS FOR PULPWOOD IN THIS SEASON.

WE AT STONE FOREST PRODUCTS APPRECIATE THE VOLUME OF PULPWOOD DELIVERED BY PRECISION PINE IN 1995.

SINCERELY

Sean

SEAN P. LEARY
AREA MANAGER

EH

CC: STEVE C. BENNETT

EXHIBIT
Tenney no. 13
2/5/03

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 536-2181
P.O. DRAWER W WINSLOW, AZ 86047

EXHIBIT
Smith No 29
[illegible]

31 Oct 95

Al Schirman, TSA
Long Valley RD
Coconino N.F.

RE: Hatch BD

Al,

As we discussed at the Hatch BD Pre Work yesterday - PP&T does not have an outlet for pulpwood at this time. Jerry Zellner at Camp Verde has indicated that he would take the wood in the spring.

In terms of Hatch BD we plan to harvest Sawlogs only at this time concentrating on the Hatch side.

We anticipate entering the Hatch side and the Boondock Side next Spring to harvest the pulpwood and Misc Saw logs that will develope.

Thank You for your understanding on this Matter.

Sincerely,

B. Smith, Pur. Rep.

Date
~~MARCH~~ 22, 1996

MILO LARSON, TIMBER STAFF
USFS - SOUTHWESTERN REGION
517 GOLD AVE, S.W.
ALBUQUERQUE, NEW MEXICO 87102

MILO,

PRECISION PINE & TIMBER, INC. IS THE HOLDER OF TIMBER SALE CONTRACT - 02-006577, OTHERWISE KNOWN AS BRANN ON THE CHALENDER DISTRICT OF THE KAIBAB NATIONAL FOREST.

WE BEGAN HARVEST OF THIS SALE IN JANUARY OF 1996. WE HARVESTED THE SAWLOG COMPONENT ONLY, AS WE DID NOT HAVE AN OUTLET FOR THE 5" TO 8.9" DBH PULPWOOD COMPONENT.

DURING THE SAWLOG HARVEST WE WERE APPROACHED BY A COMPANY INTERESTED IN HARVESTING THE PULPWOOD FOR DELIVERY TO STONE CONTAINER IN FLAGSTAFF. WE CONTRACTED WITH THIS COMPANY AND THE PULPWOOD OPERATION WAS STARTED.

TWO DAYS INTO THE HAUL THE PULPWOOD OPERATION WAS FORCED TO CEASE BECAUSE STONE CONTAINER DID NOT WANT THE WOOD.

WE ASSUMED THAT "SOMEONE" AT STONE REALIZED THAT THE WOOD WAS FROM A PRECISION PINE & TIMBER INC. SALE, BRANN, AND THAT THEY WOULD NOT ACCEPT THE WOOD. WE WERE TOLD LATER THAT A COMMENT WAS MADE BY A STONE EMPLOYEE - (SOMETHING TO THE EFFECT THAT...) - YOU DID NOT TELL ME THAT THIS WOOD WAS FROM A PRECISION SALE.

A LATER INCIDENT INVOLVES A STONE EMPLOYEE RELATING THAT STONE WOULD NOT PURCHASE PULPWOOD FROM PRECISION PINE AND TIMBER OR DUKE CITY LUMBER COMPANY.

THESE INCIDENTS FURTHER SUPPORTS OUR POSITION THAT MULTI-PRODUCT SALES NEED TO BE DISCONTINUED. THE SAWLOG AND PULPWOOD COMPONENTS NEED TO BE SOLD SEPARATELY OR THE PULPWOOD BE LISTED

WE AS A COMPANY CANNOT SURVIVE LONG WHEN WE HAVE NO OUTLET FOR A PRODUCT-(PULPWOOD)THAT WE ARE FORCED TO PURCHASE ALONG WITH SAW-LOGS WHICH WE DO REQUIRE.

WILL YOU PLEASE,ONCE AGAIN,CONSIDER SEPARATING THE SAWLOG - PULPWOOD COMPONENT FROM FUTURE TIMBER SALE PLANNING AND LAYOUT.

SINCERELY,

LORIN D. PORTER
PRESIDENT

MUD 117 / 12

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

P.O. DRAWER W WINSLOW, AZ 86047

Richard Stevens, F.S.R.
Mormon Lake R.D.

12 July 96

RE: Mud M.P.

Dick,

After meeting with everyone today I can finally put together some semblance of an Operating Plan. As we discussed Warren Smith Contracting will start the P.C. Work on Wednesday the 17th starting on PU1 and working through 2, 3 and 4 if you can get 4 squared away for us. We had started logging on the State (Park T.S.) and had to move to the Saddle Sale [illegible] today.

EXHIBIT
Smith no 46
[illegible] 2/2/04

Once TriStar has their feet on the ground on Saddle I will request permission and plan a Prework for Wld. I understand that we can work P.U. 1 without concern over the two small pieces of PC road which won't be used for PU1 any way. Hopefully the road work will progress as planed so that we can proceed behind it with logging. We will plan to harvest sawlogs 9"+ at this time.

Lewis and Lonnie have been in

contact with Stone. Stone has indicated that they will probably take our pulpwood some time this fall. We would plan to begin the pulpwood harvest once that outlet is available. At this time I don't know if we would go tree length direct or bolts thru the reload in Flag.

At any rate it appears that we will have a/the logical outlet for our pulpwood.

I will prepare more detail on other items for the Logging Prework.

Sincerely,

Keith [illegible], Par. Rep.

(Capitaken)

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-3112 • FAX (602) 535-9196
P.O. DRAWER W WINSLOW, AZ 86047

22 Jan 97

To: Various Interested Parties
From: John B. Smith, Purchaser Rep
RE: Logging Plans for Various Sales

Please find attached an estimated Logging Schedule/plan for our Sales for 1997.

These are estimated start dates and are subject to change depending upon which Mill or Mills we have open and the availability of a Market for our pulpwood.

Sincerely
John B. Smith
John B Smith

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

\- - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - -x

Washington, D.C.

Monday, February 2, 2004

Deposition of JOHN B. SMITH, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:05 a.m., Monday, February 2, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 14

seventeen years?
A. Yes, I did.
Q. And when was it you left Duke City Lumber Company?
A. Let's see. I left Duke City in the latter part of 1991.
Q. And what did you do then?
A. I was laid off for a period of months, and I went to work for Precision Pine & Timber, or actually not laid off, just out of work.
Q. When did you start your work with Precision Pine?
A. It would have been early in '92, either May or June. I don't remember which month.
Q. And could you describe what your responsibilities were once you started with Precision Pine?
A. With Precision Pine, there again, I was to act as purchaser representative, as the liaison between the company and a logging contractor and the Forest Service on Forest Service timber sales.
Q. Did you have any other responsibilities?

Page 15

A. I did. I served on various and sundry committees that I was asked to.
I was active in some of the forest planning things for specific areas in the forest as the company's representative.
Q. And were there any other things you did while you were at Precision Pine?
A. It was kind of other duties as asked to do.
Q. Do you remember what some of those other duties that you were asked to do were?
A. Oh, boy -- let's see. I did some scaling, and I'm still doing some scaling.
I kept track of logs, loads of logs coming into the sawmill and provided information to our company I guess you would call him the comptroller to establish, I established the logger pay amounts for him.
Q. All right. Is there anything else you remember that you did?
A. Not -- I know there was more things. It's just a matter of some I've done.
I just don't remember what they are at this point.
Q. Who was the company controller that

Page 16

you were talking about?
A. Mel, well, yes, Mel Bowers was the one I did the most work with.
Q. Were there others?
A. When I first went there, I'll have to kind of defer to Mr. Porter that's here on that one.
I believe it was his brother-in-law Jack Porter that was in that capacity when I went to work I believe.
Q. You mentioned you worked on some committees, including forest planning.
What did that involve?
A. It involved going to the meetings and actually having input as a member of the public into the various planning efforts that they had going.
Q. Who held these meetings?
A. The Forest Service officials; I mean various, various ones, not always the same, different districts, different forests, had different meetings, different things they were planning.
Q. So what was discussed at these sort of forest planning meetings?

Page 17

A. The ones I went to were basically the planning for a given area under consideration on what the public, me being part of the public as a representative of the company, thought needed to be done for a particular area in the land management.
Q. And about what time period was it that you were going to these sorts of meetings?
A. Off and on, during the whole time I have been working for the company except recently, and those have all kind of faded it seems to me at this point.
Q. You said you were a purchaser rep for Precision Pine?
A. Yes.
Q. Were your responsibilities at Precision Pine any different than what you were doing with Duke City?
A. No. Um-um. You're roughly the same type of, same type of contracts, so basically the same thing.
Q. Did you do work outside of contracting with the Forest Service, for instance, with state contracts or Indian reservation contracts or any other contracts?

A. Oh, yes. We had state contracts, some reservation contracts, and minimal amount of private contacts, contracts.
Q. What responsibilities did you have with those sorts of contracts?
A. With the state and with the Indian tribes, it would have been just about the same -- the contract documents for the timber sale in all, for all practical purposes were about the same.
Private individuals there is very minimal.
Q. And you mentioned that you were a liaison with the loggers and the Forest Service.
Talking about the loggers first, what did you do as the company liaison with the loggers?
A. I was a contact person. It was kind of a three-way committee if you would where we would meet with the logger, myself and my company and the Forest Service, to talk about the day-by-day, the Forest Service side administration of the contract, me working with the Forest Service on the administration, through the logger doing the actual physical



work.
Q. Did Precision Pine always hire loggers to do its work, or did it do some of the work in-house?
A. In terms of company name, I would actually have to defer that to Mr. Tenney or Mr. Porter.
There was some that you would quote say in-house, but I don't know if they would have been working under the name of Precision Pine & Timber or one of the other companies that Mr. Porter and Mr. Tenney had.
I'll have to defer part of that answer to them because I don't know.
Q. So Premium Pine had some subsidiaries or Mr. Porter and Tenney had some other companies that might have done some logging work at various times, is that what you're saying?
A. The terminology subsidiary or second, I don't know, but anyhow, there was some different entities in there.
Q. Most of the time, was it true that it was a third party that was not related to Precision Pine that did the logging work?
A. Yes. Yes.



Q. While you were at Precision Pine, did you have any responsibilities in connection with acquiring timber for the company?
A. Acquiring in what way are you -- I don't quite understand the question.
Q. Purchasing, purchasing timber sales or analyzing timber sales that the company was going to bid on, did you have any role in that respect?
A. Purchasing say at the bid table, yes.
Q. Maybe it would helpful if I just went back to some of the things that you said you were doing at Duke.
A. Okay.
Q. You, of course, said you were the purchaser rep?
A. Correct.
Q. You also mentioned you were doing some cruising at Duke?
A. Yes.
Q. Did you do any of that at Precision?
A. No, not to the extent that I did with Duke City, I did not.
Q. So it was a minor part of your work if you did it at all?



A. Yes.
Q. How about appraisal? Did you do any appraisal work for Precision Pine?
A. No, I did not.
Q. And you said you did do some work bidding for Precision Pine?
A. Yes.
Q. Okay. As for the bidding, do you remember any of the contracts that you bid?
A. The one I remember was a small tract of timber on a blow-down that was over in the Flagstaff area.
Other than that, I can't give you any specific because that particular one, I remember because of the nature of the timber that was on it.
Q. Was it unusual that you did the bidding work?
A. Yes, it was. That was not a common practice for me to do that, but I did some.
Q. Were you involved in planning when individual timber sales would be harvested by Precision Pine?
A. In the final analysis of when those were to be operated, no.

LOIS J. SCHIFFER
Assistant Attorney General
EILEEN SOBECK
ELINOR COLBOURN - D.C. Bar No. 430428
Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7369
Benjamin Franklin Station
Washington, D.C. 20044-7369
Telephone: (202) 272-9887

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| DR. ROBIN SILVER, et al., Plaintiffs, v. BRUCE BABBITT, et al., Defendants. | CIV-94-0337-PHX-CAM<br>CIV-94-1610-PHX-CAM<br>(Consolidated) |
| DR. ROBIN SILVER, et al., Plaintiffs, v. JACK WARD THOMAS, et al., Defendants. | STIPULATION CONCERNING PLAINTIFFS' CLAIMS AGAINST THE UNITED STATES FOREST SERVICE |

Defendants Jack Ward Thomas, in his official capacity as Chief of the United States Forest Service, and the United States Forest Service, and plaintiffs Dr. Robin Silver, the Forest Conservation Council, Forest Guardians, Southwest Center for Biological Diversity, Biodiversity Legal Foundation, Carson Forest Watch, Greater Gila Biodiversity Project, Maricopa Audubon Society, and Dine Citizens Against Ruining Our Environment, through their undersigned counsel, stipulate and agree as follows with respect to the claims in Civil Action Number CIV-94-1610-PHX-CAM, subject to approval of the Court:

1. The parties to this Stipulation agree that this Stipulation and the order to be entered thereon consist of a compromise of disputed claims for the purpose of settlement in CIV-94-

STS-856
federal district court az Az

1610-PHX-CAM, and shall not constitute any admission of fact or law by any party. The parties agree that they shall not cite, rely upon, or mention this settlement, this Stipulation, the Order approving this Stipulation or the Judgment entered thereon, in any other litigation. If a person cites the entry of the injunction in this case in some other litigation, the fact that this case was thereafter settled may be made known to that court. The parties agree that they shall not cite or rely upon this settlement, this Stipulation, the Order approving this Stipulation, or the Judgment entered thereon concerning the construction or application of the Endangered Species Act.

2. The United States Forest Service agrees to complete the ongoing process of consultation with the United States Fish and Wildlife Service concerning the Mexican Spotted Owl for the existing Land and Resource Management Plans ("LRMPs") and the LRMPs as amended. The United States Forest Service and its Chief agree to waive their rights to appeal in this case from the August 24, 1995 Injunction Order, this Stipulation, the Order to be entered approving this Stipulation and the Judgment to be entered thereon.

3. The Forest Service will suspend implementation or approval of all projects involving the cutting of trees in Region 3 until consultation on the existing LRMPs and the LRMPs as amended are completed (i.e., when the Biological Opinions are issued), except that the Forest Service may proceed with all projects and activities set forth in subparagraphs a through n below, during the consultation on the existing LRMPs and on the LRMPs as amended, provided that they meet the following restrictions. If a project has been omitted from Exhibit A by oversight of the Forest Service, the parties agree to discuss same and to determine if it may proceed by further stipulation.

a. Christmas tree cutting projects, involving any species, can proceed outside of riparian areas whether in or outside of designated critical habitat for the Mexican spotted owl (hereinafter

"critical habitat"), provided no tree greater than 6 inches DBH is cut. If inside critical habitat, trees may only be cut within designated areas.

b. Outside critical habitat, commercial timber sales (harvest for which a fee is paid and which is intended for resale), that are listed in Exhibit A, may proceed, if the trees are located in pinyon-juniper cover type and outside of riparian areas. Within critical habitat, commercial timber sales that are listed in Exhibit A may proceed if the trees are located in pinyon-juniper cover type, are outside riparian areas, and the dispersal habitat rule is followed.

c. Hazard tree felling can proceed only where there is immediate danger to human life or property. Routine or scheduled hazard tree removal remains suspended.

d. Cutting live trees for personal use (not intended for resale) products such as latillas, tipi poles or fence poles, other than vigas and firewood, may occur in designated areas that are located outside of riparian areas and outside of critical habitat. Dead and down timber may be gathered for such personal use products other than vigas and firewood, from designated areas that are located outside riparian areas, but may be located either inside or outside critical habitat.

e. Personal use firewood activity may proceed outside of critical habitat from general areas. Dead and down timber may be gathered from designated areas inside and outside critical habitat.

STS-858

Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas. On the Carson National Forest, all firewood must come from designated areas outside of critical habitat and riparian areas, except for existing slash piles. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas.

f. Vigas must come from designated areas outside critical habitat and riparian areas. They may be cut in Ponderosa Pine cover type in critical habitat only if the dispersal habitat rule is followed.

g. Roads and facilities projects listed on Exhibit A may proceed outside of critical habitat, except new road corridors in forested areas remain suspended. Inside critical habitat, roads and facilities projects listed on Exhibit A may proceed, if tree-cutting is confined to existing areas of disturbance (i.e. road right-of-way, administrative site, current boundary of recreation site, microwave site, etc.). Routine maintenance of Service Level C and D Forest Development roads (local and unimproved roads) that involves tree-cutting will remain suspended. Routine maintenance of Arterial, Collector and Service Level A and B Forest Development roads may proceed with the above restrictions.

h. Fences and survey line projects listed on Exhibit A may proceed outside of critical habitat. They may proceed in critical habitat provided no trees in excess of 6 inches DBH are felled.

5TST 857

i. Outside critical habitat and riparian areas, silvicultural work listed on Exhibit A, such as precommercial thinning ("TSI"), meadow clearing, wildlife projects, vegetation management, and aspen treatment may proceed. Inside critical habitat and outside riparian areas, such silvicultural work listed on Exhibit A may proceed provided no tree larger than 6 inches DBH is felled and provided the dispersal habitat rule is met. Riparian wildlife habitat improvement projects may proceed in riparian areas subject to the above limitations.

j. Outside critical habitat, prescribed burns listed on Exhibit A may proceed. Inside critical habitat, prescribed burns listed on Exhibit A may proceed provided no trees larger than 6 inches DBH are felled for firelines, fuelbreaks or other purposes and provided that the dispersal habitat rule is followed. Any control lines will be hand dug. The Forest Service will protect snags where practical.

k. Tree-cutting projects listed on Exhibit A associated with mining/minerals activities may proceed in pinyon-juniper cover type.

l. The following projects listed on Exhibit A may proceed: Manaco (after the Forest Service requests concurrence by the United States Fish and Wildlife Service on the "no effect" finding by the United States Forest Service, and the United States Fish and Wildlife Service either concurs or declines to consider the matter), Ojos Ryan, Fence-Bagnall, Lons, and Yarro.

STS-862

m. The following additional projects may proceed: Sunspot National Solar Observatory, Hutch Boondock, Black Fire (including Bank and Aspen) Salvage, Bridge Salvage, Scott Able Salvage, Brann, Mount Lemmon Federal Highway, Saint Joseph, Payment Unit One of Isabelle, Filipito Unit 4, Filipito Unit 9, Filipito Unit 8 (which has not been sold, except that within Unit 8, trees larger than 18 inches DBH shall not be commercially harvested within ten (10) years from the date of entry of the Judgment to be entered herein), Paris, and Hay on the Lincoln National Forest.

n. Emergency responses to prevent immediate, irreparable harm to human life or property caused by unforeseeable events such as wildfire, floods and storms, can be taken.

4. The Campbell Sale on the Apache-Sitgreaves National Forest and the Barber Sale on the Coconino National Forest will be cancelled by the Forest Service. The Forest Service agrees that in the absence of a catastrophic event that leaves no reasonable doubt that treatment is necessary, trees larger than 12 inches DBH will not be commercially harvested from the Campbell and Barber sale areas during the 15 years after the date of entry of the Judgment in this action. During this 15 year period, the Forest Service will not permit any precommercial thinning that removes trees over 6 inches DBH or reduces the canopy closure below 40%, nor construction of any new roads, in these sale areas.

5. The Mud Timber Sale on the Coconino National Forest is the subject of other litigation under the National Environmental Policy Act (NEPA), captioned Southwest Center for Biological Diversity, et al. v. United States Forest Service, et al., CIV-95-1927-PCT-RCB (District of Arizona). The Forest Service will modify Cutting Units 1, 4 and 16 of the Mud Timber Sale. In those Cutting Units trees larger than 12 inches DBH will not be harvested pursuant to the existing timber sale contract. The plaintiffs in that case, who are among the

5TJ-86

plaintiffs in this case, will forthwith dismiss that case voluntarily, with prejudice. The Forest Service will pay plaintiffs' reasonable attorneys' fees and costs in that litigation, the amount to be determined, if possible, through further negotiations.

6. The United States Forest Service will provide plaintiffs at least five (5) days advanced notice of the completion of consultation on the existing LRMPs and the LRMPs as amended. At that time the Forest Service will provide the plaintiffs with a copy of the most current draft of the Biological Opinion for such LRMP in its possession. The suspension of activities pursuant to the Order to be entered on this stipulation terminates when such consultations are completed (i.e. the biological opinions are issued).

7. The United States Forest Service agrees that the Rocky Mountain Research Station will conduct a literature review of the status of knowledge of songbirds in the ponderosa pine type in Arizona and New Mexico. This review will include, but not be limited to, a synthesis of existing research on songbirds and identification of research needs. The review will be subject to a blind peer review by three professional societies, including at least one society with expertise in the conservation of songbird populations. The results of the review will be published by the Station after peer review and within 18 months of entry of the Judgment herein. In addition, the Rocky Mountain Research Station will conduct a workshop to identify research needs for forest resource management in Arizona and New Mexico, including but not limited to, the research needs for federally listed species. The Station will publish this report within 18 months of the entry of the Judgment herein. The parties acknowledge that the projects provided for in this paragraph are not a substitute for, nor a prerequisite to, initiation of consultations by the United States Fish and Wildlife Service under the Endangered Species Act, nor a source of information necessary for the completion of any such consultations.

8. Regarding the notice of intent to sue dated October 11, 1994, sent by the Greater Gila Biodiversity Project and the Southwest Center for Biological Diversity regarding

 STJ-862

consultation on the LRMP level on some species listed as threatened or endangered pursuant to the Endangered Species Act, the parties agree to a "cooling off period" of thirty (30) days, beginning when the United States Forest Service receives from potential plaintiffs written notice that they intend to pursue in court their notice of intent to sue. During the cooling off period, plaintiffs will not file the suit contemplated in the notice letter and representatives of the potential plaintiffs and the United States Forest Service will meet and engage in alternative dispute resolution.

9. With approval of this Stipulation and entry of the Judgment herein, the United States Forest Service withdraws its pending Motion for Clarification and the plaintiffs dismiss any remaining claims stated in their Complaint against the United States Forest Service and its Chief, other than for attorneys' fees and costs.

10. Subject to the Court's approval of this stipulation and entry of the Judgment, the United States Forest Service agrees to pay plaintiffs' reasonable attorneys fees and costs incurred in relation to plaintiffs' claims against the United States Forest Service in this case, such amount to be determined, if possible, through further negotiations. If not resolved through negotiations, the Court will decide how much the Forest Service will pay in reasonable fees and costs to the plaintiffs.

11. The parties acknowledge that the issues concerning plaintiffs' claims against the Bureau of Indian Affairs, Department of the Interior (BIA) remain pending.

12. The parties agree to entry of the Order Approving Stipulation Concerning Plaintiffs' Claims Against the United States Forest Service and the Judgment lodged herewith. The parties agree that upon entry of the Judgment in this action the Court shall retain jurisdiction to award attorneys' fees and costs, enforce the provisions of the Order approving this

STJ863

Stipulation and the Judgment, and to resolve plaintiffs' claims against the BIA in this action.

Respectfully submitted this 18 day of October, 1995.

LOIS J. SCHIFFER
Assistant Attorney General

EILEEN SOBECK, Attorney
U.S. Department of Justice

Michael A. Johns
Assistant U.S. Attorney, for

ELINOR COLBOURN, Attorney
D.C. Bar No. 430428
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7369
Benjamin Franklin Station
Washington, D.C. 20044-7369
(202) 272-5887
Attorneys for Defendants

STEVEN SUGARMAN, Attorney
612 Old Santa Fe Trail
Santa Fe, New Mexico 87501

Mark Hughes
MARK HUGHES, Attorney
Earthlaw
University of Denver - Foote Hall
7150 Montview Boulevard
Denver, Colorado 80220

Attorneys for Plaintiffs

STS-864

Copy of the foregoing mailed this ____ day of October, 1995, to:

Mark Hughes
Earthlaw
1845 Bellaire Street
Denver, Colorado 80220
Attorneys for Plaintiffs

Steven Sugarman
612 Santa Fe Trail, Suite B
Santa Fe, New Mexico 87501
Attorney for Plaintiffs

Grant Woods
Attorney General
Mary Mangotich Grier
Assistant Attorney General
Civil Division
1275 West Washington
Phoenix, Arizona 85007
Attorneys for State of Arizona

Norman James
Jay Shapiro
Ryley, Carlock & Applewhite
101 North First Avenue, Suite 2700
Phoenix, Arizona 85003-1973
Attorneys for Apache County and White Sands Forest Products, Inc.

Stephen G. Udall
Russell H. Burdick
Apache County Attorney
P.O. Box 637
St. Johns, Arizona 85936-0637

Christopher L. Callahan
Robert D. Anderson
Joseph P. Mikitish
Fennemore Craig
Two North Central Avenue
Suite 220
Phoenix, Arizona 85004-2390
Attorneys for Stone Container Corporation

Alan I. Saltman
Gary G. Stevens
Saltman & Stevens
1800 M. Street, N.W.
Suite 700 South
Washington, D.C. 20036
Attorneys for Precision Pine & Timber, Inc.

Richard A. Segal
Gust Rosenfeld
201 North Central Avenue
Suite 3300
Phoenix, Arizona 85073-3300
Attorneys for Precision Pine & Timber, Inc.

______________________________

STS-865

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| DR. ROBIN SILVER, et al.,<br>Plaintiffs,<br>v.<br>BRUCE BABBITT, et al.,<br>Defendants. | CIV-94-0337-PHX-CAM<br>CIV-94-1610-PHX-CAM<br>(Consolidated) |
| DR. ROBIN SILVER, et al.,<br>Plaintiffs,<br>v.<br>JACK WARD THOMAS, et al.,<br>Defendants. | ORDER APPROVING STIPULATION CONCERNING PLAINTIFFS' CLAIMS AGAINST UNITED STATES FOREST SERVICE |

The Court having received and considered the Stipulation Concerning Plaintiffs' Claims Against the United States Forest Service, and good cause having been shown,

It Is Ordered as follows:

1. The Stipulation is approved in its entirety. The Stipulation and this Order consist of a compromise of disputed claims for the purpose of settlement in CIV-94-1610-PHX-CAM, and shall not constitute any admission of fact or law by any party. The parties shall not cite, rely upon, or mention the settlement, the Stipulation, this Order approving the Stipulation or the Judgment entered thereon, in any other litigation. If a person cites the entry of the injunction in this case in some other litigation, the fact that this case was thereafter settled may be made known to that court. The parties shall not cite or rely upon the settlement, the

Stipulation, this Order approving the Stipulation, or the Judgment entered hereon concerning the construction or application of the Endangered Species Act.

2. The United States Forest Service shall complete the ongoing process of consultation with the United States Fish and Wildlife Service concerning the Mexican spotted owl for the existing Land and Resource Management Plans ("LRMPs) and the LRMPs as amended. The United States Forest Service and its Chief have waived their rights to appeal in this case from the August 24, 1995 Injunction Order, the Stipulation and the Judgment to be entered hereon.

3. The Forest Service shall suspend implementation or approval of all projects involving the cutting of trees in Region 3 until consultation on the existing LRMPs and the LRMPs as amended are completed (i.e., when the Biological Opinions are issued), except that the Forest Service may proceed with all projects and activities set forth in subparagraphs a through n below, during the consultation on the existing LRMPs and on the LRMPs as amended, provided that they meet the following restrictions. If a project has been omitted from Exhibit A by oversight of the Forest Service, the parties shall discuss same and determine if it may proceed by further stipulation.

a. Christmas tree cutting projects, involving any species, can proceed outside of riparian areas whether in or outside of designated critical habitat for the Mexican spotted owl (hereinafter "critical habitat"), provided no tree greater than 6 inches DBH is cut. If inside critical habitat, trees may only be cut within designated areas.

b. Outside critical habitat, commercial timber sales (harvest for which a fee is paid and which is intended for resale), that are listed in Exhibit A may proceed, if the trees are located in pinyon-juniper cover type and outside of riparian areas. Within critical habitat, commercial timber sales that are listed in Exhibit A

STD-867

may proceed, if the trees are located in pinyon-juniper cover type, are outside riparian areas, and the dispersal habitat rule is followed.

c. Hazard tree felling can proceed only where there is immediate danger to human life or property. Routine or scheduled hazard tree removal remains suspended.

d. Cutting live trees for personal use (not intended for resale) products, such as latillas, tipi poles or fence poles, other than vigas and firewood, may occur in designated areas that are located outside of riparian areas and outside of critical habitat. Dead and down timber may be gathered for such personal use products, other than vigas and firewood, from designated areas that are located outside riparian areas, but may be located either inside or outside critical habitat. e . Personal use firewood activity may proceed outside of critical habitat from general areas. Dead and down timber may be gathered from designated areas inside and outside critical habitat. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas. On the Carson National Forest, all fire-wood must come from designated areas outside of critical habitat and riparian areas, except for existing slash piles. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas.

f. Vigas must come from designated areas outside critical habitat and riparian areas. They may be cut in Ponderosa Pine cover type in critical habitat only if the dispersal habitat rule is followed.

g. Roads and facilities projects listed on Exhibit A may proceed outside of critical habitat, except new road corridors in forested areas remain suspended. Inside critical habitat, roads and facilities projects listed on Exhibit A may proceed, if tree-cutting is confined to existing areas of disturbance (i.e. road right-of-way,

STJ-860

administrative site, current boundary of recreation site, microwave site, etc.). Routine maintenance of Service Level C and D Forest Development roads (local and unimproved roads) that involves tree-cutting will remain suspended. Routine maintenance of Arterial, Collector and Service Level A and B Forest Development roads may proceed with the above restrictions.

h. Fences and survey line projects listed on Exhibit A may proceed outside of critical habitat. They may proceed in critical habitat provided no trees in excess of 6 inches DBH are felled.

i. Outside critical habitat and riparian areas, silvicultural work listed on Exhibit A, such as precommercial thinning ("TSI"), meadow clearing, wildlife projects, vegetation management, and aspen treatment may proceed. Inside critical habitat and outside riparian areas, such silvicultural work listed on Exhibit A may proceed provided no tree larger than 6 inches DBH is felled and provided the dispersal habitat rule is met. Riparian wildlife habitat improvement projects may proceed in riparian areas subject to the above limitations.

j. Outside critical habitat, prescribed burns listed on Exhibit A may proceed. Inside critical habitat, prescribed burns listed on Exhibit A may proceed provided no trees larger than 6 inches DBH are felled for firelines, fuelbreaks or other purposes and provided that the dispersal habitat rule is followed. Any control lines will be hand dug. The Forest Service will protect snags where practical.

k. Tree-cutting projects listed on Exhibit A associated with mining/minerals activities may proceed in pinyon-juniper cover type.

l. The following projects listed on Exhibit A may proceed: Manaco (after the Forest Service requests concurrence by the United States Fish and Wildlife Service on the "no effect" finding by the United States Forest Service, and the United States Fi[illegible] and

575-869

Wildlife Service either concurs or declines to consider the matter), Ojo [illegible], Fence-Bagnall, Lons, and Yarro.

m. The following additional projects may proceed: Sunspot National Solar Observatory, Hutch Boondock, Black Fire (Including Bank and Aspen) Salvage, Bridge Salvage, Scott Able Salvage, Brann, Mount Lemmon Federal Highway, Saint Joseph, Payment Unit One of Isabelle, Filipito Unit 4, Filipito Unit 9, Filipito Unit 8 (which has not been sold, except that trees larger than 18 inches DBH will not be commercially harvested in Unit 8 for ten (10) years following entry of the Judgment to be entered herein), Paris, and Hay on the Lincoln National Forest.

n. Emergency responses to prevent immediate, irreparable harm to human life or property caused by unforeseeable events such as wildfire, floods and storms, can be taken.

4. The Campbell Sale on the Apache-Sitgreaves National Forest and the Barber Sale on the Coconino National Forest will be cancelled by the Forest Service. In the absence of a catastrophic event that leaves no reasonable doubt that treatment is necessary, trees larger than 12 inches DBH will not be commercially harvested from the Campbell and Barber sale areas during the 15 years after the date of entry of the Judgment in this action. During this 15 year period, the Forest Service will not permit any precommercial thinning that removes trees over 6 inches DBH or reduces the canopy closure below 40%, nor construction of any new roads, in these sale areas.

5. The Mud Timber Sale on the Coconino National Forest is the subject of other litigation under the National Environmental Policy Act (NEPA), captioned <u>Southwest Center for Biological Diversity, et al. v. United States Forest Service, et al.</u>, CIV-95-1927-PCT-RCB (District of Arizona). The Forest Service will modify Cutting Units 1, 4 and 16 of the Mud Timber Sale. In those Cutting Units trees larger than 12 inches DBH will not be harvested

575-870

pursuant to the existing timber sale contract. The plaintiffs in that case, who are among the plaintiffs in this case, will forthwith dismiss that case voluntarily, with prejudice. The Forest Service will pay plaintiffs' reasonable attorneys' fees and costs in that litigation, the amount to be determined, if possible, through further negotiations.

6. The United States Forest Service will provide plaintiffs at least five (5) days advanced notice of the completion of consultation on the existing LRMPs and the LRMPs as amended. At that time the Forest Service will provide the plaintiffs with a copy of the most current draft of the Biological Opinion for such LRMP in its possession. The suspension of activities pursuant to the Order to be entered on this stipulation terminates when such consultations are completed (i.e. the biological opinions are issued).

7. The United States Forest Service Rocky Mountain Research Station will conduct a literature review of the status of knowledge of songbirds in the ponderosa pine type in Arizona and New Mexico. This review will include, but not be limited to, a synthesis of existing research on songbirds and identification of research needs. The review will be subject to a blind peer review by three professional societies, including at least one society with expertise in the conservation of songbird populations. The results of the review will be published by the Station after peer review and within 18 months of entry of the Judgment herein. In addition, the Rocky Mountain Research Station will conduct a workshop to identify research needs for forest resource management in Arizona and New Mexico, including but not limited to, the research needs for federally listed species. The Station will publish this report within 18 months of the entry of the Judgment herein. The projects provided for in this paragraph are not a substitute for, nor a prerequisite to, initiation of consultations by the United States Fish and Wildlife Service under the Endangered Species Act, nor a source of information necessary for the completion of any such consultations.

MUD 645

United States Department of Agriculture
Forest Service
Coconino National Forest
2323 E. Greenlaw Lane
Flagstaff, AZ 86004
FAX: (520) 527-3620
V/TTY: (520) 527-3600

File Code: 2450

Date: MARCH 11, 1996

Mr. Lorin D. Porter, President
Precision Pine & Timber, Inc.
P O Box 70
Heber, AZ 85928

Dear Lonnie:

Per my phone conversation with you this morning , the Mud Multiproduct Sale, Contract #005556, has been released from the injunction issued by Judge Muecke last August 25 (Silver vs Thomas, No. CIV 94-1610 PHX CAM).

In order to meet the requirements of the Court Order and Stipulation Agreement which resulted from the injunction, we are currently marking all of the 12"+ DBH trees in Cutting Units 1,4, and 16 as leave trees. We already have the volume determination and are proceeding with preparing a request to the Chief, Forest Service, for approval of a partial contract cancellation. As stated in my letter dated January 19, 1996, to Billy Caskey, any calculations of compensation must be reviewed by the Chief's Office prior to any negotiated agreement between the Purchaser and Contracting Officer.

In my letter dated February 27, 1996, I mentioned that the work on specified roads listed in AT9 must be completed prior to their being used for hauling. Since the contract is no longer enjoined, the road work can proceed as normal under the contract. However, as also pointed out in the same letter, there is a timing restriction listed in provision CT6.314# which permits logging only during the period of June 1 through December 31 each year. This restriction was put into the contract due to past bark beetle activity in this area and concerns about green slash during spring logging causing a new buildup of bark beetles.

Prior to finalizing either your road work schedule or logging plans, please contact Dick Stephens, the Forest Service Representative, on the Mormon Lake Ranger District at (520) 527-3650. Dick is very familiar with the sale and will have to determine whether there is any portion of the sale area where we may be able to waive the timing restrictions if you request to log before June 1.

Also, under provision BT8.21, as a result of the injunction you are entitled to request a contract term adjustment for the time you were not allowed to operate the sale during the normal operating season (June 1 - Dec.31).

If you have any questions please give either Dick or me a call. We are available to look at the sale area with you on the ground if you wish.

Sincerely,

Ken Broyles
Contracting Officer

cc: Dick Stephens, FSR
Dan Panks, SA
Michael Johns, U.S. Attorney's Office