IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Monday, February 2, 2004

Deposition of JOHN B. SMITH, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:05 a.m., Monday, February 2, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 14

seventeen years?
A. Yes, I did.
Q. And when was it you left Duke City Lumber Company?
A. Let's see. I left Duke City in the latter part of 1991.
Q. And what did you do then?
A. I was laid off for a period of months, and I went to work for Precision Pine & Timber, or actually not laid off, just out of work.
Q. When did you start your work with Precision Pine?
A. It would have been early in '92, either May or June. I don't remember which month.
Q. And could you describe what your responsibilities were once you started with Precision Pine?
A. With Precision Pine, there again, I was to act as purchaser representative, as the liaison between the company and a logging contractor and the Forest Service on Forest Service timber sales.
Q. Did you have any other responsibilities?

Page 15

A. I did. I served on various and sundry committees that I was asked to.
I was active in some of the forest planning things for specific areas in the forest as the company's representative.
Q. And were there any other things you did while you were at Precision Pine?
A. It was kind of other duties as asked to do.
Q. Do you remember what some of those other duties that you were asked to do were?
A. Oh, boy -- let's see. I did some scaling, and I'm still doing some scaling.
I kept track of logs, loads of logs coming into the sawmill and provided information to our company I guess you would call him the comptroller to establish, I established the logger pay amounts for him.
Q. All right. Is there anything else you remember that you did?
A. Not -- I know there was more things. It's just a matter of some I've done.
I just don't remember what they are at this point.
Q. Who was the company controller that

Page 16

you were talking about?
A. Mel, well, yes, Mel Bowers was the one I did the most work with.
Q. Were there others?
A. When I first went there, I'll have to kind of defer to Mr. Porter that's here on that one.
I believe it was his brother-in-law Jack Porter that was in that capacity when I went to work I believe.
Q. You mentioned you worked on some committees, including forest planning.
What did that involve?
A. It involved going to the meetings and actually having input as a member of the public into the various planning efforts that they had going.
Q. Who held these meetings?
A. The Forest Service officials; I mean various, various ones, not always the same, different districts, different forests, had different meetings, different things they were planning.
Q. So what was discussed at these sort of forest planning meetings?

Page 17

A. The ones I went to were basically the planning for a given area under consideration on what the public, me being part of the public as a representative of the company, thought needed to be done for a particular area in the land management.
Q. And about what time period was it that you were going to these sorts of meetings?
A. Off and on, during the whole time I have been working for the company except recently, and those have all kind of faded it seems to me at this point.
Q. You said you were a purchaser rep for Precision Pine?
A. Yes.
Q. Were your responsibilities at Precision Pine any different than what you were doing with Duke City?
A. No. Um-um. You're roughly the same type of, same type of contracts, so basically the same thing.
Q. Did you do work outside of contracting with the Forest Service, for instance, with state contracts or Indian reservation contracts or any other contracts?

Page 18

A. Oh, yes. We had state contracts, some reservation contracts, and minimal amount of private contacts, contracts.
Q. What responsibilities did you have with those sorts of contracts?
A. With the state and with the Indian tribes, it would have been just about the same -- the contract documents for the timber sale in all, for all practical purposes were about the same.
Private individuals there is very minimal.
Q. And you mentioned that you were a liaison with the loggers and the Forest Service.
Talking about the loggers first, what did you do as the company liaison with the loggers?
A. I was a contact person. It was kind of a three-way committee if you would where we would meet with the logger, myself and my company and the Forest Service, to talk about the day-by-day, the Forest Service side administration of the contract, me working with the Forest Service on the administration, through the logger doing the actual physical

Page 19

work.
Q. Did Precision Pine always hire loggers to do its work, or did it do some of the work in-house?
A. In terms of company name, I would actually have to defer that to Mr. Tenney or Mr. Porter.
There was some that you would quote say in-house, but I don't know if they would have been working under the name of Precision Pine & Timber or one of the other companies that Mr. Porter and Mr. Tenney had.
I'll have to defer part of that answer to them because I don't know.
Q. So Premium Pine had some subsidiaries or Mr. Porter and Tenney had some other companies that might have done some logging work at various times, is that what you're saying?
A. The terminology subsidiary or second, I don't know, but anyhow, there was some different entities in there.
Q. Most of the time, was it true that it was a third party that was not related to Precision Pine that did the logging work?
A. Yes. Yes.

Page 20

Q. While you were at Precision Pine, did you have any responsibilities in connection with acquiring timber for the company?
A. Acquiring in what way are you -- I don't quite understand the question.
Q. Purchasing, purchasing timber sales or analyzing timber sales that the company was going to bid on, did you have any role in that respect?
A. Purchasing say at the bid table, yes.
Q. Maybe it would helpful if I just went back to some of the things that you said you were doing at Duke.
A. Okay.
Q. You, of course, said you were the purchaser rep?
A. Correct.
Q. You also mentioned you were doing some cruising at Duke?
A. Yes.
Q. Did you do any of that at Precision?
A. No, not to the extent that I did with Duke City, I did not.
Q. So it was a minor part of your work if you did it at all?

Page 21

A. Yes.
Q. How about appraisal? Did you do any appraisal work for Precision Pine?
A. No, I did not.
Q. And you said you did do some work bidding for Precision Pine?
A. Yes.
Q. Okay. As for the bidding, do you remember any of the contracts that you bid?
A. The one I remember was a small tract of timber on a blow-down that was over in the Flagstaff area.
Other than that, I can't give you any specific because that particular one, I remember because of the nature of the timber that was on it.
Q. Was it unusual that you did the bidding work?
A. Yes, it was. That was not a common practice for me to do that, but I did some.
Q. Were you involved in planning when individual timber sales would be harvested by Precision Pine?
A. In the final analysis of when those were to be operated, no.

LOIS J. SCHIFFER
Assistant Attorney General
EILEEN SOBECK
ELINOR COLBOURN - D.C. Bar No. 430428
Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7369
Benjamin Franklin Station
Washington, D.C. 20044-7369
Telephone: (202) 272-9887

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| DR. ROBIN SILVER, et al., Plaintiffs, v. BRUCE BABBITT, et al., Defendants. | CIV-94-0337-PHX-CAM<br>CIV-94-1610-PHX-CAM<br>(Consolidated) |
| DR. ROBIN SILVER, et al., Plaintiffs, v. JACK WARD THOMAS, et al., Defendants. | STIPULATION CONCERNING PLAINTIFFS' CLAIMS AGAINST THE UNITED STATES FOREST SERVICE |

Defendants Jack Ward Thomas, in his official capacity as Chief of the United States Forest Service, and the United States Forest Service, and plaintiffs Dr. Robin Silver, the Forest Conservation Council, Forest Guardians, Southwest Center for Biological Diversity, Biodiversity Legal Foundation, Carson Forest Watch, Greater Gila Biodiversity Project, Maricopa Audubon Society, and Dine Citizens Against Ruining Our Environment, through their undersigned counsel, stipulate and agree as follows with respect to the claims in Civil Action Number CIV-94-1610-PHX-CAM, subject to approval of the Court:

1. The parties to this Stipulation agree that this Stipulation and the order to be entered thereon consist of a compromise of disputed claims for the purpose of settlement in CIV-94-

STS-856

federal district court az Az

1610-PHX-CAM, and shall not constitute any admission of fact or law by any party. The parties agree that they shall not cite, rely upon, or mention this settlement, this Stipulation, the Order approving this Stipulation or the Judgment entered thereon, in any other litigation. If a person cites the entry of the injunction in this case in some other litigation, the fact that this case was thereafter settled may be made known to that court. The parties agree that they shall not cite or rely upon this settlement, this Stipulation, the Order approving this Stipulation, or the Judgment entered thereon concerning the construction or application of the Endangered Species Act.

2. The United States Forest Service agrees to complete the ongoing process of consultation with the United States Fish and Wildlife Service concerning the Mexican Spotted Owl for the existing Land and Resource Management Plans ("LRMPs") and the LRMPs as amended. The United States Forest Service and its Chief agree to waive their rights to appeal in this case from the August 24, 1995 Injunction Order, this Stipulation, the Order to be entered approving this Stipulation and the Judgment to be entered thereon.

3. The Forest Service will suspend implementation or approval of all projects involving the cutting of trees in Region 3 until consultation on the existing LRMPs and the LRMPs as amended are completed (i.e., when the Biological Opinions are issued), except that the Forest Service may proceed with all projects and activities set forth in subparagraphs a through n below, during the consultation on the existing LRMPs and on the LRMPs as amended, provided that they meet the following restrictions. If a project has been omitted from Exhibit A by oversight of the Forest Service, the parties agree to discuss same and to determine if it may proceed by further stipulation.

a. Christmas tree cutting projects, involving any species, can proceed outside of riparian areas whether in or outside of designated critical habitat for the Mexican spotted owl (hereinafter

"critical habitat"), provided no tree greater than 6 inches DBH is cut. If inside critical habitat, trees may only be cut within designated areas.

b. Outside critical habitat, commercial timber sales (harvest for which a fee is paid and which is intended for resale), that are listed in Exhibit A, may proceed, if the trees are located in pinyon-juniper cover type and outside of riparian areas. Within critical habitat, commercial timber sales that are listed in Exhibit A may proceed if the trees are located in pinyon-juniper cover type, are outside riparian areas, and the dispersal habitat rule is followed.

c. Hazard tree felling can proceed only where there is immediate danger to human life or property. Routine or scheduled hazard tree removal remains suspended.

d. Cutting live trees for personal use (not intended for resale) products such as latillas, tipi poles or fence poles, other than vigas and firewood, may occur in designated areas that are located outside of riparian areas and outside of critical habitat. Dead and down timber may be gathered for such personal use products other than vigas and firewood, from designated areas that are located outside riparian areas, but may be located either inside or outside critical habitat.

e. Personal use firewood activity may proceed outside of critical habitat from general areas. Dead and down timber may be gathered from designated areas inside and outside critical habitat.

STS-858

Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas. On the Carson National Forest, all firewood must come from designated areas outside of critical habitat and riparian areas, except for existing slash piles. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas.

f. Vigas must come from designated areas outside critical habitat and riparian areas. They may be cut in Ponderosa Pine cover type in critical habitat only if the dispersal habitat rule is followed.

g. Roads and facilities projects listed on Exhibit A may proceed outside of critical habitat, except new road corridors in forested areas remain suspended. Inside critical habitat, roads and facilities projects listed on Exhibit A may proceed, if tree-cutting is confined to existing areas of disturbance (i.e. road right-of-way, administrative site, current boundary of recreation site, microwave site, etc.). Routine maintenance of Service Level C and D Forest Development roads (local and unimproved roads) that involves tree-cutting will remain suspended. Routine maintenance of Arterial, Collector and Service Level A and B Forest Development roads may proceed with the above restrictions.

h. Fences and survey line projects listed on Exhibit A may proceed outside of critical habitat. They may proceed in critical habitat provided no trees in excess of 6 inches DBH are felled.

5TST 857

i. Outside critical habitat and riparian areas, silvicultural work listed on Exhibit A, such as precommercial thinning ("TSI"), meadow clearing, wildlife projects, vegetation management, and aspen treatment may proceed. Inside critical habitat and outside riparian areas, such silvicultural work listed on Exhibit A may proceed provided no tree larger than 6 inches DBH is felled and provided the dispersal habitat rule is met. Riparian wildlife habitat improvement projects may proceed in riparian areas subject to the above limitations.

j. Outside critical habitat, prescribed burns listed on Exhibit A may proceed. Inside critical habitat, prescribed burns listed on Exhibit A may proceed provided no trees larger than 6 inches DBH are felled for firelines, fuelbreaks or other purposes and provided that the dispersal habitat rule is followed. Any control lines will be hand dug. The Forest Service will protect snags where practical.

k. Tree-cutting projects listed on Exhibit A associated with mining/minerals activities may proceed in pinyon-juniper cover type.

l. The following projects listed on Exhibit A may proceed: Manaco (after the Forest Service requests concurrence by the United States Fish and Wildlife Service on the "no effect" finding by the United States Forest Service, and the United States Fish and Wildlife Service either concurs or declines to consider the matter), Ojos Ryan, Fence-Bagnall, Lons, and Yarro.

STS-862

m. The following additional projects may proceed: Sunspot National Solar Observatory, Hutch Boondock, Black Fire (including Bank and Aspen) Salvage, Bridge Salvage, Scott Able Salvage, Brann, Mount Lemmon Federal Highway, Saint Joseph, Payment Unit One of Isabelle, Filipito Unit 4, Filipito Unit 9, Filipito Unit 8 (which has not been sold, except that within Unit 8, trees larger than 18 inches DBH shall not be commercially harvested within ten (10) years from the date of entry of the Judgment to be entered herein), Paris, and Hay on the Lincoln National Forest.

n. Emergency responses to prevent immediate, irreparable harm to human life or property caused by unforeseeable events such as wildfire, floods and storms, can be taken.

4. The Campbell Sale on the Apache-Sitgreaves National Forest and the Barber Sale on the Coconino National Forest will be cancelled by the Forest Service. The Forest Service agrees that in the absence of a catastrophic event that leaves no reasonable doubt that treatment is necessary, trees larger than 12 inches DBH will not be commercially harvested from the Campbell and Barber sale areas during the 15 years after the date of entry of the Judgment in this action. During this 15 year period, the Forest Service will not permit any precommercial thinning that removes trees over 6 inches DBH or reduces the canopy closure below 40%, nor construction of any new roads, in these sale areas.

5. The Mud Timber Sale on the Coconino National Forest is the subject of other litigation under the National Environmental Policy Act (NEPA), captioned Southwest Center for Biological Diversity, et al. v. United States Forest Service, et al., CIV-95-1927-PCT-RCB (District of Arizona). The Forest Service will modify Cutting Units 1, 4 and 16 of the Mud Timber Sale. In those Cutting Units trees larger than 12 inches DBH will not be harvested pursuant to the existing timber sale contract. The plaintiffs in that case, who are among the

5TS-86

plaintiffs in this case, will forthwith dismiss that case voluntarily, with prejudice. The Forest Service will pay plaintiffs' reasonable attorneys' fees and costs in that litigation, the amount to be determined, if possible, through further negotiations.

6. The United States Forest Service will provide plaintiffs at least five (5) days advanced notice of the completion of consultation on the existing LRMPs and the LRMPs as amended. At that time the Forest Service will provide the plaintiffs with a copy of the most current draft of the Biological Opinion for such LRMP in its possession. The suspension of activities pursuant to the Order to be entered on this stipulation terminates when such consultations are completed (i.e. the biological opinions are issued).

7. The United States Forest Service agrees that the Rocky Mountain Research Station will conduct a literature review of the status of knowledge of songbirds in the ponderosa pine type in Arizona and New Mexico. This review will include, but not be limited to, a synthesis of existing research on songbirds and identification of research needs. The review will be subject to a blind peer review by three professional societies, including at least one society with expertise in the conservation of songbird populations. The results of the review will be published by the Station after peer review and within 18 months of entry of the Judgment herein. In addition, the Rocky Mountain Research Station will conduct a workshop to identify research needs for forest resource management in Arizona and New Mexico, including but not limited to, the research needs for federally listed species. The Station will publish this report within 18 months of the entry of the Judgment herein. The parties acknowledge that the projects provided for in this paragraph are not a substitute for, nor a prerequisite to, initiation of consultations by the United States Fish and Wildlife Service under the Endangered Species Act, nor a source of information necessary for the completion of any such consultations.

8. Regarding the notice of intent to sue dated October 11, 1994, sent by the Greater Gila Biodiversity Project and the Southwest Center for Biological Diversity regarding

 STS-862

consultation on the LRMP level on some species listed as threatened or endangered pursuant to the Endangered Species Act, the parties agree to a "cooling off period" of thirty (30) days, beginning when the United States Forest Service receives from potential plaintiffs written notice that they intend to pursue in court their notice of intent to sue. During the cooling off period, plaintiffs will not file the suit contemplated in the notice letter and representatives of the potential plaintiffs and the United States Forest Service will meet and engage in alternative dispute resolution.

9. With approval of this Stipulation and entry of the Judgment herein, the United States Forest Service withdraws its pending Motion for Clarification and the plaintiffs dismiss any remaining claims stated in their Complaint against the United States Forest Service and its Chief, other than for attorneys' fees and costs.

10. Subject to the Court's approval of this stipulation and entry of the Judgment, the United States Forest Service agrees to pay plaintiffs' reasonable attorneys fees and costs incurred in relation to plaintiffs' claims against the United States Forest Service in this case, such amount to be determined, if possible, through further negotiations. If not resolved through negotiations, the Court will decide how much the Forest Service will pay in reasonable fees and costs to the plaintiffs.

11. The parties acknowledge that the issues concerning plaintiffs' claims against the Bureau of Indian Affairs, Department of the Interior (BIA) remain pending.

12. The parties agree to entry of the Order Approving Stipulation Concerning Plaintiffs' Claims Against the United States Forest Service and the Judgment lodged herewith. The parties agree that upon entry of the Judgment in this action the Court shall retain jurisdiction to award attorneys' fees and costs, enforce the provisions of the Order approving this

STJ863

Stipulation and the Judgment, and to resolve plaintiffs' claims against the BIA in this action.

Respectfully submitted this 18 day of October, 1995.

LOIS J. SCHIFFER
Assistant Attorney General

EILEEN SOBECK, Attorney
U.S. Department of Justice

Michael A. Johns
Assistant U.S. Attorney, for

ELINOR COLBOURN, Attorney
D.C. Bar No. 430428
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7369
Benjamin Franklin Station
Washington, D.C. 20044-7369
(202) 272-9887
Attorneys for Defendants

STEVEN SUGARMAN, Attorney
612 Old Santa Fe Trail
Santa Fe, New Mexico 87501

Mark Hughes

MARK HUGHES, Attorney
Earthlaw
University of Denver - Foote Hall
7150 Montview Boulevard
Denver, Colorado 80220

Attorneys for Plaintiffs

STS-864

Copy of the foregoing mailed this
_____ day of October, 1995, to:

Mark Hughes
Earthlaw
1845 Bellaire Street
Denver, Colorado 80220
Attorneys for Plaintiffs

Steven Sugarman
612 Santa Fe Trail, Suite B
Sante Fe, New Mexico 87501
Attorney for Plaintiffs

Grant Woods
Attorney General
Mary Mangotich Grier
Assistant Attorney General
Civil Division
1275 West Washington
Phoenix, Arizona 85007
Attorneys for State of Arizona

Norman James
Jay Shapiro
Ryley, Carlock & Applewhite
101 North First Avenue, Suite 2700
Phoenix, Arizona 85003-1973
Attorneys for Apache County
and White Sands Forest Products, Inc.

Stephen G. Udall
Russell H. Burdick
Apache County Attorney
P.O. Box 637
St. Johns, Arizona 85936-0637

Christopher L. Callahan
Robert D. Anderson
Joseph P. Mikitish
Fennemore Craig
Two North Central Avenue
Suite 220
Phoenix, Arizona 85004-2390
Attorneys for Stone Container Corporation

Alan I. Saltman
Gary G. Stevens
Saltman & Stevens
1800 M. Street, N.W.
Suite 700 South
Washington, D.C. 20036
Attorneys for Precision Pine & Timber, Inc.

Richard A. Segal
Gust Rosenfeld
201 North Central Avenue
Suite 3300
Phoenix, Arizona 85073-3300
Attorneys for Precision Pine & Timber, Inc.

_______________________________

STS-865

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| DR. ROBIN SILVER, et al., Plaintiffs, v. BRUCE BABBITT, et al., Defendants. | CIV-94-0337-PHX-CAM<br>CIV-94-1610-PHX-CAM<br>(Consolidated) |
| DR. ROBIN SILVER, et al., Plaintiffs, v. JACK WARD THOMAS, et al., Defendants. | ORDER APPROVING STIPULATION CONCERNING PLAINTIFFS' CLAIMS AGAINST UNITED STATES FOREST SERVICE |

The Court having received and considered the Stipulation Concerning Plaintiffs' Claims Against the United States Forest Service, and good cause having been shown,

It Is Ordered as follows:

1. The Stipulation is approved in its entirety. The Stipulation and this Order consist of a compromise of disputed claims for the purpose of settlement in CIV-94-1610-PHX-CAM, and shall not constitute any admission of fact or law by any party. The parties shall not cite, rely upon, or mention the settlement, the Stipulation, this Order approving the Stipulation or the Judgment entered thereon, in any other litigation. If a person cites the entry of the injunction in this case in some other litigation, the fact that this case was thereafter settled may be made known to that court. The parties shall not cite or rely upon the settlement, the

Stipulation, this Order approving the Stipulation, or the Judgment entered hereon concerning the construction or application of the Endangered Species Act.

2. The United States Forest Service shall complete the ongoing process of consultation with the United States Fish and Wildlife Service concerning the Mexican spotted owl for the existing Land and Resource Management Plans ("LRMPs) and the LRMPs as amended. The United States Forest Service and its Chief have waived their rights to appeal in this case from the August 24, 1995 Injunction Order, the Stipulation and the Judgment to be entered hereon.

3. The Forest Service shall suspend implementation or approval of all projects involving the cutting of trees in Region 3 until consultation on the existing LRMPs and the LRMPs as amended are completed (i.e., when the Biological Opinions are issued), except that the Forest Service may proceed with all projects and activities set forth in subparagraphs a through n below, during the consultation on the existing LRMPs and on the LRMPs as amended, provided that they meet the following restrictions. If a project has been omitted from Exhibit A by oversight of the Forest Service, the parties shall discuss same and determine if it may proceed by further stipulation.

a. Christmas tree cutting projects, involving any species, can proceed outside of riparian areas whether in or outside of designated critical habitat for the Mexican spotted owl (hereinafter "critical habitat"), provided no tree greater than 6 inches DBH is cut. If inside critical habitat, trees may only be cut within designated areas.

b. Outside critical habitat, commercial timber sales (harvest for which a fee is paid and which is intended for resale), that are listed in Exhibit A may proceed, if the trees are located in pinyon-juniper cover type and outside of riparian areas. Within critical habitat, commercial timber sales that are listed in Exhibit A

STS-867

may proceed, if the trees are located in pinyon-juniper cover type, are outside riparian areas, and the dispersal habitat rule is followed.

c. Hazard tree felling can proceed only where there is immediate danger to human life or property. Routine or scheduled hazard tree removal remains suspended.

d. Cutting live trees for personal use (not intended for resale) products, such as latillas, tipi poles or fence poles, other than vigas and firewood, may occur in designated areas that are located outside of riparian areas and outside of critical habitat. Dead and down timber may be gathered for such personal use products, other than vigas and firewood, from designated areas that are located outside riparian areas, but may be located either inside or outside critical habitat. e .

Personal use firewood activity may proceed outside of critical habitat from general areas. Dead and down timber may be gathered from designated areas inside and outside critical habitat. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas. On the Carson National Forest, all fire-wood must come from designated areas outside of critical habitat and riparian areas, except for existing slash piles. Dead standing timber may be taken only from pinyon-juniper cover type, outside riparian areas.

f. Vigas must come from designated areas outside critical habitat and riparian areas. They may be cut in Ponderosa Pine cover type in critical habitat only if the dispersal habitat rule is followed.

g. Roads and facilities projects listed on Exhibit A may proceed outside of critical habitat, except new road corridors in forested areas remain suspended. Inside critical habitat, roads and facilities projects listed on Exhibit A may proceed, if tree-cutting is confined to existing areas of disturbance (i.e. road right-of-way,

STJ-860

administrative site, current boundary of recreation site, microwave site, etc.). Routine maintenance of Service Level C and D Forest Development roads (local and unimproved roads) that involves tree-cutting will remain suspended. Routine maintenance of Arterial, Collector and Service Level A and B Forest Development roads may proceed with the above restrictions.

h. Fences and survey line projects listed on Exhibit A may proceed outside of critical habitat. They may proceed in critical habitat provided no trees in excess of 6 inches DBH are felled.

i. Outside critical habitat and riparian areas, silvicultural work listed on Exhibit A, such as precommercial thinning ("TSI"), meadow clearing, wildlife projects, vegetation management, and aspen treatment may proceed. Inside critical habitat and outside riparian areas, such silvicultural work listed on Exhibit A may proceed provided no tree larger than 6 inches DBH is felled and provided the dispersal habitat rule is met. Riparian wildlife habitat improvement projects may proceed in riparian areas subject to the above limitations.

j. Outside critical habitat, prescribed burns listed on Exhibit A may proceed. Inside critical habitat, prescribed burns listed on Exhibit A may proceed provided no trees larger than 6 inches DBH are felled for firelines, fuelbreaks or other purposes and provided that the dispersal habitat rule is followed. Any control lines will be hand dug. The Forest Service will protect snags where practical.

k. Tree-cutting projects listed on Exhibit A associated with mining/minerals activities may proceed in pinyon-juniper cover type.

l. The following projects listed on Exhibit A may proceed: Manaco (after the Forest Service requests concurrence by the United States Fish and Wildlife Service on the "no effect" finding by the United States Forest Service, and the United States Fi[illegible] and

575-869

Wildlife Service either concurs or declines to consider the matter), Ojo Ryan, Pence-Bagnall, Lons, and Yarro.

m. The following additional projects may proceed: Sunspot National Solar Observatory, Hutch Boondock, Black Fire (including Bank and Aspen) Salvage, Bridge Salvage, Scott Able Salvage, Brann, Mount Lemmon Federal Highway, Saint Joseph, Payment Unit One of Isabelle, Filipito Unit 4, Filipito Unit 9, Filipito Unit 8 (which has not been sold, except that trees larger than 18 inches DBH will not be commercially harvested in Unit 8 for ten (10) years following entry of the Judgment to be entered herein), Paris, and Hay on the Lincoln National Forest.

n. Emergency responses to prevent immediate, irreparable harm to hum[illegible]n life or property caused by unforeseeable events such as wildfire, floods and storms, c[illegible]n be taken.

4. The Campbell Sale on the Apache-Sitgreaves National Forest and the Barber Sale [illegible] the Coconino National Forest will be cancelled by the Forest Service. In the absence of [illegible] catastrophic event that leaves no reasonable doubt that treatment is necessary, trees larger th[illegible] 12 inches DBH will not be commercially harvested from the Campbell and Barber sale ar[illegible] during the 15 years after the date of entry of the Judgment in this action. During this 15 year period, the Forest Service will not permit any precommercial thinning that removes trees over 6 inches DBH or reduces the canopy closure below 40%, nor construction of any new roads, in these sale areas.

5. The Mud Timber Sale on the Coconino National Forest is the subject of other litigation under the National Environmental Policy Act (NEPA), captioned Southwest Center for Biological Diversity, et al. v. United States Forest Service, et al., CIV-95-1927-PCT-RCB (District of Arizona). The Forest Service will modify Cutting Units 1, 4 and 16 of the Mud Timber Sale. In those Cutting Units trees larger than 12 inches DBH will not be harvested

575-870

pursuant to the existing timber sale contract. The plaintiffs in that case, who are among the plaintiffs in this case, will forthwith dismiss that case voluntarily, with prejudice. The Forest Service will pay plaintiffs' reasonable attorneys' fees and costs in that litigation, the amount to be determined, if possible, through further negotiations.

6. The United States Forest Service will provide plaintiffs at least five (5) days advanced notice of the completion of consultation on the existing LRMPs and the LRMPs as amended. At that time the Forest Service will provide the plaintiffs with a copy of the most current draft of the Biological Opinion for such LRMP in its possession. The suspension of activities pursuant to the Order to be entered on this stipulation terminates when such consultations are completed (i.e. the biological opinions are issued).

7. The United States Forest Service Rocky Mountain Research Station will conduct a literature review of the status of knowledge of songbirds in the ponderosa pine type in Arizona and New Mexico. This review will include, but not be limited to, a synthesis of existing research on songbirds and identification of research needs. The review will be subject to a blind peer review by three professional societies, including at least one society with expertise in the conservation of songbird populations. The results of the review will be published by the Station after peer review and within 18 months of entry of the Judgment herein. In addition, the Rocky Mountain Research Station will conduct a workshop to identify research needs for forest resource management in Arizona and New Mexico, including but not limited to, the research needs for federally listed species. The Station will publish this report within 18 months of the entry of the Judgment herein. The projects provided for in this paragraph are not a substitute for, nor a prerequisite to, initiation of consultations by the United States Fish and Wildlife Service under the Endangered Species Act, nor a source of information necessary for the completion of any such consultations.

MUD 645

United States Department of Agriculture
Forest Service
Coconino National Forest
2323 E. Greenlaw Lane
Flagstaff, AZ 86004
FAX: (520) 527-3620
V/TTY: (520) 527-3600

File Code: 2450

Date: MARCH 11, 1996

Mr. Lorin D. Porter, President
Precision Pine & Timber, Inc.
P O Box 70
Heber, AZ 85928

Dear Lonnie:

Per my phone conversation with you this morning , the Mud Multiproduct Sale, Contract #005556, has been released from the injunction issued by Judge Muecke last August 25 (Silver vs Thomas, No. CIV 94-1610 PHX CAM).

In order to meet the requirements of the Court Order and Stipulation Agreement which resulted from the injunction, we are currently marking all of the 12"+ DBH trees in Cutting Units 1,4, and 16 as leave trees. We already have the volume determination and are proceeding with preparing a request to the Chief, Forest Service, for approval of a partial contract cancellation. As stated in my letter dated January 19, 1996, to Billy Caskey, any calculations of compensation must be reviewed by the Chief's Office prior to any negotiated agreement between the Purchaser and Contracting Officer.

In my letter dated February 27, 1996, I mentioned that the work on specified roads listed in AT9 must be completed prior to their being used for hauling. Since the contract is no longer enjoined, the road work can proceed as normal under the contract. However, as also pointed out in the same letter, there is a timing restriction listed in provision CT6.314# which permits logging only during the period of June 1 through December 31 each year. This restriction was put into the contract due to past bark beetle activity in this area and concerns about green slash during spring logging causing a new buildup of bark beetles.

Prior to finalizing either your road work schedule or logging plans, please contact Dick Stephens, the Forest Service Representative, on the Mormon Lake Ranger District at (520) 527-3650. Dick is very familiar with the sale and will have to determine whether there is any portion of the sale area where we may be able to waive the timing restrictions if you request to log before June 1.

Also, under provision BT8.21, as a result of the injunction you are entitled to request a contract term adjustment for the time you were not allowed to operate the sale during the normal operating season (June 1 - Dec.31).

If you have any questions please give either Dick or me a call. We are available to look at the sale area with you on the ground if you wish.

Sincerely,

Ken Broyles
Ken Broyles
Contracting Officer

cc: Dick Stephens, FSR
Dan Panks, SA
Michael Johns, U.S. Attorney's Office