**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: May 10, 2004

# TABLE OF CONTENTS

**PAGE**

Index to Plaintiff's Supplemental Appendix ........ ii

Table of Authorities ........ iii

I. The Defendant Has Failed To Establish That Its Assessments Of Damages Were Valid Claims Upon Which Valid Final Decisions Could Be Based........ 1

A. Precision Pine Challenged The Validity Of The Defendant's Purported "Final Decisions" ........ 2

B. The Timber Sale Contracts Provide The Relevant Definition Of "Claim," Which Requires A Pre-existing Dispute In The Instant Case ........ 2

C. The Distinction Between Routine And Non-routine Submissions As Stated In Reflectone Does Not Apply To The Contracts Here In Issue........ 6

D. There Is No Distinction Between Contractors And The Government With Regard To What Constitutes A Claim Under The CDA........ 8

E. The Purposes Of The CDA Support The "In Dispute" Requirement In CT9.2 ..... 10

II. The Defendant Has Failed To Establish That It Has A Legal Right To The Estimated Amounts Claimed........ 12

III. Conclusion........ 20

SUPPLEMENTAL APPENDIX

# INDEX TO PLAINTIFF'S SUPPLEMENTAL APPENDIX

| Description | Supp. App. Page |
|---|---|
| Declaration of Lorin D. Porter | 1 |
| Chart of Overstated Damages | 2 |

## TABLE OF AUTHORITIES

**CASES** **PAGE**

Blinderman Const. Co., Inc. v. United States,
39 Fed. Cl. 529 (1997)....1

Everett Plywood Corp. v. United States,
512 F.2d 1082 (Ct. Cl. 1975)....5

Forest Env't. Serv. Co., Inc. v. United States,
5 Cl. Ct. 774 (1984)....15

Garrett v. General Elec. Co.,
987 F.2d 747 (Fed. Cir. 1993)....2

Hol-Gar Mfg. Corp. v. United States,
351 F.2d 972 (Ct. Cl. 1965)....6

Hoskins Lumber Co. v. United States,
24 Cl. Ct. 259 (1991)....4, 13

Little River Lumber Co. v. United States,
21 Cl. Ct. 527 (1990)....6

Madigan v. Hobin Lumber Co.,
986 F.2d 1401 (Fed. Cir. 1993)....12

Petrofsky v. United States,
488 F.2d 1394 (Ct. Cl. 1973)....6

Placeway Constr. Corp. v. United States,
920 F.2d 903 (Fed. Cir. 1990)....9, 10

Reflectone, Inc. v. Dalton,
60 F.3d 1572 (Fed. Cir. 1995).... *passim*

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed.Cir.1988)....1

Stone Forest Indus., Inc., v. United States,
973 F.2d 1548 (Fed. Cir. 1993)....5

W.M. Schlosser Co. v. United States,
705 F.2d 1336 (Fed. Cir. 1983)....1

Wise v. United States,
18 Cl. Ct. 763 (1989) .......... 2

**STATUTES AND REGULATIONS**

41 U.S.C. § 605(a) .......... 8, 9

Federal Acquisition Regulation
33.201 .......... 7

**MISCELLANEOUS**

FSH 2409.15, § 72.1, Claims by the Government Against the Purchaser (effective 4/1/99) .......... 4

S. Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), reprinted in 1978 U.S.C.C.A.N.
5235, 5235 .......... 11

## I. The Defendant Has Failed To Establish That Its Assessments Of Damages Were Valid Claims Upon Which Valid Final Decisions Could Be Based.

In its Response to Plaintiff's Motion to Dismiss Defendant's Counterclaim, or, in the Alternative, for Summary Judgment ("G's Resp. at __"), the government states that "if the United States' counterclaim must be dismissed, so too must the complaint in this action." G's Resp. at 1. Plaintiff agrees and notes that the plaintiff is the *de facto* defendant in this case, since it is the government that is seeking damages. Precision Pine & Timber, Inc. ("Precision") was obliged to file an appeal only because otherwise the government's putative "final decisions" would have become final one year after their issuance. If this Court determines that the contracting officers' decisions are not valid final decisions, there is, in fact, no need for an appeal of the decisions.

As the government properly notes, "the requirements of the CDA are jurisdictional prerequisites that must be satisfied to maintain an action in this court." G's Resp. at 5 (citing W.M. Schlosser Co. v. United States, 705 F.2d 1336, 1338-39 (Fed. Cir. 1983)). Accordingly, the defendant has the burden of establishing jurisdiction for its counterclaim by demonstrating that the appropriate CDA prerequisites have been met. See Blinderman Const. Co., Inc. v. United States, 39 Fed. Cl. 529, 557 (1997) (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed.Cir.1988)). As Precision has argued in its Motion to Dismiss Defendant's Counterclaim, or, in the Alternative, for Summary Judgment ("Pl's Motion at __"), defendant's assessment of damages were not, however, "claims" upon which valid final decisions could be based, and, thus, the government's counterclaim must be dismissed. Pl's Motion at 4, 9-10.

A. Precision Pine Challenged The Validity Of The Defendant's Purported "Final Decisions."

The government counters by first making the puzzling assertion that "Precision Pine concedes that Forest Service contracting officers issued final decisions assessing default damages with respect to each of the contracts at issue." G's Resp. at 6. This is simply not true and the fact that the government dedicates six and a half pages of its brief arguing that the contracting officers' final decisions were valid in and of itself belies the government's contention. See id. at 7-13.[1] While the contracting officers issued documents that were stylized as "final decisions," Precision does not concede that these were valid final decisions.

B. The Timber Sale Contracts Provide The Relevant Definition Of "Claim," Which Requires A Pre-existing Dispute In The Instant Case.

The primary issue in the instant case is how a "claim" is defined for CDA purposes since the CDA itself does not define the term. G's Resp. at 9; Pl's Motion at 5. See also Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575 (Fed. Cir. 1995). Accordingly, as the Federal Circuit has stated, courts must turn to the regulations implementing the CDA, the language of the contracts in issue, and the facts of the case to define the term "claim." Reflectone, 60 F.3d at 1575 (citing Garrett v. General Elec. Co., 987 F.2d 747, 749 (Fed. Cir. 1993)).[2] Since there are no regulations

[1]Every paragraph of the complaint cited by the government to support its assertion that Precision "concedes" that the contracting officers issued final decisions, in fact, states that "the Contracting Officer issued what purports to be a final decision. . . ." Complaint at ¶¶ 28, 36, 43, 51, 58, 65, 72, 79, 86, 91, 96, 102. Moreover, every one of these paragraphs is followed by a paragraph that begins: [a]ssuming that the Contracting Officer's final decision was valid . . . ." Complaint at ¶¶ 29, 37, 44, 52, 59, 66, 73, 80, 87, 92, 97, 103.

[2]The government argues in footnote 6 of its brief that Precision is implicitly asserting that parties can establish jurisdiction in this Court through agreement, citing to Wise v. United States, 18 Cl. Ct. 763, 768 (1989). G's Resp. at 12 n.6. Precision makes no such attempt to create jurisdiction in this Court. Rather, the CDA provides a contractor the right to bring an action on a claim in the United States Court of Federal Claims in lieu of appealing a contracting officer's decision to an agency board, following a contracting officer's final decision on a "claim." 41

that implement the CDA with regard to Forest Service timber sale contracts, this Court must look to clause CT9.2 contained in each of the contracts in issue which defines a claim for purposes of CDA as follows:

> (c)(i) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract.
>
> (ii) A voucher, invoice, or request for payment that is not in dispute when submitted is not a claim for the purposes of the Act. However, where such submission is subsequently not acted upon in a reasonable time, or disputed either as to liability or amount, it may be converted to a claim pursuant to the Act.

Appendix to Plaintiff's Motion ("Pl's App. at __") at 3 (emphasis supplied),[3] i.e., unless a request for payment is either disputed or ignored by the recipient of the request for a reasonable period, it is not a "claim" for purposes of the CDA.

Here, paragraph 5 of each of the "final decisions," where the alleged damages due were greater than $0, references an attached "Bill for Collection," presumably included with the intention that Precision pay these bills. Pl's App. at 15, 25, 34, 44, 53, 61, 71, 90, 102, 114. Each of these bills specified an "amount due," directed Precision to "enclose a copy of this bill with [its] check or money order," and indicated that checks should be payable to "USDA Forest Service." Pl's App. at 22, 31, 40, 50, 59, 68, 77, 99, 110, 122. Certainly these Bills for Collection were requests for payment, if not also invoices.

---

U.S.C. §§ 605, 609. Precision merely asserts that CT9.2's definition of claim in the instant case is controlling.

[3] The Lily, Gentry and Wiggins contracts contain version (10/96) of clause CT9.2 (see Pl's App. at 5); the other nine contracts in issue contain version (7/80) of the clause. See Pl's App. at 3-4. The two versions of Clause CT9.2 are identical in all respects that are material to this case.

This fact notwithstanding, Precision never had an opportunity to dispute these Bills for Collection prior to the issuance of the "final decisions," because the contracting officers sent their "final decisions" simultaneously with those Bills for Collection. Pl's App. at 15, 25, 34, 44, 53, 61, 71, 90, 102, 114. Quite simply, because the CDA requires a valid claim before a contracting officer can issue a final decision thereon, and because the contracts here in issue require a request for payment to be disputed or ignored by the recipient prior to it can constitute a claim, the contracting officers in the instant case issued "final decisions" on non-existent "claims." Accordingly, those "final decisions" did not comport with the requirements of the CDA.

This comes as no surprise to the Forest Service. The Forest Service Timber Sale Administration Handbook, effective at the time of the "final decisions," illustrates the Forest Service's own understanding that CT9.2 required a "dispute" before there can be a valid government claim when it provides that: "Bills for Collection (form FS-6500-89) relating to timber sales and retention of purchaser deposits by the Government which are not in dispute <u>are not claims</u>." Pl's App. at 130 (FSH 2409.15, § 72.1, <u>Claims by the Government Against the Purchaser</u> (effective 4/1/99)) (emphasis added). The government attempts to disown the Forest Service's own internal guidance by noting that the Forest Service's Timber Sale Administration Handbook "'does not have the force and effect of law,'" and arguing that the Forest Services policies "have no bearing upon the jurisdictional issues before this Court." G's Resp. at 13 (<u>quoting</u> <u>Hoskins Lumber Co. v. United States</u>, 24 Cl. Ct. 259, 266-67 (1991)). Precision makes no contention that the Forest Service Handbook is binding law. Moreover, it strongly disagrees that the Forest Service's own policies with regard to contracts drafted by the Forest Service can so easily be dismissed as irrelevant. At a minimum, the Forest Service Handbook "is evidence of

the custom and policy of the agency." Stone Forest Indus., Inc., v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1993) (citing Everett Plywood Corp. v. United States, 512 F.2d 1082, 1089 (Ct. Cl. 1975)). Where the jurisdictional issue in the instant case is so closely tied to interpretation of CT9.2, the Forest Service's own long-standing, pre-litigation interpretation of the contract clause most certainly does have bearing upon the jurisdictional issue before this Court.

The defendant also attempts to circumvent the contractual requirement that a request for payment be disputed before a claim can exist by asserting that "the contracting officers' final decisions assessing breach damages are not a 'voucher,' an 'invoice' or a 'request for payment.'"[4] G's Resp. at 12. The statement is accompanied by a curious footnote in which the defendant asserts that: "[t]he "Bill of [sic] Collections" sent by the respective contracting officers are irrelevant to the jurisdictional issue raised by Precision in this action." G's Resp. at 12 n.7. The defendant misses the point. It is the Bills for Collection that demand payment from Precision, therefore, it is the Bills that, per CT9.2, would become "claims" once they are disputed or are not acted upon by the recipient within a reasonable amount of time. As such, these documents are far from being "irrelevant."

The government also argues that the ordinary meaning of the term "claim" does not require a pre-existing dispute. G's Resp. at 9. In making this assertion, the government totally ignores the fact that "claim" is clearly defined by clause CT9.2. That the Forest Service understood as did Precision (see Plaintiff's Supplemental Appendix ("Pl's Supp. App. at __") at 1 ), at the time of contracting, that the contract required that a demand for the payment of money

---

[4]This argument is, however, belied by the documents themselves, i.e., paragraph 2 of every "final decision" states that it "documents the Contracting Officer's Decision regarding a claim . . . ." Pl's App. at 13, 23, 32, 42, 51, 60, 69, 78, 88, 100, 112, 125. Clearly, at the time of issuance, even the contracting officers recognized that their "decisions" were not the actual claims.

by either party needed to be disputed before it could constitute a "claim" for purposes of the CDA is evidenced by the contemporaneous provisions of the Forest Service Handbook noted above. As this Court well knows, a "contemporaneous construction of the contract, before it became the subject of dispute, is entitled to great weight." Petrofsky v. United States, 488 F.2d 1394, 1402 (Ct. Cl. 1973). See also Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965) (language of a contract must be given meaning that would have been derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances). Indeed, the Forest Service's own contemporaneous, published interpretation of the contract language deserves far more weight than the government's self-serving, *post hoc* construction.

C. The Distinction Between Routine And Non-routine Submissions As Stated In Reflectone Does Not Apply To The Contracts Here In Issue.

The government attempts to manufacture validity for the contracting officers' actions by trying to improperly extend the Federal Circuit's holding in Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995). The government argues that, under Reflectone, all "non-routine" submissions from a contractor constitute a "claim," regardless of whether they are preceded by a dispute. G's Resp. at 7. However, as Precision noted in its Motion, Reflectone applies only to contracts governed by the Federal Acquisition Regulation ("FAR") or which otherwise contain the FAR definition of "claim." Pl's Motion at 7-8. The FAR, however, does not apply to Forest Service timber sale contracts. See Little River Lumber Co. v. United States, 21 Cl. Ct. 527, 534 (1990). Nor is the FAR definition used in the subject contracts.

The government asserts that the contractual definition of "claim" in the instant contracts is "virtually identical to the definition in the FAR." Id. That may be true. However, while the language of CT9.2 relating to what constitutes a "claim" is quite similar to the language of the

FAR at issue in Reflectone, it differs in at least one very significant respect from that set out in the FAR. That is, the FAR provided that:

> A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim.

FAR 33.201 (emphasis added). Whereas, CT9.2 states that:

> A voucher, invoice or request for payment that is not in dispute when submitted is not a claim.[5]

Quite notably, under CT9.2, what is initially excluded from being a "claim" is any "request for payment that is not in dispute when submitted," whereas, what is initially excluded from being a "claim" under FAR 33.201 is any "routine request for payment that is not in dispute when submitted." The omission of the word "routine" in CT9.2 is critical since that word is the one upon which the Federal Circuit based its holding in Reflectone. There, the court quite logically found that the inclusion of the word "routine" in the second sentence of the FAR definition warranted a distinction between routine and non-routine requests for payment. This formed the basis for its conclusion that under the FAR, non-routine requests for payment needed to be in dispute in order to constitute a claim while routine requests did not. Reflectone, 60 F.3d at 1576. Logic dictates that where the word "routine" before "request of payment" has been excluded from an otherwise virtually identical definition, that the distinction which the court found in Reflectone does not hold true here. That is, the term "request for payment," without modification, as contained in CT9.2 does not thus limit itself to only "routine requests for payment" having to be in dispute.

---

[5]As noted above, the Forest Service's own Handbook interpreted CT9.2 to mean that all requests for payment needed to be in dispute in order to constitute a claim.

The government, nevertheless, argues that "Precision Pine . . . presents no authority – much less authority distinguishing the Federal Circuit's *en banc* decision in Reflectone – establishing that a dispute must exist before the Government can assert a 'claim' pursuant to a contract not governed by the FAR." G's Resp. at 8. As discussed above, the authority for the proposition that a timber sale contract requires the recipient of a request for payment to dispute or ignore that request before the government can assert a claim is contained within the contract itself. As such, the authority for distinguishing the Federal Circuit's *en banc* decision in Reflectone is contained within the opinion of Reflectone itself.

There can be no mistake that the court in Reflectone limited its own holding to contracts governed by the language of the FAR. The opinion is replete with statements that the court is interpreting the language of the FAR. On the other hand, there is no indication whatsoever that the court in Reflectone intended its holding to apply to every CDA "claim," including those not defined by the language of the FAR.

D. There Is No Distinction Between Contractors And The Government With Regard To What Constitutes A Claim Under The CDA.

The government attempts to distinguish between claims made by a contractor and claims made by the government, in order to argue that the requirement in CT9.2 that a request for payment be disputed or ignored prior to its becoming a "claim" does not apply when it is the government requesting payment. See G's Resp. at 6, 7-8, and 12. The government argues that the CDA states that "[a]ll claims by a contractor against the government [must] be in writing and shall be submitted to the contracting officer for a decision," G's Resp. at 5-6 (quoting 41 U.S.C. § 605(a)) (emphasis included in G's Resp.), but that "'claims by the government against a contractor' need only 'be the subject of a decision by the contracting officer.'" G's Resp. at 6

(quoting 41 U.S.C. § 605(a)). Next, the government asserts, albeit erroneously, that "only claims from the contractor are 'submitted.'" G's Resp. at 12, citing 41 U.S.C. § 605(a). From this, the government concludes that because "the 'dispute' language in [contract clause] CT9.2 (c)(ii) applies only to submissions, it has no relevance to Government claims." G's Resp. at 12.

The distinction that the government would have this Court create is, however, contrary to the plain language of the CDA. That is, the sentence immediately following the two sentences of 41 U.S.C. § 605(a) cited by the government, i.e., the third sentence of 41 U.S.C. § 605(a), states that:

> Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.

Thus, CDA unquestionably anticipates claims by the government being submitted.

Moreover, there is nothing in the CDA, the contracts or logic that would in any way prevent the Forest Service from submitting an invoice or other request for payment to a timber sale purchaser. In fact, given that the Forest Service is the seller of the timber, submitting requests for payment to the purchaser is done all the time.

Furthermore, the language of CT9.2 does not, either explicitly or implicitly, establish two different sets of requirements for what constitutes a "claim," i.e., one for contractors and a separate one for the government. In fact, the very first requirement for a "claim" pursuant to CT9.2 is that it be "a written demand or assertion by one of the parties. . . ." Pl's App. at 5.

The only authority the government cites in support of its contention is Placeway Constr. Corp. v. United States, 920 F.2d 903 (Fed. Cir. 1990). G's Resp. at 6, 8 n.4, 12. The relevant portion of Placeway addressed the denial of a contractor's claim by the contracting officer because of what the court determined to be the existence of a government claim for a setoff.

Placeway, 920 F.2d at 906. The government's reasoning appears to be that because the court in Placeway held that the government's denial of the contractor's claim due to the government's setoff constituted a government claim, even though the demand for the setoff was not sent to the contractor prior to what the contractor took to be a final decision, the court effectively ruled that the government does not "submit" claims. See G's Resp. at 12.

The government's use of Placeway as authority, however, is flawed. First, whether the government "submits" claims was not at issue in Placeway. In fact, Placeway makes no distinction between government and contractor claims. Nor does Placeway address a contractually established "in dispute" pre-requisite to a "claim," as is at issue in the instant case. Additionally, in Placeway there was no logical need for the government to have "submitted" its position to the contractor because the government's "claim" was encompassed within the denial of the contractor's claim. In the instant case, there is no setoff at issue, and the only potential "claim" is the government's. This attempt to use Placeway and the language of the CDA to distinguish between government claims and contractor claims, based on the word "submit," is of no import. The relevant question in the instant case is whether the Forest Service's Bills for Collection constituted claims. As discussed above, the plain language of the contracts, as well as the Forest Service's own contemporaneous interpretation of that language, answer this question in the negative.

E. The Purposes Of The CDA Support The "In Dispute" Requirement In CT9.2.

Finally, the government argues that neither the CDA's legislative history nor its purposes are consistent with a requirement that a request for payment be disputed prior to a final decision. G's Resp. at 10. The government cites to Reflectone, 60 F.3d at 1580, where the Federal Circuit addressed the goals of the CDA. In Reflectone, the court noted the CDA goals of fair and

efficient resolution of contract claims, and considered the situation where a contractor is forced to submit an identical demand for payment twice because the first demand was not in dispute. Id. at 1581. The court found that this was neither efficient nor fair to the contractor. Id. at 1581. The court did not, however, state that a pre-existing dispute requirement was categorically unfair or inefficient in every situation. In the instant case, allowing the government to proceed with improper final decisions issued at the same time it made its "written demand or assertion" would be contrary to the requirements of the contract, and unfair to Precision.

In Reflectone, the Federal Circuit also addressed another very important additional goal of the CDA, i.e., the settlement of disputes prior to litigation. Id. "[T]he act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation. . . ." Id. (quoting S. Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5235). That there was potential for negotiation and settlement in the instant case is evidenced by the fact that, as a result of some discussions with the Regional Forester, Precision paid the Forest Service for all of the damages that were assessed on the O.D. Ridge contract.[6] See Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl's Resp. at __") at 35-37. This situation exemplifies the fact that there are circumstances where a pre-existing dispute requirement furthers the goals of the CDA. This may be particularly true with respect to the timber sale contracts which are fundamentally different from contracts under the FAR because the government is the seller of goods, not the buyer of goods or services.

As the court stated in Reflectone, "[i]f the dispute requirement is of vital importance to the government's negotiating position with contractors, the government's only option is to seek

[6] Albeit this fact was not reflected in the defendant's counterclaim.

to change the FAR." Reflectone, 60 F.3d at 1582. The converse of this statement holds true with regard to Forest Service timber sale contracts, i.e., if having a dispute requirement were not of importance to the Forest Service, then the Forest Service would not have included it. The fact remains, however, that all of the contracts at issue did contain a dispute requirement, and the Forest Service issued "final decisions" on requests for payments that were not disputed or that had not otherwise ripened into a "claim" by virtue of being ignored. As such, the government's counterclaim should be dismissed.

## II. The Defendant Has Failed To Establish That It Has A Legal Right To The Estimated Amounts Claimed.

The government responds to Precision's Motion for Summary Judgment by asserting that the Forest Service complied with contract clause CT9.4, but without making any showing that it actually did.[7] Indeed, the government cannot make such a showing because the Forest Service did not comply with the clause.

As the government agrees, see G's Resp. at 13, CT9.4 clearly provides two, and only two, methods for determining damages: (1) reselling the remaining timber at the time of termination and deducting the price received on the resale from the contract price of that timber, and then adding the cost of the resale and other costs specified in the clause; or (2) appraising the value of the remaining timber, deducting that value from the contract price of the remaining timber, and then adding costs specified in the clause that are applicable in the absence of a resale. Pl's App. at 7. See Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1405-1406 (Fed. Cir. 1993) (agreed upon contract term providing the method of damages calculation in the event that the

---

[7] The government did the exact same thing in its Motion for Summary Judgment, i.e., made the assertion that the Forest Service complied with CT9.4, without showing or explaining why this assertion is true. Def's Motion for Summary Judgment at 12-14.

government does not resell timber must be enforced); Hoskins Lumber Co., Inc. v. United States, 20 F.3d 1144, 1148 (Fed. Cir. 1994) (government is entitled to damages under the formula in the contract). Despite the quite unequivocal language of the contract, here, the Forest Service combined elements of both methods to create a third approach. The apparent reason for this was that the Forest Service wanted to collect the most money possible from Precision and to do so without having to wait for the process of reselling the timber to take place.

For 11 of the contracts, i.e., all of the contracts except Hutch-Boondock, the decision documents sent to Precision by the Forest Service clearly indicated that the Forest Service intended to resell the timber remaining on the contracts at the time of termination, stating that "[t]his estimate may be adjusted once final damages are determined following the resale of the timber."[8] Plaintiff's Proposed Findings of Uncontroverted Fact in Support of its Motion for Summary Judgment ("PPFUF at __") ¶¶ 8-10 (emphasis added). Moreover, the damage calculations done for 11 of the sales were based upon an anticipated resale of each sale. PPFUF 11. However, at the time that the decision documents were sent to Precision, none of the contracts had actually been resold. Such being the case, the Forest Service's method is contrary to the two set out in CT9.4 and, as shown below, resulted in the Forest Service's demanding significantly more money than it could possibly have been entitled.

The Forest Service essentially computed the contract value of the timber remaining on the sale at termination and subtracted from this what was termed the "resale value" of that timber. Pl's App. at 20, 29, 38, 47, 57, 66, 76, 85, 97, 108, 118, 127. The government now appears to assert that this "resale value" was actually the appraised value of the timber on the

---

[8]Identical language was used in the "final decisions" on each of the contracts here in issue with the exception of Hutch-Boondock, for which a decision was made "NOT to re-offer the sale" (emphasis in original). Pl's App. at 33.

sale at termination. G's Resp. at 13-15. (As such, although counter-intuitive in phraseology, the difference between the contract price of the remaining timber and this "resale value" would be one part of a proper calculation of damages under the "no resale" formula.) However, as noted, for each sale (except Hutch-Boondock), (a) the Forest Service expressly indicated that it intended to resell the timber (PPFUF ¶¶ 8-10) and (b) consistently purported to compute damages under the resale formula of CT9.4, e.g., its calculation of damages included the cost of reselling the timber (CT.9.4(a)) and interest on the unpaid contract value of the timber remaining at the time of the termination from the date of the termination until the midpoint of the resale contract (CT9.4(d)).[9] Id. at ¶ 11.

Precision acknowledges that under CT9.4, certain costs may be added to damages assessed under the "no resale" method.[10] Moreover, Precision acknowledges that the cost of resale and interest on remaining timber can be added to damages assessed after a resale, per CT9.4 (a) and (d). However, the latter costs cannot properly or logically be computed in the absence of an actual resale or be included in damages computed using the "no resale" approach.

Nevertheless, for 11 of the contracts in issue, the Forest Service assessed damages as if a resale had occurred when, in fact, it had not. Quite notably, the cost of resale and interest added to the damage calculations for sales it had not resold at the time of assessment constitutes over $219,500.66 (see Pl. Supp. App. at 2) of the Forest Service's alleged damages of $767,625.72. PPFUF ¶ 12.

---

[9]Of course, the Forest Service included these items even though it had yet to actually resell the timber.

[10]For example, CT9.4(c) allows the Forest Service to add the cost cutting and felling certain trees where there is no resale of those trees.

Additionally, not only did the Forest Service improperly calculate damages based on "estimated" resale values, estimated cost of resale and estimated interest, but it attempted to reserve the right to still collect more damages "once final damages are determined following the resale of the remaining timber." PPFUF ¶¶ 8-10. Such multiple collections of damages are not provided for in the contracts, nor does the defendant cite any authority permitting the Forest Service to do so. As Precision has argued in its Motion, CT9.4 does not, in fact, provide the government the right to be paid an interim assessment of potential damages which will later be adjusted once the government determines the actual damages. Pl's Motion at 12 -13 (citing Forest Env't. Serv. Co., Inc. v. United States, 5 Cl. Ct. 774, 779 (1984)).

Notwithstanding the fact that the Forest Service assessed estimated damages on the basis of resales which had yet, if ever, to occur, the defendant indicates that since the date of the "final decisions," (a) three of the sales have actually been resold and (b) the remaining nine sales have not been resold and "are not intended to be resold." G's Resp. at 14. By these actions, the defendant attempts to paint the picture that the Forest Service's assessments are correct. However, nothing could be further from the truth.

As to the three sales (O.D. Ridge, Jersey Horse and Wiggins) which have been resold, even the defendant recognizes that recalculated damages, and not those contained in the contracting officers' "final decisions," are appropriate.[11] Id. With respect to the remaining nine sales, the defendant claims, based on the unsubstantiated assertion that these sales are not

[11]The government states that the reason the Forest Service has not issued final decisions recalculating the damages for the contracts that have been resold is the existence of this very litigation. G's Resp. at 14. To the extent that this is the case, and plaintiff does not believe that it is, the situation is of the Forest Service's own creation and Precision should not have to bear the consequences of the Forest Service's failure to follow the terms of the contract.

intended to be resold, that the damages assessments here in issue comport with CT9.4. However, the evidence which defendant offers does not support either (a) the assertion that "the remaining [nine] contracts . . . are not intended to be resold" or that (b) even if such an intention existed, that the damage assessments which were done assuming that the sales would be resold now comport with the "no resale" method permitted in CT9.4.

The source that the government cites for the proposition that the remaining nine contracts are not going to be resold is the Declaration of David Harris.[12] However, the government's assertions go well beyond what Mr. Harris states in his declaration. That is, Mr. Harris never states that the Forest Service has no intention of reselling all of the nine remaining sales. Rather, he states only that three of the nine sales will not be resold (Brann, Saginaw Kennedy and U-bar), Harris Declaration at ¶¶ 10, 19, and simply that four others (Gentry, Brookbank, Monument, and Lily) have not been resold to date. Id. at ¶¶ 15, 19, 21.

As noted, based on the faulty premise that all nine remaining sales will not be resold and/or that at the time of the assessments the timber had not been resold, the government asserts that the contracting officers properly assessed damages "using the 'no resale' formula" in clause

[12]The government has apparently chosen David Harris as its spokesperson for the Forest Service with regard to the adequacy of the appraisals conducted on, purported final decisions issued with regard to, and the actual or intended disposition of the contracts at issue. Defendant's Additional Proposed Findings of Undisputed Fact ¶¶ 16-19; Harris Declaration ¶¶ 1-22. Precision notes that Mr. Harris is not currently a Contracting Officer. Id. at ¶¶ 2-3. Moreover, he was only actually the Contracting Officer on two of the sales at issue, therefore he has no personal knowledge with regard to the other ten sales. Id. at ¶¶ 4, 11. He states in his declaration that he obtained the information that forms the basis for his declaration with regard to those other ten sales by reviewing the contract files. Id. at ¶ 11. Since Mr. Harris, by his own statements, indicates that he lacks personal knowledge as to anything beyond what may be stated in file documents (which may or may not accurately reflect what the Forest Service actually did), absent more, under Federal Rule of Evidence 602, Mr. Harris may not testify on the matter. Moreover, as discussed, infra, Mr. Harris's assertions are often inconsistent with the government's brief, unsupported by documentary evidence, or just plain wrong.

CT9.4. Per CT9.4, whether damages should be calculated pursuant to the resale method or the non-resale method must be determined at the time of damages assessment, depending, quite logically enough, on whether the timber has actually been resold at that time. As such, factors occurring after the assessment of damages cannot make an improperly calculated damage assessment proper.

Moreover, the government neither supports nor explains its assertions. It does cite to pages 12-127 of the Plaintiff's Appendix, as well as to paragraphs 9, 14, 18, and 21 of the Harris Declaration, included in the Appendix to the G's Resp. These cites, however, do nothing to show that the contracting officers complied with the "no resale" formula in CT9.4. The pages of the Plaintiff's Appendix to which the government cites generally contain the Decision Documents, Default Damage Calculations, and Bills for Collection for the contracts at issue. Far from supporting the government's position, these are the very documents that showed Precision the manner in which the government improperly assessed the damages under either formula permitted by CT9.4. Furthermore, the cited paragraphs from the Harris Declaration are totally at odds with the contemporaneous documents. Paragraph 14 of the Harris Declaration states:

> The remaining timber on each contract was appraised using the standard Forest Service appraisal method, and appraisal bulletin values, in effect at the time of termination. The final Contracting Officer decisions do not indicate that a final decision to re-offer the defaulted sales had been made at the time the decisions were issued and, therefore, damages were calculated as if the sale would not be resold.[13]

(Emphasis added).

This statement is simply untrue. Indeed, in the two "final decisions" actually signed by Mr. Harris himself, he stated with regard to the estimated damages that they "may be adjusted

[13] Similar statements were made in ¶ 9, ¶ 18 and ¶ 21 of the Harris Declaration.

once final damages are determined following the resale of the remaining timber" (emphasis added). Pl' s App. at 89-90, 102. Moreover, the undisputable fact is that in those "decisions" as in the "decision" involving every other contract here in issue (except Hutch-Boondock), the Forest Service assessed damages for the cost of reselling the timber and interest on delayed receipts to the mid-point of the resale contract. See Pl's Supp. App. at 2. Such being the case, clearly, damages were not calculated under the "no resale" method.

While the above reiterates that the Forest Service assessed damages using a method other than one of the two set out in CT9.4, the fact that the Forest Service did not assess damages "in accordance with CT9.4" as the defendant alleges, G's Resp. at 15, is further illustrated by the calculations of damages for O.D. Ridge. As is discussed at length in Plaintiff's Response, the Forest Service did not, in actuality, assess damages for O.D. Ridge pursuant to CT9.4. See Pl's Resp. at 35-37. Rather, because the Forest Service anticipated receiving a higher resale price for the timber than the contract value at termination, the Forest Service merely billed Precision for timber volume cut and removed but not paid for, under the guise of CT9.4.[14] Pl's App. at 47. See Pl's Resp. at 35-37.

The government's failure to follow CT9.4 is also illustrated by manner in which damages were assessed regarding Jersey Horse and Wiggins. The defendant advises that the remaining timber on these sales has been resold since the issuance of the purported final decisions. G's Resp. at 14. Nevertheless, the damage calculations for each of these sales was based on an

---

[14]The situation with O.D. Ridge provides another example of the inaccuracies in the Harris Declaration. Mr. Harris states that, with regard to O.D. Ridge, "[d]amages were assessed pursuant to CT9.4. . . ." Harris Declaration at ¶ 13. This clearly was not the case. Presumably, this inaccuracy is attributable to the fact that Mr. Harris was not the contracting officer for the O.D. Ridge sale.

anticipated resale value, an anticipated cost of resale and an estimated cost of interest to the mid-point of the sale contract that were calculated well prior to the actual resale.[15] It stands to reason then, that the damage assessment is almost assuredly incorrect and does not reflect the actual resale value or the appropriate costs and interest, as required by CT9.4.

The government concludes its Response by stating that "Precision Pine's principal objection appears to be the Forest Service's purported use of "estimated" damages." G's Resp. at 15. It is not the Forest Service's use of the word "estimated" to which Precision has objected, rather, it is the fact that what the contracting officers characterized as "estimated" damages were based on anticipated resales and thus were not properly calculated in accordance with one of the two methods prescribed in CT9.4. See discussion supra. See also Pl's Motion at 11-12. Instead of following the terms of the contract, the Forest Service here attempted to increase its damages by calculating damages in a way that best suits it. Additionally, the Forest Service has attempted to reserve the right to demand even more damages following the actual resale of the contracts if its estimates fall short. Contrary to what the government suggests on page 15 of its response, Precision is not merely asserting that the defendant simply used the "wrong formula" in assessing damages. Rather, the defendant, as a matter of law, failed to comply with the contractually provided remedies agreed to by the parties. The Forest Service was free to use the no resale method and could have calculated damages simply based on a reappraisal, etc. The Forest Service was also free to resell the timber and then assess damages. However, it chose to take a third course, to the detriment of Precision; something that the contracts do not permit.

[15] An anticipated resale calculation was performed for O.D. Ridge, however, as has been discussed, the actual "estimated" damages were not assessed pursuant to by CT9.4.

Simply put, the government should not be allowed to proceed on its claims for damages against Precision based on its grossly improper and inadequate "estimated" damages assessments.[16]

## III. Conclusion.

For the reasons set forth above, plaintiff, Precision Pine & Timber, Inc., respectfully requests that the Court grant its motion to dismiss the defendant's counterclaim, or, in the alternative, grant its motion for summary judgment on the defendant's counterclaim.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: May 10, 2004

[16] Precision does not suggest that the government would not be entitled to damages if Precision were found liable for a breach of contract. However, the government should be required to abide by the terms of the contract, including the terms for assessing damages, prior to, rather than during, litigation.

# SUPPLEMENTAL APPENDIX

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 02-131C (Judge George W. Miller) |

**DECLARATION OF LORIN D. PORTER**

I, Lorin D. Porter, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. I am currently, and at all times relevant to this case have been, the President of Precision Pine & Timber, Inc. ("Precision Pine") based in Heber, Arizona.

2. My understanding at the time of contracting for each of the contracts at issue in this case, was (and still is) that clause CT9.2 requires that a demand for money made by either party needs to be disputed by the other party prior to its becoming a claim upon which a final decision can be issued.

Dated: MAy 6, 2004

Lorin D. Porter
President
Precision Pine & Timber, Inc.

**Overstated damages based on the improper inclusion of "Cost of Resale" and "Interest" in the assessments for sales that had not been resold at the time of assessment**

| Contract | Cost of Resale | Interest |
|---|---|---|
| U-Bar | $23,468.00 | $67,855.90 |
| Monument | $2,970.00 | $10,112.38 |
| Jersey Horse | $16,722.00 | $16,265.73 |
| Gentry | $3,666.00 | $27,689.22 |
| Wiggins | $8,959.00 | $57.73 |
| Brann | $5,450.00 | $5,444.20 |
| Saginaw- Kennedy | $7,107.00 | $11,387.05 |
| Lily | $5,183.00 | $7,163.45 |
| | Total Cost of Resale **$73,525.00** | Total Interest **$145,975.66** |

Total Overstated Damages due to added Cost of Resale and Interest
**$219,500.66**

Amounts taken from the "Default Damage Calculations" documents provided by the Forest Service

O.D. Ridge is not listed because damages were not actually assessed pursuant to CT9.4

Hutch-Boondock is not listed because the decision document for the sale clearly indicated it was not intended for resale, and thus cost of resale and interest were properly not added to the damages assessment.

Brookbank and Manaco are not listed because there were no estimated damages assessed for these sales