United States Court of Appeals,
Federal Circuit.

**BARRON BANCSHARES, INC., William J. Oestreicher, Michael V. Masterson, Scott J. Teigen, Henry C. Martinsen and Donald P. Zietlow, Plaintiffs-Appellants,**
**and**
**Federal Deposit Insurance Corporation, Plaintiff-Appellant,**
**v.**
**UNITED STATES, Defendant-Appellee.**

**Nos. 03-5048, 03-5049.**

DECIDED: May 11, 2004.

**Background:** Investors, who acquired control of failing thrift through holding company, and holding company itself, brought suit against United States, alleging that passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) breached government promises made in connection with acquisition of thrift. Federal Deposit Insurance Corporation (FDIC) intervened in its capacity as receiver of failed thrift. The United States Court of Federal Claims, John P. Wiese, Senior Judge, granted government's partial summary judgment motion and motion to dismiss, 53 Fed.Cl. 310. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Schall, Circuit Judge, held that:
(1) claims against United States brought by FDIC presented justiciable case or controversy, rather than intra-government dispute;
(2) complaint of FDIC related back to original, timely complaint of investors;
(3) government's promise of supervisory goodwill and capital credit relating to investors' acquisition of failing thrift was contractual obligation binding upon United States, not merely statements of then-applicable regulatory accounting principles;
(4) contract provisions set forth in clear and unambiguous language and accompanied by integration clause could not be disregarded by reason of absence of parol evidence reflecting negotiations for those provisions;
(5) government waived any claim with respect to prior material breach or material misrepresentation by thrift; and
(6) fact issue existed as to extent to which seizure of failed thrift could be traced to government's breach of promise to forbear for period of five years from holding thrift accountable to regulatory minimum net worth requirements.

Affirmed in part, reversed in part, and remanded.

**[1] Federal Courts 🔑13**

170Bk13

A claim by the Federal Deposit Insurance Corporation (FDIC) against the United States, that does not exceed the amount owed to the insurance fund, does not present an actual case or controversy, because the FDIC and the United States are not truly adverse as to the claims of the FDIC.

**[2] Federal Courts 🔑13**
170Bk13

Claims against United States brought by Federal Deposit Insurance Corporation (FDIC), as receiver for failed thrift, presented justiciable case or controversy, rather than intra-government dispute, in context of lawsuit alleging that passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) breached government promises made in connection with acquisition of thrift, since any recovery by FDIC would have involved additional amounts to be paid out to thrift's creditors and potentially to its shareholders. Federal Deposit Insurance Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.

**[3] Contracts 🔑29**
95k29

Whether a contract exists is a mixed question of law and fact.

**[4] Contracts 🔑176(1)**
95k176(1)

Contract interpretation is a question of law that is reviewed de novo.

**[4] Federal Courts 🔑776**
170Bk776

Contract interpretation is a question of law that is reviewed de novo.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**[5] Limitation of Actions 🔑127(3)**
241k127(3)

Complaint of Federal Deposit Insurance Corporation (FDIC), as receiver for failed thrift, related back to original, timely complaint of investors, in lawsuit against United States alleging that passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) breached government promises made in connection with acquisition of thrift; investors' complaint set forth all operative facts from which FDIC's later-asserted claims arose, notice of related case had been filed identifying suit as *Winstar*-related case, predecessor Resolution Trust Corporation (RTC) actively and timely participated in suit, and FDIC had role coincident with investors' pursuit of claims of failed thrift. Federal Deposit Insurance Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.; 28 U.S.C.A. § 2501; RCFC, Rule 15(c), 28 U.S.C.A.

**[6] United States 🔑73(22)**
393k73(22)

Government's promise of supervisory goodwill and capital credit relating to investors' acquisition of failing thrift was contractual obligation binding upon United States, not merely statements of then-applicable regulatory accounting principles, and promise was breached by passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) and its implementing regulations, although forbearance letter did not explicitly recognize capital credit, and capital maintenance agreement did not expressly include, in determination of required capital, any amounts permitted by Federal Savings and Loan Insurance Corporation (FSLIC) in assistance agreement and any forbearances issued in connection with transaction. Federal Deposit Insurance Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.

**[7] United States 🔑70(2.1)**
393k70(2.1)

Contract provisions set forth in clear and unambiguous language and accompanied by integration clause could not be disregarded by reason of absence of parol evidence reflecting negotiations for those provisions, in investor's lawsuit against United States alleging that passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) breached government promises made in connection with acquisition of thrift. Federal Deposit Insurance Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.

**[8] United States 🔑66**
393k66

Mutual intent to contract is required to prove an enforceable agreement with the government, and that there must be an offer, an acceptance, consideration, and governmental authority.

**[9] Contracts 🔑152**
95k152

When construing a contract, a court first examines the plain meaning of its express terms.

**[10] Evidence 🔑397(1)**
157k397(1)

The "parol evidence rule" is a rule of substantive law that prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding.

**[11] Evidence 🔑397(1)**
157k397(1)

**[11] Evidence 🔑448**
157k448

The parol evidence rule renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement; evidence of the parties' course of dealing constitutes the kind of parol evidence that is prohibited by the rule.

**[12] Contracts 🔑143(2)**
95k143(2)

**[12] Contracts 🔑152**
95k152

If the terms of a contract are clear and unambiguous, they must be given their plain meaning, and extrinsic evidence is inadmissible to interpret them; a contract provision is only ambiguous if susceptible to more than one reasonable meaning.

**[12] Evidence 🔑448**
157k448

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

If the terms of a contract are clear and unambiguous, they must be given their plain meaning, and extrinsic evidence is inadmissible to interpret them; a contract provision is only ambiguous if susceptible to more than one reasonable meaning.

**[13] Evidence 🔑445(1)**
157k445(1)

The parol evidence rule does not bar consideration of the parties' dealings during contract performance but prior to litigation.

**[14] Evidence 🔑397(1)**
157k397(1)

Parol evidence in the form of pre-contract negotiations and dealings is barred from consideration by the parol evidence rule.

**[15] United States 🔑75(2)**
393k75(2)

Government waived any claim with respect to prior material breach or material misrepresentation by thrift, which could have given government right to terminate contract and could have precluded any recovery of damages by thrift for government's breach of promise to afford specified regulatory treatment of supervisory goodwill and capital credits to thrift, since government continued to perform under contract by making assistance payments to thrift until government completed its five-year obligation.

**[16] Contracts 🔑318**
95k318

Under the prior material breach doctrine, when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its non-performance at the time of the alleged breach.

**[17] Contracts 🔑94(5)**
95k94(5)

If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient. Restatement (Second) of Contracts § 164.

**[18] Federal Civil Procedure 🔑2487**
170Ak2487

Genuine issue of material fact existed as to extent to which seizure of failed thrift could be traced to government's breach of promise to forbear for period of five years from holding thrift accountable to regulatory minimum net worth requirements, precluding summary judgment, in context of lawsuit against United States alleging that passage of Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) breached government promises made in connection with acquisition of thrift. Federal Deposit Insurance Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

Susan E. Barnes, Lindquist & Vennum PLLP, of Minneapolis, Minnesota, argued for plaintiffs-appellants Barron Bancshares, Inc., et al. Of counsel on the brief were Mark J. Briol and William G. Carpenter, Briol & Associates, PLLC, of Minneapolis, Minnesota.

Ellis Merritt, Jr., Federal Deposit Insurance Corporation, of Dallas, Texas, argued for plaintiff-appellant Federal Deposit Insurance Corporation. On the brief were John V. Thomas, Mary Ann McNamar, John M. Dorsey III, and Richard M. Schwartz, FDIC Legal Division, of Washington, DC.

Tarek Sawi, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Richard B. Evans and Joanne E. Johnson, Trial Attorneys.

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

***1** In this *Winstar*-related case, Barron Bancshares, Inc. ("Barron Bancshares"), and Mssrs. Oestreicher, Masterson, Teigen, Martinsen, and Zietlow ("Investors") (collectively, "Barron") and the Federal Deposit Insurance Corporation ("FDIC") [FN1] appeal from the decision of the United States Court of Federal Claims (i) granting partial summary judgment in favor of the United States and (ii) granting the United States' motion to dismiss counts one through eight and eleven of Barron's first amended complaint and count three of the FDIC's complaint. *Barron Bancshares, Inc. v. United States,* 53 Fed.Cl. 310

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(2002). The court determined that the capital credit and goodwill provisions in Barron's *Winstar*-type contract with the United States were not contractual obligations, but merely statements of then-applicable regulatory accounting principles. *Id.* at 315-20. The court further determined that the United States was not liable for its breach of the five- year forbearance provision of the contract by reason of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C. and 26 U.S.C.) ("FIRREA"), and its implementing regulations. *Id.* at 323-25. The court concluded that although the United States breached the forbearance provision of the contract, that breach was not the cause of the seizure of Monycor, the thrift institution acquired by Barron pursuant to its contract with the United States. *Id.*

We conclude that the supervisory goodwill and capital credit provisions of Barron's contract with the United States were contractual obligations, and that the United States breached those obligations. In addition, while we agree with the Court of Federal Claims that the United States breached the contract's five-year forbearance provision, we conclude that there are genuine issues of material fact as to whether that breach caused the seizure of Monycor. The decision of the Court of Federal Claims is therefore affirmed-in-part and reversed-in-part. The case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I.

The circumstances surrounding the thrift crisis of the early 1980s and the resulting enactment of FIRREA have been extensively set forth in opinions of the Supreme Court, this court, and the Court of Federal Claims. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ( " *Winstar IV* "); *Winstar Corp. v. United States,* 64 F.3d 1531 (Fed.Cir.1995) (en banc) ("*Winstar III* "); *Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992) ("*Winstar II* "); *Winstar Corp. v. United States,* 21 Cl.Ct. 112, 113-14 (1990) ("*Winstar I* "). A brief summary of these circumstances may provide context for this particular *Winstar*-related dispute.

Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions ("thrifts"). To attract new deposits, thrifts had to offer interest rates that far exceeded the income the thrifts were receiving from mortgage agreements previously entered into at lower rates. *Castle v. United States,* 301 F.3d 1328, 1332 (Fed.Cir.2002). Between 1981 and 1983, more than four hundred thrifts declared bankruptcy. This threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation ("FSLIC"), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts. *Winstar IV,* 518 U.S. at 846-47, 116 S.Ct. 2432.

***2** To deal with this crisis, the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts and outside investors to purchase insolvent thrifts in supervisory mergers. *Id.* at 847, 116 S.Ct. 2432. In such a transaction, the FHLBB would permit the acquiring investors to allocate any shortfall between liabilities and real assets to an intangible asset known as "supervisory goodwill." *See Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1370 (Fed.Cir.2001). The Bank Board would then allow the new or restructured thrift to count supervisory goodwill toward its reserve capital requirements, and to amortize the goodwill over a long period of time. *Winstar IV,* 518 U.S. at 849-50, 116 S.Ct. 2432. In addition, the FSLIC offered cash contributions in the form of capital credits that acquiring thrifts were permitted to count as permanent credits to regulatory capital. *Id.* at 853, 116 S.Ct. 2432. Finally, banking authorities granted regulatory forbearances whereby they would forbear from enforcing a thrift's regulatory capital requirements for a specified period of time. *See, e.g., Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1345 (Fed.Cir.2001) ("*Cal Fed* ") (the Brentwood and Family transactions).

Despite these various measures, the crisis in the savings and loan industry continued. As a result, on August 9, 1989, Congress enacted FIRREA, in order to prevent the collapse of the industry, to attack the causes of the crisis, and to restore public confidence. *Winstar IV,* 518 U.S. at 856, 116 S.Ct. 2432. FIRREA abolished the FHLBB and the FSLIC, transferred thrift insurance activities to the FDIC, established the Office of Thrift Supervision ("OTS") as the new thrift regulatory agency, created the Resolution Trust Corporation ("RTC") to liquidate or otherwise dispose of certain closed thrifts and their assets, and made substantial changes in the regulation of the savings and loan industry. *Id.* In particular, FIRREA mandated a minimum capital requirement

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

for thrifts and prohibited the use of supervisory goodwill. In its wake, many thrifts rapidly fell out of compliance with regulatory capital requirements and were seized by regulators. *Id.* at 856-58, 116 S.Ct. 2432.

II.

Barron County Federal Savings & Loan ("Barron County"), an ailing thrift located in Barron, Wisconsin, reported insolvency on May 31, 1985. *Barron Bancshares,* 53 Fed.Cl. at 311. In response, the Chicago office of the FHLBB decided to recapitalize Barron County by converting it from a mutual association to a stock association and by selling its stock. *Id.* at 311-12. After soliciting bids, the Bank Board selected the Investors to acquire the stock of the reformed thrift, renamed Monycor. *Id.* at 312. The transaction was recorded in five documents: three Bank Board Resolutions, an Assistance Agreement, and a Forbearance Letter. *Id.*

In Bank Board Resolution Nos. 86-1215, 86-1215A, and 86-1215B, the FHLBB authorized the conversion of the thrift, the purchase of stock by the Investors, the execution of the Assistance Agreement, and the issuance of the Forbearance Letter. *Id.* Resolution No. 86-1215 contained the various accounting principles applicable to the recapitalized thrift, including the capital credit and supervisory goodwill provisions at issue in this case. *Id.* It directed the thrift to use the "push-down" accounting method to record the value of the acquisition on its books. *Id.* Under that method, the thrift's assets were to be "marked to market," or valued as of the date of the transaction. *Id.* Application of this accounting method resulted in an excess of liabilities over assets, creating $5,907,708 in supervisory goodwill that Monycor was to record as an intangible asset. *Id.* Of this sum, $4,908,000 constituted unallocated goodwill that Monycor could count toward its regulatory capital requirements. *Id.* The supervisory goodwill provision contained in the Resolution provided for any intangible assets created by the acquisition to be amortized by the straight-line method over a period not to exceed twenty- five years. *Id.* Resolution No. 86-1215 further established that the Investors were entitled to record a capital credit equal to the ultimate contribution by the FSLIC. *Id.* at 318 n. 12.

***3** Pursuant to section 6(A)(1) of the Assistance Agreement, the FSLIC contributed cash to Monycor to assist the Investors in making it a viable institution. *Id.* The Investors were to contribute $4.25 million, *see id.,* while the FSLIC was to contribute $6.675 million, subject to adjustment based on the Initial Audit mandated by section 5 of the agreement. Assistance Agreement § 6(A)(1). The FSLIC ultimately contributed approximately $9.7 million to Monycor. *See Barron Bancshares,* 53 Fed.Cl. at 314.

Section 6(A)(1)(iii) of the Assistance Agreement related to capital credit; it classified cash paid to the thrift by the FLSIC as a cash component of net worth rather than an offsetting deduction to supervisory goodwill. *Id.* at 312-13. The Assistance Agreement also incorporated the accounting principles stated in the three Bank Board Resolutions. *Id.* Section 19 of the agreement stated that the regulations applicable to the transaction were those in effect at the time of the transaction, *id.* at 316 n. 11, while section 24 of the agreement set forth an integration clause that incorporated the Bank Board Resolutions and the Forbearance Letter and excluded from the parties' contract all parol agreements and discussions. *Id.* at 316 n. 10.

The Forbearance Letter completed the set of five documents constituting the contract. In it, the United States guaranteed Monycor that the under-performing assets on its books prior to the acquisition would not be counted against the recapitalized thrift in satisfying its net worth requirements for five years, until December 15, 1991. *Id.* at 312. The Forbearance Letter also specified the accounting treatment of losses on assets and operations acquired from Monycor's predecessor. *Id.* at 312 n. 3.

Upon completion of the acquisition, the Investors became the Board of Directors of Monycor and Barron Bancshares, Monycor's holding company, with Mr. Oestreicher serving as Monycor's President. During its operation, Monycor adhered to Generally Accepted Accounting Principles ("GAAP"), which include the "push-down" or "purchase" method of accounting set forth in Bank Board Resolution No. 86-1215. Monycor never recorded a capital credit during its existence, nor did it amortize its goodwill in accordance with the Bank Board Resolutions. *Id.* at 318 n. 13. Rather, Monycor opted for an accelerated write-off schedule in accordance with GAAP. *Id.*

In December of 1989, the OTS informed Monycor that it had failed FIRREA's capital requirements. [FN2] Shortly thereafter, in January of 1990, the OTS announced in Thrift Bulletin 38-2 that FIRREA had eliminated "previously granted capital and accounting forbearances." Any thrift that failed to meet capital

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

requirements as a result was required to submit a capital plan. Monycor submitted its capital plan to the OTS in March of 1990 (supplemented in April and May), indicating that it would achieve capital compliance. The OTS disapproved the plan on June 28, 1990, because it believed Monycor should have more than the minimum amount of capital, and it planned to implement an Individual Minimum Capital Requirement for the thrift (although the individual requirement was never approved by the OTS in Washington, D.C.). In June of 1990, the Investors contributed to Monycor an additional $600,000 in an attempt to replenish its regulatory capital. *Id.* at 313. Even so, on July 12, 1991, the OTS declared Monycor to have "substantially insufficient capital." It therefore seized the institution and appointed the RTC as receiver.

III.

***4** The Investors and Barron Bancshares filed suit in the Court of Federal Claims on August 28, 1990. In their action, they alleged that the United States had breached its contract with Barron by failing to honor the Forbearance Letter and thereby placing Monycor in receivership. They asserted that they were entitled to damages in the amount of $5.35 million, representing the value of their investment in Monycor. *Id.*

Like all cases similarly situated, Barron's suit was stayed pending the decision of the Supreme Court in *Winstar IV.* In *Winstar IV,* the Court affirmed the decision of this court in *Winstar III* that "the United States is liable to respondents [three thrifts] for breach of contract." 518 U.S. at 910, 116 S.Ct. 2432. The contracts in *Winstar IV* permitted the three failed thrifts in the case to meet regulatory capital requirements by using supervisory goodwill and to amortize "this 'asset' ... over a substantial number of years." *FDIC v. United States,* 342 F.3d 1313, 1315 (Fed.Cir.2003) (quoting *Landmark,* 256 F.3d at 1370).

The FDIC intervened in this action in March of 1997, after *Winstar IV* was decided, and filed a complaint on behalf of Monycor, the seized thrift. In its complaint, the FDIC alleged that the provisions of FIRREA and the OTS capital regulations constituted, *inter alia,* a breach of Monycor's contract rights. The FDIC sought to recover damages as established at trial, compensation for all monies expended and costs incurred, and the value of all benefits conferred on the government.

[1][2] On February 19, 1999, the FDIC moved for partial summary judgment as to liability. Thereafter, in September, the government moved to dismiss portions of both Barron's and the FDIC's complaints and for partial summary judgment. In due course, Barron renewed its previously filed motion for partial summary judgment as to liability, while the government filed a supplemental motion to dismiss the claims of the FDIC. [FN3] *Barron Bancshares,* 53 Fed.Cl. at 311.

On August 23, 2002, the Court of Federal Claims granted partial summary judgment in favor of the United States and dismissed portions of both complaints. The court ruled that the capital credit provision in the Assistance Agreement had the effect that, for regulatory purposes, cash paid to Monycor by the FSLIC would be taken into account as a cash component of net worth rather than being treated as an offsetting deduction to supervisory goodwill; it was not a contractual undertaking binding upon the United States, but only a statement of then-applicable regulatory policy. *Id.* at 319. The court made a similar ruling with respect to the supervisory goodwill provision contained in Bank Board Resolution No. 86-1215 that was incorporated into the Assistance Agreement. That provision allowed Monycor to amortize supervisory goodwill under the straight-line accounting method over a twenty-five-year period. *Id.* The court determined that the FSLIC's assistance payments and the Forbearance Letter's five-year supervisory forbearance "constituted the limit of the government's contractual undertaking." *Id.* at 318.

***5** The Court of Federal Claims concluded that the United States had committed a breach of contract by failing to honor the five-year forbearance promised in the Forbearance Letter. *Id.* at 321-23. It determined, however, that Monycor's failure to meet its capital requirements, and not the government's breach, had caused the seizure of the thrift. *Id.* at 323-25; *see also Barron Bancshares, Inc. v. United States,* No. 90-830 C (Fed.Cl. Nov.8, 2002) ("Order Denying Reconsideration"). In reaching its conclusion, the court relied upon reports by the FDIC that Monycor was experiencing "a myriad of problems unrelated to losses on pre-acquisition assets." *Barron Bancshares,* 53 Fed.Cl. at 324 (quoting an FDIC Report of Examination (Mar. 8, 1991)). Thus, according to the court, the evidence suggested that the problems at Monycor were "of investor plaintiffs' own making." *Id.* at 325. Consequently, the court granted the government's motion for partial summary judgment

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and to dismiss portions of Barron's and the FDIC's complaints. *Id.* at 326. Thereafter, the court entered judgment in accordance with Court of Federal Claims Rule 54(b). [FN4] *Id.* at 326. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

ANALYSIS
I.

[3][4] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. Cl. R. 56(c); *Castle,* 301 F.3d at 1336. In the setting of a motion for summary judgment, all justifiable factual inferences are drawn in favor of the nonmovant. *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998); *Winstar III,* 64 F.3d at 1539 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We review a grant of summary judgment by the Court of Federal Claims *de novo* to determine whether the summary judgment standard has been correctly applied. *Castle,* 301 F.3d at 1337. Whether a contract exists is a mixed question of law and fact. *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998). Contract interpretation is a question of law that we review *de novo. Id.* (citing *Winstar III,* 64 F.3d at 1540). We generally review *de novo* the trial court's legal conclusions. *See, e.g., Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1298 (Fed.Cir.2001). Before turning to the main issue in this case, we address two preliminary matters.

II.

[5] The first question is whether the FDIC's claim is barred by the statute of limitations. Pursuant to 28 U.S.C. § 2501, any claim over which the Court of Federal Claims has jurisdiction is barred unless a complaint with respect to the claim is filed in the court "within six years after such claim first accrues." The FDIC moved to intervene in this case on March 27, 1997. This was more than six years after (i) the August 9, 1989 passage of FIRREA, (ii) the December 9, 1989 issuance of FIRREA's implementing regulations, and (iii) the August 28, 1990 filing of Barron's suit. The government moved to dismiss the FDIC's suit on the ground that it was untimely.

*6 In an Order dated June 25, 2001, the Court of Federal Claims denied the government's motion. *Barron Bancshares, Inc. v. United States,* No. 90-830 C (Fed.Cl. June 25, 2001) ("Order Denying Dismissal of FDIC's Claims"). The court stated that "[u]nder even the most generous calculation of the claims' accrual date ... the FDIC's complaint, without more, is out of time." *Id.,* slip op. at 2 (citing *Ariadne Fin. Servs. v. United States,* 133 F.3d 874 (Fed.Cir.1998) ). The court nevertheless allowed the FDIC's action to proceed based upon its Rule 15(c). That rule, titled "Relation Back of Amendments," provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim ... arose out of the conduct, transaction, or occurrence set forth ... in the original pleading...." Fed. Cl. R. 15(c). The Court of Federal Claims pointed out that Barron's first amended complaint, filed on July 30, 1992, set forth "all the operative facts from which the FDIC's later-asserted claims arise, including the underlying contract documents, the reliance on government-conferred forbearances, the passage of FIRREA, and FIRREA's subsequent impact on the bank." Order Denying Dismissal of FDIC's Claims, slip op. at 3. The court also pointed out that a notice of related case had been filed on August 28, 1990, identifying the suit as a *Winstar*-related case, and that the FDIC--through its predecessor, the RTC-- had actively participated in the suit as early as 1991. *Id.* Finally, the court noted, "the FDIC acts here as receiver for the failed thrift, a role coincident with Plaintiffs' pursuit of the failed thrift's claims." *Id.* In the court's view, these facts, taken as a whole, placed the case within the purview of *Snoqualmie Tribe v. United States,* 178 Ct.Cl. 570, 372 F.2d 951 (1967).

In *Snoqualmie Tribe,* the Court of Claims addressed the application of Rule 13(c) of the former Indian Claims Commission, a rule identical to Court of Federal Claims Rule 15(c). The court stated that "the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading." *Id.* at 960. The court went on to conclude that a later-filed claim, brought on behalf of the Skykomish Tribe of Indians that technically presented a new cause of action, was not barred by the statute of limitations because it involved the claim of a closely related party, for the Snoqualmie and Skykomish Tribes were culturally intertwined. Additionally, the court noted that the claim arose under the same treaty that the Snoqualmie Tribe had invoked as the basis for its cause of action. *Id.* at 961. The court ruled that, in view of this virtual identity of tribal interests, the claim of the Skykomish Tribe was "sufficiently closely related to warrant the conclusion that the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

government received adequate notice of the possibility that it might have to defend against a broader claim." *Id.* In this case, the Court of Federal Claims reasoned that, as in *Snoqualmie Tribe,* it was "faced with later-added claims that arise out of the same transaction presented in plaintiffs' suit and that present the interests of a related party whose subsequent appearance here as a litigant the government clearly could have anticipated on the basis of the facts that plaintiffs initially had put into issue." Order Denying Dismissal of FDIC's Claims, slip op. at 3-4.

***7** The Court of Federal Claims' ruling on the statute of limitations issue presents us with a denial of the government's motion to dismiss, a matter of law we review *de novo* because the facts themselves are not in dispute. *See Banks v. United States,* 314 F.3d 1304, 1307-08 (Fed.Cir.2003). We see no error in the Court of Federal Claims' treatment of the statute of limitations issue and have nothing to add to it. We agree with the court that the FDIC's complaint sufficiently relates back to Barron's original complaint to overcome the government's challenge based upon the six-year statute of limitations. [FN5]

III.

The second preliminary matter we must address is the government's contention that the FDIC does not possess a claim that it can assert against the United States. The gist of the argument is that the FDIC cannot maintain the claims it is asserting on behalf of Monycor, the failed thrift, because the RTC, as receiver for Monycor, sold all of Monycor's legal claims to the RTC in its corporate capacity ("RTC-Corporate"), an instrumentality of the United States. This sale, the government asserts, had the effect of extinguishing the claims at issue in this case. The reasoning is that because the FDIC, in its corporate capacity as successor to the RTC, is an instrumentality of the United States, the FDIC is actually bringing claims owned by the government against the government, thus presenting a classic nonjusticiable intragovernmental dispute. *See, e.g., Anderson,* 344 F.3d at 1349 (finding on the facts that "the FDIC's presence in this matter represents no more than an intergovernmental [sic] dispute which does not rise to the requisite level of a constitutional case or controversy"). Hence, according to the government, the claim must be deemed extinguished.

The pertinent facts are these: In March of 1992, the RTC was appointed receiver for Monycor. On the day it was appointed receiver, it transferred various Monycor assets, including the claims of the FDIC at issue in this case, to RTC-Corporate. In exchange for those assets, RTC-Corporate agreed to pay the net proceeds of any recovery on the assets to the Monycor receivership estate. [FN6]

The RTC ceased to exist on December 31, 1995. *See Admiral,* 329 F.3d at 1374. Pursuant to 12 U.S.C. § 1441a(m)(2), upon the sunset of the RTC, "all assets and liabilities of the Corporation [RTC]" were transferred to the FSLIC Resolution Fund ("FRF"). [FN7] This meant that when the RTC ceased to exist, all its assets and liabilities were transferred to the FDIC in its capacity as manager of the FRF. [FN8] *Id.* at 1374-75. The FDIC thus became the owner of the Monycor claims that are at issue in this case. It also became the owner of the assets of the FSLIC that the RTC had taken over and became subject to the obligations of the FSLIC that the RTC had assumed. [FN9] As manager of FRF-RTC, the FDIC is subject to the provisions of 12 U.S.C. § 1823(d)(3), which provides in part as follows:

> ***8** (A) In General. With respect to any asset acquired or liability assumed pursuant to this section, the Corporation [FDIC] shall have all of the rights, powers, privileges, and authorities of the [FDIC] as receiver....
>
> (C) Fiduciary responsibility. In exercising any right, power, privilege, or authority described in subparagraph (A), the [FDIC] shall continue to be subject to the fiduciary duties and obligations of the [FDIC] as receiver to claimants against the insured depository institution in receivership.

(pursuant to 12 U.S.C. § 1811(a), "Corporation" refers to the FDIC).

We agree with the FDIC that, as manager of FRF-RTC and as successor-in- interest to the RTC, it is required to remit any net recovery that it may obtain on Monycor's claims to the receiver for distribution to Monycor's creditors. In other words, the FDIC is pursuing Monycor's claims for the benefit of the receivership and the receivership's creditors. Under these circumstances, the FDIC possesses a claim that it can pursue against the United States.

The government argues that the FDIC cannot rely upon 12 U.S.C. § 1823(d)(3)(C) as requiring it to assert the claims set forth in its complaint. The government notes that section 1823(d)(3)(C), by its terms, applies to assets acquired by the FDIC under section 1823 ("[w]ith respect to any asset required or liability assumed pursuant to this section"). *See* 12

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

U.S.C. § 1823(d)(1), (3)(A), (3)(C). The government points out that the FDIC did not acquire Monycor's assets pursuant to 12 U.S.C. § 1823(d)(1) ("Any ... receiver ... appointed for any insured depository institution in default, including the [FDIC] acting in such capacity, shall be entitled to offer the assets of such depository institutions for sale to the Corporation...."). Rather, as seen above, the FDIC acquired Monycor's assets in its capacity as manager of FRF-RTC when the RTC was extinguished. We are not persuaded by the government's argument. Pursuant to 12 U.S.C. § 1441a(b)(4)(A), the RTC was given the same powers that the FDIC now has under 12 U.S.C. § 1823. This would have included, of course, the right to pursue claims on behalf of Monycor pursuant to section 1823(d). In *Glass v. United States,* 44 Fed.Cl. 73 (1999), *rev'd-in-part on other grounds,* 258 F.3d 1349 (Fed.Cir.2001), the Court of Federal Claims ruled that the statutory language "all assets and liabilities of the [FDIC] shall be transferred to the FSLIC Resolution Fund" meant that among the assets transferred was the right to maintain a lawsuit on behalf of a failed thrift for breach of contract arising from FIRREA and its implementing regulations. The court stated,

> The government's interpretation--that the statute did not also transfer the status of receiver to the FRF--would mean, as the FDIC points out, that Congress chose deliberately to give FRF-RTC *in all cases fewer rights* to collect on its assets than RTC had during its existence. Even were the statutory succession not clear, such an interpretation of the statute would be illogical.

***9** *Glass,* 44 Fed.Cl. at 80 (internal quotation marks omitted) (emphasis in original). We agree with the reasoning of the Court of Federal Claims on this point. We turn now to the main issue on appeal.

IV.

[6][7] As noted above, the Court of Federal Claims ruled on summary judgment that the capital credit and supervisory goodwill provisions in the contract documents did not constitute contractual obligations. Rather, they simply were statements of then-applicable regulatory policy. The court also ruled that while the government did breach its contractual five-year forbearance obligation, the thrift's failure to meet its capital requirements, and not this breach, resulted in the seizure of Monycor. *Barron Bancshares,* 53 Fed.Cl. at 319, 323-25; Order Denying Reconsideration. Plaintiffs challenge the court's rulings on both of these issues, which we address in turn.

A. *Capital Credits and Supervisory Goodwill*

(i)

The Assistance Agreement specified that the cash paid to Monycor by the FSLIC "shall be credited to [Monycor's] net worth account." Assistance Agreement § 6(a)(1)(iii). This meant that, for capital compliance purposes, the FSLIC's contributions were to be viewed as constituting a cash component of net worth rather than as an offsetting deduction to supervisory goodwill. *See Barron Bancshares,* 53 Fed.Cl. at 313. Supervisory goodwill was to be amortized by the straight-line method over a period of up to twenty-five years, with unamortized supervisory goodwill permitted to be counted towards regulatory capital requirements. Bank Board Resolution No. 86-1215, at 6. Although the Court of Federal Claims recognized that these same provisions were part of the *Winstar* contracts, it nevertheless determined that the case before it was "non-*Winstar* " in character. *Barron Bancshares,* 53 Fed.Cl. at 318. According to the court, the assistance payments by the FSLIC, rather than particular capital credit and supervisory goodwill treatment, were the true focus of the parties' agreements and interactions. *Id.* at 318-19. The court concluded that the government intended to be contractually bound only with respect to assistance payments and the five-year forbearance, but it found lacking a mutual intent to contract with regard to treatment of goodwill and capital credits. *Id.* at 317-18.

In reaching its conclusion, the Court of Federal Claims pointed out that, in contrast to the *Winstar* transactions, the Investors made no mention of purchase accounting, capital credits, or goodwill in their bid to acquire Barron County, but requested only the five-year supervisory forbearance. *Id.* The court noted that the supervisory goodwill and capital credit provisions of the contract (as reflected in Bank Board Resolution No. 86-1215) were not the subject of precontract negotiations. *Id.* The court further noted that Monycor's failure either to record a capital credit or to maximize its supervisory goodwill over the permitted twenty-five-year period confirmed to the court that those accounting treatments were not part of the parties' shared understanding of the government's contractual obligations. *Id.* at 318. The Court of Federal Claims also pointed out that the Investors raised no objection, either in their post-FIRREA responses to regulators or in their original or amended complaints filed in the court, to FIRREA's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

abrogation of the supervisory goodwill and capital credit provisions of the contract. *Id.* It was only after the FDIC's intervention in 1997 that the Investors raised these issues. *Id.* The court therefore concluded that the Investors understood these provisions to be nothing more than statements of accounting principles applicable to the thrift at the time of the contract. *Id.* at 319.

***10** Plaintiffs contend that the decision of the Court of Federal Claims is directly contrary to the Supreme Court's precedent in *Winstar IV* because, as the Court of Federal Claims recognized, the language in the Monycor contract is virtually identical to the language in the three contracts at issue in *Winstar. Id.* at 317. Relying on *Winstar IV,* Plaintiffs argue that the court should have ruled that the supervisory goodwill and capital credit provisions in this case were contractual obligations binding upon the United States.

Plaintiffs point out first that the assistance agreements in all three *Winstar* contracts contained an Accounting Principles section virtually identical to the one in this case. Second, Plaintiffs note that the supervisory goodwill and capital credit provisions in the Monycor Bank Board Resolutions are indistinguishable from the same provisions in the Bank Board resolutions relating to Statesman Savings Holding Corp. ("Statesman Bank"), one of the failed thrifts in *Winstar.* Third, all three *Winstar* contracts also included an integration clause, to use the Court of Federal Claims' phrase, "essentially identical" to the one in the Monycor Assistance Agreement. Accordingly, Plaintiffs contend, the Supreme Court's decision in *Winstar IV* is controlling for this case: the supervisory goodwill and capital credit provisions in the Monycor contract constituted contractual obligations to which the United States was bound.

Finally, it is asserted that without supervisory goodwill or capital credit, Monycor, like the three *Winstar* thrifts, would have been insolvent immediately upon completion of the acquisition. Plaintiffs note that Monycor's audited financial statement demonstrates that as of the date of Barron County's acquisition and transformation into Monycor, the thrift recorded $5.9 million in intangible assets on its books, including $4.9 million in supervisory goodwill. At the same time, Monycor's total Stockholders' Equity was only $4.25 million. Without the ability to count the $4.9 million in supervisory goodwill (or without the capital credit), Monycor would have been insolvent by $650,000 at the close of the transaction. Plaintiffs point out that the Supreme Court found like circumstances compelling evidence of contractual intent. *See Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432 (stating that if supervisory goodwill had not been available for meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation and that "it would have been irrational ... for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment").

Plaintiffs assert that rather than considering extrinsic evidence to discern the intent of the parties, the Court of Federal Claims first should have examined the contract language to determine its plain meaning. Because the supervisory goodwill and capital credit provisions in the Monycor documents are clear and unambiguous, Plaintiffs argue, the court erred when it considered extrinsic evidence of the precontract bid and the parties' postcontract dealings to determine the parties' intent. Pointing to the integration clause in the Assistance Agreement, Plaintiffs invoke the parol evidence rule to characterize as inadmissible any evidence introduced to modify, supplement, or interpret the terms of the contract.

***11** The government responds by pointing to what it contends are considerations that distinguish the Monycor contract from the Statesman Bank contract in *Winstar IV.* First, the government notes, the forbearance letter in the Statesman Bank transaction explicitly recognized a capital credit, while the forbearance letter in the Monycor contract mentioned neither supervisory goodwill nor a capital credit. Likewise, the Bank Board resolutions in the Statesman Bank transaction explicitly acknowledged the capital credit and supervisory goodwill provisions, while in this case, Resolution No. 86-1215 only used the word "contracted" in reference to assistance payments. The government also points out that the capital maintenance agreement in the Statesman Bank transaction explained that "any determination of ... Required Regulatory Capital ... shall include ... amounts permitted by the FSLIC in the Assistance Agreement and in the forbearances issued in connection with the transactions discussed herein." In this case, by contrast, the capital maintenance agreement contained no such explanation. In fact, the government notes, the contract documents in this case state on four separate occasions--in section 14(e) and (f) of the Assistance Agreement and in the similarly worded Net Worth

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works