Maintenance Stipulation executed by Barron Bancshares and Personal Net Worth Maintenance Stipulation executed by Investors [FN10]--that future capital requirements may change, and that, if they do, Monycor is required to meet the greater requirement.

Second, the government directs our attention to evidence of the facts and circumstances surrounding the Monycor transaction. As the Court of Federal Claims found persuasive, the Investors did not include supervisory goodwill and capital credit provisions in their bid, in memoranda summarizing their negotiations, or in their discussions or inquiries. Moreover, they decided not to record any goodwill on Monycor's books immediately after the acquisition. Rather, they chose to amortize the supervisory goodwill over fifteen years rather than twenty-five, and they chose not to record a capital credit. In fact, the Investors even recognized in their own board minutes that Monycor bore the risk of changes in capital regulations.

Finally, the government disputes Plaintiffs' assertion that without the supervisory goodwill and capital credit provisions, Monycor would have been insolvent at the time the transaction closed. The government contends that Barron Bancshares and the Investors admitted that they had the ability and resources to meet the new capital requirements, and furthermore that doing so would have entailed no costs. Thus, in contrast to the situation before the Supreme Court in *Winstar IV,* it was not "irrational" for the Investors to enter into the Monycor transaction without contractual commitments with respect to supervisory goodwill and capital credits.

(ii)

We agree with Plaintiffs that the United States was contractually obligated with respect to the regulatory treatment of (i) the FSLIC's contributions to Monycor and (ii) Monycor's supervisory goodwill. In the Court of Federal Claims, it was not disputed that a contract existed between Barron and the United States. *Barron Bancshares,* 53 Fed.Cl. at 315. Neither was it disputed that the integration clause in the Assistance Agreement, which expressly incorporated the Bank Board Resolutions and the Forbearance Letter, was effective. [FN11] *Id.* at 319 ("The goodwill and capital credit provisions, though incorporated into the contract by the integration clause...."). We have stated that an integration clause "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract." *Rumsfeld v. Freedom N.Y., Inc.,* 329 F.3d 1320, 1329 (Fed.Cir.2003) (quoting John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 3.2(a) (4th ed.1998)). The government has asserted neither incompleteness of the Assistance Agreement nor fraud nor mistake in the inclusion of the integration clause. We therefore hold that the Assistance Agreement fully integrates both the Bank Board Resolutions and the Forbearance Letter into an executed contract. As a result, the United States was contractually obligated in accordance with the terms of the Resolutions and the Forbearance Letter.

***12** [8] It is in this regard that we part company with the Court of Federal Claims. Although the court recognized the effectiveness of the integration clause in the Assistance Agreement, it nevertheless evaluated extrinsic evidence in construing the terms of the contract. This we think was error. It is true, as the court explained, that mutual intent to contract is required to prove an enforceable agreement, and that there must be an offer, an acceptance, consideration, and governmental authority. *See Cal. Fed.,* 245 F.3d at 1346. In this case, however, the court was not faced with the question of whether a contract existed; rather, the task before the court was to construe what was conceded to be a fully integrated agreement.

[9][10][11][12] When construing a contract, a court first examines the plain meaning of its express terms. *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998). The parol evidence rule is a rule of substantive law that prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement "in instances where the written agreement has been adopted by the parties as an expression of their final understanding." *See, e.g., David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977). The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). Evidence of the parties' course of dealing constitutes this kind of parol evidence that is prohibited by the rule. *Alves v. United States,* 133 F.3d 1454, 1459 (Fed.Cir.1998). If the terms of a contract are clear and unambiguous, they must be given their plain meaning--extrinsic evidence is inadmissible to interpret them. *McAbee Constr.,* 97 F.3d at 1435. A contract provision is only ambiguous if susceptible to more than one reasonable meaning. *Edward R. Marden Corp. v. United States,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

803 F.2d 701, 705 (Fed.Cir.1986). In this case, because the supervisory goodwill and capital credit provisions of the contract are clear and unambiguous, we must construe them according to their plain meaning, without resort to parol evidence. In so doing, based upon the language of the transaction documents, we find the provisions to be contractually binding upon the government.

Our conclusion is consistent with the precedent of *Winstar.* In *Winstar III,* this court, *en banc,* held that the three plaintiff thrifts, Glendale Federal Bank ("Glendale"), Statesman Savings Holding Corporation, the Statesman Group Incorporated, and American Life and Casualty Company (also "Statesman Bank"), and Winstar Corporation ("Winstar"), "negotiated contracts with the bank regulatory agencies that allowed them to include supervisory goodwill (and capital credits) as assets for regulatory capital purposes and to amortize that supervisory goodwill over extended periods of time." 64 F.3d at 1545. The court's holding as to the contracts that were formed was based upon its examination of the pertinent contract documents. In the case of Glendale, the contract documents were a supervisory action agreement, Bank Board Resolution No. 81-710, and an opinion letter from Glendale's independent accountants. *Id.* at 1540-41. In the case of Statesman Bank, the documents were an assistance agreement, Bank Board Resolution No. 88-169, and an opinion from Statesman Bank's independent accountants. *Id.* at 1542-43. Finally, in the case of Winstar, the documents were an assistance agreement, a forbearance letter, Bank Board Resolution No. 84-363, and an opinion letter from Winstar's independent accountants. *Id.* at 1543-44. In *Winstar IV,* the Supreme Court affirmed the Federal Circuit's holding with respect to the contracts that were formed between Glendale, Statesman Bank, and Winstar, respectively, and the United States. *See* 518 U.S. at 864, 116 S.Ct. 2432 (Glendale), at 865-66, 116 S.Ct. 2432 (Winstar), at 867, 116 S.Ct. 2432 (Statesman Bank). The language of the Monycor documents is virtually identical to the language of the documents in the three *Winstar* transactions.

***13** Bank Board Resolution No. 86-1215 addressed supervisory goodwill and capital credit provisions, providing that GAAP was to be used except

> as it may be modified by the following procedures, which shall be employed:
> (a) Push-down accounting shall be used to reflect the Acquisition on the books of [Monycor];
> (b) The cash contributions by the FSLIC to [Monycor], pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked as a direct credit to [Monycor's] net worth;
> (c) The value of any intangible assets resulting from the Acquisition shall be amortized by [Monycor] over a period not to exceed 25 years by the straight line method....

The capital credit was also addressed in section 6(a)(1)(iii) of the Assistance Agreement, titled in part *Contributions by the [FSLIC]:* "all cash contributions made under this § 6(a)(1) shall be credited to [Monycor's] net worth account." Thus, pursuant to the Bank Board Resolution, Monycor was allowed to treat the cash contributions by the FSLIC as contributions to net worth and to book them as direct capital credits. Monycor also was allowed to amortize the value of any intangible assets resulting from the acquisition, including supervisory goodwill, over a period of up to twenty-five years by the straight-line method.

The goodwill and capital credit provisions in the Statesman Bank transaction in *Winstar III* were virtually identical to those before us. Thus, Bank Board Resolution No. 88-169 approving the Statesman Bank transaction provided for the use of GAAP

> except to the extent of the following departures from generally accepted accounting principles:
> (a) Twenty-one million dollars of the initial contribution by the [FSLIC] to [Statesman Bank], and five million dollars of the principal amount of the Subordinated Debenture issued to the FSLIC, pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of [Statesman Bank]; and
> (b) The value of any unidentifiable intangible assets resulting from accounting for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized by [Statesman Bank] over a period not in excess of twenty-five (25) years by the straight line method....

*Winstar III,* 64 F.3d at 1543. At the same time, as in the Monycor transaction, the Assistance Agreement in the Statesman Bank transaction set forth the capital credit provision: "$26 million of the contribution [made by the FSLIC] shall be credited to [Statesman Bank's] regulatory capital account and shall constitute regulatory capital...." *Winstar IV,* 518 U.S. at 866, 116 S.Ct. 2432.

Section 19 of Monycor's Assistance Agreement set

forth the applicable accounting principles, stating,

> except ... where such principles [GAAP] conflict with the terms of the Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisitions or to this Agreement; then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisitions or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date, as subsequently clarified or interpreted by the Bank Board....

***14** Thus, the principles set forth in the Bank Board Resolution trump the regulations should a conflict arise.

The Assistance Agreements in both the Winstar and Statesman Bank transactions contained virtually identical language:

> except ... where such principles [GAAP] conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified by the Bank Board....

*Winstar IV,* 518 U.S. at 865, 116 S.Ct. 2432 (Winstar transaction), at 866, 116 S.Ct. 2432 ("The Assistance Agreement between Statesman [Bank] and [the] FSLIC included an 'accounting principles' clause virtually identical to Winstar's ....").

We are not persuaded by the government's arguments regarding the differences between the contract documents in this case and those in the Statesman Bank transaction. The Monycor Assistance Agreement fully integrated the three Bank Board Resolutions and the Forbearance Letter into the executed, binding contract. Because the supervisory goodwill and capital credit provisions were explicit in Resolution No. 86-1215, and the capital credit was recited again in the Assistance Agreement, they both were terms of the contract. It is thus immaterial that the forbearance letter in the Statesman Bank transaction explicitly recognized a capital credit, while the forbearance letter in this case did not. Neither is it instructive that the capital maintenance agreement in the Statesman Bank transaction expressly included in the determination of Statesman Bank's required capital any amounts permitted by the FSLIC in the Assistance Agreement and any forbearances issued in connection with the transaction, while the capital maintenance agreement in this case did not. It is enough that the provisions were unambiguously set forth in documents that were integrated into the entire agreement between the parties.

Finally, as in *Winstar III* and *Winstar IV,* we are persuaded by evidence to the effect that the recapitalized thrift would have been out of compliance with regulatory capital standards from its inception were it unable to include supervisory goodwill in the relevant calculations. *See, e.g., Winstar III,* 64 F.3d at 1542 (Glendale transaction) ("It is not disputed that if supervisory goodwill had not been available for purposes of meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation."); *id.* at 1542 n. 5 ("Glendale asserts, and the government does not disagree, that after merging ... Glendale's net worth would have been negative $460 million if supervisory goodwill had not been counted as a capital asset."); *Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432 (stating that it would have been "irrational" for Glendale to enter into a transaction that would have rendered it immediately insolvent by approximately $460 million were it unable to count goodwill as regulatory capital). [FN12] In this case, had Monycor not been afforded the benefit of the capital credit or supervisory goodwill provisions, it would have been insolvent by $650,000 at the moment the transaction closed. *Barron Bancshares,* 53 Fed.Cl. at 312 (explaining that Monycor had $4.908 million in unallocated goodwill and sold $4.25 million in capital stock). This is additional convincing evidence that the parties intended for the supervisory goodwill and capital credit provisions to be contractual obligations, not merely statements of then-applicable regulatory accounting principles.

(iii)

***15** The Court of Federal Claims ruled, however,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that the goodwill and capital credit provisions of the Monycor contract were not contractual obligations binding upon the United States. The court stated,

> In the absence, then, of any indication that investor plaintiffs requested a capital credit and amortizable goodwill, that the parties negotiated for those accounting treatments, that the government evidenced an intent to be contractually bound by those provisions or that plaintiffs acted in a manner consistent with possessing those contract rights, we cannot conclude that this case is governed by *Winstar.*

*Barron Bancshares,* 53 Fed.Cl. at 319 (footnote omitted). We are unable to agree with the Court of Federal Claims. We have already noted that the parol evidence rule renders inadmissible evidence introduced to modify, supplement, or alter the terms of an integrated agreement. Moreover, as discussed in *Winstar III,* we based our determination as to the terms of the Glendale, Statesman Bank, and Winstar contracts upon the contract documents themselves. Neither we nor the Supreme Court relied upon parol evidence in determining the nature of the contracts between the three thrifts and the United States. [FN13]

[13][14] Significantly, the government has not directed us to a case in which contract provisions set forth in clear and unambiguous language and accompanied by an integration clause were disregarded by reason of the absence of parol evidence reflecting negotiations for those provisions. Indeed, we have consistently rejected such an approach. *See Coast Fed. Bank v. United States,* 323 F.3d 1035, 1038 (Fed.Cir.2003) ("Where, as here, the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them."); *Freedom N.Y.,* 329 F.3d at 1327 ("[W]hen a document is integrated ... a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." (quoting *Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002) (en banc))); *Landmark,* 256 F.3d at 1373 ("Because the Agreement's provisions are 'clear and unambiguous, they must be given their plain and ordinary meaning.' " (quoting *Alaska Lumber & Pulp Co. Inc. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993) )); *McAbee Constr.,* 97 F.3d at 1434 (stating that the parol evidence rule "prohibits the use of extrinsic evidence to add to or modify" the terms of a fully integrated agreement, and that if the terms of the contract are clear and unambiguous, "they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them" (citations omitted)); *City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Beta Sys. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) ( "[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face."). [FN14] In short, the contract terms speak for themselves. Bound by the four corners of the contract, we hold that the supervisory goodwill and capital credit provisions of the Monycor transaction were contractual obligations binding on the United States.

(iv)

***16** [15] We must now consider the consequences of our holding that supervisory goodwill and capital credits were obligations of the United States under the contract. In *Winstar III,* we stated,

> There can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods, and for Statesman's capital credits, in partial satisfaction of their capital requirements was a breach of the FSLIC's and the Bank Board's agreements with them. FIRREA greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital requirements. *See* 12 U.S.C. § 1464(t). The OTS by regulation treated capital credits in the same manner as supervisory goodwill, *see* 12 C.F.R. § 567.1(w), thereby restricting the use of such credits for regulatory capital purposes.

64 F.3d at 1544-45 (footnote omitted). In *Winstar IV,* the Supreme Court stated, "We accept the Federal Circuit's conclusion that the Government breached [the Glendale, Statesman Bank, and Winstar] contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth." 518 U.S. at 870. *Winstar* teaches that through FIRREA and its implementing regulations the United States breached its agreement, in contracts like the one at issue in this case, to afford specified regulatory treatment to supervisory goodwill and capital credits. This means that, in this case, FIRREA and its implementing regulations breached the government's agreement

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

with respect to the accounting treatment to be accorded Monycor's supervisory goodwill and capital credits.

[16] This case presents a wrinkle, however. In the Court of Federal Claims, the government argued that Plaintiffs were precluded from recovering damages based upon the doctrine of prior material breach. *Barron Bancshares,* 53 Fed.Cl. at 321. Under that doctrine, when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. *Coll. Point Boat Corp. v. United States,* 267 U.S. 12, 15, 45 S.Ct. 199, 69 L.Ed. 490 (1925). Faced with two parties to a contract, each of whom claims breach by the other, courts will "often ... impose liability on the party that committed the first material breach." E. Allen Farnsworth, *Farnsworth on Contracts* § 8.15, at 439 (1990); *see also Christopher Vill., L.P. v. United States,* 360 F.3d 1319, 1334 (Fed.Cir.2004). According to the Restatement, the doctrine of prior material breach is

> based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties ... if there has already been an uncured material failure of performance by the other party.

***17** Restatement (Second) of Contracts § 237 cmt. b (1981); *see also Christopher Vill.,* 360 F.3d at 1334. The government asserted in the Court of Federal Claims that the Investors committed a prior material breach of contract by failing to operate Monycor in the manner represented in the application they submitted for the thrift's acquisition. *Barron Bancshares,* 53 Fed.Cl. at 321.

[17] In the alternative, the government urged that the Investors' failure to operate Monycor in the manner specified in their application constituted a material misrepresentation. *Id.* "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164; *see also T. Brown Constructors v. Pena,* 132 F.3d 724, 728-29 (Fed.Cir.1997) (citing Restatement (Second) of Contracts § 164 cmt. a (1979)); *Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992). In short, assuming the government was contractually obligated to afford Monycor particular accounting treatment for its supervisory goodwill and capital credits and assuming further that obligation was breached, a prior material breach or a material misrepresentation on the part of the Investors could excuse the government from its contractual obligations, rendering moot its breach in enacting FIRREA.

In making these arguments, the government asserted that Barron had failed to operate Monycor in the manner it had promised. The government pointed to Barron's bid to acquire Barron County and its business plan, which stated it was Barron's intention to pursue a "more conservative style of operation" and "the traditional lines of business for savings and loan associations," with emphasis on "local residential mortgage financing." *Barron Bancshares,* 53 Fed.Cl. at 321. Instead, the government claimed, Barron engaged in "a practice of reckless lending," marked by its decision to enter the construction loan business, to open an office on the premises of a lumber yard in Minnesota owned by one of the Investors, and to extend unsecured loans to the lumber yard's customers. *Id.* The government also argued that Barron did not run Monycor in accordance with its business plan, for rather than building net worth, the Investors extracted all of Monycor's income in its initial years of operation. *Id.* In addition, the government cited loans made to business associates of one of the Investors, which directly violated the first paragraph of the Stipulation Concerning Directors and Officers ("Stipulation"). [FN15] The government also noted the decision to make the Investors the only members of Monycor's Board of Directors ("Board"), which violated the Stipulation's requirement in its second paragraph that no more than one third of the members of the Board be salaried officers or employees of Monycor. *Id.* Finally, the government contended that Barron breached section 13(f) of the Assistance Agreement by violating various statutes and regulations regarding lending practices. *Id.* at 322. [FN16]

***18** The Court of Federal Claims rejected the government's claim of prior material breach or material misrepresentation for two reasons. First, the court concluded that neither a prior material breach nor a material misrepresentation had occurred. The court determined that Barron's decision "to expand the thrift's lending program into the Minnesota markets" did not "so violate the broad mission statement of emphasizing local real estate loans so as to constitute fraud or material misrepresentation." *Id.* The court pointed out that business plans must necessarily be flexible and responsive to changes in business climate and that a policy statement such as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Monycor's is "simply too general to support a finding that the particular business decision sufficiently departed from the business strategy as to amount to fraud." *Id.* Furthermore, the court found lacking any evidence from the government that Barron's alleged violations were integral to the contract or anything other than regulatory violations for which the government had adequate remedies far less extreme than voiding the contract. *Id.* Had the regulatory violations been extreme, the court reasoned, the OTS would have seized Monycor immediately upon discovering them rather than giving repeated instructions on how to solve them. *Id.*

Second, the court determined that even if the government had proven a prior material breach, it had waived the claim. *Id.* at 323. The court noted that an injured party may either cancel a contract based on a breach, or it may instead continue the contract, in which case "the obligations of both parties remain in force ...." *Id.* (quoting *Cities Serv. Helex, Inc. v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306, 1313 (1976)). The court concluded that by continuing to make payments pursuant to the Assistance Agreement (which the court had found were "at the very heart of the contractual undertaking") until its obligations were completed in December of 1991, the government chose to continue to perform under the contract. *Id.* The court further relied upon the fact that the government did not allege that Barron had breached the contract until after commencement of the litigation. *Id.* The court ruled that the government "continued performance under the contract despite perceived material breaches," thereby failing to reserve any claim of prior breach. *Id.* (quoting *Coast-to-Coast Fin. Corp. v. United States,* 52 Fed.Cl. 352, 363 (2002)).

On appeal, the government denies that it waived its claim for a prior material breach. In fact, rather than continuing to perform in the face of a breach, the government argues, it actually terminated the contract because of Barron's breaches by seizing Monycor after it failed to cure its deficiencies. In addition, the government contends that any waiver that bars its claim for prior material breach would also bar Barron's claims to enforce the supervisory goodwill and capital credit provisions of the contract based on Barron's failure to assert them until long after the passage of FIRREA, the seizure of Monycor, and the commencement of the litigation. In response, Barron distinguishes its contractual rights to capital credit and supervisory goodwill treatment from the procedural right of the government to treat the contract as terminated upon establishing a breach by Barron. By continuing performance despite claiming that Barron had breached the contract, the government waived its right to terminate or cancel the contract, but Barron by contrast waived none of its contractual rights to supervisory goodwill and a capital credit, which could only be waived by a written modification of the contract. Thus, Plaintiffs urge us to affirm the holding of the court that the government waived its defense of prior material breach or material misrepresentation.

***19** We review *de novo* the Court of Federal Claims' decision to deny the government's motion for summary judgment based on a prior material breach or material misrepresentation. *See, e.g., Castle,* 301 F.3d at 1337. We agree with the court that through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract. We therefore do not reach the merits of the prior material breach or material misrepresentation issue.

We are persuaded by the fact that the government continued its assistance payments to Monycor until it completed its obligation to do so in December of 1991. Under these circumstances, it cannot be disputed that by doing so, the government was performing under the contract. *See Cities Serv. Helex,* 543 F.2d at 1313-17 (finding that the plaintiffs had elected to continue the contract because of their failure to take any action to end it, their continued performance, their insistence on continued government performance, and their acceptance of that performance); *Coast-to-Coast,* 52 Fed.Cl. at 363 ("These actions indicate that the government continued performance under the contract despite perceived material breaches .... The government did not reserve any claim of prior breach ....").

On the one hand, the government claims that "investor plaintiffs almost immediately implemented a practice of reckless lending," *Barron Bancshares,* 53 Fed.Cl. at 321; yet on the other, it nevertheless continued to make its assistance payments for the full five years. In order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat Barron as if it had breached the contract. *See* 14 *Williston on Contracts* § 43:15 (4th ed.2000) (explaining that faced with a material breach by the other party to a contract, one has the choice "to continue to perform under the contract or to cease to perform, and conduct

indicating an intention to continue the contract ... in effect waiv[es] the right to assert that the breach discharged any obligation to perform"); *Cities Serv. Helex,* 543 F.2d at 1313-14 (discussing four approaches to the question of whether a party's conduct precludes it from asserting prior material breach as a defense); *First Heights Bank, FSB v. United States,* 51 Fed.Cl. 659, 663-64 (2001) (explaining the rule set forth in *Cities Serv. Helex* ). It did not do that. We conclude that the government waived its right to treat Barron's actions as having terminated the contract.

In sum, we reverse the decision of the Court of Federal Claims that supervisory goodwill and capital credit treatment were not contractual obligations binding upon the United States. They were obligations of the government, and they were breached by FIRREA and its implementing regulations. At the same time, we affirm the decision of the court that by continuing to perform, the government waived any claim with respect to a prior material breach or material misrepresentation by Barron. The case is remanded to the Court of Federal Claims for a determination of the damages, if any, to which Plaintiffs are entitled by reason of the government's breach.

B. *The Government's Breach of the Forbearance Letter*

***20** [18] The Court of Federal Claims did find contractually binding the FSLIC's promise to forbear for a period of five years from holding Monycor accountable to regulatory minimum net worth requirements. *Barron Bancshares,* 53 Fed. Cl. at 321. The Investors had requested this forbearance in their bid; it had been discussed by the parties; and it was specifically enumerated in the Forbearance Letter. *Id.* The court thus ruled that the government's failure to honor this provision constituted a breach of contract. *Id.*

Ultimately, however, the Court of Federal Claims determined that the government could not be held liable for breach of the Forbearance Letter and the seizure of Monycor. The government had argued that prior material breach and material misrepresentation on the part of the Investors shielded it from liability for breach of the Forbearance Letter. *See id.* at 321-22. As just seen, the court rejected those arguments. *Id.* at 322-23. Nevertheless, the court held that it was not the government's breach of the five-year forbearance obligation, but Monycor's failure to meet its capital requirements, that caused the seizure of the thrift. *Id.* at 324-25. The court stated that the evidence was "insufficient to demonstrate that the thrift was seized as a result of a capital impairment attributable to the government's failure to honor the supervisory forbearance." *Id.* at 324. The court added: "All indications point to the conclusion that the problems at Monycor were of investor plaintiffs' own making." *Id.* at 325. Subsequently, in denying Plaintiffs' motion for reconsideration, the court stated,

> The simple fact, however, is that the bank did not meet its capital requirements, but instead was out of capital compliance with respect to its risk-based requirement by approximately $3.1 million. And it was this capital inadequacy--and not the bank's poor management--that we identified as the cause of the bank's seizure.

Order Denying Reconsideration, slip op. at 2. The court therefore entered summary judgment in favor of the government on Plaintiffs' claim for damages arising from the government's breach of the Forbearance Letter.

On appeal, Barron contends that summary judgment was inappropriate on the issue of the cause of Monycor's seizure. Relying on other *Winstar* cases, it notes that the Court of Federal Claims has previously found it inappropriate to determine the cause of a thrift's seizure at the summary judgment stage. *See, e.g., Hometown Fin., Inc. v. United States,* 53 Fed.Cl. 326, 338 (2002); *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 159-60 (2002); *Slattery v. United States,* 35 Fed.Cl. 180, 186 (1996). Moreover, according to Barron, the trial court's ruling is unclear. The summary judgment opinion states that Barron's evidence was "insufficient to demonstrate that the thrift was seized as a result of a capital impairment attributable to the government's failure to honor the supervisory forbearance" but rather that "[a]ll indications point to the conclusion that the problems at Monycor were of investor plaintiffs' own making." *Barron Bancshares,* 53 Fed.Cl. at 324, 325. Yet, in its subsequent Order Denying Reconsideration, the court identified "capital inadequacy--and not the bank's poor management ... as the cause of the bank's seizure." Slip op. at 2.

***21** The FDIC separately urges that evidence submitted before the Court of Federal Claims conflicts with the court's decision and that summary judgment was inappropriate. According to the FDIC, while the court relied upon critical examination reports issued long after Monycor had lost its goodwill and capital credit, *i.e.,* a post-FIRREA,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

December 1990 financial report, *Barron Bancshares,* 53 Fed.Cl. at 325, Barron showed that *prior to FIRREA,* Monycor was satisfying all of its capital requirements. The FDIC notes that the Investors offered a letter dated December 6, 1990, from an OTS supervisory agent advising that if the government granted the five-year forbearance in the Forbearance Letter, Monycor would exceed the minimum capital requirements under FIRREA for the quarter ending September 30, 1990.

The government responds by relying on the arguments it asserted in the trial court with respect to alleged prior material breach or material misrepresentation. Thus, it contends that Barron failed to adhere to its business plan, the terms of the Stipulation, and section 13(f) of the Assistance Agreement.

We agree with the Court of Federal Claims that the government breached its obligations set forth in the Forbearance Letter. However, we decline to affirm the court's ruling granting summary judgment in favor of the government. We think there are genuine issues of material fact surrounding the cause of the seizure of the thrift. Drawing all reasonable inferences in favor of Barron as the nonmoving party, it cannot be ruled as a matter of law that governmental breach did not result in Monycor's seizure. Importantly, it is to be remembered that the Court of Federal Claims decided the forbearance issue after holding that "the assistance payments and the five-year supervisory forbearance constituted the limit of the government's contractual undertaking." *Id.* at 318. We have held above, however, that the government's obligations under the Monycor contract also included affording agreed-upon accounting treatment to supervisory goodwill and capital credits. This holding, we think, has the effect of significantly changing the landscape of the case from what it was when the Court of Federal Claims decided the forbearance issue.

The Court of Federal Claims recognized that "FIRREA had the effect, in part, of preventing Monycor from counting either its capital credit or its unamortized goodwill toward regulatory capital." *Id.* at 313. Significantly, the banking authorities seized Monycor and placed it in receivership precisely because it failed post-FIRREA regulatory capital requirements. On December 7, 1989, the OTS informed Monycor that it failed the new FIRREA capital requirements and that it would need to submit a capital plan. In February of 1990, Monycor was directed to comply with its Net Worth Maintenance Stipulation, and the Investors were told to comply with their Personal Net Worth Maintenance Stipulations. Monycor submitted its plan on March 1, 1990, and supplemented it in April and May. In June of 1990, the Investors also infused Monycor with $600,000 in capital. Having found Monycor's capital plan inadequate, the OTS denied it on June 28, 1990. The OTS then informed Monycor that it would be seeking an Individual Minimum Capital Requirement for the thrift. Throughout 1990 and 1991, Monycor attempted to solve its regulatory capital shortfall through various means, eventually submitting its final capital plan in May of 1991. Despite acknowledgement from the OTS Regional Director that he thought the plan may have been feasible, Monycor was seized on July 12, 1991 and placed in receivership.

***22** The Court of Federal Claims granted summary judgment in favor of the government on the forbearance issue based upon the determination--in light of the record before it--that it was not the breach of the Forbearance Letter that caused the banking authorities to seize Monycor, but rather the thrift's failure to meet its capital requirements. Referring to its determination, the court stated, "[I]t was this capital inadequacy ... that we identified as the cause of the bank's seizure." Order Denying Reconsideration, slip op. at 2. Yet, as just seen, "this capital inadequacy" came in the wake of FIRREA and its regulations, which had the effect of removing the government's obligation under the contract to accord favorable treatment to supervisory goodwill and capital credits in determining whether Monycor met regulatory capital requirements. We think that, under these circumstances, there exist genuine issues of material fact with respect to the question of the extent to which Monycor's seizure can be traced to the government's breach of contract, so as to bar summary judgment in favor of the government. Accordingly, we reverse the grant of summary judgment in favor of the government on the forbearance issue and remand the case to the Court of Federal Claims for a determination of liability and, if appropriate, damages.

## CONCLUSION

The supervisory goodwill and capital credit provisions of the Monycor contract were contractual obligations of the United States. We therefore reverse the decision of the Court of Federal Claims to the contrary. FIRREA and its implementing regulations breached those obligations. At the same time, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

United States was obligated under the Forbearance Letter to forbear for five years from holding Monycor accountable to regulatory minimum net worth requirements. We affirm the decision of the Court of Federal Claims that the government breached that obligation. The case is remanded to the Court of Federal Claims for further proceedings. On remand the court will address whether Plaintiffs are entitled to damages by reason of the government's breach of contract relating to supervisory goodwill and capital credits. The court also will address whether the seizure of Monycor and its placement in receivership resulted from breach of contract on the part of the government and, if so, the damages, if any, to which Plaintiffs are entitled. Accordingly, the decision of the Court of Federal Claims is

*AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.*

FN1. We refer to Barron and the FDIC collectively as "Plaintiffs."

FN2. FIRREA called upon the OTS to "prescribe and maintain uniformly applicable capital standards" in accordance with strict statutory requirements. 12 U.S.C. § 1464(t)(1)(A); *see also Winstar IV,* 518 U.S. at 856-57 & n. 11, 116 S.Ct. 2432. Pursuant to FIRREA, thrifts were required to maintain core capital, which excluded unidentifiable intangible assets such as goodwill, at not less than three percent of total assets. 12 U.S.C. § 1464(t)(2)(A), (9)(A); *see also Winstar IV,* 518 U.S. at 857, 116 S.Ct. 2432. Though a transition rule was provided that permitted thrifts to count "qualifying supervisory goodwill" toward half the core capital requirement, this allowance was phased out by 1995. 12 U.S.C. § 1464(t)(3)(A); *see also Winstar IV,* 518 U.S. at 857, 116 S.Ct. 2432.

FN3. There is no issue in this case as to whether the FDIC's claims satisfy the case or controversy requirement of Article III of the Constitution. *See, e.g., Anderson v. United States,* 344 F.3d 1343, 1349- 51 (Fed.Cir.2003); *Admiral Fin. Corp. v. United States,* 329 F.3d 1372, 1380-82 (Fed.Cir.2003); *Landmark,* 256 F.3d at 1379-82. It is true that a claim by the FDIC that does not exceed the amount owed to the insurance fund does not present an actual case or controversy, because the FDIC and the United States are not truly adverse as to the FDIC's claims. *Admiral,* 329 F.3d at 1381-82. In this case, however, the FDIC seeks $24 million in expectation damages, far more than the approximately $9 million paid out by the government to cover the thrift's insured deposits. *Barron Bancshares,* 53 Fed.Cl. at 314. Accordingly, because any recovery by the FDIC would involve additional amounts to be paid out to the thrift's creditors and potentially to its shareholders, the FDIC's claims as receiver for the failed thrift do present a justiciable case or controversy against the United States.

FN4. On January 10, 2003, pursuant to its Rule 58, the Court of Federal Claims dismissed the remaining counts in both complaints: counts nine and ten of Barron's first amended complaint alleging a taking and due process violations of the Fifth Amendment, respectively, and corresponding counts one and two of the FDIC's complaint. Those claims are not before us in this appeal.

FN5. Because we hold that the FDIC's complaint relates back to Barron's original complaint, we need not reach the issues of whether the statute of limitations is subject to equitable tolling and whether certain agreements between the RTC and the United States Department of Justice served to toll the statute of limitations.

FN6. The RTC operated in two capacities: as receiver and as RTC- Corporate. *Admiral,* 329 F.3d at 1374. After the RTC as receiver concluded the business affairs of a failed thrift, it conveyed to RTC-Corporate, by contract of sale, assets of the thrift. *Id.* (citing *Winstar IV,* 518 U.S. at 856, 116 S.Ct. 2432; *Landmark,* 256 F.3d at 1371 n. 1). Through this process, RTC-Corporate became the owner of all of Monycor's legal claims that were formerly held by the RTC as receiver. *See id.*

FN7. FRF was the thrift deposit insurance fund managed by the FDIC. It was created when FIRREA abolished the FSLIC. *See Admiral,* 329 F.3d at 1374.

FN8. When the RTC's assets were transferred to the FRF, two accounts were created: FRF-FSLIC, 12 U.S.C. § 1821a, and FRF-RTC, 12 U.S.C. § 1441a(m). FRF-FSLIC contained the assets of FSLIC, while FRF-RTC contained the assets of the RTC. Both accounts were managed by the FDIC.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*See Admiral,* 329 F.3d at 1374-75.

FN9. The assets of the RTC, as successor to the FSLIC, included the right to repayment of payments made to insured depositors when the RTC paid insured depositors of a failed thrift. *Admiral,* 329 F.3d at 1374-75. The liabilities of the RTC, as successor to the FSLIC, included the obligation to pay breach of contract claims against the FSLIC. *Id.*

FN10. The personal net worth maintenance stipulations for Barron Bancshares and the Investors were called for by Bank Board Resolution No. 86-1215 and executed contemporaneously with the Bank Board Resolutions and the Assistance Agreement. They required Barron Bancshares and the Investors, for the first five years of the contract, to maintain the net worth of the thrift at the greater of three percent of its total liabilities or the amount required by regulation.

FN11. The integration clause read, in relevant part, "This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it...." Assistance Agreement § 24.

FN12. *See also Winstar IV,* 518 U.S. at 866, 867, 116 S.Ct. 2432 (finding that absent the ability to include goodwill in the relevant calculations, the new Winstar thrift would have had a tangible net worth of negative $6.7 million, and without its promised forbearances, the new Statesman Bank thrift would have remained insolvent by almost $9 million).

FN13. It is true that in discussing the Glendale contract, this court added that its conclusion as to the nature of the contract was "supported by other evidence and by the circumstances surrounding the transaction." *Winstar III,* 64 F.3d at 1542. The court then went on in the same paragraph to refer to "the extensive negotiations and the conditions regarding [the] use" of supervisory goodwill as demonstrating the parties' intent to use supervisory goodwill for regulatory capital purposes. *Id.* We note, however, that this paragraph immediately followed the paragraph in which the court stated,

We conclude based on all of the contemporaneous documents, which under the integration clause of the [Supervisory Action Agreement] collectively constituted the "Agreement" of the parties, that the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter. It is clear from the documents that this was the intent of the parties.

*Id.* at 1541-42. Under these circumstances, we are not inclined to attach significance to the court's passing reference to "other evidence" beyond the contract documents.

FN14. In its brief, the government refers us to authority to the effect that the parol evidence rule does not bar consideration of the parties' dealings during contract performance but prior to litigation, citing, e.g., *Blinderman Construction Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir.1982). We do not disagree. In this case, however, the court relied upon, at least in part, parol evidence in the form of precontract negotiations and dealings. *See Barron Bancshares,* 53 Fed.Cl. at 317-18 (referring to Barron's failure to request either supervisory goodwill or capital credit treatment in its bid to acquire Barron County and the absence of a discussion of either treatment in precontract negotiations). As discussed above, such evidence *is* barred from consideration by the parol evidence rule. Moreover, we do not find it necessary to resort to extrinsic evidence in this case because we hold above that the supervisory goodwill and capital credit provisions in the Monycor contract were clear and unambiguous.

FN15. The Stipulation was required by Bank Board Resolution No. 86- 1215. It was executed on the same date as the Bank Board Resolutions and the Assistance Agreement.

FN16. Section 13(f) required Monycor to "comply in all material respects with all applicable statutes, regulations...." Assistance Agreement § 13(f).

2004 WL 1048197, --- F.3d ----, 2004 WL 1048197 (Fed.Cir.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works