# In the United States Court of Federal Claims

No. 02-131C
(Filed October 29, 2004)
TO BE PUBLISHED

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Timber Sale Contracts, Prior Material Breach, Contract Disputes Act, 41 U.S.C. § 605, Tucker Act, 28 U.S.C. § 1491, Motion to Dismiss, Motion for Summary Judgment, Damages |

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. Richard W. Goeken and David J. Craig, Saltman & Stevens, P.C., Washington, D.C., of counsel.

David A. Harrington, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Lori Polin Jones and Patricia L. Disert, U.S. Department of Agriculture, Washington, D.C., of counsel.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

Plaintiff, Precision Pine & Timber, Incorporated ("Precision"), filed this action on February 15, 2002, alleging that defendant United States Forest Service ("Forest Service") improperly terminated 12 timber sale[1] contracts for breach. Precision alleged that the Forest

---

[1] There are two types of contracts at issue in this case: timber sale and multi-product sale. Contracts where only sawlogs are required to be harvested are designated "timber sale" contracts. "Sawlogs" are trees larger than 9.0 inches in diameter at breast height ("dbh"). Contracts where both sawlogs and roundwood are required to be harvested are designated "multi-product sale" contracts. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. For ease of reference, however, the two contract types will sometimes be referred to collectively as

Service was not entitled to the "estimated" damages it asserted against Precision for the alleged breaches as set forth in the contracting officers' final decisions. The Government also asserted a counterclaim seeking the damages determined to be due by the contracting officers as a result of Precision's alleged breaches. On March 10, 2004, the Court ordered that the parties file any dispositive motions simultaneously. On March 25, defendant moved for summary judgment on its counterclaim for damages. The same day, plaintiff moved to dismiss defendant's counterclaim for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), or in the alternative for summary judgment with respect to the counterclaim, asserting that the Forest Service failed to comply with the terms of the parties' contracts in computing damages. The motions were fully briefed by June 3, and oral argument was held on June 14, 2004. For the reasons set forth below, the Court DENIES plaintiff's motion to dismiss defendant's counterclaim for lack of jurisdiction. The Court GRANTS defendant's motion for summary judgment on its counterclaim to the extent that the Court holds that, on the undisputed facts, plaintiff breached the contracts. The Court DENIES defendant's motion for summary judgment with respect to the computation of damages, and GRANTS plaintiff's motion for summary judgment with respect to the computation of damages to the extent that the Court holds that the contracting officers' computations of damages are inconsistent with the parties' contracts, and the Court REMANDS the determination of contract damages to the respective contracting officers for reconsideration pursuant to the methodology that the Court has determined is required by the parties' contracts.

## *FACTS*

## I. BACKGROUND FACTS

### A. Introduction

The following facts are undisputed, unless otherwise noted. Precision Pine & Timber is an Arizona company that purchases federal timber to supply its lumber manufacturing operations. Pl. Resp. to Def. Mot. for Summ. J. at 9. This action arises out of twelve timber sale contracts awarded to Precision between August 1992 and December 1998 by the United States Forest Service. Pl. Resp. to Def. Proposed Findings of Uncontroverted Fact ("PRDPF") at 2. The twelve contracts at issue are O.D. Ridge (Contract No. 001574), Brookbank (Contract No. 001822), Jersey Horse (Contract No. 001756), Saginaw-Kennedy (Contract. No. 006585), Brann (Contract No. 006577), U-Bar (Contract No. 005051), Monument (Contract No. 005564), Manaco (Contract No. 004625), Hutch-Boondock (Contract No. 005465), Gentry (Contract No. 001939), Wiggins (Contract No. 020012), and Lily (Contract No. 020140).

### B. The Government's Prior Suspensions of the Contracts

On August 24, 1995, the United States District Court for the District of Arizona entered

---

"timber sale" contracts.

an order enjoining all timber harvesting on Forest Service timber sales in Region 3 (Arizona and New Mexico), until the Forest Service complied with its obligations under the Endangered Species Act, 15 U.S.C. § 1531 *et. seq.*, to consult with the United States Fish and Wildlife Service ("FWS") regarding the impact of Forest Service's Land and Resource Management Plans on the Mexican Spotted Owl. *Silver v. Babbitt*, 924 F. Supp. 976, 989 (D. Ariz. 1995). This injunction caused the Forest Service to suspend 14 timber sale contracts that it had entered into with Precision.[2] The suspensions were lifted as to the Brann and Hutch-Boondock multi-product sales on October 25, 1995. *See* App. to Def. Mot. at 3-4, 24. The Arizona district court lifted most of the remaining suspensions on or about December 4, 1996.[3] PRDPF at 8; *Precision Pine & Timber v. United States*, 50 Fed. Cl. 35, 51 (2001).

Throughout the suspension, Precision informed the Forest Service that it considered the Forest Service to have breached the contracts. Pl. Resp. at 10 (citing Pl. Proposed Findings of Uncontroverted Facts ("PPFUF") 1-2). At the conclusion of the suspensions, Precision submitted claim letters to the cognizant contracting officers at the Forest Service. Pl. Resp. at 11. In the letters, Precision sought to recover several million dollars in damages. *Id.* at n.3. On September 11, 1998, in response to the contracting officers' decision to award Precision only $18,242.78 as compensation, rather than the several million dollars to which Precision claimed it was entitled, Precision filed an action against the United States in this Court. *Id.* n.3. That action was docketed as 98-702C. In that action, Precision alleged that the suspensions constituted breaches of the contracts and claimed entitlement to damages. *See Precision Pine*, 50 Fed. Cl. 35.

On July 30, 2001, in resolving a motion for summary judgment, Chief Judge Damich, to whom 98-720C was assigned[4], found that the Forest Service had breached eight of the suspended contracts at issue in this case: O.D. Ridge, Brookbank, Jersey Horse, Saginaw-Kennedy, Brann, U-Bar, Monument, and Manaco. *Id.* at 74. The court determined that the Forest Service's suspension of the Hutch-Boondock multi-product sale contract did not result in a breach. *Id.* The court found the Forest Service had breached its implied duty to cooperate with respect to the

---

[2] Nine of the suspended contracts are at issue in this case. Three additional contracts–the Gentry, Lily, and Wiggins multi-product sale contracts–are also at issue in this case. They had not been executed at the time of the suspensions and, therefore, were not part of the suspensions. Furthermore, of the nine suspended contracts, Chief Judge Damich determined that only eight had been breached. *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2004). These facts are relevant to determine which contracts are subject to plaintiff's defense of prior material breach, discussed *infra*.

[3] The suspension of the Manaco Timber Sale was not lifted until March 24, 1997, due to a December 10, 1996 discovery of a Mexican Spotted Owl adjacent to the Manaco timber sale area. App. to Def. Mot. at 286.

[4] That case was transferred to the undersigned by order dated January 30, 2004.

Monument, Saginaw-Kennedy, Brann, Manaco, and Brookbank contracts. *Id.* Additionally, the court found, with respect to all but the Hutch-Boondock and Brann contracts, that the suspensions breached the Forest Service's implied duty not to hinder Precision's performance. *Id.* at 72. "[T]he length of the suspensions was both unreasonable and wrongfully caused by the Forest Service, and . . . [Precision's] operations were significantly hindered." *Id.* The 98-720C action is ongoing at the time of this opinion, with the issue of damages still to be determinated. *Id.* at 73.

**C. Current Dispute**

The current dispute between Precision and the Forest Service arose during the summer of 2000, after Precision's failure to obtain a surety acceptable to the Government. PRDPF at 13-17. On June 6, 2000, the Department of the Treasury issued a notice that Frontier Insurance Company ("Frontier Insurance"), Precision's then surety, no longer qualified as an acceptable surety on federal bonds. *Id.* at 13. The notice stated, "With respect to any bonds, including continuous bonds, currently in force with [Frontier Insurance], bond-approving officers should secure new bonds with acceptable sureties in those instances where a significant amount of liability remains outstanding. In addition, in no event are bonds that are continuous in nature to be renewed." 65 Fed. Reg. 35998-02 (June 6, 2000). Between June 9, 2000 and June 21, 2000, contracting officers sent letters notifying Precision that Frontier Insurance was no longer listed by the Department of Treasury as an acceptable surety for federal bonding. PRDPF at 13-14. In those letters the Forest Service also informed Precision that failure to obtain an acceptable surety was a breach of the contract that it had thirty days to remedy. *Id.*

Precision Pine failed to obtain an acceptable surety. *Id.* at 14. As a result, during July 2000, the Forest Service sent Precision a "Notice of Breach" regarding each of the 12 contracts. *Id.* at 15. The Notices stated the Forest Service's position that the failure to obtain an acceptable replacement surety constituted a "material breach." App. to Def. Mot. at 96-99, 168-69, 238-43, 333, 455-56. Precision was again given thirty days to remedy the breach. *Id.* From late September to early October, the contracting officers sent Precision a "final notice" regarding Precision's "material breach"and means of remedy. *Id.* at 107-08, 172-73, 251-52, 341-42, 457-58. Precision was again given thirty days to remedy the situation after which time the "contracts [were to be] terminated for breach." *Id.* By letter dated January 9, 2001, the Forest Service Regional Forester terminated the contracts at issue for breach pursuant to section CT9.3(E) of the contracts. PRDPF at 17. The termination letter stated:

> Not only have you had the time granted under the terms of the contract to rectify the situation, but you were also given more than 50 additional calendar days to comply with the terms of your contracts. In addition, you were presented with the opportunity to unburden yourself of these contracts, without the assessment of damages, through mutual cancellation at our recent settlement discussions.

*Id.*

Three days after the termination, on January 12, 2001, counsel for Precision sent a letter advising the Forest Service that Precision considered the Government's prior material breach to have relieved it of liability for the "putative defaults" and reserved its right to make this argument once the issue of the Government's breach was resolved by the court in *Precision Pine & Timber, Inc. v. United States*, No. 98-720C. Pl. Proposed Findings of Uncontroverted Fact in Supp. of its Resp. to Def. Mot. for Summ. J. at 4-5. On September 17, 2001, just over a month after resolution of the issue of breach in 98-720C, the President of Precision sent a letter to the Forest Service stating his belief that the court's determination that the contracts had been materially breached relieved Precision of any liability for its putative defaults. *Id.* at 5. The letter stated:

> [T]he Forest Service is scrupulously choosing to ignore the black letter law that a pre-existing material breach of contract, such as the Court of Federal Claims found the Forest Service committed on our sale, precludes a subsequent finding of default by Precision Pine.

*Id.* On September 28, 2001, Precision sent another letter, this time to the Washington Office of the Forest Service, taking the same position with respect to the Forest Service's prior material breach. *Id.* at 5-6.

From late February to early April 2001, the Forest Service sent packets regarding its damage claims to Precision. App. to Pl. Mot. at 12-127. Each packet contained a "Decision Document," a "Default Damage Calculations" statement, and a "Bill for Collection." *Id.* In the section of the packet labeled "Decision Document," the contracting officer explained, "This documents the Contracting Officer's Decision regarding a claim under the Contract Disputes Act by the United States Government against Precision Pine & Timber, Inc. for [a specific sum] for its default of the [timber sale contract]." *Id.* at 13, 23, 32, 42, 51, 60, 78, 88, 100, 112, 125. Furthermore, the Decision Document stated, "This estimate may be adjusted once final damages are determined following the resale of the remaining timber. At that time any surplus damages collected by this estimate will be refunded to the purchaser, or any additional damages due will be collected, as appropriate." *Id.* at 14, 24, 33, 43, 52, 60-61, 79, 89, 101, 113[5]. In conclusion the Decision Document stated, "This is the final decision of the Contracting Officer. This decision may be appealed to the Agriculture Board of Contract Appeals . . . within 90 days from the date you receive this decision." *Id.* at 15, 25, 34, 44, 53, 62, 80, 90, 102, 114.

The first page of the "Default Damage Calculations" statement explained that the "calculation of estimated damages due the United States" was "[b]ased on procedures and applicable costs described in provision CT9.4" of the timber sale contract. *Id.* at 16, 26, 35, 54, 63, 81, 94, 105, 115. The first page's summary explanation was followed by detailed calculations of the remaining timber, the cost of resale, the interest on remaining contract value,

---

[5] The damage demands for the Manaco Timber Sale and the Brookbank Multi-Product Sale were zero. *See* App. to Pl. Mot. at 78-79, 125-126.

and the calculation of resale value. *Id.* at 17-19, 27-28, 36-37, 45-46, 54-56, 64-65, 82-84, 94-96, 105-107, 115-117. The final page in each packet's damage calculation statement on was an itemization of the damages and credits, with the last two lines showing the "Estimated Damages Due Government" and "Refund Due Purchaser." *Id.* at 20, 29, 38, 47, 57, 66, 85, 97, 108, 118. Last, the packets contained a "Bill for Collection." *Id.* at 22, 31, 40, 50, 59, 68, 87, 99, 110, 123. The Bill simply restated the amount due to the Government, the due date, and the description "[Contract Name] Default." *Id.*

The estimated damages demanded by the Forest Service totaled $767,652.72. They break down by contract as follows:

| Sale Contract | Forest Service's estimated damages |
|---|---|
| O.D. Ridge Timber Sale | $148,845.38 |
| Jersey Horse Timber Sale | $ 9,035.47 |
| Saginaw-Kennedy Timber Sale | $101,642.20 |
| Brann Timber Sale | $ 36,888.97 |
| U-Bar Timber Sale | $215,691.04 |
| Monument Multi-Product Sale | $ 81,477.88 |
| Hutch-Boondock Multi-Product Sale | $ 2,278.72 |
| Gentry Multi-Product Sale | $ 92,236.78 |
| Wiggins Multi-Product Sale | $ 13,016.93 |
| Lily Timber Sale | $ 66,512.35 |
| Brookbank Multi-Product Sale | $0 |
| Manaco Timber Sale | $0 |

Pl. Mot at 4.

### D. Relevant Contract Terms

The Federal Acquisition Regulation ("FAR") does not apply to timber sale contracts because the Government in not "acquiring," but rather, is selling timber. Each of the contracts, however, contained substantially similar terms. The following sections of the contracts are relevant to this action:

CT9.2 - DISPUTES.

***

(b) Except as provided in the [Contract Disputes] Act, all disputes arising under or relating to this contract shall be resolved in accordance with this clause.

(c)(i) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract.

(c)(ii) A voucher, invoice, or request for payment that is not in dispute when submitted is not a claim for the purposes of the Act. However, where such submission is subsequently not acted upon in a reasonable time, or disputed either as to liability or amount, it may be converted to a claim pursuant to the Act.

(c)(iii) A claim by the contractor shall be made in writing and submitted to the Contracting Officer for decision. A claim by the Government against the contractor shall be subject to a decision by the Contracting Officer.

***

CT9.3 - BREACH. The Contracting Officer, with the concurrence of the Regional Forester, may terminate this contract for breach in the event Purchaser:

***

E. Fails to remedy a breach of contract within time limits stated in BT9.3.

Damages due the United States for termination under this provision shall be determined pursuant to CT9.4.

CT9.4 - FAILURE TO CUT. In the event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination Date, Forest Service shall appraise remaining Included Timber . . . . Such appraisal shall be made with the standard Forest Service method in use at time of termination.

Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:

(a) The cost of resale or reoffering;

(b) Any increase in Purchaser Credit Limit allowance for Unconstructed Specified

> Road facilities which are needed to harvest the remaining uncut volume. Such increases are limited to costs for constructing the road to the same standard and specifications required by this contract;
>
> (c) If Purchaser has failed to cut individual trees in the portions of Sale Area cutover and there is no resale of such individual trees, Purchaser shall pay Forest Service for cost of felling and removal or otherwise eliminating such uncut trees in addition to payment of damages described above . . . ;
>
> (d) The Government's loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department in TFRM 6-8025.2) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale;
>
> (e) Any increase in reforestation costs, including site preparation, seeding, and planting caused by Purchaser's failure to harvest Included Timber by Termination Date.

*See* App. to Pl. Mot. at 3-8.

## ***DISCUSSION***

## II. Motion to Dismiss Counterclaim for Lack of Subject Matter Jurisdiction

### A. Standard for Motion to Dismiss

Precision has moved to dismiss the Government's counterclaim, alleging that the Forest Service failed to take the steps necessary to establish jurisdiction in the Court of Federal Claims over its claim against Precision arising under the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq*. Pursuant to RCFC 12(b)(1), the Court is required to grant plaintiff's motion to dismiss if it finds that the Court does not possess jurisdiction over the defendant's counterclaim. Once jurisdiction is challenged, the non-moving party bears the burden of establishing jurisdiction. *Holland v. United States*, 57 Fed. Cl. 540, 550 (2003) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). When deciding a motion to dismiss, this Court must assume that all undisputed facts alleged by the non-moving party are true and must draw all reasonable inferences in the non-movant's favor. *Mexican Intermodal Equipment, S.A. de C.V. v. United States*, 61 Fed. Cl. 55, 59 (2004) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Additionally, "the court may consider all relevant evidence in order to resolve the factual dispute, including evidentiary matter outside the pleadings." *Wilson v. United States*, 58 Fed. Cl. 760, 762 (2003) (citing *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985)). "The issue is not whether a plaintiff will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims." *Id.* at 761-62 (citing *Scheuer*, 416 U.S. at 236).

**B. The Forest Service Demand for Damages Constitutes a Claim**

The United States Court of Federal Claims is a court of specific and limited jurisdiction. *United States v. King*, 395 U.S. 1, 3 (1969); *American Maritime Trans., Inc. v. United States*, 870 F.2d 1559, 1563 (Fed. Cir. 1989). The Tucker Act grants this Court "jurisdiction to render judgment upon any claim against the United States founded upon . . . any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). Furthermore, the Court "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 . . . on which a decision of the contracting officer has been issued under [41 U.S.C. § 605 (2000)]." 28 U.S.C. § 1491(b).

The CDA distinguishes between claims by a contractor and claims by the Government. *See* 41 U.S.C. § 605. "All claims by a contractor against the government [must] be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Contractor claims in excess of $100,000 must be certified as to accuracy by a duly authorized representative of the contractor. 41 U.S.C. § 605(b). On the other hand, "claims by the government against a contractor" need only "be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a). No formal submission and no certification is required for Government claims. *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 906 (Fed. Cir. 1990). The language in section 605(a) "has been construed to require a 'final decision' on a claim by the contracting officer as a 'jurisdictional prerequisite' to further legal action." *Ervin and Assocs. v. United States*, 44 Fed. Cl. 646, 653 (1999) (quoting *Sharman Company, Inc. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993)); *see Paragon Energy Corp. v. United States*, 227 Ct. Cl. 176, 645 F.2d 966, 967 (1981); *see also Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578-79 (Fed. Cir. 1994).

The Forest Service contracting officers issued what purported to be final decisions assessing default damages with respect to each of the contracts at issue. *See* Compl. ¶¶ 28, 36, 43, 51, 58, 65, 72, 79, 86, 91, 96, 102; Pl. Mot. at 3-4; *see also* PA 12-137. These final decisions were in writing, stated the reasons for the decision, informed Precision Pine of its right to appeal, were furnished to Precision, and pre-date the filing of this action. PA 12-137. Thus, final decisions addressing "the subject of" the Government's counterclaim were issued in accordance with the CDA. *See* 41 U.S.C. § 605(a).

1. *Dawco* and *Reflectone*

Precision contends that the contracting officers' final decisions are nevertheless insufficient to confer jurisdiction over defendant's counterclaim on the court. Pl. Mot. at 1. According to Precision, the final decisions do not address a Government "claim" because the amount of breach damages was not "in dispute" when the decisions were issued. *See* Pl. Mot. at

7. Precision's argument has been rejected by the United States Court of Appeals for the Federal Circuit, is contrary to the ordinary meaning of "claim," is unsupported by the legislative history and purposes of the CDA, and is belied by the language of the respective timber sale contracts.

Overruling *Dawco Constr., Inc. v. United States*, 930 F.3d 872 (Fed. Cir. 1991), and "its progeny," the Federal Circuit held in *Reflectone, Inc. v. Dalton*, that a non-routine submission from a contractor constitutes a "claim" regardless of whether it is preceded by a dispute. 60 F.3d 1572, 1575-76 (Fed. Cir. 1995) (en banc). The assertion of damages resulting from a breach of contract is not routine. *See Kentucky Dam & Bridge, Inc. v. United States*, 42 Fed. Cl. 501, 519 (1998). Consequently, even assuming for the sake of argument that the "in dispute" requirement could apply to a Government claim, despite the fact that Government claims are not "submitted" but rather are "the subject of a decision," under *Reflectone* the existence of a pre-existing dispute is irrelevant.

Precision attempts to resurrect *Dawco*'s "in dispute" requirement. Pl. Mot. at 7-8. As in *Reflectone*, the decision in *Dawco* concerned submissions by contractors – not a Government claim. *See* 930 F.2d at 877. Moreover, like *Reflectone*, the decision in *Dawco* was based upon provisions of the FAR. *See id.* at 877-78 (concluding that the FAR "mandates . . . a dispute at the time of submission"). Precision's assertion that *Dawco* created "an all-ecompassing 'in dispute' requirement" applicable to Government claims or contracts not governed by the FAR is simply incorrect. *See* Pl. Mot. at 8. Moreover, the only aspect of the "in dispute" holding of *Dawco* that survives *Reflectone* pertains to "routine" submissions from the contractor. *Dawco* and its progeny are, therefore, inapposite.

2. Ordinary Meaning of the Term "Claim"

The CDA does not define what constitutes a "claim." *Dawco*, 930 F.2d at 877, *overruled on other grounds by Reflectone*, 60 F.3d 1572. The ambiguity has been especially noted in cases involving a government claim. *Volmar Constr., Inc. v. United States*, 32 Fed. Cl. 746, 751 (1995). This court has dealt with any contested claim by evaluating it in terms of the regulations implementing the Act, the relevant contract language, and the facts of the case. *Id.* (citing *Dawco*, 930 F.2d at 877). The FAR, which governs the Government's conduct of procurements, defines "claim" as:

> [1] a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract . . . [2] A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. [3] The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 2.101. As noted above, however, the FAR does not apply to timber sale contracts because the Government is not "acquiring," but rather, is selling timber. The jurisdictional

question raised by plaintiff is whether the Government's counterclaim for damages is a "claim" within the meaning of the CDA. More specifically, Precision asserts that the Forest Service's assessments of damages were not "in dispute," as purportedly required by the contracts' definition of claim as set forth in section CT9.2(c), and therefore did not constitute final decisions upon which a CDA claim could be based. Pl. Mot. at 4. Because the FAR does not apply to the contracts, the Court must look first to the language of the CDA and then the specific facts of this case to determine whether the contracting officers' decisions were "claims" for purposes of the CDA.

"The starting point for statutory interpretation is the plain language of the statute." *Zoltek Corp. v. United States*, 51 Fed. Cl. 829, 834 (2002). Section 1491 of title 28 grants this Court "jurisdiction to render judgment upon any *claim* by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 . . . on which a decision of the contracting officer has been issued under [41 U.S.C. § 605]." 28 U.S.C. § 1491(a)(1) (emphasis added). First, the Court must determine whether there was a "claim" against the contractor. Neither the Tucker Act nor the CDA define the term "claim," and the FAR's definition of claim does not apply to these contracts. Accordingly, the Court must look to the ordinary meaning of the term. Claim has been defined as: "A demand for something as due; an assertion of a right to something." III OXFORD ENGLISH DICTIONARY 261 (2d ed. 1989); *see also Reflectone*, 60 F.3d at 1576 (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 244 (1990)) ("a demand for something due or believed to be due"). Moreover, as the Federal Circuit has explained, the ordinary meaning does not require any pre-existing dispute:

> [Construing the term] "claim" to be a written demand seeking a sum certain (or other contract relief) as a matter of right, but not necessarily in dispute, is consistent with the ordinary meaning of the term "claim": "a demand for something due or believed to be due." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 244 (1990). That the demand is made as a matter of right constitutes the essential characteristic of a claim according to both the FAR and the dictionary definitions. Nothing in the common definition of "claim," however, requires a pre-existing dispute before a demand as a matter of right can be a claim. Indeed, everything suggests the contrary.

*Reflectone*, 60 F.3d at 1576 (case citations omitted). The Federal Circuit noted additionally, that "it is illogical to require a dispute before a demand for payment rightfully due can be a 'claim' because to have a dispute the contractor must first make a demand as a matter of right, *i.e.*, a claim, that is then refused." *Id.*

The Forest Service contracting officers' final decisions assess as a matter of right damages for breach of contract. *See* PA 12-127. By demanding "something due or believed to be due," the final decisions assert a government "claim." *Reflectone*, 60 F.3d at 1576; *see also Placeway*, 920 F.2d at 906.

3. The CDA's Legislative History and Purposes Are Not Consistent With an "In Dispute" Requirement

"[N]either the CDA, its legislative history, nor the FAR, nor its history, suggests that a dispute must pre-date the contractor's submission of the claim to the CO when the claim is in the form of a non-routine demand as of right." *Reflectone*, 60 F.3d at 1576. Additionally, the CDA's goal of "providing for the efficient and fair resolution of contract claims" conflicts with a pre-existing dispute requirement. *Id.* at 1580 (citing Report of the Senate Government Affairs Comm. and the Senate Judiciary Comm. on the Contract Disputes Act of 1978, S. REP. NO. 95-1118, at 4 (1978), *reprinted in* 1978 U.S.S.C.A.N. 5235, 5238). As the Federal Circuit explained in *Reflectone*:

> Judicial inquiries into whether a dispute predated a submission are at best an inefficient use of limited resources, given that before the Board or the court reaches this question there will necessarily have been a final CO's decision denying the contractor's submission . . . . Because a dispute clearly exists at the time an appeal is dismissed for lack of a dispute pre-dating submission of the demand for payment to the CO, after dismissal the contractor need only resubmit the identical demand to the CO. The resubmitted demand would now indisputably satisfy the pre-existing dispute requirement and, therefore, be a CDA claim. The process of final decision and appeal would begin all over again, but at great cost to the parties, the boards and the courts, often with no benefit because the disputed issues on the merits have already been well defined by the course of litigation. Clearly this repetitive and needlessly drawn-out process can hardly be said to promote the efficient resolution of claims. Nor is it "fair." Requiring . . . the identical claim [to be submitted twice] is a waste . . . of time and money.

60 F.3d at 1580-81.

That is precisely the situation here. If the Government's claims were to be dismissed, the contracting officers would issue new final decisions assessing breach damages. The existence of a pre-existing dispute would clearly be satisfied. Precision would then once again challenge the assessment of breach damages. The CDA's goal of the fair and efficient resolution of claims, as well as the interests of judicial economy, would be undermined by such a result.

4. The Contractual Language Does Not Impose an "In Dispute" Requirement

The parties' written agreements in this case embodied and recognized the Court's jurisdiction granted by Congress to hear claims arising pursuant to the CDA. Precision disputed the Court's jurisdiction, arguing that the Forest Service's actions did not meet the contractual definition of "claim." Plaintiff, however, has incorrectly interpreted the contracts. Rather than limiting the Court's jurisdiction, the language of the contracts is consistent with the Court's

interpretation of 28 U.S.C. § 1491(a) and the CDA.

Interpretation of the terms of a government contract is a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Therefore, it is proper for this Court to engage in contract interpretation on a motion to dismiss. *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) (citing *Kennedy Heights Apartments, Ltd. I v. United States*, 48 Fed. Cl. 574, 578 (2001)). "The interpretation of a contract 'begins with the language of the written agreement.'" *S. Cal. Edison*, 58 Fed. Cl. at 321 (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). It is a well-established principle of contract interpretation that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972, 975 (1965). Furthermore, "an interpretation [that] gives a reasonable meaning to all parts [of a contract] will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Northrop Grumman*, 50 Fed. Cl. 443, 459 (2001) (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 235, 575 F.2d 855, 863 (1978)).

The relevant language governing claims is found in section CT9.2(c) of the contract:

> (c)(i) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract.
>
> (c)(ii) A voucher, invoice, or request for payment that is not in dispute when submitted is not a claim for the purposes of the Act. However, where such submission is subsequently not acted upon in a reasonable time, or disputed either as to liability or amount it may be converted to a claim pursuant to the Act.
>
> (c)(iii) A claim by the contractor shall be made in writing and submitted to the Contracting Officer for decision. A claim by the Government against the contractor shall be subject to a decision by the Contracting Officer.

As the Government noted at oral argument, the determinative distinction in the contractual language for establishing the damage demands as claims lies in the difference between the words "demand" and "request" used in subsections CT9.2(c)(i) and CT9.2(c)(ii) respectively. The parties necessarily intended the two provisions to have different meanings, otherwise there would have been no need for different clauses. Subsection (c)(i) defines the term "claim." There is no "in dispute" requirement included in that definition. Section (c)(ii) carves out a subset of actions that are not "claims" unless they are "in dispute." By ignoring the distinction between demand and request, Precision improperly seeks to add an "in dispute" requirement to the definition of claim found in subsection (c)(i).

In order to ascertain the purpose of this distinction we turn to the plain meaning of the different terms. As implied by CT9.2(c)(i)'s qualifying words, "as a legal right," demand means "to ask for (a thing) with legal right or authority; to claim something one is legally entitled to." IV OXFORD ENGLISH DICTIONARY 430; WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 244 (1990). On the other hand, request means "to express a wish or desire to have." XII OXFORD ENGLISH DICTIONARY 679. Read in accordance with the ordinary meaning of "demand," the damage calculations sent by the Forest Service were demands seeking, as a legal right, the payment of money, rather than requests for payment.

Although plaintiff asserts that the damages demanded by the Forest Service fall into CT9.2(c)(ii)'s "request for payment" category, the Court finds that CT9.2(c)(i)'s demand for payment as a legal right and CT9.2(c)(ii)'s request for payment unambiguously provide for different circumstances. Ambiguous contract terms do not exist simply on the basis that the parties assert different interpretations of the contract. *Westinghouse Elec. Corp. v. United States*, 41 Fed. Cl. 229, 235 (1998) (citing *Thermal Electronic, Inc. v. United States*, 25 Cl. Ct. 671, 673 (1992)). "While '[a]ny group of words can be twisted by strained construction into an ambiguity . . . this should not be done.'" *Westinghouse Elec.*, 41 Fed. Cl. at 235 (quoting *Dana Corp. v. United States*, 200 Ct. Cl. 200, 470 F.2d 1032, 1043 (1972)).

In light of the terms' ordinary, unambiguous meanings and the parties' likely intent, this Court interprets the two subsections to refer to distinctly different actions taken under the contract. Section CT9.2(c)(ii) refers to payments likely to occur in the ordinary course of the parties' contractual relationship. However, subsection (c)(i) refers to *demands* for relief, as a legal right under the contract. Demands for relief as a legal right should be understood to include demands for damages resulting from breach of contract. The Forest Service's damage correspondence constituted written assertions of a legal right to damages pursuant to CT9.3(E) and CT9.2(c)(i).

Precision argues that requiring that there first be a dispute would facilitate efficient resolution of the claims at issue. However, interpreting the contracts as requiring a pre-existing dispute before one party's demanded damages constitute a claim would prove "inimical to at least two goals of the CDA: providing for the efficient and fair resolution of contract claims." *Reflectone*, 60 F.3d 1572, 1580 (Fed. Cir. 1995) (citing Report of the Senate Governmental Affairs Committee and the Senate Judiciary Committee on the Contract Disputes Act of 1978, S. REP. NO. 95-1118, at 4 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5238). The contracts expressly provide for an efficient and fair resolution of breach and damage issues. The provisions discussed above detail both parties' legal rights to terminate for breach and subsequently demand damages. As such, the Forest Service's written demand for breach damages arising under the contract constituted a claim as defined in CT9.2(c)(i).

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

Precision sought summary judgment regarding the defendant's counterclaim for damages, arguing that: 1) defendant's prior material breach precluded the Forest Service from terminating the contracts based on Precision's failure to furnish bonding from an approved surety; 2) the Forest Service engaged in selective enforcement when it required Precision to obtain new bonding, while choosing not to terminate other contractors for failure to timely comply with the bonding provisions; and 3) the contracting officers' computations of damages are inconsistent with the parties' contracts. Defendant also moved for summary judgment, contending that: 1) Precision breached the contracts; 2) Precision waived the defense of prior material breach by choosing to continue performance; and 3) the contracting officers correctly calculated the damages to the Government resulting from Precision's breaches.

### A. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A material fact is one that might significantly affect the outcome of the litigation. *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court does not "weigh" each side's evidence. *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 76 (2002) (citing *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002)). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Id.* (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 285 F.3d 1013, 1017 (Fed. Cir. 2002)). The non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Id.* (citing *Anderson*, 477 U.S. at 256). Unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).

"The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)). "The court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors*, 812 F.2d at 1391.

**B. Precision Breached its Forest Service Contracts by Failing to Maintain Bonding with an Approved Surety**

The Government seeks a summary judgment that Precision breached the timber sale contracts at issue and therefore the Forest Service properly terminated the contracts for default. As stated in *Gilbert v. Dep't of Justice*:

> A party breaches a contract when it is in material non-compliance with the terms of the contract. *Link v. Dep't of Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995). . . . A [failure to comply] is material when it relates to a matter of vital importance, or goes to the essence of the contract. *Thomas v. Dep't of Hous. and Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin *Corbin on Contracts* §1104 (1964)). Under this formulation, the determination of whether non-compliance with the terms of a contract is material, so as to constitute a breach, is a mixed question of fact and law. What was required by way of contract performance turns on contract interpretation which is an issue of law. *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997). At the same time, the conduct of the allegedly breaching party -- in other words, what the party did or did not do -- is an issue of fact.

334 F.3d 1065, 1071 (Fed. Cir. 2003). Because the facts regarding Precision's failure to comply with the terms of the contract are undisputed, the determination of whether there was a material non-compliance with the terms of a contract, and hence breach, necessarily reduces to a question of law. *Id.* Therefore, the determination of whether Precision breached the contract is properly decided on summary judgment. *See* RCFC 56(c); *Anderson*, 477 U.S. at 247.

All of the contracts at issue in this action contained a section BT9.1, as follows:

> Performance Bond. As a further guarantee of the faithful performance of the provisions of this contract, Purchaser delivers herewith and agrees to maintain a surety bond in the dollar amount stated [in another section of the contract]. . . . Should the sureties on the bond delivered herewith, or any bond delivered hereafter in connection with this contract, become unsatisfactory to Forest Service, Purchaser shall, within 30 calendar days of receipt of demand, furnish a new bond with surety satisfactory to Forest Service.

Furthermore, the contracts provided in section CT9.3 that "[t]he Contracting Officer . . . may terminate this contract for breach in the event Purchaser . . . (E) fails to remedy a breach of contract within time limits stated in BT9.3.[6]

In 1999 and 2000, Precision used Frontier Insurance to comply with the bonding requirement in section BT9.1. However, on June 6, 2000, the Department of the Treasury

---

[6] BT9.3(b) provided: "If such breach does not require on-the-ground action by Purchaser, such breach shall be remedied within 30 calendar days. . . . If such breach is not remedied within the above time limits, Forest Service may terminate this contract."

removed Frontier Insurance Company from its list of approved sureties. 65 Fed. Reg. 35998-02 (June 6, 2000) ("with respect to any bonds . . . currently in force with [Frontier Insurance], bond approving officers should secure new bonds with acceptable sureties"). Shortly thereafter, the Forest Service notified Precision that Frontier Insurance Company was no longer an acceptable surety and, pursuant to section BT9.1, directed Precision to obtain bonding from an acceptable surety within 30 days.

Precision failed to remedy the breach within the 30-day time period. In July 2000, and again in September 2000, Forest Service contracting officers wrote letters reminding Precision that its failure to provide replacement surety bonds constituted a breach of contract. In both communications, the Forest Service offered Precision the opportunity to cure its default and warned Precision that failure to cure within 30 days could result in the termination of its timber sale contracts for material breach. Precision still did not obtain an acceptable surety. On January 9, 2001, the Forest Service notified Precision that it had terminated the contracts for breach on the theory that Precision breached section BT9.1 of its timber sale contracts by failing to maintain performance bonds from an approved surety. As a matter of law, this Court finds Precision violated an express, unambiguous provision of the contracts and, therefore, the contracting officers' decisions to terminate for breach were justified under section BT9.3. *See Abbett Elec. Corp. v. United States*, 142 Ct. Cl. 609, 614, 162 F. Supp. 772, 775 (1958).

Looking past the unambiguous language of the contracts, the correctness of the decision to terminate is supported by numerous decisions of the boards of contract appeals.[7] These boards have found that "failure to furnish adequate bonding [as] required by a government . . . contract is a material breach that justifies termination for default." *Airport Indus. Park, Inc. v. United States*, 59 Fed. Cl. 332, 334-35 (2004); *see, e.g.*, *Dieleman Constr. Co.*, ENG BCA No. 6213, 96-2 B.C.A. (CCH) ¶ 28,430, 1996 WL 419850, 1996 Eng. BCA LEXIS 12, at *22-23 (June 24, 1996) (finding that failure to provide performance and payment bonds was the "proper legal basis" for terminating appellant's contract for default); *Pac. Sunset Builders, Inc.*, ASBCA No. 39, 312, 93-3 B.C.A. (CCH) ¶ 25,923, 1993 WL 89769, 1993 ASBCA LEXIS 90, at *7-8 (Mar. 17, 1993) (stating that when sureties became unacceptable to Government, appellant's failure to provide adequate financial information justified termination of contract for default); *JaMar Constr. Co.*, ENG BCA No. 5251, 87-3 B.C.A. (CCH) ¶ 20,125, 1987 WL 41310, 1997 Eng. BCA LEXIS 57, at *9 (Aug. 21, 1987) (finding a "material breach entitling the Government to terminate the contract for default" when the contractor's surety went bankrupt and contractor could not obtain substitute bonding).

Thus, the Court concludes that on the undisputed facts, Precision breached the twelve Forest Service contracts in issue by failing to maintain bonding with an approved surety.

---

[7] Decisions of the boards of contract appeals are not binding on this Court, but can be persuasive where they are well reasoned and legally sound.

### C. Precision Waived the Excuse of Prior Material Breach Through Continued Performance

Precision asserts that the Forest Service's termination for default is invalid due to the prior material breach by the Forest Service of eight of the twelve contracts at issue: O.D. Ridge, Brookbank, Jersey Horse, Saginaw-Kennedy, Brann, U-Bar, Monument, and Manaco.[8] Precision alleges that the prior material breaches relieved it of its continued obligation to perform.

In attempting to excuse itself from liability, plaintiff invokes the principle of prior material breach: "Upon a material breach of a contract the non-breaching party has the right to discontinue performance of the contract." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992); *see also Malone v. United States*, 849 F.2d 1441, 1446 (Fed. Cir. 1988) (holding a material breach may allow the non-breaching party to avoid the contract, discharge its duties under the contract, and relieve it of a default determination and its consequences), *modified*, 857 F.2d 787 (Fed. Cir. 1985). However, even assuming that the Forest Service's suspensions constituted prior material breaches[9] such that Precision might have been relieved of its obligations under the contracts, Precision waived any right to treat the breaches in that manner by manifesting an understanding, through the continued fulfillment of its contractual obligations, that performance was to continue under the contracts. As the Court of Claims stated:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it . . . . If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Cities Serv. Helex v. United States*, 211 Ct. Cl. 222, 234-35, 543 F.2d 1306, 1313 (1976).

The case law in this Circuit has frequently analyzed and applied the doctrine of prior material breach. *See, e.g.*, *Barron Banshares, Inc. v. United States*, 366 F.3d 1366, 1380-81 (Fed. Cir. 2004); *Alaska Pulp Co. v. United States*, 48 Fed. Cl. 655, 668-71 (2001); *Ling-Temco-Vought, Inc. v. United States*, 201 Ct. Cl. 135, 144-50, 475 F.2d 630, 636-39 (1973); *N. Helex Co. v. United States*, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972). As stated above, "Upon

---

[8] Plaintiff's prior material breach defense does not apply to the Gentry, Lily, and Wiggins contracts because those contracts were entered into after the suspension periods. Furthermore, Chief Judge Damich found that the Forest Service's suspension did not breach the Hutch-Boondock multi-product sale contract, *Precision Pine*, 50 Fed. Cl. 35, so the defense is equally inapplicable to that contract.

[9] In *Precision Pine*, 98-720, the court did not reach the issue of whether breaches were "material" such that Precision would have been released from its obligations under the contracts. 50 Fed. Cl. 35.

a material breach of a contract the non-breaching party has the right to discontinue performance." *Stone Forest Indus.*, 973 F.2d at 1550. This principle presents a number of options for the non-breaching party, including whether to: 1) entirely discontinue performance under the contract, 2) explicitly reserve its right to discontinue performance for the material breach, or 3) waive the right and continue performance under the contract. Several authorities analyze the legal standard for application of the defense of prior material breach. Professor Williston's treatise describes the defense as a rigid doctrine whereby after a material breach, the non-breaching party has the choice to continue to perform under the contract or to cease to perform, and any conduct indicating an intention to continue the contract will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform. *See* 14 WILLISTON ON CONTRACTS § 43:15 (4th ed. 2000). The RESTATEMENT (SECOND) OF CONTRACTS § 246(1) states that "an obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence." RESTATEMENT (SECOND) OF CONTRACTS § 246(1). Additionally, Professor Corbin's treatise and the Uniform Commercial Code have articulated and endorsed additional variations of the legal standard for analyzing the effect of prior material breach.

In *Cities Service*, the Court of Claims summarized the four approaches for determining whether a party's conduct indicated an election to continue performance: (1) the Williston, strict formulation under which "any act indicating an intent to continue the contract is an election[,] . . . the right to end the contract cannot be preserved[, and] . . . any inconsistent act results in the loss of the right;" (2) the modified approach, articulated in *Northern Helex*, 197 Ct. Cl. at 125-26, 455 F.2d at 551, under which "the injured party may itself continue performance in certain circumstances and yet reserve its right to claim material breach without the breaching party's assent;" (3) Professor Corbin's approach, under which "an election should not be conclusive unless facts giving rise to an estoppel exist[:] either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position;" and (4) the Uniform Commercial Code approach, under which the question of "[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case." *Cities Serv.*, 211 Ct. Cl. at 235-36, 543 F.2d at 1314; *see* 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 683-88 (W.H.E. Jaeger ed., 3d ed. 1957); U.C.C. § 1-207 (2002); *see also First Heights Bank v. United States*, 51 Fed. Cl. 659, 664 (2001).

The parties' dispute lies in whether Precision sufficiently reserved its right to discontinue performance of the eight contracts, identified *supra* at 3, 18, after the Government's 1995-1996 breaches or whether the actions taken by Precision after the breaches constituted an election to continue performance and therefore a wavier of the defense with respect to those contracts.

Under the Williston formulation, Precision undoubtedly waived its right to discontinue performance. Rather than treating the Government's suspensions as material breaches, Precision continued performance, to varying degrees, under each of the eight contracts after the suspensions were lifted. Most notably, Precision actually harvested timber on seven of the eight breached contracts. Furthermore, after the suspensions were lifted, Precision executed contract

modifications on the eight breached contracts, acquired new bonding (or the contractually allowed Letter of Credit) for all eight of the breached contracts, met with the Forest Service regarding two of the contracts, and continued contractually required communication[10] on all eight breached contracts. *See* PRDPF at 8-12.

Precision fares no better under the second approach described in *Cities Service*. The modified position, first adopted in *Northern Helex*, "allowed a plaintiff to claim a material, contract-ending breach – despite having continued performance – only in the context of that plaintiff's explicit reservations of material breach claims, explanations in advance of the reasons for its continued performance, prompt suit before the Government took any action to terminate, the lack of prejudice to the Government, and other special factors." *Cities Serv.*, 211 Ct. Cl. at 235-36, 543 F.2d at 1314 (citing *N. Helex*, 197 Ct. Cl. 118, 455 F.2d 546). While Precision attempts to analogize its situation to the "particular circumstances" that gave rise to the modified approach in *Northern Helex*, the differences in the two cases far outweigh the similarities. The most glaring distinction comes from *Northern Helex*'s emphasis that "plaintiff's continued performance . . . was founded on the *required reservation*." 197 Ct. Cl. at 118, 455 F.2d at 552 (emphasis added). The court in *Northern Helex* noted the language in a letter from the plaintiff informing the Government that its failure to make payment was "a material default under the contract . . . [and plaintiff] wish[ed] to reiterate that any performance rendered by Northern Helex Company subsequent to any such defaults has been and shall be with the express understanding that such action shall not constitute a waiver of any of Northern Helex Company's rights and remedies." 197 Ct. Cl. at 118, 455 F.2d at 552.

Unlike in *Northern Helex*, plaintiff's continued performance under the contracts at issue here was not founded on any reservation of plaintiff's right to discontinue performance. 197 Ct. Cl. at 118, 455 F.2d at 552. Precision argues that it informed the Forest Service from the outset and throughout the suspension that it considered the Forest Service to be in breach of its contracts. Pl. Resp. to Def. Mot. for Summ. J. at 24; PPFUF 1-2. Throughout this period, however, plaintiff failed to notify the Forest Service that it considered the breaches to be material. *Cities Serv.*, 211 Ct. Cl. at 237 n.19, 543 F.2d at 1315 n.19 (noting that "[i]nsofar as plaintiffs may have implied that the termination amounted to a breach of contract, they never said or implied that it was a material breach ending the entire contract"). During the performance of the contract, Precision never notified the Forest Service that it continued to reserve its right to terminate for the Government's material breach. Rather, as evidenced by Precision's actions discussed above, Precision expressed only an intent to continue efforts to perform under the eight breached contracts until after the Government had terminated the contracts for breach.

Precision's counsel sent the Government a letter on January 12, 2001, three days after the Forest Service's termination for default of all the contracts at issue. The letter notified the Forest Service, for the first time, that Precision considered the Government's prior material breach to

---

[10] Such communications included: annual operating schedules submitted by Precision for some of the contracts, a request to log outside of the "normal operating season," requests to open payment units, and concerns about market conditions for harvesting.

have relieved it of liability for nine of the defaults and reserved its right to make this argument once the issue of breach was resolved by the Court in *Precision Pine & Timber, Inc. v. United States*, No. 98-720C.[11] This Court concludes, however, that Precision could not, as a matter of law, reserve the right to terminate for the Government's prior material breach three years after its occurrence, two days after the contracts had been terminated by the Government for Precision's own breach of its express contractual obligations, and after a three-year period in which Precision manifested an understanding that performance under the contracts at issue was going to continue and during which plaintiff failed to make the "required reservation." *N. Helix*, 197 Ct. Cl. at 118, 455 F.2d at 552. One side cannot continue performance after a material breach by the other, act as if the contract remains fully in force, and then only raise the defense of prior material breach when it has been terminated for its own default. *N. Helex*, 197 Ct. Cl. 118, 455 F.2d at 551.

Plaintiff attempts to further its argument with reference to the "Hobsonian" choice discussed in *Alaska Pulp*, 48 Fed. Cl. at 671. Pl. Resp. at 27. In *Alaska Pulp*, the court rejected the Government's attempt "to force the non-breaching party to choose between swallowing the [Government's violation of the contract] or abandoning the contract entirely, a Thomas Hobson's choice that would reward the breaching party and add further injury to" the non-breaching party. *Alaska Pulp*, 48 Fed. Cl. at 671. Unlike the actions taken by Precision, however, Alaska Pulp "consistently maintained that the [Government's violation of the contract] constituted a material breach of its . . . contract," and the Government was well aware "that [Alaska Pulp] still contemplated the option of a legal claim for repudiation." *Id.* The Court also found that Alaska Pulp "adequately preserved its repudiation theory in its dealings with the contracting officer and Forest Service representatives" by "establish[ing] repudiation facts and plainly characteriz[ing] the imposition of the unilateral terms as a material breach excusing further performance on its part." *Id.* at 669. In its briefs, Precision ignores these determinative facts.

Under the Corbin view, an election is binding if the breaching party changes his position in reliance on the non-breaching party's continued performance, or if the injured party's conduct has been such that it would be unjust to allow him to change his position. *Cities Serv.*, 211 Ct. Cl. at 241, 543 F.2d at 1317. Precision waited until just under four years from the lifting of the last suspension and until *after* being terminated for default itself, to notify the Forest Service of its asserted right or decision to abandon the contracts by reason of the Government's prior material breach. In light of Precision's continued manifestation of its intention to perform under the contracts and the lack of timely notice to the Forest Service regarding Precision's assertion of material breach, this Court concludes that it would be unjust under the circumstances to allow Precision to avoid liability for its breaches based on the assertion of prior material breach.

---

[11] Precision initially asserted prior material breach with respect to the nine contracts at issue in this case that were the subject of a suspension by the Forest Service, *i.e.*, O.D. Ridge, Brookbank, Jersey Horse, Saginaw-Kennedy, Brann, U-Bar, Monument, Manaco, Hutch-Boondock. Chief Judge Damich subsequently found that the Government breached only eight of those contracts. *See supra* at 3; *Precision Pine*, 50 Fed. Cl. 35 (holding that the Forest Service's suspension of the Hutch-Boondock contract did not result in a breach); *See also supra* at 18 n.8.

Essentially the same reasoning applies when one analyzes the case under the UCC approach: "Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case." U.C.C. § 2–703 cmt. 1. The facts of this case are such that the Court recognizes that complete cancellation of the contracts posed substantial risks for Precision,[12] but the law of election requires the non-breaching party to, at the very least, *reserve the right* to cancel the contract by notifying the non-breaching party of its reserved right to cancel later. This position is supported by *Cities Service*'s recognition that the UCC requires, "prompt and specific action to preserve rights and remedies in various situations and suggests that affirmative action is necessary when a seller wishes to cancel for the buyer's breach." 211 Ct. Cl. at 242 n.29, 543 F.2d at 1317 n.29 (citing UCC §§ 2-602(1), –606(1)(b), –607(3), – 608(2), –616, –703; 2 R. Anderson, Uniform Commercial Code § 2–703:35 (1971) (when seller elects to cancel, it is clear that he should manifest intention to do so; Code does not establish method of cancellation, so pre-Code law governs)). Precision's actions in waiting almost four years cannot be construed as "prompt and specific" as those terms were used in *Cities Service*.

Under any standard, Precision waived its right to cancel the contracts based on the Government's alleged prior material breach through its continued manifestation of an understanding that the contracts remained in effect by continuing to fulfill its contractual obligations. Through this continued manifestation of intention to perform under the contracts, after the Forest Service's prior breaches, Precision waived the right to be shielded from its own liability for breach of the contracts.[13]

**D. Purported Selective and Unequal Enforcement Does Not Excuse Precision's Breach**

The Government has moved for summary judgment regarding Precision's asserted claim that once Frontier Insurance was delisted by the Department of the Treasury, "the Forest Service selectively enforced the bonding requirement among companies that had previously secured bonding from Frontier Insurance Company." Compl. ¶¶ 18-21. On summary judgment, in deciding whether there are genuine issues of material fact, the Court must determine (1) whether the non-moving party has presented evidence in its opposition that creates a genuine issue of material fact; or (2) whether the non-moving party has relied solely on unsupported allegations and/or denials. *See McDonald v. United States*, 13 Cl. Ct. 255, 258 (1987). "Where the non-moving party merely asserts unsupported allegations and conclusions, the court will not deny the

[12] Precision did not have an alternative source of timber at the time. Additionally, if Precision had simply walked away from its contracts, the Government could have terminated the contract for default, suspended or debarred Precision from bidding on future timber sale contracts, or deemed Precision to be a non-responsible contractor – a designation that would preclude Precision from winning future contracts. Pl. Resp. to Def. Mot. for Summ. J. at 11-13.

[13] There is no suggestion that Precision has waived its right to claim damages for the Government's breach. In fact, as early as 1998, Precision brought suit against the United States in Docket No. 98-720C, pursuing a monetary remedy for the Forest Service's suspensions.

moving party's motion for summary judgment if the moving party meets his burden under RCFC 56(c)." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "The burden 'on the moving party may be discharged by 'showing'– that is by pointing out to the . . . Court – that there is an absence of evidence to support the non-moving party's case.'" *McDonald,* 13 Cl. Ct. at 258 (quoting *Celotex,* 477 U.S. at 325).

Plaintiff supports its assertion of "selective and unequal enforcement" by reference to "a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'" *American Exp. Isbradsten Lines, Inc. v. United States*, 204 Ct. Cl. 424, 464, 499 F.2d 552, 576 (1974) (quoting *Pac. Far E. Line, Inc. v. United States*, 184 Ct. Cl. 169, 184, 394 F.2d 990, 998 (1968)). While plaintiff styled the argument in its briefs as "selective and unequal enforcement," at oral argument plaintiff seemed to argue based upon the disparate treatment terminology used in the Government's briefs. In light of the fact that neither of the cases cited by plaintiff deal with a contract termination and plaintiff's use of the disparate treatment terminology at oral argument, this Court treats plaintiff's claim of "selective and unequal enforcement" as an allegation of disparate treatment.

An allegation that one company was treated differently from another "does not, *ipso facto*, state an actionable claim" of disparate treatment. *Asco-Falcon II Shipping Co. v. United States*, 32 Fed. Cl. 595, 604 (1994). Plaintiffs must show a breach of *contractual* obligation. *Id.* (emphasis in original). As the obligation of good faith and fair dealing is implied in these and every contract, a breach of that obligation would be relevant. *See, e.g.*, *Process Control*, 53 Fed. Cl. at 81; *Asco-Falcon*, 32 Fed. Cl. at 604-05. "[T]he government has an ever present obligation to perform its duties under a contract reasonably and in good faith . . . . However, it is well-settled that government officials are *presumed* to act . . . in good faith in the discharge of their duties." *Asco-Falcon*, 32 Fed. Cl. at 604 (citing *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986)); *Torncello v. United States*, 681 F.2d 756, 770 (1982); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301 (1976)). Therefore, "[t]o establish a breach of the duty of good faith and fair dealing a "plaintiff[] must *allege and prove*, by clear and strong evidence, specific acts of bad faith on the part of the government . . . . 'with well nigh irrefragable proof.'" *Asco-Falcon*, 32 Fed. Cl. at 604 (citing *Cont'l Collection & Disposal, Inc. v. United States*, 29 Fed. Cl. 664, 652 (1993) (citing *Kalvar*, 543 F.2d at 1301-02)). "Irrefragable proof has in turn been equated with evidence of 'a specific intent to harm.'" *Kalvar*, 543 F.2d at 1302; *see also Torncello*, 681 F.2d at 770. Consequently, "alleged disparate treatment absent a [showing] of malice or intent to harm" is insufficient to survive a motion for summary judgment. *Asco-Falcon*, 32 Fed. Cl. at 604-05; *see also CACI, Inc. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983) (holding that an intent to injure must be proved with "hard facts" and that "suspicion and innuendo" do not suffice).

First, the Government correctly asserts that Precision has failed to establish a genuine issue of material fact regarding an essential element of its claim. Precision has made no more than conclusory allegations of the Forest Service's malice or intent to harm. Precision has not produced any evidence showing that the terminations of the contracts were motivated by malice or an intent to harm. In opposition to the Government's motion for summary judgment on the

disparate treatment allegation, Precision has put forth only a declaration from the President of North Pacific Timber Enterprises ("North Pacific Timber") and counsel's oral argument allegations of "incredibly aggressive action" by the Forest Service. First, the declaration does not purport to establish malice or intent to injure by the Government. The declaration is also insufficient because the comparison necessary for determining the possibility of disparate treatment is between *similarly situated* competitors. *See Asco-Falcon*, 32 Fed. Cl. at 604. Plaintiff makes no attempt to show that Precision and North Pacific Timber were similarly situated such that the Government's purportedly disparate treatment could excuse Precision's default.

Moreover, even if plaintiff could show a difference in the Forest Service's treatment of Precision and North Pacific Timber regarding the replacement of performance bonds, plaintiff has failed to establish a genuine issue of material fact with respect to a breach by the Government of the duty of good faith and fair dealing. Precision has not shown that the Forest Service possessed a specific intent to harm. The conclusory allegations by Precision's counsel of "aggressive action" by the Forest Service against Precision are themselves insufficient to preclude summary judgment. *See McDonald*, 13 Cl. Ct. at 258; *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363 (Fed. Cir. 2000) (noting party proffered no evidence in support of his conclusory allegations and therefore failed to establish a genuine issue of material fact).

Next, the Government provided evidence that the Forest Service made the same replacement requirements of another timber company[14], operating in the same region, and also bonded by Frontier Insurance. In the Government's Supplemental Appendix, filed May 10, 2004, it submitted letters from a Forest Service contracting officer regarding the June 6, 2000 Treasury de-listing of Frontier Insurance. The substance of the letters is similar to those sent to Precision after the same Treasury Notice. As with Precision, the other company, Stone Container Corp., was informed of the need to obtain performance bonding from a new surety. Def. Supp. App. 10, 12. Unlike Precision, by October 13, 2000, Stone Container had complied with the Forest Service's request and obtained new bonding.[15]

The Court also takes note of the discretion provided by the Department of the Treasury to the Forest Service contracting officers in its instructions regarding the termination of Frontier Insurance Company as a surety acceptable on federal bonds. The Treasury Notice stated, "With respect to any bonds, including continuous bonds, currently in force with [Frontier Insurance], bond approving officers should secure new bonds with acceptable sureties in those instances where a *significant amount* of liability remains outstanding." 65 Fed. Reg. 35998-02. Precision does not sufficiently support its claim of disparate treatment because it never asserts that North Pacific Timber had a similar amount of liability remaining outstanding. In this regard, the Treasury Department's Notice sanctioned "disparate" treatment by reference to the amount of

---

[14] Stone Container Corp. d/b/a Stone Forest Industries.

[15] Gov't Supp. App. at 15-17 contains Stone Container Corp.'s replacement performance bonds, executed by Gulf Insurance Company.

liability that remained outstanding.

In light of the foregoing, this Court concludes that the Government is entitled to judgment as a matter of law with respect to plaintiff's assertion of selective and unequal enforcement or disparate treatment. Accordingly, the Court grants the Government's motion for summary judgment on its counterclaim with respect to liability.

**E. The Damage Calculation is Remanded to the Contracting Officers**

The parties have filed cross motions for summary judgment regarding the contracting officers' damage calculations. Precision contends that the contracting officers' computations of damages are inconsistent with the parties' contracts. Specifically, Precision contends that the Forest Service ignored the relevant contractual provision and created a new method of calculating damages. Conversely, the Government contends that the damages were calculated in accordance with the relevant provision of the contract and therefore there are no issues left for determination at trial with respect to the amount of damages due to the United States from Precision. As previously stated, the interpretation of provisions of a government contract is a matter of law. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996); *see also Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).

Each of the contracts contained the following section CT9.4 describing the method for calculating damages in the event of termination for breach:

> CT9.4 - FAILURE TO CUT. In the event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination Date, Forest Service shall appraise remaining Included Timber . . . . Such appraisal shall be made with the standard Forest Service method in use at time of termination.
>
> Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:
>
>> (a) The cost of resale or reoffering;
>>
>> (b) Any increase in Purchaser Credit Limit allowance for Unconstructed Specified Road facilities which are needed to harvest the remaining uncut volume. Such increases are limited to costs for constructing the road to the same standard and specifications required by this contract;
>>
>> (c) If Purchaser has failed to cut individual trees in the portions of Sale Area cutover and there is no resale of such individual trees, Purchaser shall pay Forest

> Service for cost of felling and removal or otherwise eliminating such uncut trees in addition to payment of damages described above . . . .
>
> (d) The Government's loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department in TFRM 6-8025.2) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale;
>
> (e) Any increase in reforestation costs, including site preparation, seeding, and planting caused by Purchaser's failure to harvest Included Timber by Termination Date.

In interpreting provisions of an agreement the "primary function of the court is to ascertain the intent of the parties to a contract." *Northrop Grumman*, 50 Fed. Cl. at 458; *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("[I]n the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties") (quoting 4 S. WILLISTON, *supra* at 19, § 601). The intention of a party entering into a contract is determined by an objective reading of the language of the contract, not by that party's statements in subsequent litigation. *Varilease Tech. Group*, 289 F.3d at 798. "'Contract interpretation begins with the plain language of the agreement.'" *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona*, 216 Ct. Cl. at 235-36, 575 F.2d at 863). The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Olympia Props., L.L.C. v. United States*, 54 Fed. Cl. 147, 152 (2002) (quoting *Hol-Gar Mfg.*, 169 Ct. Cl. at 388, 351 F.2d at 975). Moreover, words are to be given their plain and ordinary meaning. *Id.* (citing *Thanet Corp. v. United States*, 219 Ct. Cl. 75, 82, 591 F.2d 629, 633 (1979). An interpretation that "gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Northrop Grumman*, 50 Fed. Cl. at 459.

The Court begins its assessment of the likely intent of the parties by attempting to ascertain the plain meaning of the contract. *Gould*, 935 F.2d at 1274. In doing so, the Court finds that the section CT9.4 provides two alternative methods for determining damages in the event of breach: one where the timber has been resold; and the other where the timber has not been resold. Under the first method (*i.e.*, where there has been a resale) damages "shall be the amount by which Current Contract Value, plus costs described below [in subparagraphs (a) through (e) of CT 9.4], less any Effective Purchaser Credit remaining at the time of termination, exceeds the resale value at new Bid Rates." Under the second method (*i.e.*, where there has been no resale) "damages due shall be determined by subtracting the value established by [the Forest Service appraisal described in the first paragraph of section CT9.4] from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following

applicable costs [in subparagraphs (a) through (e) of CT9.4]."

At the time of the contracting officers' decisions in early 2001, no timber upon any of the breached contracts had been resold. Rather than employ the method applicable when there has been no resale, however, the Government created and employed a third method. Under that approach, the Government estimated the proceeds and costs of a possible future resale and utilized those estimated proceeds and costs as the basis for calculating something called "estimated damages." Each of the contracting officers' decisions stated, "This estimate may be adjusted once final damages are determined following the resale of the remaining timber. At that time, any surplus damages collected by this estimate will be refunded to the purchaser, or any additional damages due will be collected, as appropriate."[16] The Government's third method, however, is not permitted by the plain language of the contract.

A reasonable, intelligent person, acquainted with the contemporaneous circumstances, would likely understand CT9.4 to provide the Forest Service with only the two options described above for ascertaining the amount of damages due after a termination for breach. The Court believes the parties would have more clearly stated their intent to adopt a methodology whereby damages to be incurred due to a resale were estimated before any resale ever took place, if indeed it ever did. Section CT9.4 simply does not provide for the assessment of estimated damages based on a possible future resale, plus an *estimated* cost of resale and an *estimated* amount of interest, subject to reassessment after an actual resale. Thus, the Court concludes that section CT9.4 does not provide the Government the right to be paid an interim assessment of estimated damages which will later be adjusted once the Government determines its actual damages. Rather, the contracts require the Forest Service to decide whether to resell the contract and wait until the resale is concluded to calculate damages or not to resell the contract and calculate the damages immediately.

The Government has advised the Court (and Precision agrees) that since the date of the respective contracting officers' decisions, the Forest Service has, in fact, resold timber upon the O. D. Ridge, Jersey Horse, and Wiggins contracts. *See* Pl. Resp. to Def. Additional Proposed Findings of Undisputed Fact at 4. With respect to those contracts, the Government has requested a remand to the Forest Service so that the contracting officers can recalculate damages in light of the post-termination resale. The Court will grant that request and will direct the Forest Service to recalculate the damages it asserts with respect to plaintiff's breach of those three contracts in light of the subsequent resales in a manner consistent with the Court's interpretation, as set forth above, of the method for calculating damages required by section CT9.4 where there has been a resale.

The Government has also represented (and Precision agrees) that the remaining nine contracts were not resold and are not intended to be resold. *See id*. at 3. In view of the Court's conclusion that the Forest Service's calculation of "estimated damages" for breach of those contracts was not in accordance with the governing contractual provision, CT9.4, the Court will

---

[16] *See supra* at 5 n.5.

also remand those nine contracts to the Forest Service for recalculation of damages attributable to plaintiff's breach and will direct the Forest Service to recalculate the damages it asserts in a manner consistent with the Court's interpretation, as set forth above, of the method for calculating damages required by section CT9.4 of the contract where there is no resale. *See* 28 U.S.C. § 1491(a)(2); RCFC 56.2.

## *CONCLUSION*

Having concluded, for the reasons set forth above, that the Forest Service improperly calculated the damages it seeks by reason of plaintiff's breach with respect to each of the twelve contracts at issue, the Court DENIES the motion of defendant for summary judgment insofar as it relates to the calculation of damages. The Court GRANTS plaintiff's motion for summary judgment regarding the calculation of damages insofar as the Court holds that the contracting officers' computations of damages are inconsistent with the parties' contracts and REMANDS the damage determinations for those twelve contracts to the Forest Service for recalculation consistent with the foregoing analysis.[17] The Court ORDERS that: 1) the Government shall complete such recalculations within six months from the date of this Opinion and Order; 2) during such six-month period the Government shall file and serve status reports every thirty days, beginning thirty days from the date of issuance of this Opinion and Order, describing the status of the Forest Service's progress in making the recalculations; 3) at or before the end of the six-month period, the Government shall file and serve the recalculations together with a brief describing the methodology used in each recalculation and explaining how it is consistent with CT9.4 as interpreted by the Court. The Court will then consider, in consultation with the parties, what further proceedings may be warranted so that the Court may resolve any challenges by plaintiff to the recalculations with a view toward entering a final judgment in this action. In the meantime, further proceedings in this Court shall be stayed pending the filing and service of the recalculations to be conducted pursuant to the Court's remand.

IT IS SO ORDERED.

s/ George W. Miller

GEORGE W. MILLER
Judge

---

[17] The Court understands that using the Forest Service's "estimated damages" approach, which the Court has determined is not authorized by the contract, the Forest Service concluded that no "estimated damages" were due with respect to the Brookbank Multi-Product Sale and the Manaco Timber Sale. It may be that recalculations with respect to those contracts in a manner consistent with the Court's interpretation of the method for calculating damages required by section CT9.4 where there is no resale will yield similar results. Out of an abundance of caution, however, the Court has remanded the damage determinations for those contracts to the Forest Service as well.