**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>REVISED STATEMENT OF PLAINTIFF'S POSITION WITH RESPECT TO THE GOVERNMENT'S RECALCULATION OF DAMAGES</u>**

Pursuant to the Court's order of September 28, 2005, plaintiff hereby supplements its position as set forth in its filing of September 20, 2005 with regard to the government's recalculation of damages in the wake of the decision of this Court on October 29, 2004. 63 Fed. Cl. 635 (2004). As was indicated in the September 20, 2005 filing, based on review of defendant's revised calculations, plaintiff's present position is that the recalculation is defective in several respects, while in several other respects additional information is required in order for plaintiff to assess whether it comports with the requirements of contract clause CT9.4.[1]

[1]Precision Pine has used its best efforts to identify the issues it has with defendant's calculation of damages; however, Precision Pine respectfully reserves the right to identify other such issues. Moreover, nothing herein should be construed as Precision Pine's agreement to the amount of principal which defendant, as stated in its recomputations, believes is owing with regard to the Saginaw-Kennedy, Brann, U-Bar, Hutch-Boondock, and Lilly timber sales – the sales for which defendant calculates damages based on a "Predicted High Bid Appraisal value." <u>See</u> discussion, <u>infra</u>.

Set forth below in bold are the points raised by plaintiff in its initial filing. For the Court's convenience plaintiff will intersperse the requested explanation and support for its position as to each element.

**1. With regard to all of the sales:**

> **i. Defendant miscalculates the amount of interest due by calculating interest from the date of the initial Bill for Collection rather than from the date of re-calculation after summary judgment.**

Contract clause CT 4.41 (3/93) (copy attached) which is contained in each of the contracts in issue except U-Bar indicates in pertinent part that:

> Pursuant to the Debt Collection Act as amended (31 U.S.C. § 3702 et seq.) if payment is not received by the Forest Service within 30 days after the date of issue on the Bill for Collection:
>
> > (a) Simple interest shall be assessed at the higher of the U.S. Treasury current value of funds rate, . . . or the rate established by the Secretary of the Treasury under Section 12 of the Contract Disputes Act . . . Interest will begin to accrue as of the date of issue indicated on the initial Bill for Collection

The question of the proper date for interest to accrue where the actions of the party seeking interest causes resolution of the matter to be greatly extended has been the subject of discussion in several contexts. Some cases have focused on the propriety of interest accruing on the contractor's CDA claim to the extent that the contractor's failure to sign a claim release form delayed payment of the claims. In both Baker & Ford Co., GSBCA No. 5723, 81-1 BCA ¶ 14,918 (1981), and Mil-Pak Co., GSBCA 7332, 84-3 BCA ¶ 17,555 (1984), notwithstanding the period of interest specifically prescribed by the CDA, the Board tolled the accrual/collection of interest for the period caused by the contractors' delay. The reasoning in these cases is that if a party seeking interest were allowed to delay the receipt of payment and then collect interest for the period of delay caused by his own actions, he would receive more interest and conversely the

other party would pay more interest than is appropriate in the circumstances.[2] As the Board stated in Baker & Ford, "interest does not run on a [contractor's] claim that has not been perfected when the contractor has complete control over whether and when the claim is perfected." 81-1 BCA ¶ 14,918 at 73,823. That logic is equally applicable here where it was the government that was and remains in complete control of properly calculating the amount that is due it in accordance with the governing contractual provision, CT9.4. Indeed, since each of defendant's claims were, as this Court has determined, not initially calculated in accordance with the terms of the contract, it was inappropriate to attach any obligation on Precision Pine's part to pay them, let alone award the government interest and penalties for Precision Pine's refusal to pay sums it did not owe.[3] Stated another way, interest and penalty cannot properly run on any claim until it is calculated in accordance with the terms of the contract.

[2]Similarly, in Tom Shaw, Inc., ENGBCA No. 5540, 89-3 BCA ¶ 21,961 (1989), although the Board ruled that the mere overstatement of a CDA claim by a contractor did not per se delay settlement (and therefore that interest accruing from the date that the overstated claim was first submitted was not automatically precluded) the Board also indicated that had there been some evidence that the overstatement delayed the timing of settlement, a different result would have been appropriate. Id. at 110,469.

[3]Plaintiff notes the substantial difference in amounts demanded by defendant for two of the contracts is:

| Sale | Amount set forth in initial Bill for Collection | Corresponding amount set forth in defendant's recalculation |
|---|---|---|
| U-Bar | $215,691.04 | $124,367.14 |
| O.D. Ridge | $148,845.38 | $0 |

Indeed, the amount of principal sought on the claims in total was reduced from $767,625.72 to $456,218.64 as of April 28, 2005. Several subsequent revisions to the damage calculations have reduced this amount even further.

**ii. Except with regard to U-Bar,[4] defendant miscalculates the amount of interest due by using a fixed, rather than the appropriate variable, rate of interest.**

For each of the sales in issue, the Forest Service has calculated interest at a fixed rate. This is erroneous. The relevant provision of each contract (except U-Bar) indicates that

> Simple interest shall be assessed at the higher of the U.S. Treasury current value of funds rate, . . . or the rate established by the Secretary of the Treasury under Section 12 of the Contract Disputes Act. . . .[5]

Contract Clause C(T) 4.41 (3/93).

At all times relevant the CDA rate, which is established semi-annually, was higher than the corresponding U.S. Treasury current value of funds rate. As such, to the extent, if any, that interest is appropriate, CDA interest rates are applicable.

Section 12 the CDA relating to interest states in pertinent part that

> Interest on amounts found due contractors shall be paid to the contractor . . . at the rate established by the Secretary of the Treasury. . . .

41 U.S.C. § 611(emphasis added).[6]

---

[4]As discussed infra, although using a fixed rate of interest was proper with respect to U-Bar, the fixed rate actually used with regard to any damages due on U-Bar was, however, erroneous.

[5]In contrast, the language of clause CT4.4 of the U-Bar contract states that:

> [P]ayments received after the due date are subject to an interest charge at the current rate of interest prescribed by the U.S. Department of the Treasury (TFRM 6-8020.20). . . . Such interest rate shall remain unchanged until those bills have been paid or settled.

(Emphasis added and deleted).

[6]Needless to say, the language of clause CT4.41 and the CDA are parallel in their reference to the applicability of "the rate" of interest established by the Secretary of the Treasury.

The reference to "the rate" of interest established by the Secretary of the Treasury notwithstanding, in Brookfield Constr. Co v. United States, 661 F.2d 159 (Ct. Cl. 1981), the court interpreted this language as requiring that "the rate" of interest to be applied varied each six months, i.e., that the rate to be applied initially was the rate in effect on the date when interest accrued and that "this rate will rise and fall in concert with any changes in effect for subsequent six month periods." Id. at 170. This rule has been applied to determine "the rate established by the Secretary of the Treasury" relative to the Contract Disputes Act ever since. There is no basis for doing any differently in this instance.

Indeed, as the language of the U-Bar contract quoted supra at footnote 5 indicates, the Forest Service knew how to establish a fixed rate for interest. It simply did not do so with regard to sales other than U-Bar.

Based on the above, interest, if any, due on any of defendant's claims can run only from the date on which any principal amount due is calculated in accordance with the requirements of CT9.4 and, except with regard to U-Bar, must be computed using a variable rate of interest.

**iii. Defendant miscalculates the amount, if any, to which it is entitled by calculating a penalty on both principal and any interest due.**

Contract clause CT 4.41 (3/93) which again is applicable to all of the contracts in issue except U-Bar indicates that :

> **Pursuant to the Debt Collection Act** as amended (31 U.S.C. § 3702 et seq.) if payment is not received by the Forest Service within 30 days after the date of issue on the Bill for Collection:
>
> (a) [Interest shall be assessed]
>
> (b) [Debtors will be assessed administrative charges]
>
> (c) A penalty charge of 6 percent per annum will be assessed on any portion of a debt delinquent more than 90 days. This penalty charge

> will be in addition to the interest and administrative charges under paragraphs (a) and (b). Such penalty charge . . . shall be assessed on all outstanding amounts including interest and administrative costs assessed under paragraphs (a) and (b).

CT4.41 (emphasis added). This language incorporates the Debt Collection Act (the "Act") into the contract and, therefore, the Act and its implementing regulations must be followed.[7] In attempting to collect a 6% per annum penalty on any principal owing plus interest thereon and administrative charges, defendant has failed to do so.

That is, applicable regulations require that Department of Agriculture agencies, such as the Forest Service, are to assess a penalty under the Act of 6% a year on a "unpaid debt balance delinquent for more than 90 days." 7 C.F.R. § 3.34 (a)(2).[8] The terms "unpaid debt balance" and "unpaid debt balance delinquent for more than 90 days" are undefined in the regulations. However, the plain meaning of the words does not encompass either interest or administrative cost. Indeed, as of the 90th day after the due date for payment, the only balance likely delinquent would be principal.

Moreover, the Act states that "interest . . . does not accrue on a charge assessed under subsection (e) of this section," 31 U.S.C. 3717(f), i.e., charges under subsection (e) include "a penalty of not more than 6% a year for failure to pay a part of a debt more than 90 days past

---

[7]Indeed, a contract provision which by its terms provides the government with damages for a breach of contract without regard to any actual damages suffered would be unenforceable. See Fred A. Arnold, Inc. v. United States, 18 Cl.Ct. 1, 12-13 (1989) (stating that "there is a . . . long held principle that whenever the . . . amount stipulated in the contract . . . for failure of performance bears no relation to actual damages . . . courts decline to enforce the terms of the stipulation" (internal citations omitted)); see also L & A Jackson Enterprises v. United States, 38 Fed. Cl. 22, 42 (1997) (requiring that "the amount of liquidated damages bear a reasonable relationship to any actual damages that may be sustained by the breach" (citing Higgs v. United States, 212 Ct.Cl. 146, 151-52 (1976)).

[8]For the reasons noted above, for a debt to be delinquent it must first be calculated in accordance with the provisions of CT9.4.

due." 31 U.S.C. § 3717(e)(2). Even though the Act expressly forbids charging interest on the penalty imposed by the Act, through CT9.4 the Forest Service attempts to circumvent that prohibition by charging the 6% penalty on accrued interest: something which is no different mathematically from the activity expressly prohibited by the Act.[9]

By enacting 31 U.S.C. § 3717(f), Congress precluded compounding the assessment penalty with an assessment of interest. That is, Congress declared that the total amount of interest and the total amount of penalty must be computed without regard to each other. The

---

[9]Using the example of a principal amount of $100, a penalty of 6% per annum and interest of 4% per annum over 10 years illustrates how the total indebtedness would be the same under both the method used by defendant and the method prohibited by the Act. (For simplicity sake a fixed rate of interest has been used, however, the results would be the same using a variable interest rate.)

Pursuant to the method used by defendant:

1. Add the interest totaling 40% (4% interest over 10 years) to the original debt to obtain a subtotal of $140.

2. Calculate total penalty as 60% (6% penalty over 10 years) of that sub total, i.e., $84 (60% of $140) and add that amount to the $140 making the total amount owed $224.

The method prohibited by the Act is to:

1. Add penalty totaling 60% (6% per year over 10 years) of the original debt to obtain a subtotal of $160.

2. Calculate total interest as 40% (4 per year for 10 years) of that sub total, i.e., $64 (40% of $160) and add the result to the $160 making the total amount owed $224.

As can be seen, both methods result in the same total amount of indebtedness. Whereas, not charging interest on penalty or penalty on interest does not, i.e., in the example total interest would be $40 (4% interest over 10 years) and total penalty would be $60 (6% penalty over 10 years) and adding these amounts to principal would result in a total of only $200.

Forest Service's attempt to do otherwise in clause CT4.41(c), and make collection on this basis, is not as required "pursuant to the Debt Collection Act" but is in direct contravention of the Act.

Moreover, even if: (1) the computation of a penalty on both principal and interest were appropriate (which it is not), (2) defendant's calculation of interest using a fixed rate were correct (which it is not), and (3) interest should be calculated from the date of the initial Bill for Collection (which it should not be), defendant's calculation of penalty is still erroneous. As can be seen on the Summary of Default Damages submitted by the defendant on September 16, 2005, defendant computed the amount of penalty in a very crude and simplistic manner. Using the Brann sale as an example, defendant calculated the amount of penalty as follows:

1. It computed the total amount of interest allegedly owed. (For Brann it determined interest to be $7,187.11 by multiplying the alleged principal ($25,994.78 ) by a fixed interest rate (6.375 %) by the time between the initial bill and September 30, 2005 (4.33699 years).

2. It added the amount that it calculated for interest to principal to come up with a subtotal for Principal and Interest (i.e., for Brann defendant determined that principal plus interest through September 30, 2005 was $33,181.89 by adding $7,187.11 of interest to principal of $25,994.78).

3. To determine penalty it then multiplied this amount by 6% per annum for 4.33699 years (i.e., $33,181.89 x 6% x 4.33699 = $41,816.46).

The fallacy of this calculation is that it assumes that $33,181.89 was the amount of principal plus interest throughout the 4.33699 years when, in fact, it was only the amount of principal and interest on the last day – September 30, 2005. Simply put, defendant's amount for penalty is calculated on an erroneous and overstated amount.

**iv. For those sales for which damages were determined by re-appraisal (Saginaw-Kennedy, Brann, U-Bar, Hutch-Boondock, and Lilly), defendant has not provided sufficient detail to determine whether those appraisals are correct.**

For each of the sales noted in the revised calculation of damages, defendant premises its damages on something called the "Predicted High Bid Appraisal value" of the timber remaining on the sale at the time of termination.[10] For example, with regard to the Saginaw-Kennedy sale, the recalculation indicates that the "Predicted High Bid Appraisal value" for sawlogs was $14.93 per ccf and $.73 per ccf for pulpwood which, when multiplied by the estimated remaining volume of each type of timber and the products are summed, results in a total "Predicted High Bid Appraisal value" of $35,071.58. Defendant has provided no underlying data to indicate how the "Predicted High Bid Appraisal value" of the remaining sawtimber ($14.93/ccf in the case of Saginaw-Kennedy) was calculated. That is, with regard to the "Predicted High Bid Appraisal value" of the remaining timber for each of the listed sales defendant has not indicated:

(a) The Basic Data Period used and the values applicable in that Basic Data Period;

(b) The analysis by which defendant confirmed that these values were the product of bids from competitive areas;

(c) Any adjustments made to Basic Data Period values, the basis for those adjustments and the precise means by which those adjustments were calculated;

---

[10]The term "Predicted High Bid Appraisal value" is not a term set out either in contract clause CT9.4 or in standard Forest Service appraisal procedures and its meaning is not readily apparent. CT9.4 of the contracts here in issue talks about the computation of the government's damages where a purchaser fails to cut the timber on a sale by the date of termination being premised on the amount which the Forest Service actually receives upon a resale (i.e., not any "predicted" amount) or, if there is no resale, upon the value of that timber established by appraisal. Precision Pine, 62 Fed.Cl. 635, 655 (2004) ("the government's third method [of calculating damages] is not permitted by the plain language of the contract").

(d) What defendant calculated for logging and hauling costs including, road maintenance, skidding and temporary road construction and the basis for its calculation of each;

(e) Any Market Value Adjustments made, the basis for them and the precise means by which the amount of those adjustments were calculated;

(f) Any quality value adjustments made, the basis for them and the precise means by which the amount of then was calculated;[11] and

(g) Whether it applied any rollback to determine the "Predicted High Bid Appraisal value at termination," and if so what that roll back factor was and the basis for its application.

Until at least this information is provided, Precision Pine cannot assess defendant's "Predicted High Bid Appraisal value" and thus whether damages on the listed sales were computed in accordance with CT9.4.

**2. With regard to individual sales:**

**a. Defendant has failed to credit Precision Pine for effective Purchaser Credit that existed on the Brookbank contract at the time of default, which should have been credited to Gentry or Jersey Horse.**

The recalculation of damages for the Brookbank sale on the Apache-Sitgreaves National Forest not only indicates that there are no damages due the government (because the Resale Value substantially exceeded the maximum potential damages) but that at the time that the sale terminated uncompleted, Precision Pine had accumulated $2,752.54 worth of earned effective

[11] E.g., on page 2 of the default damage calculation for U-Bar (filed 4/28/05), the Forest Service indicates that the quality value adjustments was updated because of significant changes in the formulas that were instituted after the original sale was sold but provides no details.

unused purchaser credits. Simply put, these credits, which are earned by the contractor by building specified permanent roads in the forest, are like company script and can be used to pay for a variety of things on a timber sale. Indeed, the Forest Service did apply such credits in several of the recalculations to reduce the amounts that Precision Pine would otherwise have owed the government.[12] Moreover, pursuant to 16 U.S.C. § 535 and the timber sale contract, such credits are transferable to other timber sales within the same National Forest.

However, with respect to the credits earned on the Brookbank contract, the Forest Service has failed to apply these credits to any amount that is owing. This is improper. There is no reason why the $2,772.54 remaining on Brookbank was not applied to an amount deemed owing on another sale. In particular, since the Forest Service has calculated that there are damages owing on the Gentry and Jersey Horse sales, both of which are also located on the Apache-Sitgreaves National Forest, there is no reason why these credits were not transferred and/or otherwise applied to the damages claimed to be owed on one of those sales.

**b. Defendant is not entitled to the cost of resale with regard to timber sales which were not, in fact, actually resold, i.e., Monument, Gentry and Lilly.**

Plaintiff withdraws this assertion.

**c. Defendant is not entitled to the cost of resale on Wiggins.**

Defendant seeks a total of $9,128.70 with respect to a very small amount of timber left uncut (991 ccf) at the time that the sale terminated uncompleted. As the recalculation of damages shows, the reason that there are any damages at all lies in the fact that the Forest Service expended $9,878.60 to re-sell timber which by its calculations only had a value of

[12] See, e.g., the recalculation of damages on the Saginaw-Kennedy sale where defendant credited Precision Pine with $9,764.47 of effective purchaser credit remaining on that sale.

$723.40. Given the miniscule value of the timber, there was no need for the Forest Service to have incurred costs anything like those that it did. That is, under the circumstances, since the appraised value of the timber was less than $10,000 (indeed substantially below that threshold), defendant was fully authorized to sell this timber by soliciting informal bids from potential purchasers. See 36 C.F.R. § 223.80. By spending more than 13 times the value of the timber in the process of selling it, defendant hardly mitigated its damages; something which it is required to do. See Thomas Creek Lumber and Log Co. v. United States, 36 Fed.Cl. 220, 247-48 (1996) (stating that "the government, when enforcing a damages clause, has a duty to mitigate such damages when a contractor breaches the contract between the parties" and that "[t]he government cannot charge the contractor for damages which could have been avoided by the government 'with reasonable effort and without undue risk or expense'" (quoting Ketchikan Pulp Co. v. United States, 20 Cl.Ct. 164, 166 (1990)). Obviously here, the Forest Service could have readily avoided the costs of resale and, as such, they are not chargeable to Precision Pine.

**d. Defendant uses the wrong rate of interest for the U-Bar sale.**

As set forth supra at footnote 5, the fixed interest rate applicable to damages on U-Bar is the one set out in the U.S. Department of the Treasury (TFRM 6-8020.20) on the applicable date. For the reasons outlined above, for U-Bar this date is no earlier than April 28, 2005. As set forth in the Summary of Final Default Damages filed by the defendant in this matter on September 16, 2005, it, on the other hand, believes that the appropriate date is February 17, 2001 and has applied a rate of 6.375% per annum to the principal it deems to be owing since that date. While 6.375% was the applicable rate of interest under the CDA on February 17, 2001, it was not the rate set out in the U.S. Department of the Treasury in TFRM 6-8020.20 either on that date or on April 28, 2005. TFRM 6-8020.20, in fact, indicated the following rates:

| Date | Rate indicated as of that date in TFRM 6-8020.20 |
| --- | --- |
| February 7, 2001 | 6% |
| April 28, 2005 | 1% |

As such, irrespective of the inappropriate date for the commencement of interest which defendant has used or the incorrectness of amount of principal to which defendant has applied it, defendant's calculation of interest through September 30, 2005 with respect to U-Bar is erroneous.

**e. Defendant is not entitled to any penalty on the U-Bar sale.**

As noted above, the contractual provision pursuant to which defendant may be entitled to penalty on a delinquent debt is C(T)4.41 (a clause which incorporates the Debt Collection Act into the timber sale contract). Unlike the other contracts here in issue, the U-Bar sale does not contain C(T)4.41. Indeed, it does not contain any clause pursuant to which the Debt Collection Act was incorporated into the U-Bar contract. This fact notwithstanding, contract clause CT4.4 of the U-Bar contract does indicate that if the contractor breaches his contractual obligation to pay a bill presented to him, the Forest Service will impose interest and "In addition, amounts overdue shall be subject to an additional **6 percent penalty** charge."

Such a penalty for breaching the terms of the contract, existing without regard to actual damage, if any, suffered by the Government is, however, unenforceable. See supra footnote 7. Moreover, CT4.4 of the U-Bar contract contains a provision which stays all remedies (including the Purchaser's obligation to make the payment and the imposition of any penalty) for any period during which a bona fide dispute exists and the Purchaser files and prosecutes an appeal of the contracting officer's decision in accordance with the Contract Disputes Act. Since that is exactly

what Precision Pine did after receiving the contracting officers' final decisions, there is no basis for the assessment of any penalty in this matter no matter how computed.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: October 11, 2005