U.S. Department of Justice

Civil Division

DMC:KAB:DHarrington
DJ No. 154-02-131

Telephone: (202) 307-0277
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

November 2, 2005

*Via Facsimile & U.S. Mail*

Alan Saltman, Esq.
Saltman & Stevens, P.C.
1801 K Street, N.W.
Washington, D.C. 20006

Re: *Precision Pine & Timber, Inc. v. United States*, Fed. Cl. No. 02-131C (Judge George W. Miller)

Dear Mr. Saltman:

I am writing in response to your October 24, 2005 letter, in which you ask for additional information about the default damages calculations in this action.

Five post-termination appraisal summaries were provided to you on October 20, 2005. In addition to that information, you ask that the following information be provided for the Bramm, Saginaw-Kennedy, U-Bar and Hutch-Boondock contracts: (1) "the analysis by which the Forest Service confirmed that values set out in the Base Data Period were the product of bids from competitive areas;" and (2) "the precise means by which" the Forest Service calculated skidding costs, haul costs, road maintenance costs, slash removal costs, temporary road construction costs, a quality adjustment, and any unusual adjustment.

At this juncture, the only issue before the Court is whether the appraisals used as the basis for the default damages calculations were conducted in accordance "with the standard Forest Service method in use at the time of termination." Therefore, the pertinent issue is not how the Forest Service calculated the various line items in the appraisals, but whether calculations were done in accordance with Forest Service procedures.

As an initial matter, it is worth pointing out that each of the appraisals was performed by the Forest Service within a month of the contract's termination. In addition, we are prepared to provide a declaration confirming that the appraisals were conducted in accordance with the Forest Service method in use at the time of termination. However, because the precise parameters of the calculations are both complex and irrelevant, we do not believe it is appropriate or productive to delve further into such matters.

EX. 2

For instance, the quality adjustment is the product of a computer algorithm that takes data such as average dbh and percent clear face and calculates the appropriate factor. It should, therefore, be sufficient to verify that the Forest Service arrived at the quality adjustment factor using this standard method.

Similarly, the rolling quarterly average price for the competitive area (i.e., the base data period values) is determined by Forest Service personnel every three months in the ordinary course of business. No special calculation or determination was done specifically for the terminated contracts. It should, therefore, be sufficient to confirm this fact in a declaration.

Finally, with respect to the U-Bar appraisal, a clarification is in order. This appraisal appears to contain no quality adjustment on line 25, but an "unusual adjustment" on line 26. This is because the U-Bar quality adjustment was inadvertently input on line 26. There should be no unusual adjustment for the U-Bar contract. Significantly, this has no effect upon the appraisal's bottom line – a fact that will be included in the declaration concerning these appraisals.

It is my expectation that supplying a declaration along the lines described above will resolve the remaining issues with respect to the post-termination appraisals.

Very truly yours,

David Harrington

David A. Harrington
Trial Attorney
Commercial Litigation Branch