IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 02-131C (Judge George W. Miller) |

Declaration of David P. Harris

I, David P. Harris, declare as follows:

1. I am a Supervisory Forester in the Region 3, Regional Office of the U.S. Department of Agriculture Forest Service ("Forest Service") located in Albuquerque, New Mexico. Region 3 covers the states of Arizona and New Mexico.

2. As a Supervisory Forester, I am responsible for regional oversight of all sale preparation and sale administration aspects of timber sale contracts in Region 3. I am responsible for the training and certification of timber sale administrators and Contracting Officers in Region 3. In this role I am responsible for providing the necessary training opportunities and testing required for meeting the national standards established for certified sale administrators and Contracting Officers. Additionally, I supervise both the Regional TEA Appraisal specialist and the Regional

Mensurationist (measurement specialist). I have held my current position since December 1, 2002.

3. Previously, I served as a Timber Specialist and Contracting Officer on the Kaibab National Forest in Williams, Arizona. I served in that position from January 1994 to November 2002. As timber specialist and Contracting Officer for the Kaibab National Forest, my responsibilities included oversight of the Forest timber management program, including but not limited to, timber sale preparation, appraisal, contract formulation, and contract administration. In this capacity, I issued Final Decisions of the Contracting Officer, conducted damage appraisals and assessments, and prepared litigation reports and administrative records for the Court of Federal Claims.

4. In my current position I have served as the primary contact for all matters relating to Precision Pine & Timber, Inc. v. United States, United States Court of Federal Claims, number 02-131C. I have reviewed and updated each of the original damage assessment documents initially provided by the Contracting Officers for each of the defaulted timber sales.

5. Each of the contracts in question contains provision CT9.4—Failure to Cut (4/82), which describes the method for calculating damages in the event of termination for Breach.

> CT9.4-Failure to Cut-(4/82) In the event of (a) termination for Breach or (b) Purchaser's failure to cut

designated timber on portions of Sale Area by Termination Date, Forest Service shall appraise remaining Included Timber, unless termination is under CT8.2 or BT8.22. **Such appraisal shall be made with the standard Forest Service method in use at the time of termination.**

Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:

(a) The cost of resale or offering;

(b) Any increase in Purchaser Credit limit allowance for un-constructed Specified Road facilities which are needed to harvest the remaining uncut volume. Such increases are limited to costs for constructing the road to the same standard and specifications required by this contract;

(c) If Purchaser has failed to cut individual trees in the portions of the Sale area cutover and there is no resale of such individual trees, Purchaser shall pay Forest Service the cost of felling and removal or otherwise eliminating such uncut trees in addition to payment of damages described above, except for occasional trees not cut for reasons stated in BT6.4;

(d) The Government's loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department in TFRM6-8025.2) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof from Termination Date until midpoint in the contract resale period, less any time in excess of 1 year needed to make the resale;

(e) Any increase in reforestation costs, including site preparation, seeding, and planting caused by Purchaser's failure to harvest Included Timber by Termination Date.

App. Ex. 1 (emphasis added).

6. The Transaction Evidence Appraisal (TEA) system is approved as the primary method of appraising stumpage values within the Forest Service. App. Ex. 2 (FSH 2409.18, § 45.12). The TEA system has been in use in Region 3 since approximately 1987 and is the system that was in effect on January 9, 2001.

7. The appraisals at termination for the Brann, Saginaw-Kennedy, Hutch-Boondock and U-Bar timber sales were completed in January of 2001 and were conducted in accordance with the policies and procedures for Transaction Evidence Appraisals in Region 3. General appraisal guidance is contained within the National Timber Sale Preparation Handbook, see App. Ex. 2 (FSH 2409.18, Ch. 40), while specific direction pertinent to Region 3 is contained within the Regional Timber Sale Appraisal Handbook, see App. Ex. 3 (FSH 2409.22).

8. "The Transaction Evidence Appraisal (TEA) method is designed to estimate the fair market value of timber based on bid rates of past timber sale transactions. . . . When appraising an individual timber sale, the predicted bid value is adjusted based on the differences in sale conditions, values and costs between base period sales and the conditions of the sale being appraised." App. Ex. 2 at § 45.3.

9. The Forest Service Handbook provides:

> <u>Base Period Data for Transaction Evidence</u>. Transaction evidence methods normally use past sales history to establish values, sale conditions, costs, or other data for preparing transaction evidence appraisals. It is the responsibility of the Regional Forester to establish the normal base period length; to lengthen the base period to assure an adequate number of representative, competitive transactions; or to shorten the base period to respond more rapidly to market changes (FSM 2420.43). Update the data base quarterly by dropping sales data from the oldest quarter and adding sales data from the most recent quarter.

App. Ex. 2 at § 45.31.

10. The Transaction Evidence Data Base is maintained at the Regional Office. Region 3 policy for Base Period Data is to use a four-quarter rolling base period to develop base period prices by species-product groups and average costs for haul, road maintenance, slash disposal, skidding and temporary road costs. Sales included in the base period are: sales within Region 3 over $2,000 in appraised value for which bids were accepted during the quarter. Sales with delayed award dates are included in the quarter in which bids are opened. Sales that do not sell at the time of bid opening, but are subsequently re-offered and sold, are recorded in the quarter in which they are sold. App. Ex. 3 at § 11.21.

11. Sale appraisal data is provided to the Regional Office, by each Forest, within one week of bid opening. Base

period data is updated every quarter and the results are published in a Region 3 Appraisal Bulletin for use in appraising timber sales in the next quarter. See App. Ex. 4 (Appraisal Bulletin No. 01, CY 2001).

12. The base period price and costs displayed on Appendix Exhibit 4 were calculated in accordance with standard regional policy and practices and represent the Base Period Price and average costs for Region 3 in January, 2001. This data was used to appraise any timber sale in Region 3 between January and March of 2001.

13. The contracting officers for the Hutch-Boondock, U-Bar, Brann and Saginaw-Kennedy contracts conducted the appraisals at termination utilizing the Base Period prices and average cost data displayed in Appendix Exhibit 4. No separate, special Regional average base period data collection was contemplated or undertaken for the appraisals at termination.

14. The sale specific conditions that an appraiser takes into account in Region 3 are: (1) sale skidding cost; (2) sale haul cost; (3)sale slash disposal cost; (4) sale temporary road cost; (5) sale road maintenance cost (for system roads only); and (6) Ponderosa Pine Quality Adjustment. These costs are for sawtimber volume only as roundwood (pulpwood) is offered at the prevailing Regional Standard Rate.

15. Sale specific costs for each item, except Quality Adjustment, are compared against Regional average costs and a sale specific "adjustment" is developed for each cost item.

16. The Forest Service Manual provides: "Appraised resale value must be comparable to current contract value." App. Ex. 2 at § 47. In order to determine a "comparable" value, where no change in methodology had occurred, appraisers compared the original sale specific costs for hauling, slash disposal, road maintenance and temporary roads to current Regional base period data. These sale specific costs were calculated by the original appraisers and reflect conditions unique to the particular contract being appraised. Accordingly, as discussed below, sale specific costs from the original appraisals generally were carried forward into the post-termination appraisals for the Brann, Saginaw-Kennedy, Hutch-Boondock and U-Bar contracts.

17. Purchasers are required to maintain Forest Service system roads commensurate with their use and, therefore, contract provision C/CT5.4-Road Maintenance is included in each contract. Region 3 (R3) Standard Road Maintenance Specifications are made part of the timber sale contract by reference. The sale specific road maintenance costs are developed with the assistance of Forest engineering personnel and are dependent on the type of maintenance required, the

length of the road to be maintained, the number of times the road is to be maintained. Specific cost estimates for each maintenance item were developed and the engineers were directed to use the Southwestern Region Road Construction Cost Guide to prepare the estimates. The total estimated costs for all road maintenance is developed and divided by the total sale sawtimber volume to develop the sale specific cost per unit to be entered into the TEA program and ultimately displayed on line 17 of the appraisal summary. See App. 3 & 5 at 42.

18. The sale specific slash disposal costs are developed using a cost constructed method. Total costs in wages, equipment use, overhead, and supplies needed to complete the required slash disposal work are calculated for each of the selected slash treatment methods to be used on the sale area. The constructed cost appraisal is completed for all work that is required, both by the purchaser and by the Forest Service. Total slash disposal costs are calculated, summed and divided by the total sawtimber volume on the sale area to determine the sale specific unit costs for slash disposal, which are inserted into the TEA program and displayed on line 20 of the Appraisal Summary. See App. Ex. 5 at 43.

19. The sale specific temporary road costs are developed using an established cost per mile to open or construct and also close planned temporary roads, times the miles of planned

roads. Costs are totaled and divided by sale sawtimber volume to determine the unit cost, which is input into the TEA program and displayed on line 23 of the Appraisal Summary. See App. 3 & 5 at 45.

20. Log Hauling Costs are calculated based upon "Round Trip Minutes" from the sale area to the mill and return with additional cost factors included for delay. Round Trip Minutes are affected by road width, surface type, horizontal alignment (or grade). Haul cost analysis is a very detailed analysis process involving the appraiser and engineering support to develop the system of links and nodes which, combined, form the route of haul for analysis. Regional average truck costs per hour, volume per load, average cost per minute of haul and delay are all factored into the analysis. Calculation of route and costs are completed with the assistance of an automated analysis program called (in 2001) NETWORK II. See App. 5 at 41.

21. The original sale-specific costs for haul, road maintenance, slash and temporary roads were utilized in the post-termination appraisals. There have been no changes in the cost constructed methodology in the period between the original appraisal dates and January 9, 2001. Therefore, the cost adjustments for haul, slash, road maintenance and temporary

roads were conducted in accordance with standard Forest Service appraisal methodology.

22. Detailed updating of these sale specific costs for the post-termination appraisals would have resulted in increased damages to the purchaser. The most notable increase in costs would have come from updating the hauling cost analysis. At the time of termination, neither of the mills (Williams for the Brann and Saginaw-Kennedy, nor Winslow for the Hutch-Boondock and U-Bar sales) to which the sales were originally appraised were in existence. Updating the haul costs to reflect delivery to the nearest mill (Heber) would have increased sale specific haul costs. Comparing increased sale haul costs to the Regional average would have resulted in a lower "adjustment" and, therefore, a lower predicted bid value. This would, in turn, have increased the difference between current contract value and appraised value at termination and, accordingly, increased the amount of damages.

23. Further, additional time spent by Forest Service personnel recalculating haul costs, or any other sale specific costs, would have been reflected as an increased cost of resale in the damage assessment portion of the calculations. This would have been charged to the purchaser and, therefore, would have further increased the amount of damages. App. Ex. 1 (CT9.4(a)).

24. The procedure for determining the sale specific skidding costs in Region 3 changed between the times of the original appraisals and the appraisals at termination.

25. There was no skid cost adjustment required for the original U-Bar appraisal, so none was generated. The skid cost adjustment for the Hutch-Boondock sale was manually calculated and displayed as an "Unusual Cost" on the original appraisal summary. Since this cost was calculated as a skid cost, it was not carried forward as an "unusual cost" on the appraisal at termination. Both Brann and Saginaw-Kennedy utilized the TEA program to calculate the original skid costs using the required skid cost variables, which are volume pre acre, volume per tree and average external skid distance.

26. As of January 9, 2001, sale specific skidding costs were derived using average volume per acre, average volume per tree and average external skid distances for the sale as a whole and were calculated utilizing a standard regression formula. The formula was imbedded within the automated TEA program. See App. Ex. 5 at § 44.

27. Accordingly, in the post termination appraisals, the required skid cost variables were entered into the TEA program and the standard skid cost regression formula was applied. See App. Ex. 5 at § 44. The calculated result was displayed on

line 11 of the Appraisal Summary, and the sale specific skid cost adjustment displayed on line 12.

28. Had the appraiser for the U-Bar timber sale chosen to display "$0.00" skid cost adjustment on the appraisal at termination, to be consistent with the original appraisal, it would have reduced the appraised value at termination and, therefore, increased damages for U-Bar in the amount of $9,285.42.

29. The final sale specific variable to be considered in an appraisal is the Ponderosa Pine Quality Adjustment (QA). "The objective of applying a quality adjustment is to reflect true historical changes in stumpage rates due to variability in quality between sales." App. Ex. 3 & 5. The sale specific variables which go into the quality adjustment calculations are Quadratic Mean DBH (QMDBH) and percent grade.

30. Between the time of the original appraisals (1992 for U-Bar and 1994 for the Hutch-Boondock, Brann and Saginaw-Kennedy appraisals) and January 9, 2001, the Region 3 Ponderosa Pine Quality Adjustment formulas and formula coefficients changed significantly. It is the policy within the Region to update the Quality Adjustment formulas annually. Therefore, the Ponderosa Pine Quality Adjustment values for the Brann, Saginaw-Kennedy, Hutch-Boondock and U-Bar timber sales were manually recalculated in January 2001 by Region 3 Measurement

Specialist Jeff Hogg using the Ponderosa Pine Quality Adjustment formulas then in effect, and the original sale average QMDBH and percent grade from the original cruise data. The calculated Quality Adjustment was displayed on line 25 of the Appraisal Summary.[1]

31. Had the appraisers used the original sale Quality Adjustments in the appraisals at termination, it would have resulted in lowered appraised stumpage values at termination and, therefore, an increase in total damages for the purchaser. Damages for the four sales in question would have increased by the amount of $352,353.34, plus applicable interest and penalty.

32. The U-Bar and Hutch-Boondock post-termination appraisals were completed in January 2001 by Mr. Richard Stephens (USFS-Retired), contracting officer on the Coconino National Forest. I, David P. Harris, completed the post-termination appraisals for the Brann and Saginaw-Kennedy contracts and completed them in early February 2001, while serving as the contracting officer for the Kaibab National Forest. The post-termination appraisals were reviewed and approved in late January and early February 2001 by Mr. Alan

---

[1] The U-Bar appraisal appears to have no Quality Adjustment on line 25, but shows an "unusual adjustment" on line 26. This is because the U-Bar Quality Adjustment was inadvertently input on line 26. This bevue has no effect upon the result of the U-Bar appraisal.

Lucas. Mr. Lucas was the Regional Sale Administration specialist in the Region 3 Regional Office at that time. Mr. Lucas currently works for the Forest Service in Region 4 (Utah). Mr. Lucas's former position in the Regional Office is my current position.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __9th__ day of January 2006.

David P. Harris
Supervisory Forester