**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-131C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 31, 2006

# TABLE OF CONTENTS

**PAGE**

Index to Plaintiff's Supplemental Appendix ..... iii

Table of Authorities ..... iv

Introduction ..... 1

I. Arguments Applicable To More Than One Contract ..... 3

A. The Debt Collection Act Does Not Support The Government's Argument That Interest And Penalties Are Due From 2001 ..... 3

B. Precision Pine's Decision Not To Pay The Improper Bills For Collection Was Appropriate ..... 7

C. The Government Seeks An Impermissible Recovery Of Compound Interest By Claiming Debt Collection Act Interest From 2001 On Clause CT9.4(d) Interest That Did Not Arise Until After A Resale Occurred Years Later ..... 14

D. The CDA Interest Rate To Be Applied Under CT4.41 Is Variable, Not Fixed ..... 17

E. Defendant Concedes That It Calculated Its Penalty Claim Wrongly, However, Its Newly Revised Calculation Of Penalty Continues To Overstate The Amount Of Penalty ..... 19

II. Contract Specific Arguments ..... 21

A. The Government Has Demonstrated No Entitlement To The Effective Purchaser Credit On Brookbank ..... 21

B. The Forest Service Is Not Entitled To The Costs It Incurred In Attempting To Resell The Small Amount Of Pulpwood On The Wiggins Contract ..... 23

C. Defendant Concedes That It Used The Wrong Rate Of Interest In Computing Its Damages Claims On U-Bar ..... 26

D. Defendant Is Not Entitled To Assess A Penalty Charge Under The U-Bar Contract ..... 26

Conclusion ....................................................................................................................29

SUPPLEMENTAL APPENDIX

## INDEX TO PLAINTIFF'S SUPPLEMENTAL APPENDIX

**Description** **PSA Page**

Forest Service Contract Clause CT9.2 "Disputes" (7/80) ............................................................1

Forest Service Contract Clause CT9.2 "Disputes" (10/96) ..........................................................3

Excerpt from Jersey Horse II Timber Sale Contact showing April 24, 2002 Award Date...............5

Work Sheet Presenting Sample Calculation of Penalty....................................................................6

Table of Treasury Current Value of Funds Interest Rates, 1978 to Present ...................................7

Contract Clause CT4.4 (1/84) from U-Bar Timber Sale Contract .................................................10

## TABLE OF AUTHORITIES

**CASES** **PAGE**

Amax Land Co. v. Quaterman,
181 F.3d 1356 (D.C. Cir. 1999) ....................18

Aminoil v. E.P.A.,
599 F.Supp. 69 (C.D.Cal. 1984) ....................5

Brookfield Constr. Co. v. United States,
661 F.2d 159 (Ct.Cl. 1981) ....................17

Capital Development Co. v. United States,
49 Fed.Cl. 178 (2001), aff'd sub nom. Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed.Cir. 2002)....................15, 16

Commonwealth Edison Co. v. United States Nuclear Regulatory Comm'n,
830 F.2d 610 (1987)....................5

Engle Investors v. United States,
21 Ct.Cl. 543 (1989) ....................1

Fairchild Republic Co.,
ASBCA No. 29385, 85-2 BCA ¶ 18,047, aff'd on recon., 86-1 BCA ¶ 18,608,
dismissed for lack of jurisdiction, Fairchild Republic Co. v. United States,
810 F.2d 1123 (Fed.Cir.1987)....................5

Fred A. Arnold, Inc. v. United States,
18 Cl.Ct. 1 (1989) ....................28

Higgs v. United States,
212 Ct.Cl. 146 (1976) ....................28

J.F. Shea Co., Inc. v. United States,
784 F.2d 338 (Fed.Cir. 1985)....................17

Ketchikan Pulp Co. v. United States,
20 Cl.Ct. 164 (1990) ....................23

L & A Jackson Enterprises v. United States,
38 Fed.Cl. 22 (1997) ....................28

Miller v. United States,
140 F.Supp. 789 (Ct.Cl. 1956)....................23

Navarre Bachand Farms, Inc. v. Small Bus. Admin.,
No. 421, 1988 WL 412457 (SBA OHA Aug. 26, 1988) ....................5, 6

Precision Pine & Timber, Inc. v. United States,
62 Fed.Cl. 635 (2004) .................... *passim*

Seaboard Lumber Co. v. United States,
48 Fed.Cl. 814 (2001), aff'd, 308 F.3d 1283 (Fed.Cir. 2002) ....................1, 10, 11, 13, 20

Thomas Creek Lumber & Log Co. v. United States,
36 Fed.Cl. 220 (1996) ....................23

United States v. Pacific Coast European Conf.,
451 F.2d 712 (9th Cir. 1971) ....................5

Wadley Southern Railway Co. v. Georgia,
235 U.S. 651 (1915) ....................5

Westchester Fire Ins. Co. v. United States,
52 Fed.Cl. 567 (2002) ....................8, 9, 10

**STATUTES AND REGULATIONS**

31 U.S.C. § 3701(b)(1) ....................4

31 U.S.C. § 3717(g) ....................18

31 U.S.C. § 3717(g)(1) ....................28

41 U.S.C. § 605(b) ....................8

7 C.F.R. § 3.21(a) ....................28

7 C.F.R. § 3.34(a)(2) ....................28

7 C.F.R. § 3.34(c)(2) ....................28

36 C.F.R. § 223.42 ....................21

36 C.F.R. § 223.80 ....................25

**Introduction**

In Defendant's Response To Plaintiff's Motion For Summary Judgment And Defendant's Cross-Motion For Summary Judgment On The Issue Of Quantum ("G Br."), the government argues, ironically, that it is entitled to prevail on its recalculated counterclaim and to charge Precision Pine & Timber, Inc. ("Precision Pine") interest and penalty from 2001 as recalculated yet again in its brief based on the "plain language" of the contracts. (G Br. at 5).[1] The government, "in asserting a counterclaim, bears the initial burden of demonstrating that it acted reasonably and in accordance with the procedures set out in the contract for calculating damages." Seaboard Lumber, Co. v. United States, 48 Fed.Cl. 814, 819 (2001) (construing damage provisions of Forest Service timber sale contract). Indeed, the law in this Court has been clear on this point for some time:

> The Court concludes that defendant was required to calculate damages in accord with the provisions (Section C9.4) of the defaulted contract. This was what the parties agreed to in the event of contract termination and this is what the parties had a right to expect when the termination occurred. In seeking damages, defendant must rely on the express terms of the terminated contract.

Engle Investors v. United States, 21 Ct.Cl. 543, 549 (1989). However, it is the law of the case that the Forest Service here ignored the exclusive contractual remedies that it provided to itself for determining the principal amount of its damages in clause CT9.4:

[1]As the Court indicated in its order of March 20, 2006, it did not anticipate the filing of motions for summary judgment on the issue of the computation of damages. Because the Court's Order of January 13, 2006 did not specify the nature of the filing to be made, Precision Pine simply used the title Summary Judgment in order to facilitate electronic filing, but did not intend for its filing to be a formal motion for summary judgment. As was made clear in its opening filing and again in the instant brief, Precision Pine does not seek judgment in its favor in a particular amount at this time, but believes that the matter should be remanded to the parties for recalculation following clarification of the issues under consideration by the Court. With respect to the issue of quantum, Precision Pine does not challenge the amounts of principal sought by the government on the contracts at issue, except as discussed in Precision Pine's opening brief and the instant brief.

> [T]he Court concludes that section CT9.4 does not provide the Government with the right to be paid an interim assessment of estimated damages which will later be adjusted once the Government determines its actual damages. Rather, the contracts require the Forest Service to decide whether to resell the contract and wait until the resale is concluded to calculate damages or not to resell the contact and calculate the damages immediately.

Precision Pine & Timber, Inc. v. United States, 62 Fed.Cl. 635, 655 (2004). Here, the Forest Service indicated in each of its estimated damage calculations that it intended to resell the remaining timber on each of the terminated contracts. PA 12 (U-Bar: "This estimate may be adjusted once final damages are determined following the resale of the remaining timber"); PA 22 (Monument: same); PA 50 (Jersey Horse: same); PA 59 (Gentry: same); PA 68 (Wiggins: same); PA 77 (Brookbank: same); PA 90 (Brann: same); PA 101 (Saginaw-Kennedy: same); PA (Lily: same); PA 122 (Manaco: same).[2] As this Court has already held, it was not even possible for the government to properly calculate its damages until the resale was made. Precision Pine, 62 Fed.Cl. at 655. Thus, because the Forest Service was not entitled to recover any of the estimated damages for which it billed Precision Pine in 2001, Precision Pine was fully justified in refusing to pay the Forest Service's invalid bills.

Instead of following the contractually prescribed procedures for seeking damages, in 2001 the Forest Service created out of whole cloth a new means of determining its damages, which was contrary to that provided in the contract and which also happened to result in the total damages being sought from Precision Pine to be considerably overstated in the Forest Service's favor. The Forest Service's first attempt to abide by the plain terms of the contracts came on

[2]Only with respect to the Hutch-Boondock contract did the Forest Service state that no resale was intended. PA 31. However, the damages sought on Hutch-Boondock in 2001 were still identified as an "estimate" and subject to future adjustment. Id.

April 28, 2005, six months after being ordered to do so by this Court. Thereafter, the government submitted two additional recalculations of the damages on July 14, 2005 and September 16, 2005.[3] Indeed, the Forest Service's September 16, 2005 determination that Precision Pine owed $427,994.19 in principal represents a 44% reduction from the amount ($767,553.72) that it demanded in 2001. If the Forest Service is to be heard to argue that the "terms of the contracts" authorized it to assess interest and penalties, a necessary prerequisite must be that it at least <u>attempted</u> to calculate the amount of principal owed in the manner specified by the contracts. As demonstrated below, and viewed against this backdrop, the government's arguments that it is entitled to interest and penalties from 2001 are wholly unavailing.

## I. Arguments Applicable To More Than One Contract.

### A. The Debt Collection Act Does Not Support The Government's Argument That Interest And Penalties Are Due From 2001.

The government contends that the Debt Collection Act allows it to charge interest on an "outstanding debt on a United States government claim" and "requires agencies to assess interest on overdue obligations." G Br. at 7. Of course, these contentions do not answer the fundamental question here, <u>i.e.</u>, whether a debt or an obligation has arisen where the agency totally ignores the contractual procedures that it drafted and by which it is required to determine the existence of any such debt or obligation.

[3] As discussed below, in support of its March 6, 2006 brief, the government has once again submitted revised calculations which contain further adjustments to the principal, interest and penalties it seeks in this matter.

The government argues that the term "debt" under the Debt Collection Act includes an "amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States . . . ." 31 U.S.C. § 3701(b)(1). In the context of this case, of course, the key word is "determined." Here, the contracts contain a provision that was drafted by the Forest Service, which specifies the methodology by which the amount owed to the government MUST be "determined." See Precision Pine, 62 Fed.Cl. at 640 (setting forth the contents of CT9.4). This Court has already held that CT9.4 defines the exclusive methodology to be used in determining damages and that the Forest Service did not follow that methodology:

> The Court begins its assessment of the likely intent of the parties by attempting to ascertain the plain meaning of the contract. *Gould,* 935 F.2d at 1274. In doing so, the Court finds that the section **CT9.4 provides two alternative methods for determining** damages in the event of breach: one where the timber has been resold; and the other where the timber has not been resold. Under the first method (*i.e.,* where there has been a resale) damages "**shall be the amount** by which Current Contract Value, plus costs described below [in subparagraphs (a) through (e) of CT9.4], less any Effective Purchaser Credit remaining at the time of termination, exceeds the resale value at new Bid Rates." Under the second method (*i.e.,* where there has been no resale) "damages due **shall be determined by** subtracting the value established by [the Forest Service appraisal described in the first paragraph of section CT9.4] from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs [in subparagraphs (a) through (e) of CT9.4]."
>
> * * *
>
> Thus, **the Court concludes that section CT9.4 does not provide the Government the right to be paid an interim assessment of estimated damages which will later be adjusted once the Government determines its actual damages**.

Id. at 654-55 (emphasis supplied). In light of the plain language of clause CT9.4 and the previous adjudication by this Court, it is clear that the bills for collection issued by the Forest Service in 2001, which were impermissibly based on an estimate of damages, did not "determine" the amount of any debt owed by Precision. Because an attempt to properly

determine damages as provided for by the contract is a prerequisite for debt to arise and, as the Court has concluded that was not done here, it is simply not possible for the Forest Service to seek payment of interest and penalty on a non-existent "debt" under the Debt Collection Act. See Fairchild Republic Co., ASBCA No. 29385, 85-2 BCA ¶ 18,047, aff'd on recon., 86-1 BCA ¶ 18,608 at 93,396 ("[T]he existence of a "debt" for purposes of determining the applicability of the Debt Collection Act must be determined by the contract terms . . .), dismissed for lack of jurisdiction, Fairchild Republic Co. v. United States, 810 F.2d 1123 (Fed.Cir.1987) (Board's decision not appealable).[4]

Another instructive case in this regard is Navarre Bachand Farms, Inc. v. Small Bus. Admin., No. 421, 1988 WL 412457 (SBA OHA Aug. 26, 1988), where, after a small business owner defaulted on a loan, the SBA foreclosed under state law and then bought the property that had secured the loan at the foreclosure sale. The agency then sought to utilize the Debt Collection Act to offset funds owed to the small business by another U.S. agency from the

[4]An attempt to impose large penalties on "non-payment" of an amount that has not been finally determined to be lawfully due is invalid because of its chilling affect on an individual's right to challenge unlawful government action, particularly where, as here, the government did not even make a reasonable attempt to meet its obligations under the contracts. See, e.g., Commonwealth Edison Co. v. United States Nuclear Regulatory Comm'n, 830 F.2d 610, 620-21 (1987) (There is no prohibition on charging penalties under the Debt Collection provided those amounts are found to be lawfully due); see also United States v. Pacific Coast European Conf., 451 F.2d 712, 717-719 (9th Cir. 1971) (defendant had a right to bring a "substantial" but ultimately losing attack on agency action without risk of incurring statutory penalties); Aminoil v. E.P.A., 599 F.Supp. 69 (C.D.Cal. 1984):

> [T]hat right [to judicial review] is merely nominal and illusory if the party affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for the protection of the law.

Id. at 75, quoting Wadley Southern Railway Co. v. Georgia, 235 U.S. 651, 661 (1915).

amount of the "deficiency" between the proceeds of the foreclosure sale and the loan amount. However, the SBA Office of Hearings and Appeals ("OHA") found that state law required a party seeking foreclosure to apply to the state court for a deficiency determination so that the court could determine the true market value of the property sold at the foreclosure. The OHA framed the issue before it as follows:

> The Debt Collection Act to of 1982 contains no answer to the question posed here, *viz*., whether a deficiency exists after a foreclosure by advertisement in South Dakota or anywhere. The Debt Collection Act provides answers about what is to be done about collecting a debt due to the Federal Government after it has been determined that a debt in fact exists. This proceeding seeks to determine, therefore, whether the agency must first prove in the South Dakota Court that a deficiency exists before it comes to this forum for permission to apply the offset provisions of the [Debt Collection] Act.

Id. at *8. Not surprisingly, the OHA concluded that for a debt to arise that could be subject to the Debt Collection Act, it first must be quantified in conformity with the procedures established by state law. Id. at *10. Similarly, here the contracts established the procedures pursuant to which the debt must be determined and as this Court has already ruled, until such time as those procedures are followed the government has no right to payment. Precision Pine, 62 Fed.Cl. at 655. In this case, of course, the government did not even attempt to comply with the procedural requirements of the contracts for determining the amount, if any, of the debt until April 28, 2005, at the earliest. Thus, because no "debt" arises for purposes of the Debt Collection Act until the contractual procedures specified for determining the amount of the debt to be collected have been applied, the Debt Collection Act as well as its interest and penalty provisions could not have even arguably applied until the existence of a debt is properly determined. Defendant's argument that a "debt" arises under the Debt Collection Act simply because a federal official says so, despite that official's complete disregard for the contractual requirements placed on that

official for correctly determining that debt is incorrect and, therefore, the government's attempt to recover interest and penalties from 2001 is improper.[5]

B. Precision Pine's Decision Not To Pay The Improper Bills For Collection Was Appropriate.

The government contends that once a contractor is presented with a bill for collection it can "at least as a practical matter" either pay it and assert a CDA claim against the Forest Service or refuse to pay it and require the Forest Service to bring a CDA claim for the amount due against it. G Br. at 7-8. The first option, as the government and this Court are well aware, as a "practical matter" was no option at all. Here, Precision Pine had been decimated by the Forest Service's breach of 11 of its timber sale contracts during a suspension that lasted for 16 months in 1995-1996 and a subsequent suspension of all of the larger diameter timber on its Forest Service sales during the next peak harvest season in 1997. Precision Pine, having been deprived by the government's suspensions of its best Forest Service timber for three consecutive years, was not in a position to pay overstated Forest Service's bills for collection which were not determined in a manner even close to that required by terms of the contracts.

The government's second "practical" option fares no better. Along with its invalid bills for collection, the contracting officers also issued so-called final decisions seeking the estimated amount of damages set forth in the bills of collection to which it was not entitled. See Precision

[5]A different case might be presented had the Forest Service at least reasonably attempted to determine the amount of damages owed in conformity with its contractual obligations under CT9.4, but, in so doing, made inadvertent, computational errors. By contrast here, as the Court ruled, the Forest Service's attempt to determine damages by an estimate was both unreasonable and contrary to the plain language of the contracts.

Pine, 62 Fed.Cl. at 638-39. The government suggests that Precision Pine should have waited for the government to file suit on the claims, however, had Precision Pine waited until the government saw fit to bring suit, the final decisions, including the improperly determined and overstated amounts upon which they are based, almost certainly would have been final and not subject to further review in any forum. 41 U.S.C. § 605(b); see also contract clause CT9.2 "Disputes" (7/80) – (10/96) ("(f) The Contracting Officer's decision shall be final unless the contractor appeals or files a suit as provided in the [Contract Disputes] Act"). Plaintiff's Supplemental Appendix ("PSA") 1-4. Thus, simply doing nothing and allowing the contracting officers' final decisions to become unappealable by operation of law was not an option realistically available to Precision Pine. Rather, its decision to contest the final decisions and challenge the invalid calculations upon which they were based was entirely appropriate and has been vindicated by the Court.

The government also cites Westchester Fire Ins. Co. v. United States, 52 Fed.Cl. 567 (2002), in support of its contention that Precision Pine should have either paid the claims or waited for the Forest Service to bring suit on the invalid claims in order to avoid the imposition of interest charges. Westchester is, however, readily distinguishable as it was not decided under the Debt Collection Act and involved a bonding surety (not a contractor) who refused to meet its obligation to pay the government's demands for the excess costs it incurred in completing work upon which the bonding surety's insured had been defaulted. Id. Unlike the instant case, in which this Court ruled against the government at summary judgment and found that the Forest Service was not entitled to recover any of its "estimated" damages, the court in Westchester found that the surety was liable for the all of the excess costs sought by the government, except a

small fraction of the amount claimed, which had been incorrectly included in the government's bill due to a "computational error." Id. at 586. Indeed, the court noted that at the time that the government filed its counterclaim it had already amended the amount it sought to recover to reflect the correct amount owed by the surety. Id. at 574. It is in those circumstances that the court in Westchester observed that if the surety wished to avoid the imposition of interest it might have paid the full amount of the demand and then sought "rescission" of the small overpayment, which the court believed the government would likely have repaid "immediately." Id. at 586.

Here, by contrast, it is clear that the Forest Service was not entitled to any payment based on its interim estimate of damages. Precision Pine, 62 Fed.Cl. at 655. Moreover, had Precision Pine paid the overstated bills for collection in full in 2001 and then sought "rescission" for the hundreds of thousands of dollars that it would have overpaid, Precision Pine would have had the impossible task of having to determine the "correct" amount owed under CT9.4 based on a reappraisal of the remaining timber made with the standard Forest Service appraisal method in use at the time.[6] Moreover, even if Precision Pine had been able to determine the correct amount of damages following a reappraisal of the remaining timber on the sales, it is abundantly clear that the Forest Service would certainly have refused to pay a penny in "rescission" and would have forced Precision Pine to go through the very litigation it actually conducted to demonstrate that the imposition of estimated damages was improper under the contracts from the start. For

[6]This is a task which the Forest Service itself has attempted and been unable to successfully complete on at least three earlier occasions.

all of these reasons, Westchester is vastly different than the instant matter and provides no guidance to this Court for the proper resolution of this case.

The government also argues that it is entitled to recover interest by analogy to the way this Court handles CDA interest on a contractor's claims. G Br. at 8-9. Of course, this is not a case involving a contractor's claim nor does the government seek interest under the CDA here. In support of its analogy, the government again cites Westchester, however, for all of the reasons set forth above that case has no application here. The government also cites to the trial court's opinion in Seaboard Lumber Co. v. United States, 48 Fed.Cl. 814 (2001), aff'd, 308 F.3d 1283 (Fed.Cir. 2002), however, Seaboard, if anything, supports Precision Pine's view of the matter.

Seaboard involved the government's attempt to collect default damages under Forest Service timber sale contracts to which the Debt Collection Act did not apply and where the court applied common law principals to award interest on the amount of government claims proven at trial. Id. at 836. Unlike the instant case, in Seaboard the court noted several times that the Forest Service had calculated its damages in full accordance with B9.4, a forerunner to CT9.4 that is at issue in this case. See, e.g., Seaboard, 48 Fed.Cl. at 822 ("The government has met its initial burden by reselling the same goods and calculating the damages in accordance with the contractually-agreed upon formula").[7] It was from this initially reasonable calculation of the Forest Service's damages, made in conformity with the contract, to which adjustments were

[7]The Court also concluded that the Forest Service had appraised the remaining timber in accordance with its standard practice. Id. at 829.

subsequently made based largely on evidence at trial as to the cost of changes that the Forest Service had made in the resale contacts.

Moreover, even though the court in Seaboard found that the Forest Service's initial determination of damages had been in conformity with the requirements of the contract, it nevertheless refused the government's request for interest from the date that the government first made its demand for payment. Id. at 837. Indeed, based on considerations which the court conceded had no bearing on the correctness of the damage calculations, the court found that the accrual of interest should start more than six years after the contracting officer's original demand for payment had been made. Id. Here, by contrast, the Forest Service only first attempted to comply with its contractual obligations in its April 28, 2005 submission (and even that was fatally flawed and has been revised three times to date) yet seeks interest and penalties from 2001. Thus, Seaboard supports Precision Pine's view that interest cannot start running from the date of the submission of an invalid bill for collection.

The government's attempts to analogize to the CDA are inapt in another regard as well. That is, the government asserts that it should be awarded interest from the time that the bills for collection were issued because a contractor submitting a claim under the CDA, who ultimately prevails on only a part of its claim, would still be entitled to interest on that portion of its claim that succeeded. G Br. at 8. This analogy misses the mark because here, the Forest Service was never entitled to payment of any potion of the interim, estimated damages it sought to recover in its 2001 bills for collection. Precision Pine, 62 Fed.Cl. at 654-55 ("[T]he Court concludes that section CT9.4 does not provide the Government the right to be paid an interim assessment of

estimated damages which will later be adjusted once the Government determines its actual damages"). Indeed, as noted above, the Forest Service told Precision Pine that it was going to resell the timber remaining under the contract, a choice that meant that it simply could not have even calculated damages until such time as the resales had been made. Id. Thus, unlike the analogy presented by the government, here, no aspect of the government's attempt to assess interim, estimated damages was valid. Obviously, when no part of a claim is properly pending, no interest can accrue on it.[8]

Finally, the government contends that because the contracting officers promptly issued bills for collection and Precision Pine did not instantly file suit and agreed to periodic stays of these proceedings, that it cannot argue that interest should not accrue because the government's initial failure to comply with the contracts caused significant delay in this action.[9]

---

[8]The government makes misleading and incorrect statements in a failed attempt to show that its original, improper estimates of damages were not overstated. That is, the government argues that there was no change to the amount billed "on several contracts" from the original 2001 estimate of damages. G Br. at 8 n.5, citing Pl. Mot. at 4. This is extremely misleading because, as the chart at page 4 of plaintiff's motion demonstrates, when the Forest Service finally attempted to calculate the damages in accordance with the contract, the amount of damages changed on every contract on which damages are being sought (except for Hutch-Boondock). Indeed, except for one contract on which damages increased by just $6,000, for each and every contract the "estimated damages" had been overstated by the Forest Service in its own favor.

With respect to O.D. Ridge, the Forest Service argues that a portion of the reduction in damages was due to the fact that Precision Pine paid a bill for collection for timber removed from the sale area. While this much is true, that fact did not deter the Forest Service from pursuing summary judgment on the full amount of its counterclaim on O.D. Ridge, even though Precision Pine had paid the amount owed in full long ago. See Defendant's Motion for Summary Judgment dated March 25, 2004 at 17. The Forest Service only relented in seeking collection of this amount following a remand of the matter to the contracting officer.

[9]The government's claim that "Precision Pine repeatedly requested to stay this action" is quite disingenuous. The government cites to two motions for stays to which the government

A similar argument was made by the government and rejected in Seaboard, 48 Fed.Cl. at 837. There, the government contended that plaintiff could not avoid the accrual of interest on the government's claims from the date of their issuance because a period of delay in the case had been caused by the plaintiff. Even though the court fully agreed that plaintiff's litigation decisions had delayed resolution of the case, the court found that other factors contributed to the delay as well and, therefore, that it was only appropriate to start the accrual of interest some six years after the Forest Service had issued its demand for payment. Id. Accordingly, even assuming that some part of the delay in this matter were attributable solely to Precision Pine's litigation decisions (a point that Precision Pine does not concede and the record does not support), that alone would not mean that the government was entitled to interest from the date of issuance of its bills for collection.

Moreover, the government studiously avoids the central point made by Precision Pine on this issue that here the government had complete control over its own compliance with the contracts' requirements in assessing damages and, rather than abide by its own contractual remedy (something the Forest Service did in Seaboard), the Forest Service instead created, employed and then attempted for several years to defend a wholly unauthorized and contractually impermissible method of determining its damages. The cases cited by Precision Pine demonstrating that in such circumstances a party may not benefit by recovering interest for a protracted delay that its actions caused are, therefore, fully applicable. Pl. Br. at 10-11 (and cases cited therein).

---

itself either agreed (Docket #10) or did not oppose (Docket 12). The basis for both of those stays was an attempt to resolve, informally, the damages in Precision Pine v. United States, 98-720C, an exercise that ultimately did not succeed, as this Court is well aware.

C. The Government Seeks An Impermissible Recovery Of Compound Interest By Claiming Debt Collection Act Interest From 2001 On Clause CT9.4(d) Interest That Did Not Arise Until After A Resale Occurred Years Later.

On page 10 of its brief, the government argues that it has properly calculated interest pursuant to CT9.4(d) as well as the Debt Collection Act interest provided for under CT4.41 such that no impermissible recovery of interest on interest is had. This is quite plainly incorrect. The government's error arises once again from its improper attempt to start the running of interest under the Debt Collection Act from the date of issuance of its estimated bills for collection in 2001. That is, for contracts where a resale occurred, i.e., Jersey Horse and Wiggins, clause CT9.4(d) provides that the compensation for delayed receipt of stumpage payments is to be measured by the interest on the unpaid contract value from the termination date to the mid-point of the resale contract, less any time in excess of one year needed to make the resale. PA 4. The purpose of interest under CT9.4(d) is to compensate the Forest Service for the time value of money during that time period when the government may not be receiving stumpage payments between (1) contract termination and (2) the time after a resale when performance of the resale contract (and stumpage payments) are likely to have resumed. By contrast, CT4.41 only provides for interest once the resale has taken place, the Forest Service's damages including interest pursuant to CT9.4(d) have been correctly determined, a proper bill for collection has issued, and the purchaser does not make payment of the amount actually due by the date set forth in that proper bill.

Here, however, the government, once again not content with the remedy it provided itself under the contracts, seeks to recover Debt Collection Act interest under CT4.41 on interest computed pursuant to CT9.4(d) from the date that the estimated bills for collection were issued

in 2001, i.e., a time well prior to any resale having been conducted and, thus, also well prior to damages based on a resale being determinable. Precision Pine, 62 Fed.Cl. at 655. By doing so, the Forest Service seeks to obtain interest for the delayed receipt of stumpage payments under CT9.4(d) and simultaneously for Precision Pine's "failure" to pay a bill for collection that was not yet even calculable.

This point can be demonstrated with respect to the government's damage calculations on Jersey Horse. That is, the Forest Service's damages following the resale of Jersey Horse on April 24, 2002 include interest under clause CT9.4(d) in the amount of $24,345.71 for the delayed receipt of stumpage payments from January 9, 2001 i.e., the date the Jersey Horse I contract was terminated, to December 31, 2004 i.e., the termination date of the Jersey Horse II resale contract. PA 141.[10] Despite assessing interest for the delayed receipt of stumpage payments under CT9.4(d), the government also seeks to recover interest under the Debt Collection Act as if the bill for collection had been validly calculated and issued on March 1, 2001, i.e., more than a year before the resale even took place. PA 170. This is clearly neither proper nor contemplated by the terms of the contract which require the government to wait until after the resale to seek damages and the provision of interest under CT9.4(d) on delayed receipt of stumpage payments during this period (Precision Pine, 62 Fed.Cl. at 655) Moreover, the Court of Federal Claims has already rejected a similar attempt by the government to collect interest under both the Debt Collection Act and CT9.4(d) simultaneously because this improperly over-compensates the government for the loss of the time value of money. Capital

[10]As demonstrated below, the amount of interest sought by the Forest Service under CT9.4(d) for the Jersey Horse contract is overstated.

Development Co. v. United States, 49 Fed.Cl. 178, 186-87 (2001), aff'd sub nom. Seaboard Lumber Co. v. United States, 308 F.3d 1283 (Fed.Cir. 2002).[11] Because the government fundamentally overreaches by trying to obtain interest under two clauses in a manner that has already been rejected by the Court of Federal Claims, this Court too should refuse the government's improper attempt to obtain a double recovery of interest here.

Additionally, the government simply ignores Precision Pine's argument that, with respect to Jersey Horse and Wiggins i.e., the two sales that were actually resold and upon which the government seeks damages, the government's calculations wholly failed to take into account the requirement of CT9.4(d) that interest be reduced to the extent that the resale took "in excess of one year" to complete. Pl. Br. at 13 n.7; see also PA 141. Here, the termination of the Jersey Horse I contract occurred on January 9, 2001, however, the resale of was not made until the Jersey Horse II contract was awarded to Precision Pine on April 24, 2002 (PSA 5), i.e., one year plus 109 days later. Deducting the time period in excess of one year to make the Jersey Horse resale reduces the period during which interest accrues from 726 days to 622 days and reduces the amount of CT9.4(d) interest, as calculated by the government, from $24,325.71 to $20,790.77. This reduction in interest under CT9.4(d), further reduces the base amount claimed by the government on Jersey Horse from $17,056.01 (PA 124) to $13,521.07.[12] Depending on

[11]Defendant asserts that "unlike this case, the contracts in Capital Development did not contain CT4.41." This, however, is a distinction without a difference with respect to the present argument because CT4.41 simply applies the Debt Collection Act to the amount of the government's claim, which is precisely what the Court did in Capital Development.

[12]This calculation uses a fixed rate of interest, however, for all of the reasons set forth in section I. E. supra, Precision Pine contends that "the rate" of interest calculated by the Treasury in TFRM G-8025.2 as specified in contract clause CT9.4(d) should also be variable, which results in a further reduction of the principal amount allegedly owed on Jersey Horse.

the date that the resale of Wiggins was made, a comparable reduction is due on that contract as well. Accordingly, because the government has ignored this argument, Precision Pine should be found to have prevailed on this point and the calculations should be remanded for the appropriate reduction in interest under CT9.4(d) to be applied, which will also result in a corresponding reduction in Debt Collection Act interest.

### D. The CDA Interest Rate To Be Applied Under CT4.41 Is Variable, Not Fixed.

The parties appear to be in agreement that the CDA rate of interest is the rate to be applied under CT4.41 for all contracts except U-Bar, but disagree as to whether the CDA rate is to be fixed or variable. As demonstrated in Precision Pine's opening Brief at pages 14-15, the matter has been conclusively resolved in this Circuit by Brookfield Constr. Co. v. United States, 661 F.2d 159, 170 (Ct.Cl. 1981), which found that where a contract requires the application of "the rate" of interest established for the CDA, that rate must be variable, i.e., "rate will rise and fall in concert with any changes in effect for subsequent six month periods." See also J.F. Shea Co., Inc. v. United States, 784 F.2d 338, 340 (Fed.Cir. 1985) (Pre-CDA standard contract provision providing for the payment of interest at the rate determined by the Secretary of the Treasury under the Renegotiation Act from the date Contractor submits his written appeal required payment of interest at a variable rate). As the parties agree is the case here, clause CT4.41(a) expressly adopts "the rate" of interest under the CDA and, therefore, the parties have opted out of the application of the Debt Collection Act, including any putative requirement that a fixed rate of interest be applied.

The only case law cited by the government is Amax Land Co. v. Quaterman, 181 F.3d 1356 (D.C. Cir. 1999), which is readily distinguishable because in Amax the government's ostensible authority to charge a variable rate of interest was not contained in a contract clause but was simply contained in a regulation that had been adopted unilaterally by the agency. Id. at 1361-62. The court found that the agency could not set rates administratively via unilateral regulations that deviated from the Debt Collection Act's requirement that a fixed rate of interest be used. Id. at 1367. However, Amax contains no discussion of 31 U.S.C. § 3717(g) of the Debt Collection Act which does allow the rate of interest to be established by agreement of the parties in a contract. Thus, Amax does not address the instant situation where a contract clause specifies a rate of interest that is variable.[13] Accordingly, a variable rate of interest under the CDA must be applied here in conformity with the law of this Circuit, which is something that the government has not done in its damage calculations.

Finally, the government tries to avoid the fact that in clause CT4.4, adopted in 1984, i.e., more than nine years prior to the version of CT4.41 at issue here, the Forest Service demonstrated that it was fully capable of specifying when a fixed rate of interest would apply but did not do so in CT4.41. In this regard, the government contends that because CT4.41 refers to the Debt Collection Act while CT4.4 does not, the Court should infer that the parties here intended to use the fixed rate established in the Debt Collection Act. However, such an inference would require the Court to ignore the fact that the Debt Collection Act was passed in 1982, i.e., two years prior to the Forest Service's adoption of CT4.4, which would potentially have made

[13] Even if Amax were not readily distinguishable, it is both non-binding and in conflict with the law of this Circuit requiring the use of a variable rate of interest in these circumstances.

the reference to a fixed rate of interest in that clause superfluous. Under the current circumstances it is more appropriate to conclude that the Forest Service at all times following the passage of the Debt Collection Act in 1982 specified the type of rate (variable or fixed) that would be applied in its contract. In CT4.4 it specified a fixed rate, while in clause CT4.41, which became standard in March of 1993, it changed course and, as is specifically permitted by the Debt Collection Act, began using a variable rate of interest.[14]

E. Defendant Concedes That It Calculated Its Penalty Claim Wrongly, However, Its Newly Revised Calculation Of Penalty Continues To Overstate The Amount Of Any Penalty.

Despite defendant's admission at the October 20, 2005 status conference that its calculation of penalty charges was incorrect, defendant failed to respond to an alternative calculation provided by Precision Pine by letter shortly thereafter. Instead, defendant has, for the first time in its March 6, 2006 filing, submitted eight pages of new calculations, which it claims "are restated interest and penalty calculations." See DA 001-007.[15] Defendant's calculations do not adopt the approach proffered by Precision Pine to calculating the penalty, nor does the government's brief offer any critique of that approach.[16] Instead, the government, without any

[14]Precision Pine's position is preferable to the government's position because the goal of contract damages is to compensate the injured party for its actual losses and, therefore, a variable rate of interest actually occurring during the damage period should be favored as it is a more accurate measure of the actual cost of money incurred during the period when compared to a rate of interest fixed as of some arbitrary point in time.

[15]For reasons not explained, the government has also seen fit to increase the amount of principal being sought on the Jersey Horse contract by $375.59. Compare DA 001 with P. App. 170.

[16]Incredibly, defendant asserts that "to the extent that Precision Pine disagrees with the Forest Service's interest and penalty calculations, it should have submitted corrected calculations with its brief." G Br. at 15, n.7. Of course, even if Precision Pine had done so, it would now,

supporting detail, merely sets forth an approach which it claims represents an assessment of 6% penalty on the outstanding debt every 12 months. G Br. at 14. Although the exact calculations performed by the government are not set out in detail, the government's approach nonetheless clearly overstates the amount of any penalty to which the government may be entitled. As Precision Pine argued in its opening brief, because the outstanding debt (including interest thereon) is an amount which changes daily, the far more accurate way to calculate the total penalty that is due, if any, is (1) to calculate the amount of any penalty for each period during which the interest was fixed, (2) to do so based on the principal plus total accrued interest to date as of the mid-point of each such period, and (3) then sum the amount of penalty calculated for each period. Pl. Br. at 19. Precision Pine has attached a copy of a sample calculation of how this approach would work in practice on the Brann sale. See PSA 6. This approach is fully consistent with the clause and has the advantage of causing the penalty, if any, to be more accurately applied to combined principal and interest as they accrue.

---

once again, be in the position of responding to yet another set of the government's calculations presented in its response brief. In any event, it always has been and remains the government's burden to properly calculate the damages to which it claims to be entitled -- something which has been and unfortunately continues to be a moving target. See Seaboard, 48 Fed.Cl. at 822 (initial burden is on the government to calculate damages in accordance with contractually agreed upon formula). Precision Pine has frequently demonstrated where the government is in error, however, it is emphatically not Precision Pine's obligation to present a competing "correct" calculation, at least until directed to do so following this Court's resolution of the parties' differences with respect to the legal issues pertaining to those calculations.

## II. Contract Specific Arguments.

### A. The Government Has Demonstrated No Entitlement To The Effective Purchaser Credit On Brookbank.

Precision Pine has amply demonstrated that $2,752.54 of purchaser credit remained on the Brookbank sale following termination and after it was determined that Precision Pine owed no damages on the contract. Pl. Br. at 19-22. Indeed, the contracting officer conceded as much. PA 77. The government, quite disingenuously, asserts that the purchaser credit was "taken in to account" and "properly applied" in the government's April 2005 damage recalculations. G Br. at 15-16. In fact, the government simply included the purchaser credit in the appraised value of the timber on the Brookbank contract at the time of termination. PA 131. However, the appraised value ($60,666.73) was more than sufficient to compensate the Forest Service for its "damages" on the contract ($34,764) <u>and</u> to provide the Forest Service with a surplus of more than $23,000. Thus, there was no need to actually apply any of the purchaser credit to "pay" damages on the Brookbank contract because the Forest Service sustained none.

In fact, the government has presented no argument demonstrating that it is entitled to retain any portion of the purchaser credit earned by Precision Pine, rather it just concocts procedural excuses as to why it won't repay these funds. G Br. at 16. In this regard, the Forest Service misreads its regulation at 36 C.F.R. § 223.42 to preclude the transfer of purchaser credit to pay down damages claimed on other sales. However, all that the regulation actually precludes is the transfer of credits <u>from</u> a sale on which the Forest Service has an outstanding claim for damages. <u>See</u> PA 178. Here, because there was no claim for damages on Brookbank, that regulation did not prevent the transfer of purchaser credit from that contract. This view makes

common sense particularly in comparison to the position that these credits simply escheat to the Forest Service.

Additionally, the government asserts that Precision Pine's written request for the transfer of these funds to pay down other damages claimed by the Forest Service is "untimely and impermissible." G Br. at 16. The Forest Service provides no legal authority for this view and there is no reason in law or logic why, rather than allowing the purchaser credit to be forfeited, the Forest Service cannot transfer it to reduce the amount claimed on the Gentry sale, which remains pending before this Court in this matter. Moreover, Precision Pine's position that the purchaser credits may be properly used on the Gentry sale is also fully consistent with the Forest Service Contract and Manual provision. See Pl. Br. at 21. The government, however, ignores these points in its brief.[17]

Instead, the government once again relies on a declaration of Forest Service employee David P. Harris who claims that Precision Pine's requested transfer inexplicably "is administratively impossible" because the sales (Brookbank, Gentry and Jersey Horse) have been "closed" by the Forest Service "since approximately October of 2001, and therefore no mechanism for transferring purchaser credit exists." DA 0045-0046. Again, however, given that

[17]Precision Pine has also submitted a written request that the Forest Service simply apply the purchaser credit from Brookbank to offset charges for timber removed from an ongoing sale on the same National Forest. PA 180. The government has presented no reason why this could not be done, except that the purchaser credit issue remains pending in this action. Accordingly, Precision Pine requests that the Court enter an order finding that Precision Pine owes no damages on the Brookbank sale, remanding the matter to Forest Service contracting officer with instructions to provide Precision Pine with a credit for $2,752.54, plus CDA interest from March 1, 2001 for ongoing timber operations on the Apache-Sitgreaves National Forest.

there is no dispute that these funds were earned by Precision Pine and remained unused on the Brookbank sale, Mr. Harris' declaration provides no explanation of why a corresponding appropriate reduction could not be made to ongoing charges incurred by Precision Pine on the Apache-Sitgreaves National Forest. In sum, the government's position appears to be that because it decided to close the sales, it intends to keep the purchaser credit earned by Precision Pine without providing Precision Pine any corresponding consideration and without citation of any legal authority that it is entitled to do so. This is not the law, except perhaps in the despotic society to which Judge Whitaker referred to in the infamous case of Miller v. United States, 140 F.Supp. 789 (Ct.Cl. 1956). Precision Pine respectfully requests that to the extent the Court determines that any amount is due the Forest Service in this matter, that a deduction in the amount of $2,752.54 be made from the principal found to be due and that the amount of interest and penalty, if any, also be reduced to reflect the reduction in principal that should already have been accomplished.

### B. The Forest Service Is Not Entitled To The Costs It Incurred In Attempting To Resell The Small Amount Of Pulpwood On The Wiggins Contract.

The government does not dispute that when enforcing a damages clause, it has a duty to mitigate such damages and that it "cannot charge the contractor for damages which could have been avoided by the government 'with reasonable effort and without undue risk or expense.'" See Thomas Creek Lumber & Log Co. v. United States, 36 Fed.Cl. 220, 247-48 (1996), quoting Ketchikan Pulp Co. v. United States, 20 Cl.Ct. 164, 166 (1990). Nor does the government dispute that the Forest Service expended $9,878.60 to resell pulpwood which, by its own calculations, only had a value of $723.40. PA 167.

The government does argue that because it was required to determine the remaining volume of timber, incurring re-cruising costs of $7,703.60 was appropriate. However, such an approach here was clearly unreasonable. As the declaration of Mr. Harris demonstrates "The first step in completing an appraisal of the remaining included timber is to determine the volume of included timber (whether standing, or cut and decked) that remains on the sale area." PA 0043, ¶ 8. Here, the simple fact remains that the Forest Service knew, down to the CCF, the precise volume of pulpwood that remained on the sale area at the time of termination based on its own Timber Sale Statement of Account. PA 68 ("At the time of termination, the remaining volume of included timber (per ATSA statements) on the Wiggins Multi-Product Sale was 991 ccf of pulpwood"); accord PA 165. It may be that, in some circumstances, recruising of the remaining volume is necessary to determine the value of the remaining timber, such as when a portion of a sale containing multiple species of differing values has been harvested, or to determine whether the remaining trees have a higher or lower value per CCF than what was sold under the original contract as would be the case if mostly large diameter trees or small diameter trees had been harvested prior to termination. Here, however, none of those factors are at issue because at the time of termination the Forest Service already knew that only pulpwood remained on the sale area, the precise volume of that pulpwood (991 ccf), and the price at which that volume of pulpwood would be reoffered ($.73/ccf).[18] Thus, the Forest Service was well aware that the value of the 991 ccf on the sale area at the time of termination was just $723.43.

[18] As Mr. Harris explains, the price of pulpwood is administratively set by the Forest Service within Region 3. PA 0044, ¶ 11.

Moreover, Mr. Harris asserts that there was a need to remark the remaining standing timber on the sale area due to the scattered nature of the remaining volume. PA 0043, ¶ 9. Mr. Harris' claim with respect to the need to incur remarking costs is, however, flatly contradicted by the original damages calculations prepared by the contracting officer for the sale. PA 69 ("Because the sale was mostly cut out, it will need no remarking. . . ."). Mr. Harris, who was not the contracting officer for the Wiggins sale, makes no attempt to explain this discrepancy.

Furthermore, the government does not dispute that it could have utilized the informal bidding process provided to it by 36 C.F.R. § 223.80 (PA 179) for the sale of the small volume/value of timber that remained on the Wiggins sale. Instead, the government suggests that its decision to go through a formal bidding process in reoffering the pulpwood on Wiggins was due to its self-proclaimed "equitable policy" to use the same method for resale as for the original sale which "helps ensure that the original purchaser is not adversely affected by the process used to effectuate the resale." G Br. at 19. This makes no sense because here the stated policy objective of avoiding prejudice to the original bidder was subverted by the Forest Service's use of formal bidding processes which needlessly increased the cost of resale.

At bottom, the Forest Service spent $9,878.60 to recruise, remark and resell $723.43 of pulpwood by turning a blind eye to the obvious economics of the situation, which were known to it before it incurred any costs, simply because it wanted to and believed that it could foist the bill onto Precision Pine. However, as noted above, the law does not allow the Forest Service to charge the contractor for "damages" which could have been avoided by reasonable effort and without undue risk or expense. In this case, all of the costs incurred above and beyond the

$723.43 value of the pulpwood remaining on the Wiggins sale were unreasonable and cannot be properly assessed against Precision Pine.

C. Defendant Concedes That It Used The Wrong Rate Of Interest In Computing Its Damages Claims On U-Bar.

The government admits that its use of an interest rate of 6.375% on U-Bar was incorrect and resulted in overstated damages in this matter. G Br. at 19. The parties are in agreement that the appropriate rate of interest as of February 1, 2001, when the original estimated damage calculations were performed is 6.0%. However, for all of the reasons set forth above in sections I. A & B, Precision Pine maintains that interest cannot begin to run until, at a minimum, the Forest Service attempted to calculate damages in the manner specified by the contract. As the Court is aware, the Forest Service's first attempt to calculate damages in conformity with clause CT9.4 (which calculations have been revised three times subsequently and are still incorrect) was April 28, 2005. At that time, the appropriate rate of interest for use on the U-Bar contract was 1.0%. PSA 8.

D. Defendant Is Not Entitled To Assess A Penalty Charge Under The U-Bar Contract.

Once again the government overreaches in an attempt to recover money, this time in the form of a penalty, to which it is not entitled under the plain terms of the U-Bar contract. Clause CT4.4 (1/84) of the U-Bar contract specifically provides for the recovery interest on an overdue principal payment. PSA 10. The clause then goes on to provide for an additional and separate penalty charge:

> In addition, amounts over due in excess of 90 days shall be subject to an additional 6 percent penalty charge.

Id. Thus, the plain language of the clause demonstrates that the Forest Service's remedy of a penalty is separate from its remedy of interest and that the penalty is not, in of itself, interest.

This is significant because, while it does not stay the accrual of interest during a dispute over payment, CT4.4 does stay many of the Forest Service's remedies, including the payment of any penalty charge, during the pendency of a bona fide dispute prosecuted by the contractor under the CDA:

> Forest Service remedies for Purchaser's failure to pay amounts due, except for accrual of interest, suspension of all or any part of Purchaser's Operations and Administrative offset, shall be stayed for so long as (a) bona fide dispute exists as to Purchaser's obligation to make such payment, and (b) Purchaser files and prosecutes a timely claim under the Contract Disputes Act of 1978.

Id.[19] Once again, unwilling to simply abide by the contract language that it drafted, the government argues that the "penalty charge" is, in realty, "interest." G Br. at 21. In support of this contention, the government lamely renames the "penalty charge" as "penalty interest." Unfortunately for the government, the newly minted term "penalty interest" appears nowhere in clause CT4.4, whereas the term "penalty charge" is twice referred to in the clause as being "in addition" to interest that is separately authorized by the clause.[20]

---

[19]The government does not contend, nor could it, that the conditions of subsections (a) and (b) have not been met. Indeed, in the time that Precision Pine's bona fide CDA claims have been pending, the Forest Service has reduced the principal amount of its original claim on U-Bar by $91,215.90 (Pl. Br. at 4) and in its March 6, 2006 brief the government further concedes that it had overstated the rate of interest that it has applied to this revised principal amount. See G Br. at 19.

[20]Clause CT4.4 which stays the accrual of a penalty during the period of a dispute is wholly in keeping with the law of this Circuit recognizing that a contract provision which by its terms provides the government with damages for a breach of contract without regard to any

The government also seeks to rely on a USDA debt collection regulation 7 C.F.R. § 3.34(a)(2), which it claims requires the collection of a penalty on overdue debts and which is, therefore, contrary to clause CT4.4. G Br. at 21. However, the government is wrong for a number of reasons. First, the cited USDA regulation is promulgated under the Debt Collection Act (see 7 C.F.R § 3.21(a)), however, the remedies provided under CT4.4 of the U-Bar contract are not provided for with reference to the Debt Collection Act or any other statutory provision. Thus, the USDA regulations implementing the Debt Collection Act, which were adopted after clause CT4.4 (1/84) was issued, can play no role in interpreting the remedies provided for under that clause. Second, even assuming that the Debt Collection Act applies, that statute specifically authorizes the parties to a contract to opt out of the penalty charge otherwise provided for by the Debt Collection Act. 31 U.S.C. § 3717(g)(1). This is precisely what CT4.4 does. Third, even assuming the regulation cited by the government applied here, there is no conflict between CT4.4 and the regulation because, as demonstrated above, no debt had been properly "determined" within the meaning of the Debt Collection Act or the USDA regulations to which any penalty could attach (at least until the Forest Service's attempt to determine the existence of the principal amount of that debt in conformity with the requirements of CT9.4). Fourth, assuming the USDA regulation applied to U-Bar, which it does not, the USDA regulation specifically provides that the agency may waive collection of all or any part of the penalty assessed under the regulations because the matter is being contested in court. 7 C.F.R. § 3.34(c)(2). Again, this is precisely what clause CT4.4 does. In light of the foregoing, CT4.4 properly stays the accrual of penalties on the U-Bar contract in the circumstances of this case, which is wholly in keeping with case law

---

actual damages suffered would be unenforceable. See Fred A. Arnold, Inc. v. United States, 18 Cl.Ct. 1, 12-13 (1989); see also L & A Jackson Enterprises v. United States, 38 Fed.Cl. 22, 42 (1997), citing Higgs v. United States, 212 Ct.Cl. 146, 151-52 (1976).

demonstrating that penalties may not be imposed while the legality of underlying claim is being reviewed. See supra n.4.

**Conclusion**

In light of the foregoing, Precision Pine respectfully requests that the Court enter an order finding that the amounts, if any, due the Forest Service should have been computed in the manner set forth herein and remanding the matter to the parties for recalculation.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 31, 2006

# SUPPLEMENTAL APPENDIX