No. 02-131C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF QUANTUM

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: April 14, 2006

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. Precision Pine Owes $427,994.19 In Default Damages . . . . . . . . . . 2

A. The United States' Proposed Findings Of Fact With Respect To The Magnitude Of Default Damages Have Not Been Contested And, Therefore, Are Established . . . . . . . . . . 2

B. Default Damages Have Been Calculated Pursuant To CT 9.4 As Construed By The Court's October 2004 Order . . . . . . . . . . 3

1. The Forest Service Correctly Calculated The Adjustment Required By CT 9.4(d) . . . . . . . . . . 4

2. The Forest Service Correctly Applied The Effective Purchaser Credit On The Brookbank Contract . . . . . . . . . . 6

3. Precision Pine Has Not Established A Failure To Mitigate Damages . . . . . . . . . . 8

II. The Forest Service Has Properly Calculated Interest And Penalty Charges . . . . . . . . . . 10

A. Interest And Penalty Charges Accrue As Of The Date Of The Forest Service's Initial Bill Of Collection . . . . . . . . . . 10

B. The Contracts And The Debt Collection Act Prescribe A Fixed Interest Rate . . . . . . . . . . 13

C. CT 9.4(d) Does Not Affect The Accrual Of Interest Pursuant To CT 4.41 . . . . . . . . . . 15

D. The Six Percent *Per Annum* Penalty Charge Should Be Assessed Every Twelve Months On The Outstanding Balance . . . . . . . . . . 16

E. The United States Correctly Calculated Interest And Penalty Charges On The U-Bar Contract . . . . . . . . . . 17

1. The Applicable Interest Rate For The U-Bar Contract Is Six Percent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Penalty Interest Of Six Percent *Per Annum* Is Owed On The U-Bar Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

**Cases:**


Amax Land Company v. Quarterman,
181 F.3d 1356 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Aminoil v. EPA,
599 F. Supp. 69 (C.D. Cal. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Anderson v. Yungkau,
329 U.S. 482 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Barmag Barmer Maschinenfabrik AG. v. Murata Machinery, Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Commonwealth Edison Co. v. NRC,
830 F.2d 610 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cuyahoga Metro. Housing Auth. v. United States,
65 Fed. Cl. 534 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fairchild Republic Co.,
ASBCA No. 29385, 85-2 BCA ¶ 18,047 (Mar. 28, 1985) . . . . . . . . . . . . . . . . . . . . . . 12

Ferguson Propeller, Inc. v. United States,
59 Fed. Cl. 51 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

International Transducer Corp. v. United States,
30 Fed. Cl. 522 (1994), aff'd, 48 F.3d 1235 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . 19

Navarre Bachand Farms, Inc. v. SBA,
1988 WL 412457 (S.B.A. Aug. 26, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-13

Pure Gold, Inc. v. Syntex,
739 F.2d 624 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001), aff'd, 308 F.3d 1283 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Pacific Coast European Conf.,
451 F.2d 712 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes and Regulations:**

7 C.F.R. § 3.34(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

36 C.F.R. § 223.42. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

31 U.S.C. § 3701(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

31 U.S.C. § 3717(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 15

# INDEX TO SUPPLEMENTAL APPENDIX

| Document | Page |
|---|---|
| Wiggins II – Report of Timber Sale | 1 |
| Wiggins II – Transaction Evidence Appraisal Summary | 2 |
| Jersey Horse II – Report of Timber Sale | 3 |
| Letter from Eleanor S. Towns to Lorin D. Porter (Nov. 16, 2001) | 4 |
| Letter from Kerry Nedrow to Precision Pine & Timber, Inc. (Dec. 6, 2001) | 5 |
| Letter from Kerry Nedrow to Lon Porter (Jan. 28, 2002) | 10 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-131C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF QUANTUM**

**INTRODUCTION**

Missing from Precision Pine's motion is any acknowledgment that in mid-2000, Precision Pine & Timber, Inc. ("Precision Pine") breached twelve timber and multi-product sale contracts. Despite repeated warnings from the Forest Service, Precision Pine chose not to cure its breach. Consequently, on January 9, 2001, Precision Pine's contracts were terminated for default. The Forest Service's right to damages for Precision Pine's multiple defaults is undeniable.

After terminating Precision Pine's contracts, the Forest Service assessed default damages pursuant to contract clause CT 9.4. PA8-123.[1] The Forest Service notified Precision Pine that the assessed damages might be modified in the event that uncut timber on the defaulted contracts was resold. Id. Some months later, the Forest Service resold the remaining timber on the O.D. Ridge, Jersey Horse and Wiggins contracts. See DSA1, 3. No resale occurred with respect to the other nine defaulted contracts.

---

[1] Plaintiff's appendix is cited in this brief as "PA__." Plaintiff's supplemental appendix is cited as "PSA__." Defendant's appendix is cited as "DA__." And defendant's supplemental appendix accompanying this reply is cited as "DSA__." The United States' supplemental appendix contains documents responding to material submitted with Precision Pine's reply brief.

Before the Forest Service had modified the assessed damages, Precision Pine filed this action. In October 2004, the Court ruled that Precision Pine had breached its timber sale contracts and affirmed the contracts' termination for default. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 645-54 (2004). However, the Court concluded that in assessing default damages, the Forest Service had misconstrued contract clause CT 9.4. Id. at 654-55. Accordingly, the Court directed the Forest Service to recalculate default damages "in a manner consistent with the Court's interpretation" of CT 9.4. Id. at 655.

The Forest Service complied with the Court's directive. In April 2005, the Forest Service filed recalculated default damages. Def.'s April 2005 Status Report (filed Apr. 28, 2005) (docket no. 58). A correction with respect to the Gentry contract was filed in July 2005 and, pursuant to Court order, a revision with updated interest and penalty charges was submitted in September 2005. See Def.'s Unopposed Mot. To File Revised Damages Calculations And For A Status Conference (July 14, 2005) (docket no. 59); Notice of Filing Revised Damages Calculations (filed Sept. 16, 2005) (docket no. 63). The United States now respectfully requests that the Court enter judgment awarding the damages owed for Precision Pine's default.

## ARGUMENT

### I. Precision Pine Owes $427,994.19 In Default Damages

#### A. The United States' Proposed Findings Of Fact With Respect To The Magnitude Of Default Damages Have Not Been Contested And, Therefore, Are Established

On March 6, 2005, the United States filed proposed findings of uncontroverted fact regarding the "principal" due as default damages. See Def.'s PFOF ¶¶ 1-15. The proposed findings are based upon the damages assessed by the Forest Service in accordance with the

Court's interpretation of CT 9.4. Id. As set forth in the United States' proposed findings of fact, the total default damages owed by Precision Pine, excluding interest and penalty charges, is $427,994.19. Def.'s PFOF ¶¶ 1-12.

Precision Pine filed no opposition to the United States' proposed findings of fact and, therefore, the proposed findings are deemed established. Ferguson Propeller, Inc. v. United States, 59 Fed. Cl. 51, 58 (2004); RCFC 56(h)(2) ("In determining any motion for summary judgment, the court will . . . deem the material facts claimed and adequately supported by the moving party to be established."); see also Barmag Barmer Maschinenfabrik AG. v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984) ("The party opposing [summary judgment] motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant.").

Accordingly, the Court should grant the United States' cross-motion for summary judgment and enter judgment in favor of the United States in the amount of $427,994.19, excluding interest and penalties.

### B. Default Damages Have Been Calculated Pursuant To CT 9.4 As Construed By The Court's October 2004 Order

In its response brief, Precision Pine raises three objections to the calculation of the "principal" owed as default damages.[2] None are supported by proposed findings of fact and arguments of counsel are not sufficient to raise a genuine issue of fact. For this reason alone, the Court should disregard Precision Pine's objections and enter judgment for the United States. Pure Gold, Inc. v. Syntex, 739 F.2d 624, 626-27 (Fed. Cir. 1984) ("To counter a motion for

---

[2] Precision Pine's arguments with respect to interest and penalty charges are addressed separately below. See section II, infra.

summary judgment, specific facts, and not mere assertions of counsel or conclusory statements, must be set forth."). Additionally, as explained below, Precision Pine's objections are without merit.

**1. The Forest Service Correctly Calculated The Adjustment Required By CT 9.4(d)**

Precision Pine first contends that the Forest Service incorrectly calculated the adjustment in CT 9.4(d). Pl.'s Reply at 16-17.[3] As explained in our cross-motion, contract clause CT 9.4(d) provides an adjustment (using an appropriate interest rate) that allows a direct comparison of the original timber sale's value and the post-termination resale value. See Def.'s Response & Cross-Motion at 10-11. This adjustment is calculated by taking the value of the original contract at termination and adding "interest at the current rate being paid for borrowing by the United States" though the mid-point of the new contract. See, e.g., DA11-12 ("Interest will be charged on the total number of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale.").

According to Precision Pine, the United States did not correctly perform the required calculation on two contracts – Wiggins and Jersey Horse – that were resold by the Forest Service. See Pl.'s Reply at 16-17. Precision Pine suggests that the Forest Service needed more than one year to resell Wiggins and Jersey Horse and, therefore, a reduction should be made for "any time in excess of 1 year needed to make the resale." Id. at 16. Precision Pine is mistaken.

[3] In this brief, Precision Pine's motion for summary judgment is cited as "Pl.'s Br. at __." The United States' response and cross-motion for summary judgment is cited as "Def.'s Response & Cross-Motion at __." And Precision Pine's reply and response to the United States' cross-motion is cited as "Reply at __."

The Wiggins contract was terminated on January 9, 2001. The contract was re-offered for sale in July 2001 – less than one year after the default termination. PA165. The Forest Service notified the high bidder that it had won the sale on July 11, 2001 and contract documents were then executed. PA165; DSA1. Thus, the Forest Service did not need "in excess of 1 year . . . to make the resale" of Wiggins. The CT 9.4(d) adjustment for Wiggins was, therefore, correctly calculated.

Likewise, the Jersey Horse contract was terminated on January 9, 2001. The Jersey Horse contract was re-offered for sale in November 2001 – less than one year after the default termination. DSA3. The Forest Service granted Precision Pine a waiver of the rule that the defaulted purchaser cannot bid on a contract's resale, which enabled Precision Pine to bid on the Jersey Horse II contract. DSA4. The Forest Service informed Precision Pine that it was the high bidder on November 28, 2001. See DSA5. Thus, the Forest Service did not need "in excess of 1 year . . . to make the resale" of the Jersey Horse contract. The CT 9.4(d) adjustment used for Jersey Horse was appropriate.

In its reply brief, Precision Pine argues that "the resale was not made until the Jersey Horse II contract was awarded to Precision Pine on April 24, 2002." Pl.'s Reply at 16. Precision Pine is mistaken. The Jersey Horse resale occurred (and Precision Pine was informed it was the high bidder) in November 2001. Moreover, it was Precision Pine – not the Forest Service – that delayed the actual signing of contract documents. After notifying Precision Pine that it was the high bidder, on December 6, 2001, the Forest Service requested Precision Pine to submit documents to verify its financial ability to perform. DSA5. The Forest Service set a January 4, 2002 deadline. Id. Precision Pine failed to provide the needed information and, as a result, the

Forest Service was unable to finalize the contract. See DSA10. It would be inappropriate to penalize the Forest Service for Precision Pine's own lack of diligence. Moreover, the plain language of CT 9.4(d) calls for a reduction in interest only when the time "needed" by the Forest Service "to make the resale" exceeds one year. See DA34. The Forest Service conducted the resale, notified the high bidder, and was prepared to execute contract documents in less than one year. Thus, the Forest Service did not need more than one year to complete the resale of Jersey Horse. The CT 9.4(d) adjustment for Jersey Horse was, therefore, correctly calculated.

### 2. The Forest Service Correctly Applied The Effective Purchaser Credit On The Brookbank Contract

Precision Pine's second objection concerns the effective purchaser credit on the Brookbank contract. Effective purchaser credit is an administrative credit that is governed by contract provisions and Forest Service regulations. See DA15; PA180 (36 C.F.R. § 223.42). As a result, purchaser credit is treated differently than cash deposits made by a purchaser. See id.

Contract clause CT 9.4 provides that any unused purchaser credit on a contract that is terminated for default is to be taken into account in assessing default damages. DA33-34. In accordance with CT 9.4, the Forest Service considered the Brookbank purchaser credit in calculating the damages owed as a result of Precision Pine's default of the Brookbank contract. PA81, 128-31. Precision Pine does not assert that the Forest Service calculations failed to comply with CT 9.4. Precision Pine suggests instead that the Forest Service should have unilaterally transferred the Brookbank purchaser credit to the Gentry contract. See Pl.'s Reply at 22.

Purchaser credit can be transferred from one contract to another in certain limited circumstances. See, e.g., DA15; PA178. However, the purchaser's written request is an

unequivocal prerequisite to transfer. See DA15 (clause CT 4.211) (allowing a transfer only "[u]pon Forest Service approval of Purchaser's written request"). Because Precision Pine did not request any such transfer, the Forest Service was not authorized to transfer the Brookbank purchaser credit. Accordingly, in both March 2001 and April 2005, the Brookbank purchaser credit was properly taken into account in calculating default damages on the Brookbank contract. See PA81, 128-31.

On October 20, 2005, the Court held a status conference at which the United States explained that Precision Pine's argument about the Brookbank purchaser credit was without merit because Precision Pine had never requested a transfer as required by CT 4.211. Six days later, Precision Pine sent a letter to the Forest Service that sought for the first time a transfer of the Brookbank purchaser credit. See PA180. This request came nearly five years after the Brookbank contract was terminated, over four years after the initial assessment of default damages, and about four years after the Brookbank contract was administratively closed. Precision Pine neither explains nor justifies its failure to seek a transfer before October 26, 2005.

Attempting to shift the focus from its own neglect, Precision Pine suggests that the Forest Service lacks legal authority to deny a post-termination request to transfer purchaser credit. Pl.'s Reply at 22. Precision Pine is mistaken. When a contract is terminated, purchaser credit must be applied in accordance with CT 9.4. DA33-34 (establishing the formula for determining default damages). The Forest Service did just that. See PA81, 128-33. Furthermore, the ability to transfer purchaser credit is never unfettered, but is subject to "such additional restrictions as may be necessary for its orderly use." 36 C.F.R. § 223.42. Restrictions on requests to transfer

purchaser credit made after a default termination, after default damages are assessed, and after the contract has been administratively closed, fall squarely within this authority.

Furthermore, even if Precision Pine had made a timely written request, the Forest Service would have been obligated to deny it. Forest Service regulations state that a "transfer shall not be granted for . . . claims for damages due the United States." 36 C.F.R. § 223.42. Precision Pine is seeking to transfer purchaser credit from Brookbank to Gentry for this very purpose – to pay "claims for damages due the United States" on the Gentry contract. Thus, section 223.42 prohibits the transfer sought by Precision Pine.

Ignoring the plain language of this regulation, Precision Pine cites Forest Service Manual provisions that supposedly would permit the transfer of purchaser credit to the Gentry sale. Pl.'s Reply at 22; PA177. The cited provisions, however, have absolutely nothing to do with purchaser credit. Rather, the cited provisions address the refund of cash deposits that exceed the amount owed to the United States. PA177 (discussing the refund of "deposits in excess of amounts due" and the "transfer of excess deposits"). Because Precision Pine is not seeking to transfer "excess deposits," the cited Forest Service Manual provisions are inapposite.

### 3. Precision Pine Has Not Established A Failure To Mitigate Damages

Precision Pine also contends that the Forest Service failed to mitigate damages on the Wiggins contract by conducting a post-termination appraisal of the remaining timber. See Pl.'s Reply at 23-26. CT 9.4 states that "[i]n the event of a termination for breach . . . the Forest Service shall appraise remaining included timber." DA33 (emphasis added). The word "shall" indicates a mandatory action. E.g., Anderson v. Yungkau, 329 U.S. 482, 485 (1947) ("The word 'shall' is ordinarily [t]he language of command."). Thus, the contract requires a post-termination

appraisal of remaining included timber. See DA43 (Harris Decl. ¶ 7). The suggestion that the Forest Service failed to mitigate damages by performing a mandatory post-termination appraisal is baseless.

Precision Pine argues that the Forest Service should have simply looked at a Timber Sale Statement of Account ("TSSA") printout to assess the volume of timber remaining on the sale area. Pl.'s Reply at 24-25. At the time of the default termination, the sale area was in a state of disarray. Some payment units had been fully harvested, others had not. See DA43-44. Some timber had been cut and removed from the sale area, other timber had been cut and decked in the sale area, and still other timber had been left standing. Id. In such a situation, blindly accepting a TSSA printout – rather than going to the sale area to accurately assess the state of harvesting – would be unreasonable.[4] Additionally, according to the contract, the Forest Service was to appraise the remaining timber using the standard Forest Service method at the time of termination. DA33, 43. Blind reliance on a TSSA printout has never been the Forest Service's standard methodology. See DA43-44. Finally, because the volume obtained from the post-termination appraisal also serves as the basis for the sale to a new purchaser, the resale cannot proceed until an accurate appraisal of remaining timber has been completed. DA44. In sum, it was necessary to conduct a post-termination appraisal to determine how much timber had been cut and removed, to permit the resale of uncut timber, and to comply with the contract.[5] DA45.

---

[4] In fact, the post-termination appraisal arrived at volume numbers that were somewhat higher than the then-current TSSA. DSA2 (102 ccf timber, 1029 ccf roundwood).

[5] Precision Pine suggests that there is a "discrepancy" between Mr. Harris's declaration and the original damages calculation regarding "remarking." Pl.'s Reply at 25. No discrepancy exists. While the contracting officer did not anticipate wholesale remarking of the sale, she did (continued...)

Precision Pine also argues that the resale of the Wiggins contract should have been done by informal bids. Pl.'s Reply at 25. As explained in our principal brief, Forest Service policy is to use the same method for resale the for an original sale. Def.'s Response & Cross-Mot. at 19; see also DA45. Were this not the case, a lower price on resale could result from the sale process itself. Moreover, here, there was no reason to deviate from this standard practice. The only potential savings from an informal sale was the ability to forego local advertising. DA45. The cost of local advertising for Wiggins was less than $100. DPFOF ¶ 15; see also DA45; PA166. The Forest Service decision not to alter the sale approach to attempt to obtain such minimal savings was reasonable. See Cuyahoga Metro. Housing Auth. v. United States, 65 Fed. Cl. 534, 546-47 (2005) ("The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.").

## III. The Forest Service Has Properly Calculated Interest And Penalty Charges

### A. Interest And Penalty Charges Accrue As Of The Date Of The Forest Service's Initial Bill Of Collection

As explained in our cross-motion, under the terms of the contracts and the Debt Collection Act, interest on the default damages owed by Precision Pine begins to accrue on "the date of issue" of the Forest Service's initial bill of collection. Def.'s Response & Cross-Motion at 6-9. Precision Pine does not dispute that its contracts provide for Debt Collection Act interest from the date of the initial bills of collection. E.g., DA17-18, 22-23, 36-38. Nor does Precision

[5](...continued)
anticipate some remarking would be required as evidenced by a line item for paint. PA69.

Pine dispute that Debt Collection Act establishes a "minimum annual rate of interest" that accrues "on an outstanding debt on a United States Government claim." 31 U.S.C. § 3717(a). Instead, Precision Pine brazenly asserts that the Forest Service did not attempt to determine the amount owed as default damages until April 2005.[6] See, e.g., Pl.'s Reply at 2-3. Precision Pine's assertion is contrary to undisputed facts and the law of the case.

Forest Service contracting officers issued final decisions in February and March 2001 that assessed default damages in accordance with the Contract Disputes Act ("CDA"). See Precision Pine, 62 Fed. Cl. at 638; PA8-123. Each decision document (1) states that it "documents the Contracting Officer's Decision regarding a claim under the Contract Disputes Act by the United States Government against Precision Pine & Timber, Inc.," (2) attaches "default damage calculations" that are "[b]ased on procedures and applicable costs described in provision CT9.4," and (3) specifies "the damages due the government" for Precision Pine's default. PA9, 12-16, 19, 22-25, 28, 31-34, 38, 41-43, 47, 50-53, 56, 59-62, 65, 68-72, 74, 77-81, 84, 90-93, 96,101-04, 108, 111-14, 121, 123; see also Precision Pine, 62 Fed. Cl. at 638. The decision documents were accompanied by bills of collection and were provided to Precision Pine. Precision Pine, 62 Fed. Cl. at 638. And the Court ruled that the contracting officers' decisions assert a "Government claim" for default damages upon which the Court possesses

[6] Apparently hoping that repetition will prove an adequate substitute where evidence is lacking, Precision Pine repeats this claim *ad nauseam* throughout its brief. See Pl.'s Reply at 3 (did not "attempt[] to calculate" the amount owed); id. at 4 ("did not 'determine' the amount of any debt owed"); id. at 5 n.4 ("did not even make a reasonable attempt" to assess damages); id. at 6 ("the government did not even attempt to comply with the procedural requirements" for determining damages); id. at 7 n.5 (did not "reasonably attempt[] to determine" default damages); id. at 11 (the Government "only first attempted to comply" in April 2005); id. at 26 (the "first attempt to calculate damages" pursuant to CT 9.4 was in April 2005).

jurisdiction. Id. at 641-45. Thus, Precision Pine's repeated assertion that the Forest Service never attempted to determine default damages is unfounded and contrary to the law of the case.

Precision Pine cites two administrative decisions that supposedly justify a later start date for Debt Collection Act interest. See Reply at 5-6. The first decision, Fairchild Republic Co., ASBCA No. 29385, 85-2 BCA ¶ 18,047 (Mar. 28, 1985), concerns a putative administrative offset. The board concluded that there was no administrative offset, and that the Debt Collection Act was inapplicable, where the contract price was unilaterally reduced as a result of defective pricing information supplied by a contractor. Id. The board in Fairchild never discusses the accrual of interest under the Debt Collections Act. The second decision, Navarre Bachand Farms, Inc. v. SBA, 1988 WL 412457 (S.B.A. Aug. 26, 1988), is an unreported opinion of the Small Business Administration Office of Hearing and Appeals that is equally unavailing. Navarre, like Fairchild, does not address when interest pursuant to the Debt Collection Act begins to run. In Navarre, the SBA merely states that the Debt Collection Act "provides answers about what is to be done about collecting a debt due to the Federal Government after it has been determined that a debt in fact exists." Id. at *8 (finding that South Dakota law supplied the "procedure" for determining whether a deficiency exists after a foreclosure). This unremarkable statement lends no support to Precision Pine's argument.[7]

[7] The cases referenced in footnote 4 of Precision Pine's brief are no different. See Pl.'s Reply at 5 n.4 (citing Commonwealth Edison Co. v. NRC, 830 F.2d 610 (7th Cir. 1987), United States v. Pacific Coast European Conf., 451 F.2d 712 (9th Cir. 1971), and Aminoil v. EPA, 599 F. Supp. 69 (C.D. Cal. 1984)). None discuss when interest accrues under the Debt Collection Act. In fact, Pacific Coast and Aminoil do not even mention the Act.

In this action, the Contract Disputes Act supplies the "procedure" pursuant to which a "debt" is determined.[8] This Court has already ruled that the Forest Service issued final decisions pursuant to the CDA – decisions that establish that a "debt" was owed by Precision Pine. Precision Pine, 62 Fed. Cl. at 645; see also 31 U.S.C. § 3701(b)(1) (defining the term "debt" as "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States"). Precision Pine's bald assertion that the Forest Service "did not even attempt to comply with the procedural requirements" for assessing default damages is utterly baseless. Accordingly, Precision Pine has established no basis for refusing to calculate interest in accordance with the plain language of the contracts.

**B. The Contracts And The Debt Collection Act Prescribe A Fixed Interest Rate**

With the exception of the U-Bar contract, the rate of interest is established by comparing "the U.S. Treasury current value of funds rate" and "the rate established by the Secretary of the Treasury under section 12 of the Contract Disputes Act" on the date that the bill of collection was issued. See Def.'s Response & Cross-Motion at 11-12; DA37-38 (quoting CT 4.41). Pursuant to the Debt Collection Act, the higher rate is applied for the duration of the indebtedness. 31 U.S.C. § 3717(c) ("the rate of interest" charged "is the rate in effect on the date from which interest begins to accrue" and "remains fixed for the duration of the indebtedness");

[8] Contract clause CT 9.4 does not provide the "procedure" for assessing default damages; it simply supplies the formula that is used to calculate such damages. Precision Pine appears to concede that a claimant's miscalculation of damages – as opposed to a failure to attempt to calculate damages – has no effect on the accrual of interest. See Pl.'s Reply at 10-11; Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 836 (2001) ("The fact that the amount has been reduced in litigation does not mean that it would be unfair to assess interest on the balance."), aff'd, 308 F.3d 1283 (2002).

Amax Land Company v. Quarterman, 181 F.3d 1356, 1359 (D.C. Cir. 1999) ("The Debt Collection Act plainly forbids the utilization of shifting interest rates.").

Precision Pine argues that the mere reference to CDA interest in CT 4.41 opts out of the Debt Collection Act and establishes a variable interest rate. Pl.'s Br. at 17. Precision Pine's reading of CT 4.41 is unsupported and unreasonable.

Relying upon 31 U.S.C. § 3717(g), Precision Pine asserts that the Debt Collection Act allows the parties to set the interest rate by agreement. Pl.'s Reply at 18. Section 3717(g) allows a contract to "explicitly" fix "interest or charges." 31 U.S.C. § 3717(g). However, Precision Pine cites no authority establishing that section 3717(g) changes the requirement that the "rate of interest" must be "fixed for the duration of the indebtedness." 31 U.S.C. § 3717(c). Moreover, even assuming that section 3717(g) potentially allows variable interest, CT 4.41 neither "explicitly" opts out of the Debt Collection Act, nor "explicitly" establishes a variable interest rate.

CT 4.41 simply uses the CDA interest rate as a benchmark for comparison as of a particular date. As explained in Amax, the current value of funds ("CVF") rate "sets a floor" on rate of interest charged on outstanding debts. Amax, 181 F.3d at 1368. The Government is free establish a higher interest rate. Id. CT 4.41 does just that by fixing interest at the higher of the CVF rate and the CDA rate on the date of the bill of collection. Put differently, the comparison required by CT 4.41 ensures that the interest rate charged by the Forest Service is not less than the floor established by the Debt Collection Act.[9] Thus, the reference to CDA interest as a

---

[9] The variable interest rate used in Precision Pine's illustrative calculation drops below the 6 percent floor established by the CVF rate on the date of the bill of collection. See PSA6.

(continued...)

benchmark is consistent with the requirements of the Debt Collection Act – not evidence of an intent to "opt out" of the Act. And any doubt is eliminated by the introductory clause of CT 4.41, which expressly states that the Forest Service is charging interest "[p]ursuant to the Debt Collection Act." E.g., DA37.

Precision Pine also points to clause CT 4.4 (1/84) in the U-Bar contract. Pl.'s Reply at 18-19. The U-Bar contract, which makes no reference to the Debt Collection Act, states that the "interest rate shall remain unchanged until those bills have been paid or settled." DA9. Precision Pine's reference to a different provision in a different contract sheds no light on the meaning of CT 4.41. Furthermore, as explained in our cross-motion, Precision Pine's contracts take different paths to the same destination. The U-Bar contract states that interest will accrue at a fixed interest rate. See DA9. The other contracts state that interest is being charged "pursuant to the Debt Collection Act," which in turn establishes a fixed interest rate for the duration of the indebtedness. 31 U.S.C. § 3717(c). Precision Pine's repeated reference to the U-Bar contract – a contract that contains different contract clauses and uses different language – is a red herring.

**C. CT 9.4(d) Does Not Affect The Accrual Of Interest Pursuant To CT 4.41**

In its reply brief, Precision Pine changes the focus of its argument regarding CT 9.4(d). Precision Pine has dropped its claim that CT 9.4(d) confers a "double recovery," see Pl.'s Br. at 12, asserting instead that interest under the Debt Collection Act cannot accrue until the date of

---

[9](...continued)
Precision Pine's interpretation of CT 4.41 would, therefore, be contrary to the Debt Collection Act and Department of Agriculture regulations. See 31 U.S.C § 3717(a); 7 C.F.R. § 3.34(a)(2). The Court should not adopt such an interpretation.

resale because damages could not have been calculated in accordance with the Court's October 2004 interpretation of CT 9.4 until that time, see Pl.'s Reply at 14-16.

Precision Pine does not attempt to reconcile its argument with the plain language of the contracts or the Debt Collection Act's statutory provisions. See id. As explained above, both the contracts and the Act mandate interest from the date of issuance of the respective bills of collection. See section II.A., supra; Def.'s Response & Cross-Motion at 5-9. The fact that a court may ultimately decide that a different amount is due has no bearing on the date that interest begins to accrue. Precision Pine's attempt to disregard the contractual language and the Debt Collection Act should be rejected.[10]

### D. The Six Percent *Per Annum* Penalty Charge Should Be Assessed Every Twelve Months On The Outstanding Balance

The contracts each assess a "penalty charge of 6 percent per annum." DA37-38 (quoting CT 4.41); DA9 (U-Bar). This penalty charge applies to "all outstanding amounts including interest and administrative costs." Id. Accordingly, in conjunction with our cross-motion, we submitted calculations that assess a 6 percent simple interest penalty on the outstanding debt (i.e., "all outstanding amounts including interest and administrative costs") every 12 months. See DA1-7.

In its reply brief, Precision Pine objects to this approach. Precision Pine proposes instead a convoluted alternative that is not supported by the contract language, the Debt Collection Act,

[10] CT 9.4(d) affects only two of twelve contracts (Wiggins and Jersey Horse) and, even with respect to those contracts, the delay in accrual of CT 4.41 interest would be less than one year. DSA1 (resale of Wiggins occurred in July 2001); DSA3 (resale of Jersey Horse occurred in November 2001). Thus, even if it were viable, Precision Pine's argument would have virtually no effect on the calculation of damages.

or any other authority. Pl.'s Reply at 20 (arguing that "the way to calculate the total penalty" is: "(1) to calculate the amount of any penalty for each period during which the interest was fixed, (2) to do so based on the principal plus total interest to date as of the mid-point of each such period, and (3) then sum the amount of penalty calculated for each period."); see also PSA6 (providing an illustrative calculation for the Brann contract). The Court should reject Precision Pine's proposed methodology, which fails to calculate a six percent *per annum* penalty on the "outstanding debt" as required by the respective contracts and the Debt Collection Act.

### E. The United States Correctly Calculated Interest And Penalty Charges On The U-Bar Contract

#### 1. The Applicable Interest Rate For The U-Bar Contract Is Six Percent

Precision Pine concedes that interest on the U-Bar contract accrues at a fixed rate. See Pl.'s Reply at 26. Precision Pine also admits that the applicable interest rate in February 2001 – the month that the Forest Service issued the bill of collection for U-Bar – was 6 percent. Id. Therefore, interest on U-Bar accrues at 6 percent *per annum*. See DA9 (providing that interest on U-Bar accrues from the date of the bill of collection). The restated interest and penalty calculations included with the United States' cross-motion use this interest rate. See DA1-7.

#### 2. Penalty Interest Of Six Percent *Per Annum* Is Owed On The U-Bar Contract

The U-Bar contract provides that amounts overdue by more than 90 days are subject to an additional 6 percent charge. DA9. Precision Pine originally argued that charging such a penalty on delinquent payments is legally unenforceable. Pl.'s Br. at 25. In our cross-motion, we explained that penalty interest at 6 percent *per annum* is expressly authorized by the Debt Collection Act and Department of Agriculture regulations. Def.'s Response & Cross-Motion

at 20. As a result, Precision Pine no longer appears to claim that the 6 percent penalty cannot legally be imposed.

Precision Pine now suggests that the penalty – though assessed by applying a 6 percent interest rate to the overdue debt balance – is not interest. Pl.'s Reply at 27. As a result, according to Precision Pine, CT 4.4 stays accrual of the penalty during the pendency of a *bona fide* dispute prosecuted under the Contract Disputes Act. Id.

Precision Pine's position cannot be squared with the contract language, the definition of penalty interest, the purpose of the stay of "other remedies," or Department of Agriculture regulations. The U-Bar contract charges a penalty on delinquent debts that accrues from the date of the bill of collection at an interest rate of six percent. See DA9. The manner in which the penalty is calculated belies the notion that the penalty is not interest. And the contract declines to stay the "accrual of interest" – whether assessed as a penalty or otherwise. Id. Furthermore, according to Black's Law Dictionary, "penalty interest" is defined as an "exaction for past due obligations." Black's Law Dictionary at 562 (abridged 6th ed. 1991) (citing penalty interest charged by the IRS on overdue taxes as an example). The penalty charged by the U-Bar contract falls squarely within this definition.

The purpose of the stay of "other remedies" also lends no support to Precision Pine's position. The stay is intended to prevent inefficiencies that would result if two different actions were filed in two different courts concerning a single dispute. Staying the accrual of the penalty on overdue debt would not serve this goal. Indeed, because penalty interest accrues only on the amount that the tribunal ultimately determines to be due, the only result of a stay would be to discourage the payment of overdue debts owed to the Government.

Finally, Precision Pine's reading of CT 4.4 is contrary to Department of Agriculture regulations, which direct that penalty interest be charged on overdue debts. See 7 C.F.R. § 3.34(a)(2). The Court should not construe CT 4.4 in a way that would conflict with applicable agency regulations. E.g., International Transducer Corp. v. United States, 30 Fed. Cl. 522, 529 (1994) (contract provisions must "be read in light of the regulations under which they are administered"), aff'd, 48 F.3d 1235 (Fed. Cir. 1995).

In sum, like Precision Pine's other contracts, a penalty charge on the outstanding balance on the U-Bar contract accrues at the rate of 6 percent *per annum*. Precision Pine's argument that this charge is not an "accrual of interest" and, therefore, is stayed while it prosecutes this action, is without merit.

**CONCLUSION**

For these reasons, and the reasons stated in our cross-motion, the United States respectfully requests that the Court enter judgment upon behalf of the United States upon its counterclaim in the amount of $427,994.19, plus interest and penalties through the date of payment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

April 14, 2006