# In the United States Court of Federal Claims

No. 02-131 C
Filed December 22, 2006

_____
                                         )
PRECISION PINE & TIMBER, INC.,           )
                                         )    Timber sale contracts , calculation of
                                         )    damages due to contractor's breach,
                    Plaintiff,           )    Debt Collection Act, 31 U.S.C. § 7301 *et.*
        v.                               )    *seq.,* timing of interest accrual,
                                         )    fixed interest rate, variable interest
THE UNITED STATES,                       )    rate, mitigation, penalty charge
                                         )
                    Defendant.           )
_____  )


        Alan I. Saltman, Saltman & Stevens, P.C., Richard W. Goeken and Bryan T. Bunting, Saltman & Stevens, P.C., Washington, D.C., of counsel.

        David A. Harrington, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.  Lori Polin Jones and Patricia L. Disert, U.S. Department of Agriculture, Washington, D.C., of counsel.


## OPINION AND ORDER

GEORGE W. MILLER, Judge.

        This matter is before the Court on plaintiff's motion for summary judgment filed February 6, 2006, and defendant's cross-motion for summary judgment filed March 6, 2006. Both plaintiff, Precision Pine & Timber, Inc. ("Precision"), and defendant, the United States ("the Government"), move for summary judgment on damages attributable to plaintiff's breach of ten timber contracts with the United States Forest Service ("Forest Service").[1]  Both parties

_____

        [1] There are two types of contracts at issue in this case: timber sale and multi-product sale. Contracts where only sawlogs are required to be harvested are designated "timber sale" contracts.  "Sawlogs" are trees larger than 9.0 inches in diameter at breast height ("dbh").  Contracts where both sawlogs and roundwood are required to be harvested are designated "multi-product sale"

(continued...)

request summary judgment on: (1) the proper date for the accrual of interest and penalty charges; (2) whether a fixed or variable rate of interest should be used in the damage calculations; (3) whether the Forest Service can charge interest simultaneously under two separate contract provisions; (4) whether Precision is entitled to transfer certain purchaser credits earned on one contract (Brookbank) to offset amounts it owes the Forest Service on other contracts; (5) whether the Forest Service properly mitigated its damages with respect to the Wiggins contract; (6) whether Precision is liable for penalty charges on the U-Bar contract; and (7) the proper method of calculating penalty charges.

For the reasons set forth below, the Court GRANTS in part and DENIES in part Precision's motion with respect to the timing of interest and penalty accrual. The Court DENIES as moot Precision's motion with respect to simultaneous accrual of interest under two different contract provisions. The Court DENIES Precision's motion and GRANTS the Government's motion with respect to whether a fixed or variable interest rate should be used. The Court DENIES Precision's motion and GRANTS the Government's motion with respect to the transfer of earned credits on the Brookbank contract. The Court DENIES Precision's motion and GRANTS the Government's motion with respect to whether the Forest Service failed to mitigate its damages on the Wiggins contract. The Court GRANTS Precision's motion and DENIES the Government's motion with respect to whether the Forest Service may collect a penalty charge on the U-Bar contract during the pendency of court proceedings. The Court DENIES Precision's motion and GRANTS the Government's motion with respect to the proper method of calculating penalty charges.

## BACKGROUND

From 1994 to 1998, the Forest Service and Precision entered into the ten[2] timber sale contracts that remain at issue in this case. *Precision Pine & Timber, Inc. v. United States,* 62 Fed. Cl. 635, 636 (2004). The contracts that remain at issue are: Brookbank, Jersey Horse,

---

[1](...continued)
contracts. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. For ease of reference, however, the two contract types will sometimes be referred to collectively as "timber sale" contracts.

[2]There were originally twelve contracts at issue. Precision's initial claim included the Manaco contract and the O.D. Ridge contract. *Precision Pine & Timber, Inc. v. United States,* 62 Fed. Cl. 635, 636–37 (2004). The Forest Service does not seek damages on these two contracts in its latest revised damage calculations. *See* App. to Pl.'s Mot. at 117. Because neither party raises any additional issues relating to those contracts, the Court is presented with no further disputes for it to resolve with respect to those two contracts. In contrast, although the Forest Service does not seek any damages on the Brookbank contract, Precision contends that it is entitled to transfer certain credits that it earned on the Brookbank contract to offset amounts that it owes the Forest Service on other contracts. *See* Pl.'s Mot. at 19–22.

Saginaw-Kennedy, Brann, U-Bar, Monument, Hutch-Boondock, Gentry, Wiggins, and Lily.  *See* App. to Pl.'s Mot. at 170; Pl.'s Mot. at 19–22.  In June of 2000, the Department of the Treasury ("Treasury") delisted Precision's then-surety, Frontier Insurance, from its list of acceptable sureties maintained in Treasury Circular 570.  *Precision Pine,* 62 Fed. Cl at 638; *see also* Surety Companies Acceptable on Federal Bonds: Termination—Frontier Insurance Company, 65 Fed. Reg. 35998–99 (June 6, 2000).  Between June 9, 2000, and June 21, 2000, Forest Service contracting officers notified Precision that Treasury no longer recognized Frontier Insurance as an acceptable surety and reminded Precision that failure to maintain acceptable bonding constituted breach under the terms of the timber sale contracts.  *Precision Pine,* 62 Fed. Cl at 638.  Precision Pine failed to obtain an acceptable surety, and, during July 2000, the Forest Service sent Precision a "Notice of Breach" for each of the contracts.  *Id.*  In each case, the Forest Service offered Precision another thirty days to obtain a suitable surety.  *Id.*  The Forest Service terminated the contracts at issue on January 9, 2001, after it issued further warnings of the pending contract terminations, and provided Precision with further opportunity to obtain suitable bonding.  *Id.*

At the time of the terminations, nine of the contracts that were then at issue were involved in a companion case before Chief Judge Edward J. Damich, docketed as 98-720 C ("*Precision I*").[3]  *See Precision Pine & Timber v. United States*, 50 Fed. Cl. 35 (2001).  Moreover, at the time of termination both parties had motions for summary judgment pending before Chief Judge Damich on the issue of whether the Forest Service had breached the timber sale contracts involved in *Precision I*.  *Precision Pine,* 62 Fed. Cl. at 638; *Precision Pine*, 50 Fed. Cl. at 37.  Chronologically, the Forest Service's alleged breaches in *Precision I* preceded Precision's failure to obtain a suitable surety.  On January 12, 2001, Precision advised the Forest Service that it considered that the Forest Service's alleged breach of the contracts in *Precision I* relieved Precision from any liability for default damages on the contracts that would form the basis of this action.  *Precision Pine*, 62 Fed. Cl. at 638.

Between February and April 2001, the Forest Service issued its initial "Bills for Collection" for the default damages it alleged were due.  *Precision Pine,* 62 Fed. Cl. at 638.  To calculate these damages, the Forest Service deducted the contracts' "estimated" resale values from their existing values at the time of termination, and adjusted that amount to account for the cost of reselling the contracts and to apply certain credits that Precision had earned in performance of the contracts.  *Id.* at 639.  Included with each bill was a decision document which advised Precision that its estimates were "[b]ased on procedures and applicable costs described

---

[3]  Six contracts that remain at issue in this case are involved in *Precision I*: Brookbank, Jersey Horse, Saginaw-Kennedy, Brann, U-Bar, and Monument.  *Precision Pine*, 50 Fed. Cl. at 39.  The two contracts that are no longer at issue in this case, Manaco and O.D. Ridge, are also involved in *Precision I*.  *Id.*  In addition, *Precision I* involves five contracts that were never involved in this case: Hay, St. Joe, Salt, Mud, and Kettle.  *Id.*

in provision CT9.4." *Id.* The Forest Service advised Precision that "[t]his estimate may be adjusted once final damages are determined following the resale of the remaining timber." *Id.*

On July 30, 2001, Chief Judge Damich issued his opinion in *Precision I,* finding that the Forest Service had breached eight of the contracts that were then at issue in this case: O.D. Ridge, Brookbank, Jersey Horse, Saginaw-Kennedy, Brann, U-Bar, Monument, and Manaco. *Precision Pine,* 50 Fed. Cl. at 73–74. Chief Judge Damich did not find that the Forest Service breached the Hutch-Boondock contract. *Id.*

Precision filed this action on February 15, 2002, alleging that the Forest Service improperly terminated the twelve timber sale contracts. *Precision Pine,* 62 Fed. Cl. at 636. Precision also alleged that the Forest Service's default damage calculations based on resale estimates were inconsistent with the governing contractual provisions. *Id.* The Government asserted a counterclaim seeking the default damages it asserted were due. *Id.* On March 25, 2004, defendant moved for summary judgment on its counterclaim for damages. *Id.* The same day, plaintiff moved to dismiss defendant's counterclaim for lack of subject matter jurisdiction, or in the alternative for summary judgment with respect to the counterclaim, asserting that the Forest Service failed to comply with the terms of the parties' contracts in computing damages. *Id.* On October 29, 2004, this Court denied Precision's motion to dismiss. *Id.* The Court also granted the Government's motion for summary judgment to the extent that it found that Precision breached the contracts at issue. *Id.* The Court denied the Government's motion, and granted Precision's motion, with respect to whether the Forest Service's damage calculations were proper. *Id.*

The Court held that the contracts provide "two alternative methods for determining damages in the event of breach: one where the timber has been resold; and the other where the timber has not been resold." *Id*. at 654. Under the first method, the Forest Service must "wait until the resale is concluded to calculate damages." *Id*. at 655. Under the second method, the Forest Service can "decide . . . not to resell the contract and calculate the damages immediately." *Id*. The Court held that by attempting to collect its so-called "estimated damages," the Forest Service employed a "third method" that is not permitted under the contracts. *Id.* The Court ordered the Forest Service to recalculate its damages in accordance with the governing contract terms within six months of the date on the Court's opinion. *Id*. at 656.

On April 28, 2005, the Forest Service issued its initial damage calculations in accordance with the Court's order. App. to Pl.'s Mot. at 125–68. The Forest Service subsequently revised its damage calculations on two occasions. On July 14, 2005, the Forest Service reduced the principal on the damages for the Gentry contract from $63,329.56 to $35,029.56. *Compare* App. to Pl.'s Mot. at 124 *with* App. to Pl.'s Mot. at 169. Here, the Forest Service reduced the damage total to take into account $28,600 of unobligated cash in Precision's account. *Compare* App. to Pl.'s Mot. at 135 *with* App. to. D.'s Mot. at 62. By leave of the Court, the Forest Service submitted a second revision to its damage calculations on September 16, 2005 in order to

"resolve a discrepancy."  Although the Forest Service does not specifically identify what it changed in the calculations, a comparison of its last revision of the damage calculations with previous versions reveals that the Forest Service corrected a three-cent discrepancy between the damage summary sheet and the damage calculation sheet for the Wiggins contract.  *Compare* App. to Pl.'s Mot. at 170 *with* App. to Pl.'s Mot at 124 *and* App. to Pl.'s Mot. 168.

In its revised damage calculations, the Forest Service applied interest accruing from early 2001.  *See* App. to Pl.'s Mot. at 170.  The precise dates varied from contract to contract depending upon the date that the Forest Service issued its initial bill for collection for each individual contract.  *See* App. to Pl.'s Mot. at 125–168.  The Forest Service applied a fixed interest rate on all interest calculations.

The latest revised damages demanded by the Forest Service total $427,618.61, excluding interest and penalty charges.  They break down by contract as follows:

| Sale Contract | Forest Service's estimated damages of 2001 | Final revised damages excluding interest and penalty charges |
|---|---|---|
| O.D. Ridge | $148,845.38 | $ 0 |
| Jersey Horse | $   9,035.47 | $  17,056.01 |
| Saginaw-Kennedy | $101,642.20 | $  83,157.15 |
| Brann | $ 36,888.97 | $  25,994.78 |
| U-Bar | $215,691.04 | $124,367.14 |
| Monument | $ 81,477.88 | $ 70,845.50 |
| Hutch-Boondock | $   2,278.72 | $   2,278.72 |
| Gentry | $ 92,236.78 | $ 35,029.56 |
| Wiggins | $ 13,016.93 | $  9,128.70 |
| Lily | $ 66,512.35 | $ 59,761.05 |
| Brookbank | $0 | $0 |
| Manaco | $0 | $0 |

Pl.'s Mot at 4.

In its motion for summary judgment, Precision asks the Court to hold that: (1) interest and penalty charges should not begin to accrue until September 16, 2005, the date on which the Government submitted its final revised damage calculations in accordance with the Court's 2004 opinion, Pl's Mot. at 10; (2) a variable rate of interest should be used in the damage calculations; (3) the Forest Service cannot charge interest simultaneously under CT4.41, *see infra* page 8, and CT9.4, *see infra* page 9–10; (4) Precision is entitled to transfer certain earned purchaser credits from the Brookbank contract to offset amounts it owes the Forest Service on other contracts; (5) the Forest Service failed to mitigate its damages with respect to the Wiggins contract; (6) Precision is not liable for penalty charges on the U-Bar contract; and (7) penalty charges should be calculated annually as of the midpoint of each annual period.[4]  In its cross-motion filed on March 6, 2006,[5] the Government asks the Court to hold that: (1) interest and penalty charges should begin to accrue as of the dates in 2001 on which the Forest Service issued its original bills for collection based upon its estimated damages calculations; (2) a fixed rate of interest should be used in the damages calculations; (3) the Forest Service is entitled to collect interest simultaneously under both CT4.41 and CT9.4; (4) Precision is not entitled to transfer any remaining earned purchaser credits from the Brookbank contract to offset amounts it owes the Forest Service on other contracts; (5) the Forest Service did not fail to mitigate damages under the Wiggins contract; (6) Precision owes the Forest Service penalty charges on the U-Bar contract; and (7) penalty charges should be calculated annually as of the last day of each annual period.  Precision filed its reply brief on April 2, 2006.  Defendant filed its reply brief on April 14, 2006.  After careful review, the Court concluded that additional briefing was necessary with respect to the calculation of penalty charges and, on October 5,2006, ordered the parties to file and serve supplemental briefs on that subject.  The Government filed its initial supplemental brief on October 11, 2006.  Precision filed a responsive brief on November 3, 2006.  The Government filed a reply brief on November 15, 2006.

---

[4]Initially, the Forest Service applied the penalty charges on the entire balance of the amount that was currently due.  Precision argued that such methods overstated the penalty charges because the outstanding balance increases over time, and that the Forest Service's methods presume that the balance was constant over the course of the indebtedness.  The Government considered Precision's argument and agreed on this point. D.'s Resp. at 14.

[5]On March 6, 2006, the Government also filed its Proposed Findings of Uncontroverted Fact pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  Because Precision did not file its own RCFC 56(h)(1) filing contesting these facts, and because it does not appear from Precision's other briefs that it disputes any of the facts set forth in the Government's filing, those facts are considered established.

***DISCUSSION***

**1.      Standard for Summary Judgment**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A material fact is one that might affect the outcome of the litigation.  *Anderson*, 477 U.S. at 248.  A material fact is "genuine" only if a reasonable finder of fact "could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, the court does not "weigh" each side's evidence.  *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 76 (2002) (citing *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002)).  Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion."  *Id.* (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 285 F.3d 1013, 1017 (Fed. Cir. 2002)).  The non-moving party carries the burden of producing evidence to demonstrate a genuine issue of material fact in dispute sufficient to allow a reasonable finder of fact to rule in its favor.  *Id.* (citing *Anderson*, 477 U.S. at 256).  "[M]ere denials or conclusory statements are insufficient" to withstand summary judgment.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)).  "When both parties move for summary judgment, each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is under consideration."  *Promac, Inc. v. West*, 203 F.3d 786, 788 (Fed. Cir. 2000) (citing *Mingus Constructors*, 812 F.2d at 1390).

**2.      Principles of Contract Interpretation and Relevant Contract Terms**

Government contract interpretation is a matter of law.  *Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed. Cir. 1998)*; Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985).  Therefore, "contract interpretation is suited to resolution by summary judgment."  *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) (citing *Kennedy Heights Apartments, Ltd. I v. United States*, 48 Fed. Cl. 574, 578 (2001)).  Contract interpretation "begins with the language of the written agreement."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)  A contract interpretation should give words their plain and ordinary meaning, as understood by a reasonably intelligent person familiar with the contemporaneous circumstances.  *Olympia Props., L.L.C. v. United States*, 54 Fed. Cl. 147, 152 (2002) (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388 (1965)).  "An interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a

weird and whimsical result." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl., 443, 459 (2001) (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 235–36, 575 F.2d 855, 863 (1978)).

The Federal Acquisition Regulation does not apply to timber sale contracts because the Government is not "acquiring," but rather, is selling timber. With the exception of the U-Bar contract, however, each contains substantially similar terms.

All of the contracts at issue, except for the U-Bar contract, contain CT4.41 which provides, in pertinent part:

> Payments are due and payable on the date of issue as indicated on the Bill for Collection. . . .  Such charges may be, but are not limited to: (a) damages pursuant to CT9.4 . . . .
>
> . . .
>
> Pursuant to the Debt Collection Act, as amended (31 U.S.C. 370, *et seq*.), if payment is not received by the Forest Service within 30 days after the date of issue as indicated on the Bill for Collection:
>
> > (a)    Simple interest shall be assessed at the higher of the U.S. Treasury current value of funds rate, as published by the Secretary of Treasury in the Federal Register, or the rate published by the Secretary of Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611).  Interest will begin to accrue as of the date of issue as indicated on the initial Bill for Collection.
> >
> > (b)    Debtors will be assessed administrative charges in addition to the delinquent amount due. . . .
> >
> > (c)    A penalty charge of 6 percent per annum will be assessed on any portion of a debt delinquent more than 90 days.  This penalty charge will be in addition to the interest and administrative charges under paragraphs (a) and (b).  Such penalty charge shall accrue from the date of issue as indicated on the Bill for Collection and shall be assessed on all outstanding amounts including interest and administrative costs assessed under paragraphs (a) and (b).

App. to Pl.'s Mot. at 3.

In lieu of CT4.41, the U-Bar contract contains C4.4, which provides in pertinent part:

>   Such payments received after the due date are subject to an interest charge at the current rate prescribed by the U.S. Department of Treasury . . . beginning from the date the bill was due.  Such interest rate shall remain unchanged until those bills have been paid or settled.  If followup become [sic] necessary due to failure to pay principal and/or interest due, cost of such billings may be added to amounts due.  In addition, amounts overdue in excess of 90 days shall be subject to an additional 6 percent penalty charge.  Payments will be credited on the date received by the designated depositary or collection officer.

>   Forest Service remedies for Purchaser's failure to pay amounts due, except for accrual of interest, suspension of all or any part of Purchaser's Operations and administrative offset, shall be stayed for so long as (A) a bona fide dispute exists as to Purchaser's obligation to make such payments and (B) Purchaser files and prosecutes a timely claim under the Contract Disputes act of 1978.

App. to Pl.'s Mot. at 2.

All of the contracts also contain CT9.4, which provides for the calculation of default damages:

>   In the event of . . . termination for breach . . ., Forest Service shall appraise remaining Included Timber, unless termination is under CT8.2 or BT8.22.  Such appraisal shall be made with the standard Forest Service method in use at the time of termination.

>   Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which the Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates.  If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:

>>   (a) The cost of resale;

>>   . . .

>>   (d) The Government's loss caused by the delay in receipt of stumpage payments.  Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department . . .) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof

> from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale . . . .

App. to Pl.'s Mot. at 4.

The Brookbank contract contains CT4.211, which provides:

> Upon Forest Service approval of Purchaser's written request, unused Effective Purchaser Credit . . . shall be transferred from this contract to Purchaser's other timber sale contracts within the same National Forest . . . . Transfers of less than $500 or transfers out of monies needed to meet unfulfilled payment obligations . . . will not be approved.

App. to D's Mot. at 15.

## A.    Timing of Accrual of Interest and Penalty Charges

Both parties move for summary judgment on whether the Forest Service may collect interest and penalties accruing from the date of its estimated damage bills issued between February and April 2001. In its previous opinion, the Court held that the Government was not entitled to collect on these bills. *Precision Pine*, 62 Fed. Cl. at 655–56. In light of that holding, Precision contends that interest and penalty charges should not accrue until September 16, 2005, the date on which the Government submitted its final revised damage calculations in accordance with the Court's 2004 opinion. Pl.'s Mot. at 10.

The Government, in opposition, focuses on the language in CT4.41 providing that interest and penalty charges accrue from the dates indicated on the "initial" bills for collection. D.'s Mot. at 6. In the Government's view, although the Court ultimately decided that the Forest Service was not entitled to collect on those bills, they were nonetheless the "initial" bills for collection. Hence, the Government argues, interest should begin to accrue on the dates of issue of those bills for collection. The Government further contends its position is supported by *Seaboard Lumber Co. v. United States*, 48 Fed. Cl. 814 (2001), *aff'd*, 308 F.3d 1283 (Fed. Cir. 2002). D.'s Mot at 8–9. In that case, the court held "that the amount has been reduced in litigation does not mean that it would be unfair to assess [pre-judgment] interest on the balance." *Seaboard*, 48 Fed. Cl. at 836. The Government argues that, like the plaintiff in *Seaboard*, Precision has merely reduced the amount owed through litigation. D.'s Mot at 8–9. The Government also invokes the Debt Collection Act ("DCA"), 31 U.S.C. § 3701 *et seq.*, as additional authority permitting the accrual of interest on any "outstanding debt on a United States government claim." D.'s Mot. at 7 (quoting 31 U.S.C. § 3717(a)(1)).

The Court concludes that to the extent that the DCA applies to the collection of interest, it applies only to "outstanding" debts. In order for a debt to be outstanding for the purposes of the DCA, there must first exist some amount due. In this case, the individual contracts

-10-

determine when an amount becomes due.  Until such amounts become due under the contracts, no "outstanding debts" exist for the purposes of the DCA.  Therefore, whether Precision owes interest pursuant to the DCA and whether Precision owes interest pursuant to the timber contracts is the same question.  In this case CT4.41 triggers the accrual of interest from the date of issue as indicated on the bill for collection.[6]  That contract provision further specifies the type of payments that its provisions cover.  In particular, CT4.41 provides that "[s]uch charges may be, but are not limited to . . .  damages *pursuant to CT9.4*" (emphasis added).  As the Court held in its previous opinion, the Forest Service failed to calculate damages in accordance with CT9.4 when it issued its initial bills for collection based upon its estimated damages calculations.

The Government's position would read the phrase "pursuant to CT9.4" out of the contract.  Under this interpretation, the Government would be entitled to interest and penalty charges as soon as it submitted any claim for default damages—without regard to whether the asserted claims are even permitted by the contracts.  The Court rejects this interpretation in favor of one that gives "reasonable meaning to all parts" of a contract.  *Northrop Grumman*, 50 Fed. Cl. at 459.  In its motion, the Government notes that each decision document that accompanied the bills for collection advised Precision that the estimates were "[b]ased on procedures and applicable costs described in CT9.4."  D.'s Reply at 11.  Merely invoking the correct contract provision is not enough.  CT4.41 requires that damages recoverable under that provision must be calculated *pursuant to CT9.4*.  This Court has already decided that the Forest Service did not in fact calculate its estimated damages in accordance with CT9.4.  The Court distinguishes this situation from one in which a contracting party misapplies a contractual provision to calculate damages and through either arithmetic error or faulty input data arrives at an incorrect damage amount.  In this case, the Forest Service did not apply CT9.4 at all.  Indeed, it was not even possible to correctly calculate damages pursuant to CT9.4 at the time that the Forest Service issued its first bills because, as the Court previously held, the Forest Service must first resell the contracts or decide not to resell the contracts.  *Precision Pine,* 62 Fed. Cl at 254–55.

The Court does not find the *Seaboard* case to be on point.  As a preliminary matter, unlike the timber contracts at issue in this case, the contract in *Seaboard* did not provide for the collection of interest and was not subject to the DCA because the contract was executed before its enactment.  *Seaboard,* 48 Fed. Cl. at 836.  The *Seaboard* case concerned the Government's ability to collect interest under the federal common law of contracts.  *Id.*  Moreover, in *Seaboard*, the Government did not even request that interest on damages accrue before the resale.  The Government's position, consistent with this opinion, was that interest should accrue as of the date *after the resale* that the contracting officer notified the contractor of the amount

---

[6] By way of comparison, when the parties intended that certain interest accrue prior to issuance of a bill for collection, they so provided explicitly.  In particular, CT9.4 entitles the Government to recover the lost time-value of the unpaid stumpage payments as of the date of contract termination.  *See supra* page 9–10.

due. *Id.* at 818, 836–37.  For various reasons, the Court ultimately selected a date that was in fact several years later than the Government's suggested trigger date.  *See id.* at 837.

     In addition to relying upon the plain language of a contract, the Court's interpretation should avoid "weird" or "whimsical" results.  *Northrop Grumman*, 50 Fed. Cl. at 459.  In this case, adopting the Government's interpretation would have the strange and unintended consequence of requiring the Forest Service to issue invalid, pre-sale bills in order to obtain pre-sale interest in the case of a default.  Consider a hypothetical situation in which the Forest Service elects to resell a timber contract after a default.  Because it is impossible to calculate damages before the contract is resold, every bill for collection of damages issued before such date will be invalid and unenforceable against the contractor.  If the Court were to accept the Government's position, however, the Forest Service could issue an invalid, pre-sale bill that would serve the limited purpose of establishing an earlier date to trigger the accrual of interest and penalty charges.  In fact, under this approach, the *only* way in which the Government would be entitled to pre-sale interest and penalty charges would be to first issue an invalid, pre-sale bill for collection and later issue a valid bill when the damages become calculable.  The Court is not convinced that the timber contracts at issue contemplate such a procedure.  If the parties intended that Precision be liable for pre-sale interest penalty charges in those cases in which the Forest Service resells the timber contracts after default, there are undoubtably simpler and more straightforward ways to accomplish such a result than to implement a procedure by which the Forest Service is required to issue its contractor an invalid bill for collection.  The Court declines to interpret the contracts to require the Forest Service to issue uncollectible bills in order to obtain pre-sale interest in the case of a default.[7]

     Accordingly, the earliest date from which the Government may accrue interest under the contracts is April 28, 2005, the date the Forest Service issued its initial damage calculations computed in accordance with the Court's October 29, 2004, Opinion and Order interpreting CT9.4.  The Forest Service, however, revised its calculations twice after that date.  The plaintiff contends that "interest . . . should only accrue as of the time defendant first advised Precision Pine of the claims against it in conformity with the terms of the contract, *i.e.*, on September 16, 2005."  The Court finds that the Government issued the final damage calculations for ten of the twelve original contracts on April 28, 2005.  App. to Pl.'s Mot at 128–68.  Further, the adjustment made on September 16, 2005, to the damage summary sheet concerning the Wiggins contract, involving a three-cent discrepancy, was *de minimis*.  *See supra* page 4–5.  Thus, the

_____

     [7] It is of little consequence that CT4.41 includes the phrase that it covers payments "not limited to" those enumerated in its list.  A "*provision directed to a particular matter controls over the provision which is general in its terms.*"  *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307 (Fed. Cl. 2004) (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972, 980 (1965)). *See also Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir.1996); RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981).  Accordingly, insofar as CT4.41 allows for the collection of interest on damages, those damages must be "pursuant to CT9.4."

only remaining question is whether interest on the Gentry contract accrued from April 28, 2005, or whether the interest did not begin to accrue until the Forest Service submitted its reduced damage calculations for that contract on July 14, 2005.

Here, the Court is satisfied that the Forest Service met the requirements of CT4.41 by submitting bills for collection for damages calculated pursuant to CT9.4 as interpreted by the Court. As set forth above, the Court distinguished situations in which the Forest Service fails to apply the correct contract provision, from situations in which the Forest Service simply misapplies a contractual provision to calculate damages, such as this case. Here, the incorrect damage amount resulted from mistaken inputs into the calculation, rather than the application of extra-contractual methods of calculation. Given the amount of contracting that the Government engages in, disputes as to certain amounts are bound to arise frequently. The Court declines to hold that every bill for collection must be unassailable down to the cent, but rather, in this case, that the bill for collection must be calculated pursuant to CT9.4 as interpreted by the Court in its Opinion and Order filed October 29, 2004.

### B.    Simultaneous Interest Accrual Under CT4.41 and CT9.4

The parties have moved for summary judgment on a corollary issue, *i.e.*, whether the Forest Service can collect interest accruing during the same time frame under both CT4.41 and CT9.4. Precision contends that permitting the Government to collect interest simultaneously under both CT4.41 and CT9.4 would constitute an impermissible double recovery. Pl.'s Mot. at 12–13. In the Government's view, CT9.4 establishes the amount of principal upon which CT4.41 accrues interest. D.'s Mot. 11.

In light of the Court's decision in Section 2.A, *supra*, however, this issue is moot. There are only two contracts with amounts owing that were successfully resold: Jersey Horse and Wiggins. Interest on the Jersey Horse contract accrued under CT9.4 from the date of termination, January 9, 2001, through the midpoint of the resale contract period 726 days later, *i.e.*, January 5, 2003. App. To Pl.'s Mot. at 141. Interest on the Wiggins contract accrued from January 9, 2001, through the midpoint of the resale contract period 360.5 days later, *i.e.*, January 4, 2002. App. To Pl.'s Mot. at 167. Because the Forest Service did not issue its bill for collection until April 28, 2005, there is no overlap between interest that accrued under CT4.41 and CT9.4, and the Court does not reach the question whether the Government is entitled to collect interest accruing during the same time frame under both provisions .

### C.    Duration of Interest Accrual Under CT9.4(d) for the Jersey Horse and Wiggins Contracts

The parties also move for summary judgment with respect to whether the Government is required to reduce the length of time that it accrues interest on the Wiggins and Jersey Horse contracts. The relevant provision, CT9.4(d), requires the Government to deduct time "in excess of 1 year needed to make the resale" from the time used to calculate interest. *Supra* pages 9–10.

Because the uncontested evidence shows that Wiggins was resold within the one-year time frame, *see* Supp. App. to D's Mot at 1 (showing that the Forest Service re-sold the Wiggins contract on July 16, 2001, roughly six months after the Forest Service terminated Precision's contract), the only question before the Court is whether the Forest Service must deduct the time in excess of one year "needed to make the resale" of the Jersey Horse contract.

Some additional facts are required at this point. The Jersey Horse contract was ultimately re-awarded to Precision on April 24, 2002. Supp. App. to Pl.'s Mot. at 5. As a defaulted purchaser, Precision would ordinarily be disqualified from bidding on a resale contract. 36 C.F.R. § 223.86 (2001) ("Except as otherwise provided . . ., no bid will be considered in the resale of timber remaining from any uncompleted timber sale contract from any person, or from an affiliate of such person, who failed to complete the original contract."). Precision sought a waiver to bid on the resale and the Forest Service granted the waiver by letter dated November 16, 2001. Supp. App. to D.'s Mot. at 4 ("[P]ursuant to 36 C.F.R. § 223.86, [the Forest Service Regional Forester] conclude[s] that it is in the public's best interest to allow Precision Pine to bid on the Jersey Horse II Timber Sale."). The Forest Service opened bids for the resale of the Jersey Horse contract on November 28, 2001, and announced that Precision was the high bidder. *Id.* By letter dated December 6, 2001, the Forest Service informed Precision that it was the high bidder and advised Precision that the "award of the sale will be withheld pending the outcome of a review to affirm [Precision's] abilities as a responsible purchaser." Supp. App. to D.'s Mot. at 5. The Forest Service requested that Precision submit certain information to demonstrate its "financial ability to carry out this Timber Sale Contract." *Id.* The Forest Service set a deadline of January 4, 2002, for Precision to furnish the requested information. *Id.* Precision failed to furnish the information and by letter dated January 28, 2002, the Forest Service again requested that Precision provide the information. Supp. App. to D.'s Mot. at 10. The Forest Service advised Precision that it would accept a Certificate of Competency from the Small Business Administration in lieu of the requested financial information. *Id.* The Forest Service gave Precision until February 28, 2002, to respond and, again, advised Precision that if it did not meet the new deadline, the "contract will not be awarded." *Id.* The contract was finally awarded and executed on April 24, 2002. Supp. App. to Pl.'s Mot. at 5.

Precision contends that the Forest Service took longer than one year to complete the resale of the Jersey Horse contract. Accordingly, Precision argues that the Forest Service must reduce the number of days used to calculate interest charges under CT9.4(d) from 726 days to 622 days. P.'s Reply at 16. The Government counters that it completed "making the resale" on November 28, 2002, when it announced that Precision was the high bidder. D.'s Reply at 4–6. The remaining time required to execute the contract was a result of Precision's own delay. *Id.* The Government further argues that "[i]t would be inappropriate to penalize the Forest Service for Precision Pine's own lack of diligence." D.'s Reply at 6. Thus, the questions presented are: (1) what does it mean to "make the resale" and (2) does CT9.4 permit Precision to benefit from its own delay.

The contract permits the Forest Service one year to "make the resale" before it must deduct time from its 9.4(d) calculations. The Court finds that a reasonable person acquainted with the contemporaneous facts would likely understand this phrase to mean the date on which the contract was executed. The Court interprets the phrase to "make the resale" to mean the same thing as "to sell." A reasonably intelligent person would understand this to require some degree of mutual obligation. The Oxford English Dictionary defines "sell" as "[t]o give up or hand over (something) to another person for money (or something that is reckoned as money)." 14 OXFORD ENGLISH DICTIONARY 935 (2d ed. 1989). In other words, in order to "sell" something, one must give something up. Here, the Forest Service consistently reserved the right to decline to award the contract to Precision throughout its communications with Precision leading up to the contract execution. Thus, the Forest Service did not "give up" or "hand over" anything of value until the contract was awarded and executed on April 24, 2002.

It was Precision's own delay, however, that caused the resale to extend beyond one year. "It is a principle of fundamental justice that if a promisor is personally the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, the promisor cannot take advantage of the failure." 13 WILLISTON ON CONTRACTS § 39:6 (4th ed.) (discussing what the treatise describes as the "prevention doctrine"). Here, Precision's liability under CT9.4 is subject to the condition that the Forest Service resell the contract within a year. It is uncontested that the Forest Service informed Precision on December 6, 2001, that it was the high bidder in the resale, and permitted four weeks to furnish the required information. Had Precision met this deadline, the Forest Service would have accomplished the resale within a year of Precision's breach. The Court finds that the Forest Service allowed Precision a reasonable amount of time to furnish the information relating to its responsibility as a contractor. Any time in excess of one year that it took the Forest Service to complete the sale is attributable to Precision's own delay and not to any lack of diligence on the part of the Forest Service. Accordingly, the Court holds that the Forest Service is not required to deduct from the period over which interest accrues under CT9.4(d) the time it took in excess of one year to re-award the Jersey Horse contract to Precision.

**D.      Use of Fixed Interest Rates**

Both parties have moved for summary judgment on whether the contracts other than U-Bar require accrual of interest at a fixed or variable rate. As discussed above, the contracts contain two clauses that permit the accrual of interest: (1) either CT4.41 or CT4.4, and (2) CT9.4. All of the contracts, except U-Bar, contain clause CT4.41, which permits the collection of interest "pursuant to the Debt Collection Act" at a rate equal to the higher of "U.S. Treasury current value of funds rate"[8] ("CVF") or the rate applicable under the Contract Disputes Act

_____

[8] The CVF rate generally changes only once a year and "is equal to the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point." 31 U.S.C. §

(continued...)

("CDA").[9]  The DCA provides that the rate of interest is "the rate in effect on the date from which interest begins to accrue" and "remains fixed at that rate for the duration of the indebtedness." 31 U.S.C. § 3717(c).  In lieu of CT4.41, the U-Bar contract contains CT4.4, which explicitly requires that "[s]uch interest rate shall remain unchanged until those bills have been paid or settled."  *See supra* page 9.  Precision does not challenge the Government's right to apply a fixed interest rate in that case.  Pl.'s Mot. at 13 n.8.

Neither party disputes that the CDA rates were higher than the CVF rates at all relevant times.  *See* Pl.'s Mot. at 14; D.'s Mot. at 12.  Precision relies on *Brookfield Constr. Co. v. United States*, 228 Ct. Cl. 551, 567, 661 F.2d 159, 170 (Ct. Cl. 1981), to support its position that insofar as "the rate established by the Secretary of the Treasury" under the CDA applies, such rate will "rise and fall in concert with any changes in effect for subsequent six month periods."  Precision further argues that because the Forest Service explicitly included the language that the interest rate remains unchanged in the U-Bar contract, but not in the other contracts, this demonstrates that the Forest Service "knew how to state that a fixed rate of interest was to apply to amounts due and owing."  Pl.'s Mot. at 15.  The Government contends that the contract requires that the accrual of interest be pursuant to the DCA.  Accordingly, the Government argues that applicable rate must remain fixed as provided by the DCA.  The Government relies on *Amax Land Company v. Quarterman*, 181 F.3d 1356, 1359 (D.C. Cir. 1999), to support its position that, although the DCA permits the Government the flexibility to set a rate higher than CVF, whatever rate it ultimately selects must remain fixed.

Congress enacted the DCA in 1982 "to increase the efficiency of Government-wide efforts to collect debts owed the United States."  Pub. L.  97–365, 96 Stat. 1749 (1982).  Among other things, this legislation requires federal agencies to charge a minimum amount of interest on all outstanding debts.[10]  31 U.S.C. § 3717(a)(1) ("The head of an executive, judicial, or legislative agency *shall* charge a minimum annual rate of interest on an outstanding debt on a United States Government claim . . . ." (emphasis added)).  It provides that interest accrues from the date "notice of the amount due is first mailed to the debtor" and "remains fixed at that rate for

---

[8](...continued)
3717(a)(1).  The CVF rate may change as frequently as quarterly "if the average investment rate for the 12-month period ending at the close of the prior calendar quarter, rounded to the nearest whole percentage point, is more or less than the existing published rate by 2 percentage points."  *Id.* § 3717(a)(2).

[9]The CVF rate on April 28, 2005, was 1.0%.  69 Fed. Reg. 63569–70 (Nov. 2, 2004).  The applicable CDA rate on that date was 4.25%.  69 Fed. Reg. 78522–23 (Dec. 30, 2004).

[10]As defined in 31 U.S.C. § 3701(b)(1), "the term 'claim' or 'debt' means any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency."

the duration of the indebtedness." 31 U.S.C. § 3117(b)–(c).  The DCA provides limited exceptions to the general requirement that federal agencies must charge interest on outstanding debts.  In particular, it does not apply "if a statute, regulation required by statute, loan agreement, or *contract* prohibits charging interest or assessing charges or explicitly fixes the interest or charges."  31 U.S.C. § 3717(g)(1) (emphasis added).  In other words, the parties need not adopt any particular language for claims under the contract to be subject to the DCA.  Rather, agencies are required to apply DCA interest to all outstanding debts owed the Government under a contract, unless the contracting parties agree to opt out of the DCA interest provisions, or unless another authority exempts the claim.

Hence, even if the contracts were silent regarding interest due, the DCA would have nonetheless applied.  Further, the DCA would have required a fixed rate of interest.  Thus, the question presented is whether the language in CT4.41 alters the default rule that a fixed rate of interest applies.  Precision argues, in essence, that because case law exists holding that interest owed under the CDA is variable, to the extent the contractual terms select the CDA rate the parties have "opted out of the application of the Debt Collection Act, including any putative requirement that a fixed rate of interest be applied."  Pl.'s Reply. at 17.  The Court disagrees.  The contract does not demonstrate any intent to opt out of the DCA.  To the contrary, the contract expressly emphasizes that the accrual of interest under CT4.41 be pursuant to the DCA.  In this case the contract merely permits the Forest Service, under certain circumstances, to collect interest at a rate higher than the general rate provided by the DCA.

The Court is equally unpersuaded that the inclusion of the language requiring a "fixed" interest rate in the U-Bar contract can be read to suggest that a variable rate applies in the other contracts.  To the extent that a contract is unambiguous, interpretation is confined to the plain language of the contract and the use of extrinsic evidence is improper. *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *see also HRE, Inc. v. United States*,  142 F.3d 1274, 1276 (Fed. Cir. 1998); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).  In this case, applying a negative inference based on a separate and independent agreement would constitute the use of extrinsic evidence.  In the absence of any language specifically requiring the use of a variable interest rate, the Court declines to read such a requirement into the contract.  In this case, the Court finds that the default DCA rules, requiring a fixed interest rate, apply.

The parties have additionally moved for summary judgment with respect to whether the interest permitted under CT9.4(d) must also be calculated by reference to a fixed or variable rate of interest.  As background, CT9.4 provides the method of calculating default damages.  In the case of a resale, the measure of damages equals the amount by which the current contract value "exceeds the resale value at new Bid Rates."  *Supra* page 9.  This amount is also subject to certain adjustments.  One such adjustment permits the Forest Service to recover its "loss caused by the delay in receipt of stumpage payments."  *Id.*  This amount is measured

by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department . . .) on the unpaid contract value at Termination Date.  Interest will be charged for the total number of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale.

*Supra* page 9–10.  Here, Precision argues that the choice of the phrase "current rate" indicates that CT9.4(d) contemplates a variable rate.  Pl.'s Mot. at 16–17.  Precision additionally notes that CT4.4(d) does not contain a reference to the DCA.  *Id.* at 16.  The Government contends the language "the rate"—as opposed to "the rates"—indicates that the parties agreed to a single fixed rate.  D.'s Mot. at 10 n.6, 12.

This is a closer question than whether CT4.41 requires a fixed or variable rate, because the DCA is not expressly incorporated in CT9.4(d), nor would the DCA otherwise apply to interest under CT9.4(d).  As a general rule, the DCA requires federal agencies to charge interest on "outstanding" debts only.  31 U.S.C. § 3717(a)(1).  The purpose of CT9.4(d), however, is not to compensate the Forest Service for the delay in receipt of payment of outstanding debts, but rather to calculate what those debts are in the first instance.  Moreover, the DCA does not permit the accrual of interest until after "notice of the amount due is first mailed to the debtor."  *Id.* § 3717(b)(2).  In this case, the Forest Service must resell the contract or decide not to resell the contract, perform the damages calculations including the calculations under CT9.4(d), and then send notice to the contractor.  By the terms of CT4.41, after the Forest Service mails notice interest then begins accrue pursuant to the DCA.

The parties' textual arguments are unpersuasive.  Neither use of the adjective "current" nor reference to "the rate" offers insight into whether the interest rate should be applied on a fixed or variable basis.  However, the procedure that the contracts provide for collecting default damages leads the Court to conclude that the interest permitted under CT9.4(d) must be applied on a fixed-rate basis.  As the Court explained in its previous opinion, before calculating damages under CT9.4, the Forest Service must first either complete a resale of the contract or decide not to resell the contract.  *Precision Pine,* 62 Fed. Cl. at 654–55.  Once the Forest Service determines the amount owed under CT9.4 and delivers a bill for collection, CT4.41 provides that such amounts become due immediately.  *Supra* page 8 ("Payments are due and payable on the date of issue as indicated on the Bill for Collection. . . .").

In order to apply a variable interest rate, the specific rates must be known at the time of calculation.  Thus, a variable interest rate is necessarily backward-looking and cannot be used to calculate amounts due for future time periods because it is not possible to predict what the future rates will be.  Here, the only way that the Forest Service could apply a variable rate would be if the contract either  required the Forest Service to wait until the midpoint of the resale period to perform the calculations or permitted future damage adjustments or reimbursements once the

adjusted CVF rates become known.[11]  There is no indication in the language of the contracts that such procedures were contemplated.  The Court is additionally skeptical that the parties understood that these provisions would require that a claim for default damages hang in suspense for potentially years so that the parties can apply a variable rather than a fixed interest rate.  Moreover, elsewhere in the contracts the parties have explicitly provided that the DCA, which requires a fixed interest rate, governs the accrual of interest.  This casts some doubt that the contracting parties placed such value on the use of variable interest rates that they would have been willing to delay the calculation and payment of default damages in order to make use of variable interest rates.

Although in this specific case the Forest Service did not issue its bills for collection until after the midpoint of the resale period had passed, and thus, the use of a variable rate was possible, "[t]he fundamental and cardinal rule is that the intention of the parties is to be ascertained *as of the time they executed the contract*."  11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:2 (4th ed.) (emphasis added).  The Court concludes that at the time of contracting, the parties would have understood that the Forest Service could immediately deliver and collect on a bill for collection after a successful resale following a default, and as a consequence would necessarily use a fixed rate of interest because it would not be possible for the Forest Service to predict what future CVF rates would be.  Accordingly, the Court concludes that a fixed interest rate applies to interest under CT4.41 and to interest under CT9.4(d).

### E.    Effective Purchaser Credit on Brookbank Account.

Both parties have moved for summary judgment regarding the issue whether the Forest Service was required to transfer credits earned on the Brookbank account to other debts owed on different contracts.  Contractors earn Purchaser Credits by building permanent roads in the forest.  Pl.'s Mot. at 20.  The credits may be "used to pay for a variety of things on a timber sale."  *Id.*  CT9.4 requires the Forest Service to apply these unused purchaser credits to the amount owed on the same contract at the time of default.  *Supra* page 9.  At the time of the default on the Brookbank contract, Precision had accumulated $2,752.54 in purchaser credits.  App. to Pl.'s Mot. at 131.  Precision did not owe the Forest Service any damages after the Brookbank resale, however, and thus the Forest Service did not have a debt on that sale against which it could apply the purchaser credit.  *Id.*

The contract provides, in section CT4.211, *see supra* page 9, that the Forest Service may transfer the credits to other contracts upon "Purchaser's written request."  Precision contends that the Forest Service should transfer the effective purchaser credit to offset other debts it owes.  Pl.'s Mot. at 19–22.  The Government contends that 36 C.F.R. § 223.42 prohibits the transfer of purchaser credits to offset default damages.  That regulation provides:

---

[11] The CVF rate generally changes only once a year, but under certain conditions can change as frequently as quarterly.  *See supra* note 8.

> The Forest Service may permit transfer of unused effective purchaser credit earned . . . from one timber sale account to another timber sale account of the same purchaser within the same National Forest, provided the sale contracts provide procedures for the use of purchaser credit. Approval for transfer shall not be granted for amounts needed to satisfy unfulfilled payment obligations or claims for damages due the United States. Purchaser credit transferred under this paragraph is subject to such additional restrictions as may be necessary for its orderly use.[12]

36 C.F.R. § 223.42. The Government further argues that to the extent that the regulations and the contracts permit the transfer of purchaser credits, Precision's request comes "years after the contract was terminated for default" and is thus "untimely and impermissible." D.'s Mot. at 16.

The Court finds that the contract does not create a right to a transfer of purchaser credits. Rather, the contract establishes that the Forest Service may, at its discretion, permit the transfer of purchaser credits upon written request provided that the request is otherwise permissible under the contract and 36 C.F.R. § 223.42. The contract states that the transfer of purchaser credits is subject to "Forest Service approval of Purchaser's written request." Although the contract lists the circumstances under which the Forest Service will not approve the transfer, the contract does not establish that the purchaser has an affirmative right to a transfer in all other cases. Thus, even if the written request for transfer were assumed to be timely the Forest Service was under no obligation to transfer the purchaser credits to another contract.

---

[12] The parties disagree whether 36 C.F.R. § 223.42 prohibits the transfer of credits *from* a defaulted contract upon which amounts are owed, or whether it prohibits the transfer of credits *to* defaulted contract upon which amounts are owed. Precision adopts the first interpretation, narrowly construing 36 C.F.R. § 223.42 to prohibit only transfers of amounts needed to pay damages "on the contract *from which* the Purchaser proposes to make the transfer." Pl.'s Mot. at 20–21. The Government adopts the second interpretation, construing the regulation to prohibit all transfers for the purposes of satisfying outstanding claims for damages. D.'s Reply at 8. If Precision is correct, 36 C.F.R. § 223.42 would not prohibit the transfer of credits from Brookbank to another defaulted contract because Precision does not owe any amount on the Brookbank contract. If the Government is correct, 36 C.F.R. § 223.42 would prohibit the transfer of credits from Brookbank to another defaulted contract with amounts owing. Precision states that it would, in any event, be willing to transfer the Brookbank credits to an active timber sale on which it did not owe damages or any other payment obligations. Pl.'s Mot. at 22. In light of the Court's holding above, that the Brookbank contract itself does not establish a right to a credit transfer, the Court does not need to construe 36 C.F.R. § 223.42.

F.       **Wiggins Mitigation**

Both parties move for summary judgment on the issue of whether the Forest Service is entitled to collect $9,128.70 in connection with the resale of the Wiggins contract. The Forest Service calculated that remaining pulpwood available for resale had a value of $723.40. App. to Pl.'s Mot. at 167. Precision argues that the Forest Service was required to mitigate its damages and that conducting an expensive appraisal for such a low value contract was inappropriate under the circumstances. The Forest Service contends that the appraisal was required by CT9.4, which provides that the "Forest Service shall appraise remaining Included Timber. . . . Such appraisal shall be made with the standard Forest Service method in use at the time of termination." *Supra* page 9. The contract further permits the Forest Service, in the case of a resale, to recoup the "cost of resale." *Supra* page 9. Precision does not argue that the costs of conducting reappraisals are not "costs of resale" but rather that the decision to conduct an appraisal in connection with the resale of the Wiggins contract was unreasonable under the circumstances.

The Court agrees that the contract requires that the Forest Service conduct an appraisal. The critical inquiry, thus, is whether the Forest Service conducted the appraisal "with the standard Forest Service method in use at the time of termination." The Forest Service contends that it did and Precision does not dispute that the Forest Service appraised the timber in accordance with standard method then in use; rather, Precision appears to argue that the Forest Service should have used some other, less expensive method of appraisal. Here, the plain language of the contract prevails, and the Court holds that the Forest Service was not required, under the circumstances, to utilize a method of appraisal different from its standard method.

Precision also challenges the Forest Service's decision to formally resolicit bids on the Wiggins contract. Precision argues that because the contract value was less that $10,000 the Forest Service could have used an informal bid process. Pl.'s Mot. at 23. The Forest Service contends that it maintains a policy "to use the same method for a resale as the original sale." D.'s Mot. at 19. The Government advises that this policy is designed to "ensure that the original purchaser is not adversely affected by the process used to effectuate the resale." D.'s Mot. at 19. In any event, the Forest Service contends that a simplified procurement process would have generated only $100 of savings in connection with advertising the resale. *Id.* Precision, again, does not contest these facts. The Government argues that the $100 for advertising was *de minimis*. *Id.* The Court agrees. To the extent that the Forest Service would have only realized $100 worth of cost savings, such an amount is too trivial to require the Forest Service to abandon its policy objectives of maintaining consistency throughout the resale process. Accordingly, the Forest Service was not required to use an informal bidding process, and did not fail to mitigate its damages under the Wiggins contract.

### G.     Penalties Under the U-Bar Contract

Both parties move for summary judgment on the issue whether the Forest Service may collect a six-percent penalty on amounts due under the U-Bar contract.  The Government argues that the DCA provides statutory authority for agencies to collect up to a six-percent penalty charge on debts overdue more than 90 days.  *Id.*  Moreover, the Government argues that the governing contract provision, CT4.4, *see supra* page 9, permits the Forest Service to collect a six-percent penalty charge.  That provision, however, suspends all remedies "except for accrual of interest" while a CDA claim is pending.  The Government, thus,  urges the Court to treat the six-percent penalty charge as "penalty interest" that is not subject to suspension of remedies provision.  D.'s Mot. at 21.

Precision first contends that this provision is unenforceable as a matter of law.  Precision supports its position by citing two cases which hold that liquidated damages must bear a relationship to actual damages.  *See* Pl.'s Mot. at 25 n.16 (citing *Fred A. Arnold, Inc., v. United States*, 18 Cl. Ct. 1, 12–13 (1989); *L & A Jackson Enterprise v. United States*, 38 Fed. Cl. 22, 42 (1997)).  The Court concludes that these cases are not on point.  The cases cited by Precision concern liquidated damages which are not involved here.  More importantly, penalty charges are explicitly authorized by the DCA.  As discussed above, *supra* page 16–17, in the absence of contractual, statutory, or regulatory provisions to the contrary, the DCA is applicable to all debts owed the Government.  31 U.S.C. § 3717(g)(1).  Thus, even if the Court accepted Precision's argument that the penalty charge provision in the U-Bar contract was "unenforceable," the Government would still have a statutory right to collect the same charges.

Once again, the critical inquiry for the Court is whether the parties have, through contract, opted out of the DCA provisions.  In this case, the Court finds that the parties have done so.  The relevant contractual provision suspends all remedies except for the accrual of interest while a CDA claim is pending.  The Government argues that the penalty charge should be thought of as "penalty interest."  The Court declines to adopt the Government's approach.  A contract should be read as a whole giving "reasonable meaning to all parts" of a contract.  *Northrup Grumman*, 50 Fed. Cl. at 459.  Here, the contract specifically distinguishes between "interest" and "penalty charges" and only exempts "interest" from the general suspension of remedies.  Accordingly, the Court holds that all penalty charges are suspended while this action is pending.

### H.     Calculation of Penalty Charges

Both parties move for summary judgment with respect to the calculation of penalty charges.  CT4.41 provides

> [a] penalty charge of 6 percent per annum will be assessed on any portion of a debt delinquent more than 90 days.  This penalty charge will be in addition to . . . interest and administrative charges . . . .  Such penalty charge shall accrue from the date of

issue as indicated on the Bill for Collection and shall be assessed on all outstanding amounts including interest and administrative costs . . . .

The Government asserts that in order to correctly calculate the penalty charge, it must first determine the "outstanding debt on the anniversary date of the Forest Service bill for collection." D.'s Supp. Brief at 1. This amount does not include any prior penalty charges but does include interest and administrative costs. D.'s Supp. Brief at 1.

Precision argues that because the outstanding balance changes daily, the Government's proposed method of calculation overstates the amount owed by calculating the penalties at the end of each period. Instead, Precision argues, the Forest Service should assess penalties from the midpoint of each period. Precision demonstrates that this method approximates to within 0.1% the amount that would be owed if the calculations were performed daily. Pl.'s Supp. Resp. at 3; Ex. 2 to Pl.'s Supp. Resp. Although Precision's approach appears sound, and the parties may wish to adopt such an approach in future contracts, the Court does not believe that it can read such a method into these contracts. The plain language of the contracts state only that the rate is to be assessed "per annum." The Court concludes that a reasonably intelligent person acquainted with the contemporary facts would interpret this language to require that the penalty charges be assesses at the end of each annual period, absent some indication that the parties contemplated another method of computation. Here, there is simply no indication that the parties intended that the penalty charges were to be calculated with reference to the midpoint of each annual period.

### CONCLUSION

The Court grants Precision's motion with respect to the timing of interest accrual to the extent that it holds that interest does not accrue until April 18, 2005, the date on which the Forest Service submitted its bills for collection in accordance with Court's previous opinion. The Court denies as moot Precision's motion with respect to simultaneous accrual of interest under two different contract provisions. The Court denies Precision's motion and grants the Government's motion with respect to whether a fixed or variable interest rate should be used, holding that a fixed rate should be used under both CT4.41 and CT9.4(d). The Court denies Precision's motion and grants the Government's motion with respect to the transfer of earned credits on the Brookbank contract, holding that Precision is not entitled to a transfer of credits. The Court denies Precision's motion and grants the Government's motion with respect to whether the Forest Service failed to mitigate its damages on the Wiggins contract, holding that the Forest Service did not fail to mitigate its damages because it was discharging its contractual obligations when it appraised the remaining timber. The Court grants Precision's motion and denies the Government's motion with respect to whether the Forest Service may collect a penalty charge on the U-Bar contract during the pendency of court proceedings, holding that the contract suspends the application of penalty charges during the pendency of the CDA proceedings. The Court denies Precision's motion and grants the Government's motion with respect to the timing of penalty charge calculations, holding that such charges should be

assessed annually upon the balance due, excluding penalty charges, as of the final day of each annual period.

In accordance with this opinion, the Clerk is directed to enter judgment for the Government in the following amounts:

1.     With respect to the Jersey Horse contract, Precision owes $ 17,056.01 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

2.     With respect to the Saginaw-Kennedy contract, Precision owes $ 83,157.15 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

3.     With respect to the Brann contract, Precision owes $ 25,994.78 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

4.     With respect to the U-Bar contract, Precision owes $ 125,367.14 plus 1.0% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from the conclusion of this litigation, including the exhaustion of any appellate proceedings.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

5.     With respect to the Monument contract, Precision owes $ 70,845.50 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

6.     With respect to the Hutch-Boondock contract, Precision owes $2,278.72 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

7.      With respect to the Gentry contract, Precision owes $35,029.56 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

8.      With respect to the Wiggins contract, Precision owes $9,128.70 plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.

9.      With respect to the Lily contract, Precision owes $59,761.05, plus 4.25% annual, simple, fixed interest accruing from April 28, 2005 until paid, and a 6% penalty charge accruing from April 28, 2005 until paid.  The penalty charges shall be assessed annually upon the balance due, excluding previously assessed penalty charges, as of the final day of each annual period.


IT IS SO ORDERED.

                                        s/ George W. Miller
                                        GEORGE W. MILLER
                                        Judge